SQUIRE, SANDERS & DEMPSEY L.L.P.
Joseph A. Meckes (State Bar No. 190279)
Daniel T. Balmat (State Bar No. 230504)
One Maritime Plaza, Suite 300
San Francisco, CA  94111-3492
Telephone:  +1.415.954.0200
Facsimile:   +1.415.393.9887

Attorneys for Plaintiff
THE O.N. EQUITY SALES COMPANY

*ORIGINAL FILED*

MAY 3 1 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE O.N. EQUITY SALES COMPANY, an Ohio Corporation, | Case No. |
| Plaintiff, | C 07 2844 |
| vs. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| DANIEL MARIA CUI, an individual, | |
| Defendant. | |

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. _____

Plaintiff THE O.N. EQUITY SALES COMPANY ("ONESCO"), for its Complaint against Defendant DANIEL MARIA CUI, an individual, alleges as follows:

## I.    THE PARTIES

1.    Plaintiff ONESCO is an Ohio corporation, with its principal place of business in Cincinnati, Ohio.

2.    Upon information and belief, Defendant Daniel Maria Cui resides at 6556 Lansing Court, Pleasanton, California 94566.

## II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction of this Complaint pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the value of $75,000, exclusive of interest and costs, and is between citizens of different states.

4.    Personal jurisdiction exists and venue is also conferred under 28 U.S.C. § 1391(a) inasmuch as Defendant resides in this judicial district.

## III.    BACKGROUND

### A.    The Lancorp Financial Fund Business Trust.

5.    The genesis of this case is Defendant's investments in a private placement offered by the Lancorp Financial Fund Business Trust (the "Lancorp Fund"), a Nevada Business Trust unaffiliated with ONESCO.

6.    Non-party Gary Lancaster ("Lancaster") previously held Series 6 and 7 licenses with the NASD and was a registered representative with ONESCO from March 23, 2004 to January 3, 2005.  Lancaster was not affiliated with ONESCO at the time of the subject transaction.

7.    Lancaster served as Trustee of the Lancorp Fund.  Lancaster never disclosed the existence of, or his involvement with, the Lancorp Fund to ONESCO.

8.    Upon information and belief, in or about March 17, 2003, Lancaster made available a private placement memorandum (the "Private Placement Memorandum") for the Lancorp Fund.  A true and accurate copy of the Private Placement Memorandum is attached hereto as **Exhibit A.**

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. _____

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

9.      Prior to investing in the Lancorp Fund, all potential investors, including Defendant, were required to review a copy of this Private Placement Memorandum.

10.     According to the Private Placement Memorandum, the Lancorp Fund was an unregistered, closed-end, non-diversified management investment company.  Its investment objective involved "the issuance of Forward Commitments ... to large financial institutions relating to debt securities bearing interest or sold at a discount ...."  Exh. A.  According to records received from the court appointed Receiver in *Securities and Exchange Commission v. Megafund Corporation, et al.*, Case No. 3:05-CV-1328-L, U.S. District Court Northern District of Texas, Lancaster apparently invested significant dollars from the Lancorp Fund into an investment called Megafund, which was later revealed to be a Texas-based Ponzi scheme.

11.     The Private Placement Memorandum identified the significant risk associated with the Lancorp Fund, including but not limited to, the following:

- The [Lancorp Fund] is newly organized and has limited development capital and experience.

- This investment is suitable only for investors having substantial financial resources and who desire at least a one-year investment.

- Except for certain redemption rights, the Investor Shares will not be transferable.

- The Investor Shares will have limited voting rights as specified in the Declaration of Trust and Bylaws.

[Exh. A at p.1.]

12.     The "high risk" associated with the Private Placement Memorandum was repeated throughout:

The securities offered hereby are high risk, illiquid investments which prohibit transfer.  See "Risk Factors - Restrictions on Transfer."  Further, this offering is intended to be a "private placement" pursuant to Section 4(2) of the 1933 Act and/or Rule 506 of Regulation D promulgated thereunder, and exempt from registration under the 1933 Act and various state securities laws.  Accordingly, we have established certain minimum standards which a prospective investor must meet in order to be eligible to purchase our Investor Shares.
[Exh. A at p. 9.]

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. _____

B.     **Minimum Requirements For Investors.**

13.     Participation in the Lancorp Fund was limited to accredited investors or "sophisticated, well-informed investors." The Private Placement Memorandum details that the offering was limited "to no more than 100 investors, of which no more than 35 may be non-accredited investors as defined in Regulation D promulgated under the 1933 Act. The remaining investors must be 'Accredited Investors.'" Exh. A at p. i.

14.     To invest in the Lancorp Fund, Defendant was *required* to first certify and demonstrate that he qualified as either an "accredited" investor, or as a "sophisticated, well-informed investor." To qualify as an "accredited investor," an investor in the Lancorp Fund had to demonstrate, in pertinent part, that he or she:

> [I]s a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000; [or] ... is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; [or] ... any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person ...

> [Exh. A at 9 (citing Regulation D, 1933 Securities Exchange Act).]

15.     To qualify as a "sophisticated, well-informed investor," the investor had to provide the Lancorp Fund with "reasonable grounds to believe":

- That he is a sophisticated, well-informed investor and is able to understand and utilize the information contained herein, or is represented by a Purchaser Representative;

- That he or his Purchaser Representative has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of the investment in the Trust;

- That he has financial strength and experience in investment transactions and is able to bear the economic risk of the investment in the Trust; and

- That he understands the necessity of compliance with the foregoing.

///

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

16.    Defendant certified in his subscription agreement that he "has made other risk capital investments or other investments of a speculative nature … by reason of his business and financial experience" and "has carefully evaluated his financial resources and investments and acknowledges that he is able to bear the economic risks of this investment." A true and accurate copy of Defendant's "Subscription Agreement," executed on July 30, 2003, is attached as **Exhibit B**.

### C.    The Private Placement Memorandum Repeatedly Discloses No Broker/Dealer Involvement

17.    As a sophisticated and experienced investor who executed his respective copy of the Private Placement Memorandum, Defendant also acknowledged that the Lancorp Fund was managed exclusively by its Trustees, and that it had no relationship of any kind with a broker-dealer or other investment advisor. Throughout the Private Placement Memorandum it is specifically disclosed that there is no broker/dealer involved. For example, at page 4 of the Private Placement Memorandum it is specifically stated: "This offering is a 'best efforts' and 'minimum-maximum' offering by the Trust, *without the assistance of any broker-dealer or any other selling agent*. There will be no compensation payable to the Trust or any other party in connection with the sale of the Investor Shares." Exh. A at p. 4 (emphasis added). Similar language is found at page 12 of the Private Placement Memorandum:

> The Investor Shares will be sold on a "best efforts" by the Trust *without the assistance of any broker-dealer* or selling agent subject to our right to reject any offer to purchase an Investor Share in whole or in part. There is no firm commitment on the part of the Trust or any other party to purchase any of the Investor Shares not otherwise sold in this offering.
>
> [Exh. A at p. 12 (emphasis added).]

18.    Likewise, on page 7 of the Private Placement Memorandum, in discussing internal management, it is specifically disclosed: "The Trust will not be managed like a typical closed-end investment company. The trust will be internally managed by the trustees and will not have any separate investment advisor." Exh. A at p. 7.

///

SQUIRE, SANDERS & DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco CA 94111-3492

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. _____

19.    In fact, if the Defendant sought the assistance of his own purchaser representative in evaluating the merits of investing in the Trust, he was required to:

> [C]omplete and return to the Trust a Purchaser Representative Questionnaire … The Trust will [then] evaluate the qualifications of each proposed Purchaser Representative and will notify the prospective investor as to the acceptability of such person as a Purchaser Representative.  Each Purchaser Representative will be required to disclose to the prospective investor whom he represents any past, present or proposed future relationship of such Purchaser Representative with the Trust or any of its subsidiaries, or any other party of this offering.

[Exh. A at p. 9.]

**D.    Defendant Knew That Lancaster Was Not Acting On Behalf Of ONESCO.**

20.    ONESCO's lack of involvement is further evidenced by Lancaster's personal disclosures in the Private Placement Memorandum.  Lancaster, as Trustee of the Lancorp Fund, described himself in the following manner:

> Gary L. Lancaster has spent the majority of his professional career in the specialized field of trust administration, financial consulting, and asset management. He has been the Fund's Trustee since its formation on December 9, 2002. From 1995 to 1996, Mr. Lancaster was a planning officer and retirement specialist handling investments, estate planning, and trusts with First Interstate Bank - Wells Fargo/Stephens, Inc. From 1997 to 1999, he was an insurance specialist in investments, estate planning and trusts for BA Financial Services, Inc. ***Since 1999 Mr. Lancaster has been employed as a vice president of financial services and a financial consultant of U.S. Bancorp, an affiliate of the Escrow Agent under this memorandum. Since June 1996, Mr. Lancaster has been the owner of Lancorp Financial Group, LLC. Mr. Lancaster is an investment adviser registered with the Commission under the Investment Advisers Act of 1940, as amended.***

[Exh. A at p. 15 (emphasis added).]

Noticeably absent from this disclosure is ***any mention of ONESCO***, or Lancaster's relationship therewith.  Indeed, as explained below, Lancaster was not affiliated with ONESCO when Defendant purchased under the Private Placement Memorandum.

21.    Likewise, at page 25 of the Private Placement Memorandum, in explaining the business strategy of the Lancorp Fund and the background of its trustee, Gary Lancaster, there is no reference or suggestion that there is any broker-dealer involved.

///

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. _____

1
2
3
4
5
6
7
8
9

Lancorp Financial Fund Business Trust was formed to capitalize on certain investment opportunities that arise in today's practice of syndicating the underwriting of debt securities by financial institutions. Oftentimes, internal corporate policies and legal regulations limit a financial institution's ability to provide large amounts of funds or grant extremely large loans to its customers. Although the Trust has not participated in any transactions utilizing the business strategy described in this memorandum, Gary L. Lancaster, one of the Trustees, has participated in numerous transactions utilizing such strategy in his previous positions as an officer of several financial institutions, which enabled him to gain the necessary knowledge while developing significant business contacts at many other institutions who regularly participate in the syndication of debt securities offerings. Those contacts, when combined with the Trust's investment strategy, which is discussed below, are expected to facilitate the Trustees' ability to enter into transactions on behalf of the Trust.

10

[Exh. A at p. 25.]

11

E.    **Conditions For Purchase**

12

22.    As a condition to purchasing under the Private Placement Memorandum, each

13

investor was required to represent that he meets each of the following requirements:

14
15

- Is acquiring the Shares for investment and not with a view to resale or distribution;

16
17

- Can bear the economic risk of losing his entire investment, if the investor declines the insurance insuring his Investor Shares;

18
19
20

- Recognizes the prohibition on transferability of the Shares; has adequate means for providing for his current financial needs and possible personal contingencies; has no need for liquidity of this investment; and, has no reason to anticipate any change in his personal circumstances, financial or otherwise, which might cause him to attempt to resell or transfer his Shares;

21
22
23

- Is familiar with the nature and risks attendant to investments of this nature and has determined that the purchase of the Shares is consistent with his projected income and investment objectives; and

24
25
26

- Has by himself, or together with his Purchaser Representative, the requisite knowledge and experience in business and financial matters to be capable of evaluating the merits and risks of making an investment in the Trust.

27

[Exh. A at p. 10.]

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. _____

**F.    Subscription Agreement**

23.    In executing the Subscription Agreement for the Lancorp Fund, which was a condition to purchase, Defendant first confirmed that:

> No oral representations have been made or oral information furnished to the undersigned or his advisers in connection with the Offering of the Shares were in any way inconsistent with the information furnished.

24.    He also confirmed:

> (b)    The undersigned (i) has adequate means of providing for his current needs and possible personal contingencies, (ii) has no need for liquidity in this investment, (iii) is able to bear the substantial economic risks of an investment in the Shares for the period of time described in the Confidential Memorandum, and (iv) at the present time, could afford a complete loss of such investment.

> (c)    The undersigned recognizes that the Trust has a limited financial and operating history and no history of profitable operations, and that the Shares as an investment involve special risks, including those disclosed to the undersigned by the Trust.

> (d)    The undersigned understands that the Shares have not been nor will be registered under the Securities Act or the securities laws of any state, in reliance upon an exemption therefrom for non-public offerings. The undersigned understands that the Shares must be held for the period of time described in the Confidential Memorandum. The undersigned further understands that the Trust is under no obligation to register the Shares on his behalf or to assist him in complying with any exemption from registration.

> (e)    The Shares are being purchased solely for his own account for investment and not for the account of any other person and not for distribution, assignment, or resale to others and no other person has a direct or indirect beneficial interest in the Shares. The undersigned or his advisers have such knowledge and experience in financial, tax, and business matters to enable him to utilize the information, made available to him in connection with the Offering of the Shares to evaluate the merits and risks of the prospective investment and to make an informed investment decision with respect thereto.

> (f)    The undersigned realizes that he may not be able to sell or dispose of his Shares as there will be no public market. In addition, the undersigned understands that he has no right to transfer the Shares.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

-7-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. _____

(g) The undersigned, if a corporation, partnership, trust, or other entity, is authorized and otherwise duly qualified to purchase and hold the Shares, such entity has its principal place of business as set forth on the signature page hereof, and such entity has not been formed for the specific purpose of acquiring the Shares.

(h) All information which the undersigned has provided to the Trust concerning himself, his financial position, and his knowledge of financial and business matters, or, in the case of a corporation, partnership, trust or other entity, the knowledge of financial and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date set forth at the end hereof and if there should be any adverse change in such information prior to his subscription being accepted, he will immediately provide the Trust with such information.

[Exh. B at p. SB-7.]

25.    ONESCO did not authorize or have any knowledge of the Private Placement Memorandum and/or the Lancorp Fund.

26.    Lancaster did not provide Defendant any materials, be it business cards or correspondence or otherwise, identifying or referring to ONESCO in any context with Defendant.

27.    Defendant never opened any form of account with ONESCO or established any contractual relationship.

28.    Defendant never purchased any investments or other securities at any point in time, from ONESCO.

29.    ONESCO never received or disbursed funds for any transactions involving Defendant.

**G.    Defendant's Pre-March 23, 2004, Execution of A Subscription Agreement.**

30.    Defendant executed a Subscription Agreement with Lancorp Fund on or about July 30, 2003.

31.    In Section 1(D) of Defendant's Subscription Agreement, it is plainly stated that Defendant's tendered cash contribution is "irrevocable." While it appears there was some activity by Defendant after the execution of the Subscription Agreement, such activity occurred *after* Lancaster was terminated by ONESCO on January 3, 2005. And, in any event, such subsequent activity was predicated solely upon conduct pre-dating the execution of the Subscription

SQUIRE, SANDERS & DEMPSEY L.L.P.
One Maritime Plaza Suite 300
San Francisco, CA 94111-3492

1  Agreement.

2  **H.    Filing Of NASD Actions.**

3      32.    In or about March 2007, non-party Marc E. Robertson ("Robertson") initiated an

4  action with the National Association of Securities Dealers, Inc. (Case No. 07-00936) against

5  ONESCO, wherein he seeks to hold ONESCO responsible for the Private Placement

6  Memorandum on the grounds that, generally, Lancaster was associated with ONESCO, and

7  ONESCO negligently supervised Lancaster. Robertson filed an Amended Statement of Claim,

8  adding Defendant and others as Claimants in the same NASD action, on or about April 3, 2007.

9  Claims are brought under federal and state securities law, violations of state consumer protection

10  statutes, breach of contract, common law fraud, breach of fiduciary duty, and negligence and

11  gross negligence. A true and accurate copy of the NASD Claimants' First Amended Statement of

12  Claim (without exhibits) is attached hereto as Exhibit C.

13  **COUNT I**

14  **(Declaratory Relief)**

15      1.    Plaintiff realleges and incorporates the foregoing paragraphs as if fully rewritten

16  herein.

17      2.    No form of written arbitration agreement exists between ONESCO and Defendant.

18      3.    Thus, Defendant seeks to invoke Rule 10301 of the NASD Code or Arbitration as

19  a basis for arbitration. It provides:

20          Any dispute, claim or controversy eligible for submission under the
    Rule 10100 Series between a customer and a member and/or
21          associated person arising in connection with the business of such
    member or in connection with the activities of such associated
22          persons shall be arbitrated under this Code, as provided by any duly
    executed and enforceable written agreement or upon the demand of
23          the customer. . . .

24      4.    To compel arbitration under NASD Rule 10301, an investor must show that his or

25  her claim: (1) involves a dispute between (i) a member and a customer or (ii) an associated

26  person of the member and a customer; and (iii) arises in connection with the business activities of

27  a member or in connection with the activities of the associated person.

28  ///

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco CA 94111-3492

-9-
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. _____

5.   Defendant was not a customer of ONESCO.

6.   Defendant was not a customer of an associated person of ONESCO.  Specifically, Lancaster was not associated with ONESCO at the time of the events providing the basis for his claims.

7.   Accordingly, ONESCO lacks any obligation to arbitrate any claims against Defendant, including with respect to the NASD Actions.  Defendant contends otherwise.

8.   Declaratory relief from this Court will resolve these controversies and limit the uncertainties.

9.   As alleged herein, a real, substantial and immediate controversy is presented regarding the rights, duties, and liabilities of the parties.  ONESCO therefore requests declaratory judgment from this Court pursuant to Rule 57 of the Federal Rules of Civil Procedure that (a) ONESCO has no obligation to arbitrate the NASD Actions; and (b) ONESCO has no obligation to arbitrate any claims regarding or relating to the Lancorp Fund.

## COUNT TWO

### (Injunctive Relief)

1.   Plaintiff re-alleges and incorporates the foregoing paragraphs as if fully rewritten herein.

2.   ONESCO will be irreparably harmed if compelled to arbitrate a claim for which it has no contractual obligation to do so.

3.   ONESCO thus seeks preliminary and permanent injunctive relief (1) enjoining the Defendant from further proceedings in the NASD actions; and (2) enjoining the Defendant from filing any arbitration claims before the National Association of Securities Dealers, Inc. against ONESCO relating to the Lancorp Fund.

///

///

///

///

///

SQUIRE, SANDERS &
DEMPSEY L.L.P
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
Case No. _____

1    WHEREFORE, ONESCO respectfully requests relief as follows:

2        (a)    A declaration, pursuant to Rule 57 of the Federal Rules of Civil Procedure, that (a)

3    ONESCO has no obligation to arbitrate the NASD Actions; and (b) ONESCO has no obligation

4    to arbitrate any claims regarding or relating to the Lancorp Fund.

5        (b)    Preliminary and permanent injunctive relief (1) enjoining the Defendant from

6    further proceedings in the NASD actions; and (2) enjoining the Defendant from filing any

7    arbitration claims before the National Association of Securities Dealers, Inc. against ONESCO

8    relating to the Lancorp Fund.

9        (c)    Any and all other relief that this Court may deem appropriate.

10

11                                          Respectfully submitted,

     Dated: May 31, 2007                    SQUIRE, SANDERS & DEMPSEY L.L.P.
12

13

14                                   By:

15                                          Joseph A. Meckes

                                            Attorneys for Plaintiff
16                                          THE O.N. EQUITY SALES COMPANY

17

18   OF COUNSEL:

19   Marion H. Little, Jr., Esq. (0042679)
     Michael R. Reed, Esq. (0063995)
20   ZEIGER, TIGGES & LITTLE LLP
     3500 Huntington Center
21   41 South High Street
     Columbus, OH  43215
22   Telephone:    (614) 365-9900
     Facsimile:    (614) 365-7900
23
     Attorneys for Plaintiff
24
     SANFRANCISCO/221091.4
25

26

27

28

                                     -11-
                        COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
                                     Case No. _____

*Confidential Private Placement Memorandum*

# LANCORP FINANCIAL FUND BUSINESS TRUST

**Sale of 50,000 Investor Shares at a price of $5,000 per share**
**Minimum purchase five shares**

**Limited to no more than 100 investors, of which no more than 35 may be Non-Accredited Investors**

Lancorp Financial Fund Business Trust (the "Trust"), a recently formed Nevada business trust, is an unregistered closed-end non-diversified management investment company. Our investment objective involves the issuance of Forward Commitments (defined in this memorandum) to large financial institutions relating to debt securities bearing interest or sold at a discount (the "Permitted Investments") which satisfy each of the following criteria:

- The securities are original issue debt securities rated "A+" by Standard & Poor's Corporation or "A1" by Moody's Investor's Service, the sale of which have been registered pursuant to the 1933 Act, and issued by an entity having, at the time the Forward Commitment is issued, a long-term credit rating of at least "A+" by Standard & Poor's Corporation, "A1" by Moody's Investors Service, or the equivalent rating of any other recognized rating service;

- On the date of delivery to the Trust, the securities (a) are the subject of one or more irrevocable purchase orders obtained by the Trustees, on behalf of the Trust, which obligate qualified creditworthy third party subscribers acceptable to a Qualified Bank and the Trustees to purchase the securities for an amount greater than the amount to be withdrawn by the Trustees from the Trust upon delivery of such securities; or (b) have a yield to maturity of at least 350 basis points higher per annum than the 10-year U.S. Treasury securities market rate on such date; or (c) provide a yield to maturity of 200 basis points higher per annum than the market rate for such security class on the day of delivery, whichever is greater; and

- The securities (a) do not bear interest only, and (b) do not have a final maturity of more than 10 years.

- In addition, to the extent that cash is not invested in the Permitted Investments, the Trust may invest in a Qualified Bank's money market accounts as specified in the Declaration of Trust.

|  | Offering Price | Sales Load (1) | Proceeds to Lancorp Financial Trust (2) (3) |
|---|---|---|---|
| Per Share | $5,000 | $-0- | $5,000 |
| Total Minimum Offering | $5,000,000 | $-0- | $5,000,000 |
| Total Maximum Offering | $250,000,000 | $-0- | $250,000,000 |

(1)   There will be no commissions paid with respect to the sale of the Investor Shares.
(2)   If an investor requests insurance to insure the investor's investment in the Trust, there will be a charge against such investor's Investor Shares for insurance premiums. The premium will be an amount equal to three percent per annum of the total invested by the investor, payable at the rate of 0.75 percent each quarter ending on March 31, June 30, September 30, or December 31 of each year,. Therefore, each $5,000 invested by an Insured Shareholder will be subject to a charge of $37.50 each quarter. Any insured investor may have his Investor Shares redeemed at the end of any quarter, thereby limiting his exposure for insurance premiums to only 0.75 percent for the quarter in which redemption occurs. The Trustees will not be entitled to any compensation from the Trust until all paid insurance premiums have been refunded to the Insured Shareholders out of the Quarterly Income. See "Fee Table and Synopsis" and "Certain Provisions of the Declaration of Trust and Bylaws – Insurance Covering Investor Shares."
(3)   Any expenses of the Trust related to this offering will likewise be paid out of any compensation which may be due to the Trustees. The Investor Shares will not be charged with any such expenses. See "Fee Table and Synopsis" and "The Trust – The Trustees."

*This investment involves risks. See "Risk Factors" beginning on page 8 of this memorandum.*

This memorandum sets forth concisely information about the Trust that you should know before investing. You are advised to read this memorandum and to retain it for future reference.

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS MEMORANDUM IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR A DEFINITE PERIOD OF TIME.**

**The effective date of this Memorandum is March 17, 2003**

EXHIBIT

A

**SUBSCRIPTION AGREEMENT**
**LANCORP FINANCIAL FUND BUSINESS TRUST**
**SUBSCRIPTION AGREEMENT**

Lancorp Financial Fund Business Trust
1382 Leigh Court
West Linn, Oregon 97068

     Re:     Offering of Shares of Lancorp Financial Fund Business Trust

Gentlemen:

     1.     <u>Subscription</u>.  The undersigned hereby applies to purchase the number of shares of the Investor Shares of Lancorp Financial Fund Business Trust, a Nevada business trust (the "Trust"), par value $0.001 per share (the "Shares") indicated below in accordance with the terms of this Subscription Agreement and the private placement materials relating to the offering (the "Offering") of the Shares (such private placement materials, including all financial statements, exhibits and schedules contained therein or attached thereto, and any amendments and supplements thereto, is hereinafter referred to as the "Confidential Memorandum").  Any capitalized terms used herein shall have the same meaning as used in the Confidential Memorandum.  The undersigned has received a copy of the Confidential Memorandum.  The Shares are being offered by the Trust.  Subject to the terms and conditions of the Confidential Memorandum and this Subscription Agreement, the undersigned hereby irrevocably offers to purchase _____5_____ Shares and therefore tenders to the Trust:

     (a)     One executed Lancorp Financial Fund Business Trust Purchaser Questionnaire;

     (b)     One executed Lancorp Financial Fund Business Trust Purchaser Representative Questionnaire, if a Purchaser Representative is used;

     (c)     If applicable, one executed Lancorp Financial Fund Business Trust Accredited Investor's Letter; and

     (d)     A check payable to "Lancorp Financial Fund Business Trust Escrow Account" in the amount of $25,000 for the Shares.  It is understood that the cash contribution tendered is irrevocable by the undersigned and may be deposited for collection in accordance with the Confidential Memorandum, regardless and independent of the sale of any other Shares in the Trust.  The check tendered shall be held in a separate escrow account established by the Trust as described in the Confidential Memorandum, and shall be promptly returned to the undersigned if the Shares are not subscribed for and accepted by the Trust pursuant to the terms and conditions specified in the Confidential Memorandum.  Upon the acceptance of subscriptions for the Shares by the Trust as specified in the Confidential Memorandum, the cash held in the escrow account will be released to the Trust as provided in the Confidential Memorandum.

     (e)     <u>Color copy</u> of a photo ID, driver's license or passport.

     2.     <u>Acceptance and Subscription</u>.  The undersigned understands and agrees that this subscription is made subject to the following terms and conditions:

     (a)     The Trust will have the right to reject this subscription, in whole or in part.

     (b)     This subscription will be deemed to be accepted by or on behalf of the Trust only when it is signed by the Trust.

EXHIBIT

B

**LANCORP FINANCIAL FUND BUSINESS TRUST**
**ACCREDITED INVESTOR'S LETTER**


Lancorp Financial Fund Business Trust
1382 Leigh Court
West Linn, Oregon 97068

   Re:  Purchase of Shares in Lancorp Financial Fund Business Trust

Gentlemen:

   As a condition precedent to your delivery to the undersigned of a Confidential Memorandum with respect to the offer to purchase Shares in Lancorp Financial Fund Business Trust, a Nevada business trust as described in said Confidential Memorandum, I represent and warrant to you that:

   1.  I am an "Accredited Investor" as defined in Rule 501(a) of the Securities Act of 1933, as amended; or

   2.  I had income in excess of $200,000 in each of the preceding two years or joint income with my spouse in excess of $300,000 in each of those years and I have a reasonable expectation of reaching the same income level in the current year; or

   3.  My net worth or joint worth with my spouse exceeds $1,000,000.

Dated: _____, 2003.

           Signature


           Print Name

(c)     The Trust will have no obligation to accept subscriptions for the Shares in the order received.

(d)     The Offering may be terminated at any time by the Trust prior to the final acceptance of subscriptions for the required number of the Shares as specified in the Confidential Memorandum.

3.     <u>Representations and Warranties</u>.  The undersigned represents and warrants as follows:

(a)     The undersigned has received information, and has carefully reviewed the Confidential Memorandum and has relied on the disclosures contained therein, information otherwise provided to him in writing by the Trust, or information from books and records of the Trust.  The undersigned understands that all documents, records and books pertaining to this investment have been made available for inspection by his attorney and/or his accountant and/or his Purchaser Representative and him, and that the books and records of the Trust will be available, upon reasonable notice, for inspection by investors during reasonable business hours at its principal place of business.  The undersigned and/or his advisers have had a reasonable opportunity to ask questions of and receive answers from the Trust, or a person or persons acting on its behalf, concerning the Offering of the Shares, and all such questions have been answered to the full satisfaction of the undersigned.  No oral representations have been made or oral information furnished to the undersigned or his advisers in connection with the Offering of the Shares were in any way inconsistent with the information furnished.

(b)     The undersigned (i) has adequate means of providing for his current needs and possible personal contingencies, (ii) has no need for liquidity in this investment, (iii) is able to bear the substantial economic risks of an investment in the Shares for the period of time described in the Confidential Memorandum, and (iv) at the present time, could afford a complete loss of such investment.

(c)     The undersigned recognizes that the Trust has a limited financial and operating history and no history of profitable operations, and that the Shares as an investment involve special risks, including those disclosed to the undersigned by the Trust.

(d)     The undersigned understands that the Shares have not been nor will be registered under the Securities Act or the securities laws of any state, in reliance upon an exemption therefrom for non-public offerings.  The undersigned understands that the Shares must be held for the period of time described in the Confidential Memorandum.  The undersigned further understands that the Trust is under no obligation to register the Shares on his behalf or to assist him in complying with any exemption from registration.

(e)     The Shares are being purchased solely for his own account for investment and not for the account of any other person and not for distribution, assignment, or resale to others and no other person has a direct or indirect beneficial interest in the Shares.  The undersigned or his advisers have such knowledge and experience in financial, tax, and business matters to enable him to utilize the information, made available to him in connection with the Offering of the Shares to evaluate the merits and risks of the prospective investment and to make an informed investment decision with respect thereto.

(f)     The undersigned realizes that he may not be able to sell or dispose of his Shares as there will be no public market.  In addition, the undersigned understands that he has no right to transfer the Shares.

(g)     The undersigned, if a corporation, partnership, trust, or other entity, is authorized and otherwise duly qualified to purchase and hold the Shares, such entity has its principal place of business as set forth on the signature page hereof, and such entity has not been formed for the specific purpose of acquiring the Shares.

(h)     All information which the undersigned has provided to the Trust concerning himself, his financial position, and his knowledge of financial and business matters, or, in the case of a corporation, partnership, trust or other entity, the knowledge of financial and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date set forth at the end hereof, and if there should be any adverse change in such information prior to his subscription being accepted, he will immediately provide the Trust with such information.

SB-7

(i)     The undersigned, if he is an individual, is at least 21 years of age.

(j)     <u>Compliance with Regulation D</u>.  The undersigned understands and agrees that the following restrictions and limitations are applicable to his purchase and his resales, hypothecations or other transfers of the Shares *pursuant* to Regulation D under the Securities Act:

(i)     The undersigned agrees that the Shares shall not be sold, pledged, hypothecated or otherwise transferred unless the Shares are registered under the Securities Act, and the securities laws of any state, or are exempt therefrom;

(ii)     A legend in substantially the following form has been or will be placed on any certificate(s) or other document(s) evidencing the Shares:

THE SECURITIES REPRESENTED BY THIS INSTRUMENT OR DOCUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. AS AMENDED, OR THE SECURITIES LAW OF ANY STATE. WITHOUT SUCH REGISTRATION, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE COMPANY TO THE EFFECT THAT ANY SUCH TRANSFER SHALL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES LAW OF ANY STATE, OR ANY RULE OR REGULATION PROMULGATED THEREUNDER.

(iii)     Stop transfer instructions to the transfer agent of the Shares have been or will be placed with respect to the Shares so as to restrict the resale, pledge, hypothecation or other transfer thereof, subject to the further items hereof, including the provisions of the legend set forth in subparagraph (ii) above; and

(iv)     The legend and stop transfer instructions described in subparagraphs (ii) and (iii) above will be placed with respect to any new certificate(s) or other document(s) issued upon presentment by the undersigned of certificate(s) or other document(s) for transfer.

(k)     The undersigned acknowledges that _____*N/A*_____ (complete if applicable) has acted as his "Purchaser Representative" as defined in Regulation D promulgated under the Securities Act, and (i) that he can bear the economic risk of this investment; (ii) he has relied upon the advice of such Purchaser Representative as to the merits of an investment in the Trust and the suitability of such investment for the undersigned; and (iii) such Purchaser Representative has confirmed to him, in writing, any past, present or future material relationship, actual or contemplated, between such Purchaser Representative or its Affiliates and the Trust, or its Affiliates.

(l)     The undersigned understands that neither the Securities and Exchange Commission nor the securities commission of any state has made any finding or determination relating to the fairness for public investment in the Shares and that the Securities and Exchange Commission as well as the securities commission of any state will not recommend or endorse any offering of securities.

(m)     The undersigned understands that:

(i)     No assurances are or have been made regarding any economic advantages (including tax) which may inure to the benefit of the undersigned;

(ii)     No assurances are or have been made concerning the distribution of profits to the Trust's investors; and

(iii)     He is aware that this subscription is independent of any other subscription for the Shares.

(n)    The undersigned acknowledges and is aware that it never has been represented, guaranteed, or warranted to him by the Trust, its directors, officers, agents or employees, or any other person, expressly or by implication, as to any of the following:

(i)    The approximate or exact length of time that he will be required to remain as an owner of his Shares;

(ii)    The percentage of profit and/or amount of or type of consideration, profit or loss to be realized, if any, as a result of this investment; or

(iii)    That the limited past performance or experience on the part of the Trust, or any future projections will in any way indicate the predictable results of the ownership of the Shares or of the overall financial performance of the Trust.

(o)    The undersigned acknowledges that the Trust has made available to him or his Purchaser Representative, if any, or other personal advisers the opportunity to obtain additional information to verify the accuracy of the information furnished to him and to evaluate the merits and risks of this investment.

(p)    The undersigned confirms that he has consulted with his Purchaser Representative, if any, or other personal advisers and that said Purchaser Representative or other advisers have analyzed the information furnished to him and the documents relating thereto on his behalf and have advised him of the business and financial aspects and consequences of and liabilities associated with his investment in the Shares. The undersigned represents that he has made other risk capital investments or other investments of a speculative nature, and by reason of his business and financial experience and of the business and financial experience of those persons he has retained to advise him with respect to investments of this nature. In reaching the conclusion that he desires to acquire the Shares, the undersigned has carefully evaluated his financial resources and investments and acknowledges that he is able to bear the economic risks of this investment.

(q)    The undersigned acknowledges that all information made available to him and/or his Purchaser Representative, if any, and/or personal advisers in connection with his investment in the Shares, including the information furnished to him is and shall remain confidential in all respects and may not be reproduced, distributed or used for any other purpose without the prior written consent of the Trust.

4.    Indemnification.    The undersigned agrees to indemnify and hold harmless the Trust and its Affiliates from and against all damages, losses, costs, and expenses (including reasonable attorneys' fees) which they may incur by reason of the failure of the undersigned to fulfill any of the terms or conditions of this subscription, or by reason of any breach of the representations and warranties made by the undersigned herein, or in any document provided by the undersigned to the Trust.

5.    Limitation on Transfer of the Shares.    The undersigned acknowledges that he is aware that there are substantial restrictions on the transferability of the Shares. Since the Shares will not be, and since the undersigned has no right to require that they be, registered under the Securities Act, or the securities laws of any state, the Shares may not be, and the undersigned agrees that they shall not be, sold or transferred except pursuant to an effective registration statement or an exemption from such registration statement under said statutes. The undersigned also acknowledges that he will be responsible for compliance with all conditions on transfer imposed by any federal or state securities statute and securities law administrator and for any expenses incurred by the Trust for legal or accounting services in connection with reviewing such a proposed transfer and/or issuing opinions in connection therewith.

6.    Survival.    The foregoing representations, warranties and undertakings are made with the intent that they may be relied upon in determining the undersigned's suitability as an investor in the Trust and the undersigned hereby agrees that such representations and warranties shall survive his purchase of the Shares in the Trust. The undersigned hereby acknowledges and agrees that he is not entitled to cancel, terminate or revoke this Subscription Agreement, or any agreements hereunder, and that this Subscription Agreement and such agreements shall survive (a) changes in the transactions, documents, and instruments previously furnished to the undersigned which are not materially adverse, and (b) the undersigned's death or disability.

7.    Notices. All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the undersigned or to the Trust at the respective addresses set forth herein.

8.    Miscellaneous.

(a)    The undersigned agrees not to transfer or assign this Subscription Agreement, or any of the undersigned's interest herein, and further agrees that the transfer or assignment of the Shares acquired pursuant hereto shall be made only in accordance with all applicable laws.

(b)    The undersigned agrees that the undersigned may not cancel, terminate, or revoke this Subscription Agreement or any agreement of the undersigned made hereunder and that this Subscription Agreement shall survive the death or disability of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, successors, and assigns.

(c)    Notwithstanding any of the representations, warranties, acknowledgments, or agreements made herein by the undersigned, the undersigned does not thereby or in any other manner waive any rights granted to the undersigned under federal or state securities laws.

(d)    Words of any gender used in this Subscription Agreement shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise. In addition, the pronouns used in this Subscription Agreement shall be understood and construed to apply whether the party referred to is an individual, partnership, joint venture, corporation or an individual or individuals doing business under a firm or trade name, and the masculine, feminine and neuter pronouns shall each include the other and may be used interchangeably with the same meaning.

(e)    This Subscription Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.

(f)    This Subscription Agreement shall be enforced, governed, and construed in all respects in accordance with the laws of the State of Texas and all obligations hereunder shall be deemed performable in West Linn, Oregon.

(g)    Within 10 days after receipt of a written request from the Trust, the undersigned agrees to provide such information and to execute and deliver such documents as reasonably may be necessary to comply with any and all laws and ordinances to which the Trust is subject.

IN WITNESS WHEREOF, I have executed this Subscription Agreement as of the 10th day of *July* , 2003.

**INTENTIONALLY LEFT BLANK**

SB-10

## TYPE OF OWNERSHIP

(Check One)

_____ Individual (one signature required)

_____ Joint Tenants with Right of Survivorship (both parties must sign)

_____ Tenants in Common (both parties must sign)

_____ Community Property (one signature required if interest held in one name, *i.e.*, managing spouse, two signatures required if interest held in both names).

_____ Trust

_____ Corporation

_____ Partnership

Please print here the exact name (registration) investor desires for the Shares.

[ *Dan Maria Cui* ]

**NAME OF REFERRING PARTY:**   Provide the name of the person(s) or entity who initially informed you of Lancorp Financial Fund.

Name(s):    *Bob Reese*

Address:    *316 Mio Valley Centre #159*

            *Carmel, Ca 93923*

Phone:    REDACTED

**SIGNATURE PAGE**
**FOR PURCHASER REPRESENTATIVE**

(If Applicable)

      The Purchaser Representative named in Paragraph 3(k) has executed this Subscription Agreement this ____ day of _____, 2003, to evidence his acknowledgment of and agreement to the representations and warranties contained in Paragraph 3.

 

                                           _____

                                         Signature of Purchaser Representative

                                         Printed Name _____

                                         Street Address or P.O. Box _____

                                         City and State _____ Zip Code _____

THE STATE OF _____ *
                                   *
COUNTY OF _____ *

      On this ____ day of _____, 2003, before me, the undersigned, a Notary Public of said State, duly commissioned and sworn, personally appeared _____, known to me to be the person or person(s) whose name is (or whose names are) subscribed to the within instrument, and acknowledged that he (or she or they) executed the same for the purposes and consideration therein expressed, AND WHO ALSO UPON OATH SWORE THAT THE STATEMENTS THEREIN CONTAINED ARE TRUE AND CORRECT.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

 

                                           _____

                                         Notary Public for the State of _____
                                         Printed Name: _____
                                         My Commission Expires: _____

**SIGNATURE PAGE
FOR INDIVIDUAL INVESTOR**

_Tan Maria Cui_

Signature

REDACTED

Social Security Number

_Dan Maria Cui_

Print or Type Name

Residence Address:

_6552 Lansing Ct
Pleasanton CA 94526_

Mailing Address:

_6536 Lansing Ct
Pleasanton, CA 94526_

Executed at _San Mateo_, this _30_ day of _July_, 2003.

THE STATE OF _California_

COUNTY OF _San Mateo_ *

On this _30_ day of _July_, 2003, before me, the undersigned, a Notary Public of said State, duly commissioned and sworn, personally appeared _Daniel Mattos Maria Cui_ known to me to be the person or person(s) whose name is (or whose name are) subscribed to the within instrument, and acknowledged that he (or she or they) executed the same for the purposes and consideration therein expressed, AND WHO ALSO UPON OATH SWORE THAT THE STATEMENTS THEREIN CONTAINED ARE TRUE AND CORRECT.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public for the State of _California_
Printed Name: _Mokhtar Bakhoum_
My Commission Expires: _11-24-06_

SB-13

**SIGNATURE PAGE
FOR CORPORATE OR PARTNERSHIP INVESTOR**

Name of Corporation or Partnership (Please Print or Type)

By _____
    Signature of Authorized Agent

Title: _____

Taxpayer Identification Number: _____

Address of Principal Offices: _____

_____

_____

Mailing Address, if Different: _____

_____

_____

Attention: _____

    Executed at _____, this _____ day of _____, 2003.

THE STATE OF _____ *
                                *
COUNTY OF _____ *

    On this ____ day of _____, 2003, before me, the undersigned, a Notary Public of said State, duly commissioned and sworn, personally appeared _____, known to me to be the person or person(s) whose name is (or whose names are) subscribed to the within instrument, and acknowledged that he (or she or they) executed the same for the purposes and consideration therein expressed, AND WHO ALSO UPON OATH SWORE THAT THE STATEMENTS THEREIN CONTAINED ARE TRUE AND CORRECT.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

                                        _____
                                        Notary Public for the State of _____
                                        Printed Name: _____
                                        My Commission Expires: _____

SB-14

**SIGNATURE PAGE
FOR TRUST INVESTOR**

Name of Trust (Please Print or Type)

_____

Name of Trustee (Please Print or Type)

By_____
   Trustee's Signature

Date Trust was Formed: _____

Taxpayer Identification Number: _____

Trustee's Address: _____

_____

_____

Attention: _____

     Executed at _____, this _____ day of _____, 2003.

THE STATE OF _____ *
                                *
COUNTY OF _____ *

     On this ___ day of _____, 2003, before me, the undersigned, a Notary Public of said State, duly commissioned and sworn, personally appeared _____, known to me to be the person or person(s) whose name is (or whose names are) subscribed to the within instrument, and acknowledged that he (or she or they) executed the same for the purposes and consideration therein expressed, AND WHO ALSO UPON OATH SWORE THAT THE STATEMENTS THEREIN CONTAINED ARE TRUE AND CORRECT.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

                              _____
                              Notary Public for the State of _____
                              Printed Name: _____
                              My Commission Expires: _____

SUBSCRIPTION ACCEPTED:

LANCORP FINANCIAL FUND BUSINESS TRUST


By _____
    Gary L. Lancaster, Chairman


Date: _____, 2003.

ARBITRATION TRIBUNALS OF THE
NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

*In the Matter of the Arbitration Between:*

MARC E. ROBERTSON, AXINA ADLERBERT,
DANIEL M. MARIA CUI, THOMAS E. ROBERTSON
AND BERT BAUMER,

      CLAIMANTS,

    vs.                                 Case No. 07-00936

THE O.N. EQUITY SALES COMPANY,

      RESPONDENT,

## FIRST AMENDED STATEMENT OF CLAIM

CLAIMANTS MARC E. ROBERTSON (hereinafter referred to as "M. ROBERTSON"), AXINA ADLERBERT (hereinafter referred to as "ADLERBERT"), DANIEL M. MARIA CUI (hereinafter referred to as "MARIA CUI"), THOMAS E. ROBERTSON (hereinafter referred to as "T. ROBERTSON"), and BERT BAUMER (hereinafter referred to as "BAUMER") (all hereinafter referred to as "CLAIMANTS") sue THE O.N. EQUITY SALES COMPANY (hereinafter referred to as "ONESCO" or "RESPONDENT"), and allege the following:

### JURISDICTIONAL ALLEGATION

1.    The jurisdiction of this Tribunal is invoked under the Federal Arbitration Act and pursuant to the arbitration clauses contained in (a) the licensing agreement that RESPONDENT has with the National Association of Securities Dealers, Inc. ("NASD"), by which they individually and collectively agreed to submit all disputes and/or complaints (i) with

EXHIBIT

C

customers and/or (ii) arising out of or in connection with its business and/or (iii) arising out of

the employment or termination of employment of its associated persons to arbitration, (b) the

NASD *Code Of Arbitration Procedure*, and (c) the Form U-4 of Gary L. Lancaster. See, e.g.,

Spear, Leeds & Kellogg v. Central Life Assur. Co., 85 F.3d 21 (2d Cir. 1996); Oppenheimer

& Co., Inc. v. Neidhardt, 56 F.3d 352 (2d Cir. 1995); Lehman Bros., Inc. v. Certified Reporting

Co., et al., 939 F. Supp. 1333 (N.D. Ill. 1996); Miller v. Flume, 139 F.3d 1130 (7th Cir. 1998).

## GENERAL ALLEGATIONS

2.      At all times relevant hereto, ROBERTSON resided in Winthrop, Washington.

ROBERTSON is fifty (50) years old and works as a cabinet designer. He formerly worked as

a carpenter. His wife, Linda M. Robertson, is fifty-one (51) years old and helps him in his

business.

3.      ADLERBERT resides in Hovas, Sweden. ADLERBERT is thirty-five (35)

years old and a full-time homemaker.

4.      At all times relevant hereto, MARIA CUI resided in Pleasanton, California.

MARIA CUI is fifty-seven (57) years old. MARIA CUI works for a sulfur company. His wife,

Robin R. Maria Cui, is forty-seven (47) years old. She works part-time for the Pleasanton

Unified School District during lunch hours at the school as a yard supervisor.

5.      At all times relevant hereto, T. ROBERTSON resided in Larkspur, California.

T. ROBERTSON is eighty (80) years old and retired. He formerly worked as a covert

operations officer for the CIA for 25 years. His wife, Elizabeth Robertson, is sixty-seven (67)

years old. She is self-employed as an artist. T. ROBERTSON is M. ROBERTSON'S father.

6.    At all times relevant hereto, BAUMER resided in Aromas, California. BAUMER is seventy-four (74) years old and self-employed. His wife, Mercedes Baumer, is thirty (30) years old and a full-time homemaker. They have two children.

## I.    RESPONDENT ONESCO NEVER INSPECTS LANCASTER'S OFFICE

7.    In 2004, ONESCO employed dozens or hundreds of representatives who, like Lancaster, worked out of their house or other off-site locations scattered around the country. Most of these representatives had limited industry experience and operated other businesses in addition to their securities business through ONESCO.

8.    In 1986, the NASD specifically warned ONESCO and other firms with such off-site working arrangements that the "conduct of off-site representatives most frequently resulting in violations of NASD rules involves unauthorized private securities transactions, or 'selling away.'" The NASD emphasized that "firms employing off-site representatives are responsible for establishing **and carrying out** procedures that will subject these individuals to effective supervision designed to monitor their securities-related activities **and to detect and prevent regulatory and compliance problems.**" The NASD made a number of specific recommendations that would assist firms such as ONESCO in preventing "selling away" transactions by their registered representatives, such as annual, unannounced inspections of the offices of their registered representatives and the review of incoming and outgoing correspondence and sales literature. The NASD specifically cautioned that "to fulfill these obligations, a firm should consider whether the number and location of its registered principals

provides the capability to supervise its off-site representatives effectively." (See attached Exhibit "A.")

9.    The SEC has also made clear on numerous occasions that surprise inspections of off-site locations are required, that these unannounced examinations must be conducted at least twice yearly, and that customer files must be examined during these inspections. See In the Matter of Royal Alliance Assoc., Inc., Exchange Act Release No. 38174, 63 SEC Docket 1643 (January 15, 1997) (broker-dealer's practice of conducting a pre-announced compliance examination of its off-site registered representatives only once a year was inadequate to satisfy its supervisory obligations); In the Matter of Consolidated Investment Services, Exchange Act Release No. 36687, 61 SEC Docket 20 (January 5, 1996) (broker-dealer's supervision of a small office run by a single registered representative inadequate without surprise inspections, and annual compliance questionnaires inadequate substitute for on-site inspections); In the Matter of NYLife Securities, Exchange Act Release No. 40459, Admin. Proc. File No. 3-9712 (September 23, 1998) ("the Commission has determined that firms with a high number of one or two person offices have not discharged their supervisory obligations where there were no surprise inspections.") (broker-dealer's reliance on supervisory interviews of registered representatives and annual inspections of branch offices by regional compliance personnel without examining any customer files was inadequate to prevent and detect registered representative's violations).

10.    The SEC has stated that these off-site location inspections should include at least:

(1)    A review of a sampling of customer files, including account opening documents and trading records;

(2)    A review of the signature guarantee log;

(3)    A review of correspondence, advertisements, and sales literature made available at the remote office;

(4)    A review of business records, including physical and computer files;

(5)    In-person questioning of the representative by the supervisor about business activities, including inquiry about any unusual activity; and

(6)    In-person interview by the supervisor of the representative's assistant or support staff, if any, about the remote office's business and any unusual activity. (See Quest Capital Strategies, Inc., Release Number 34-44935 (October 15, 2001).

(See attached Exhibit "B," p. 3)

11.    ONESCO ignored these specific warnings by the NASD and directives by the SEC and failed to comply with its supervisory obligations over Gary L. Lancaster (hereinafter referred to as ("Lancaster"). Lancaster worked from an office located at 1382 Leigh Ct. in West Linn, Oregon. ONESCO **never inspected** Lancaster's office, let alone subject his off-site location to the annual, unannounced inspections advised by the NASD and required by the SEC.

| DATE | INSPECTION |
|---|---|
| March 2004 | NONE |
| April 2004 | NONE |
| May 2004 | NONE |

Page 5 of 167

| June 2004 | NONE |
|---|---|
| July 2004 | NONE |
| August 2004 | NONE |
| September 2004 | NONE |
| October 2004 | NONE |
| November 2004 | NONE |
| December 2004 | NONE |
| January 2005 | NONE |

12.    RESPONDENT ONESCO should have immediately inspected Lancaster's office upon his hiring because, among other reasons (i) the firm needed to determine his level of understanding of securities industry rules and firm procedures and confirm that he was indeed complying with these rules and procedures, (ii) Lancaster had been involuntarily terminated by two prior broker-dealers, (iii) Lancaster had been out of the securities industry for a year and a half, (iv) Lancaster disclosed that he was engaged in an outside business, Lancorp Financial Group, LLC, from the same location as his business address for ONESCO, and (v) Lancaster generated no production while at ONESCO.

13.    The SEC has specifically noted that firms need to keep untried personnel working off-site under closer than normal surveillance. See e.g. SECO Securities, Inc., SEC Rel. No. 34-26054 (Sept. 1, 1988). This explains why brokerage firms such as Walnut Street Securities, Inc. have procedures which require inspections of off-site locations within 90 days after the person becomes registered with the firm. (See attached Exhibit "C.")

14.    RESPONDENT ONESCO'S supervisory procedures were deficient.  The firm did require that off-site locations be inspected every year, but waited until the end of the year to conduct the inspection.  This gave brokers like Lancaster a one year safe harbor from supervisory scrutiny.

## II.    RESPONDENT ONESCO FAILS TO REVIEW LANCASTER'S INCOMING AND OUTGOING CORRESPONDENCE, EMAILS, AND SALES LITERATURE

15.    ONESCO failed to establish any procedures for the review of incoming and outgoing correspondence, Internet (e.g. e-mail) communications, and sales literature used by Lancaster, and simply relied upon him to forward these materials to the firm.  ONESCO never monitored any of Lancaster's sales presentations, never reviewed on-site customer account documentation and other books and records, and never met with Lancaster to discuss the products he was selling and his sale methods.  To the contrary, RESPONDENT simply relied upon Lancaster to conduct himself appropriately, to forward to his supervisor all securities related correspondence, and to truthfully complete annual questionnaires concerning his conduct.

16.    Stated simply, supervisory obligations require a firm to obtain enough information to reasonably ensure that the day-to-day activities of off-site locations comply with applicable rules and regulations.  See Regulatory and Compliance Workshop (Feb. 23, 2000).  RESPONDENT ONESCO took no steps to reasonably ensure that the day-to-day activities in Lancaster's West Linn, Oregon office complied with NASD and firm rules and requirements and federal and state securities laws.

III.   **RESPONDENT ONESCO FAILS TO INDEPENDENTLY VERIFY THAT LANCASTER WAS NOT SELLING UNAPPROVED SECURITIES THROUGH HIS OUTSIDE BUSINESS**

17.    While Lancaster was registered with ONESCO, ONESCO allowed Lancaster to operate other businesses. The SEC has stated that **"allowing a registered representative to engage in outside business activities involves the risk that the representative will use his outside business to carry out or conceal violations of the securities laws."** Broker-dealers must **"require independent verification of such matters as the nature and extent of outside business activities and a representative's outside sources of income."** See Prospera Financial Services, Inc., Exchange Act Rel. No. 43352 (September 26, 2000); PFS Investments, Inc., Exchange Act Rel. No. 40269 (July 28, 1998).

18.    RESPONDENT ONESCO'S procedures and compliance system were deficient because the firm did not take any steps to review Lancaster's outside business activities and confirm that Lancaster was not using his outside businesses to sell unregistered securities. By not requesting, inspecting and independently verifying documentation from Lancaster concerning his outside businesses, RESPONDENT ONESCO failed to properly supervise Lancaster.

> **"Allowing a registered representative to engage in outside business activities involves the risk that the representative will use his outside business to carry out or conceal violations of the securities laws. Although [the broker/dealer] required that representatives obtain permission before engaging in outside business activities, the [broker/dealer] had no procedures for reviewing, analyzing, or following up on the information representatives provided concerning their outside activities. [The broker/dealer's] procedures were deficient for failing to require inspections of its off-site offices that were not registered as branches with the NASD or to require independent verification of**

such matters as the nature and extent of outside business activities and a
representative's outside sources of income."

Signal Securities, Inc., Exchange Act Rel. No. 43350 (September 26, 2000); Walnut Street
Securities, Inc., Exchange Act Rel. No. 35975 (July 17, 1995).

19.     Lancaster disclosed to ONESCO that he was the President of Lancorp Financial
Group, LLC (hereinafter referred to as "Lancorp"), and that Lancorp received commissions
from 401k plans. Lancaster specifically disclosed that Lancorp conducted "**Investment-Related
Business.**" (See attached Exhibit "D," p. 2-3.) ONESCO negligently approved Lancaster's
involvement with Lancorp and negligently failed to confirm that Lancaster was not selling away
through Lancorp. (See Exhibit "D," p. 1.)

20.     Lancaster did not hide his involvement in the fraudulent Lancorp Financial Fund
Business Trust offering.  First, as stated earlier, he disclosed his involvement with Lancorp
Financial Group, LLC to ONESCO when he was hired in February 2004. Second, Lancaster
filed a Reg-D Offering for Lancorp Financial Fund Business Trust with the SEC.  (See
attached Exhibit "E.") Finally, Lancaster disclosed his involvement with the Lancorp Financial
Fund Business Trust to ONESCO orally **and** in writing through an amendment to his Form U-
4. (See attached Exhibit "F.") RESPONDENT negligently failed to investigate Lancaster's
involvement with Lancorp Financial Fund Business Trust.

**IV.   IN EARLY SEPTEMBER 2004, RESPONDENT ONESCO LEARNS OF A PENNSYLVANIA INVESTIGATION OF LANCASTER'S INVOLVEMENT WITH LANCORP FINANCIAL FUND BUSINESS TRUST, AND FAILS TO INSPECT LANCASTER'S OFFICE AND INDEPENDENTLY CONFIRM THAT LANCASTER WAS NOT SELLING AWAY**

21.    On September 8, 2004, ONESCO received a letter from the State of Pennsylvania alerting the firm that the Pennsylvania Securities Commission was investigating Lancaster's outside business activities.   The Commission requested information from RESPONDENT concerning Lancaster's outside businesses.  (See attached Exhibit "G.") RESPONDENT negligently failed to inspect Lancaster's office and investigate his involvement with Lancorp Financial Group, LLC and Lancorp Financial Business Trust.

**V.   THE SEC HAS SANCTIONED RESPONDENT ONESCO FOR FAILING TO MAINTAIN AN ADEQUATE SUPERVISORY SYSTEM AND FOR FAILING TO REASONABLY SUPERVISE A REGISTERED REPRESENTATIVE WHO WAS SELLING AWAY**

22.    RESPONDENT ONESCO has already been sanctioned once by the SEC for the firm's failure to adopt procedures reasonably designed to protect and prevent selling away transactions by its registered representatives.  The SEC found that during the period between April 1994 and January 1995, an ONESCO representative, Michael D. Gibson, sold over $2.7 million in unregistered, fraudulent bonds issued by C'est Lestial Waters, Inc. ("CWI") to public investors. The SEC made the following finding concerning ONESCO'S deficient supervisory system and deficient supervisory practices:

> ONESCO failed reasonably to supervise Gibson with a view to preventing his violations of the federal securities laws. As part of its failure to supervise, ONESCO failed to establish procedures, and a system for applying such procedures, which would reasonably be expected to prevent and detect, insofar as practicable, such violations, in that:

1.    ONESCO failed to clearly and effectively communiate to its personnel the assignment of, and the method for carrying out, its responsibilities for supervising Gibson;

2.    ONESCO did not have in place adequate and effective procedures and systems for monitoring Gibson's outside business activities; and

3.    ONESCO failed to adequately respond to facts and circumstances of which it had notice concerning Gibson's conduct.

(See attached Exhibit "H.")

23.    The SEC censured ONESCO, imposed a monetary fine on ONESCO, and required ONESCO to adopt new supervisory procedures, including procedures for inspection of its off-site locations. ONESCO failed to comply with its undertakings to the SEC and failed to adopt new procedures designed to reasonably detect and prevent selling away activities by Lancaster and other off-site representatives.

## VI.    RESPONDENT ONESCO FAILS TO INVESTIGATE LANCASTER'S LACK OF PRODUCTION

24.    Lancaster did not generate **any** commission revenue while associated with RESPONDENT ONESCO.

| MONTH | COMMISSION PRODUCTION |
|---|---|
| March 2004 | 0 |
| April 2004 | 0 |
| May 2004 | 0 |
| June 2004 | 0 |
| July 2004 | 0 |

Page 11 of 167

| August 2004 | 0 |
|---|---|
| September 2004 | 0 |
| October 2004 | 0 |
| November 2004 | 0 |
| December 2004 | 0 |
| January 2005 | 0 |

25.    ONESCO failed to investigate how Lancaster was supporting himself in view of his lack of production, which in and of itself is a "red flag" of selling away activities. (See e.g., Consolidated Investment Services, Inc., SEC Release No. 34-36687 (1/5/96) ("CIS [the brokerage firm] assumed that McCormick's [the broker's] decline in production was due to the fact that he was going to focus his energies on this non-securities business venture . . . however, CIS knew little about McCormick's outside business venture and took no steps to find out about it or determine the reason for the decline.") See also SEC Staff Bulletin No. 17: Remote Office Supervision (Exhibit "B," p. 6.) ("A representative appearing to live more lavishly than his business income would allow might be a 'red flag' indicating pursuit of improper or outside business activities."); Kirkpatrick, Pettis, Smith, Polian, Inc., et al., Release No. 34-48748 (November 5, 2003) ("Firm hired the representative with . . . a history of financial insolvency and failed to increase the level of supervision of the representative's activities").

## VII.    RESPONDENT ONESCO IMPROPERLY ALLOWS LANCASTER TO PARK HIS SECURITIES LICENSE

26.    Prior to joining RESPONDENT ONESCO, Lancaster's last employment in the securities industry consisted of a 4-day stint at Quick & Reilly, Inc., which ended on December

19, 2002. (See attached Exhibit "I," p. 2.) If Lancaster had not found employment in 2004, he would have lost his securities licenses and would have had to retake his securities licensing examinations.

27.     The NASD has repeatedly advised brokerage firms that they are prohibited from allowing a registered representative to park his securities license with the firm in order to avoid the re-examination requirement applicable to persons who have not been registered for more than 2 years. The NASD has repeatedly sent out notices advising member firms that they are prohibited from sponsoring an application for registration where there is no intent to maintain the applicant's employment with the firm. (See attached Exhibit "J.") Stated simply, the NASD rules prohibit member firms from sponsoring or maintaining the registration of a registered representative who is not functioning as a representative.

28.     Lancaster generated no business for RESPONDENT ONESCO. RESPONDENT ONESCO knew from this absence of production that Lancaster was simply parking his securities licenses with the firm, and negligently allowed him to do so.

## VIII.  RESPONDENT ONESCO NEGLIGENTLY FAILS TO INVESTIGATE LANCASTER'S BACKGROUND, AND NEGLIGENTLY FAILS TO PLACE LANCASTER UNDER SPECIAL SUPERVISION

29.     Prior to joining RESPONDENT ONESCO, Lancaster was associated with several brokerage firms. One of these brokerage firms, Stephens, Inc., fired Lancaster for lack of production. (See Exhibit "I," p. 4.) Another broker-dealer, U.S. Bancorp Piper Jaffray Inc. terminated Lancaster because he was discharged from their affiliate, U.S. Bank, for failure to follow U.S. Bank's policies and procedures. (See Exhibit "I," p. 2.) Lancaster also disclosed

to the firm that he had been unemployed for six (6) months in the year prior to his association

with RESPONDENT, that he had been out of the securities industry for more than one year,

and that his last position in the securities industry lasted for only 4 days. (See Exhibit "I," p.

2 & 5.) These disclosures were supervisory red flags for RESPONDENT.

    30.    NASD Rule 3010(e), part of the NASD supervisory rule previously numbered

Article III, Section 27, provides that "[e]ach member shall have the responsibility and duty to

ascertain by investigation the good character, business repute, qualifications and experience

of any person prior to making such a certification in the application of such person for

registration with this association." In NASD Notice to Members 88-67, dated September 1988,

the NASD reminded ONESCO and all other brokerage firms that "member firms have an

obligation to thoroughly research a potential employee's background before hiring such

person," and that "the NASD has brought disciplinary actions against member firms who have

failed to properly research a potential employee's background prior to hiring such person."

(See attached Exhibit "K.")

    31.    RESPONDENT negligently failed to investigate Lancaster's background prior

to submitting his Form U-4 to the NASD, and falsely certified to the NASD on this Form that

the firm had conducted such an investigation.

    32.    RESPONDENT should have placed Lancaster under special supervision at the

time of his hiring, but negligently failed to do so. RESPONDENT negligently allowed

Lancaster to work in a remote office with no on-site supervision. RESPONDENT also

negligently allowed Lancaster to engage in an outside business from that off-site location.

## IX.  RESPONDENT ONESCO REPORTS INACCURATE INFORMATION TO THE NASD ON LANCASTER'S FORM U-5

33.     RESPONDENT ONESCO submitted a Form U-5 for Lancaster on January 3, 2005. (See attached Exhibit "L.")  RESPONDENT falsely listed Lancaster's employment address as 11020 King Street, Suite 325, in Overland Park, Kansas, when RESPONDENT knew full well that Lancaster was doing business from his home at 1382 Leigh Ct. in West Linn, Oregon. (See Exhibit "L," p. 1.) RESPONDENT also inaccurately represented that Lancaster was not the subject of an investigation, even though RESPONDENT knew that the State of Pennsylvania was investigating Lancaster.  (See Exhibit "L," p. 2.) (See Question #7A)

34.     Lancaster may have been an independent contractor with RESPONDENT. However, the NASD and the States of Oregon, Washington and California have made clear on numerous occasions that broker/dealers may not avoid their supervisory obligations by entering into independent contractor relationships with their agents.  In Notice to Members 86-65 (9/12/86), the NASD specifically noted that:

> Irrespective of an individual's location or compensation arrangements, **all associated persons are considered to be employees of the firm with which they are registered for purposes of compliance with NASD rules governing the conduct of registered persons and the supervisory responsibilities of the member.** The fact that an associated person conducts business at a separate location or is compensated as an independent contractor does not alter the obligations of the individual and the firm to comply fully with all applicable regulatory requirements.

(See Exhibit "A." pp. 1-2.)

35.     During all periods material hereto, RESPONDENT ONESCO was licensed and authorized to do business in the States of Oregon, California and Washington and did business

in Oregon, California and Washington through Gary L. Lancaster, a registered representative of ONESCO. ONESCO is a registered securities broker/dealer with the States of Oregon, California, and Washington and the Securities and Exchange Commission ("SEC") and is a member of the National Association of Securities Dealers, Inc. ("NASD").

36.    Lancaster, at all times relevant to the transactions alleged herein, was a registered representative, employee, and agent of RESPONDENT ONESCO. (See Exhibit "I.") At all times relevant hereto, Lancaster was the individual account executive responsible for the handling of transactions with CLAIMANTS at ONESCO and was acting within the scope of his position of employment and/or agency and/or apparent agency with ONESCO.

37.    Lancaster and ONESCO agreed and undertook to perform the duties of a securities broker, financial consultant, and brokerage firm relative to recommending and supervising the recommendation of transactions with CLAIMANTS.

38.    The acts committed by Lancaster and RESPONDENT ONESCO, as alleged herein, were done by the firm personally through the use of the mails or other instrumentalities of interstate commerce. The acts of RESPONDENT ONESCO and each employee, agent, and representative of RESPONDENT ONESCO are deemed to be the acts of and are chargeable to and binding upon RESPONDENT ONESCO under principles of agency law, licensing, controlling person and the doctrine of *respondeat superior.*

39.    RESPONDENT ONESCO, acting through Lancaster, recommended that CLAIMANTS invest in the following unregistered, fraudulent investment:

| CLAIMANT | DATE | INVESTMENT | AMOUNT |
|---|---|---|---|
| M. ROBERTSON | 7/06/04 | Lancorp Financial Fund Business Trust/Megafund Corporation | $50,000 |
| ADLERBERT | 5/24/04 | Lancorp Financial Fund Business Trust/Megafund Corporation | $60,000 |
| ADLERBERT | 5/09/05 | Lancorp Financial Fund Business Trust/Megafund Corporation | $40,000* |
| MARIA CUI | 4/08/04 | Lancorp Financial Fund Business Trust/Megafund Corporation | $25,000 |
| MARIA CUI | 4/08/04 | Lancorp Financial Fund Business Trust/Megafund Corporation | $7,000 |
| MARIA CUI | 4/22/05 | Lancorp Financial Fund Business Trust/Megafund Corporation | $1,241.96* |
| MARIA CUI | 9/06/05 | Lancorp Financial Fund Business Trust/Megafund Corporation | $200,000* |
| T. ROBERTSON | 12/15/04 | Lancorp Financial Fund Business Trust/Megafund Corporation | $75,000 |
| BAUMER | 5/11/05 | Lancorp Financial Fund Business Trust/Megafund Corporation | $200,000* |
| | | TOTAL: | $658,241.96 |

*Lancaster's license with RESPONDENT terminated on January 3, 2005. (See Exhibit "I.")  However, CLAIMANTS relied on the false and misleading representations concerning Lancorp that Lancaster made while he was associated with RESPONDENT ONESCO, and CLAIMANTS did not know that Lancaster had been terminated by RESPONDENT ONESCO.*

40.    RESPONDENT ONESCO, acting through Lancaster, made numerous false representations to CLAIMANTS concerning this Lancorp Financial Fund Business Trust (hereinafter referred to as "Lancorp") and Megafund Corporation (hereinafter referred to as "Megafund") (Lancorp Financial Fund Business Trust and Megafund Corporation are referred to collectively as "Lancorp/Megafund") investment, including:

    i.    Lancorp would invest in Forward Commitments issued by large financial institutions.  These Forward Commitments were described as debt securities rated A+ by Standard & Poor's Corporation or "A1" by Moody's Investors Service issued by financial institutions to help finance their loans. These financial institutions would also have long-term credit ratings of at least A+ by Standard & Poor's Corporation, A1 by Moody's Investors Service, or the equivalent rating of another recognized rating service.

    ii.    All securities purchased by Lancorp would have a liquidation value greater than the amount paid or such a securities liquidation value would be insured by AIG Insurance Company or another equivalently rated insurer at all times.

    iii.    The Lancorp investment was safe, insured, and had no sales charges.

41.    RESPONDENT ONESCO, acting through Lancaster, failed to disclose to CLAIMANTS that:

    i.    CLAIMANTS' monies were invested in Megafund, a Ponzi scheme. (See attached Exhibit "M.")

    ii.    Megafund offered a high yield investment trading program that did not exist. Most of the investor monies were misappropriated.

42.    RESPONDENT ONESCO, acting through Lancaster, failed to disclose to CLAIMANTS that:

    i.    This Lancorp/Megafund investment was not registered with the Securities and Exchange Commission in violation of Section 5 of the Securities Act of 1933. (See Exhibit "M.")

    ii.    This Lancorp/Megafund investment was not registered with the States of Oregon, California and Washington in violation of Oregon, California and Washington laws. (See attached Exhibit "N.")

43.    RESPONDENT ONESCO, acting through Lancaster, misrepresented and omitted to disclose numerous material facts to CLAIMANTS concerning the Lancorp/Megafund investment, its operations, the risks involved in this investment, and the use of funds obtained from the sale of the Lancorp/Megafund investment to CLAIMANTS and others. RESPONDENT failed to review the risks of this investment with CLAIMANTS. The Lancorp/Megafund investment constituted a "Ponzi scheme" pursuant to which the issuers used at least a portion of the proceeds received from the issuance of this investment to make so-called "interest" payments to earlier investors.

44.    In connection with the above offer of securities, RESPONDENT ONESCO, acting through Lancaster, failed to disclose the following material facts, among others, which were necessary to disclose in order to make the statements made, in light of the circumstances under which they were made, not misleading:

   a. The financial condition of the issuer.

   b. The potential risks of investing in the program.

   c. The use of investment proceeds.

   d. The nature of the association between the issuer and companies that rendered services to the issuer, including the insurer of the investment.

   e. The percentage of investments used for sales commissions and other offering expenses.

   f. The identity, background, experience and disciplinary history of the individuals associated with the issuer, including the issuer's officers and principals.

45.    RESPONDENT ONESCO, acting through Lancaster, failed to disclose to CLAIMANTS that RESPONDENT had not conducted a proper due diligence into this investment. RESPONDENT ONESCO allowed Lancaster to hold himself out as a licensed representative of RESPONDENT ONESCO and did not disclose to CLAIMANTS that the firm had not reviewed this investment and that the firm was not properly supervising Lancaster.

46.    It is well-settled that a brokerage firm which recommends a security has a duty to ensure that its representations have a reasonable basis:

> In summary, the standards . . . are strict. [A salesman] cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his recommendation, he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation. Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information.

Hanley v. SEC, 415 F.2d 589, 595-97 (2nd Cir. 1969) (emphasis added).[1]  In short, a

broker-dealer must not only "know the customer," but the broker-dealer must also know the

"security."  RESPONDENT ONESCO and Lancaster did not "know" Lancorp/Megafund

because they failed to conduct a reasonable investigation ("due diligence") into

Lancorp/Megafund before recommending this security to CLAIMANTS.

47.    NASD Rule 3010 requires that each member establish and maintain a system

to supervise the activities of each registered representative that is reasonably designed to

achieve compliance with applicable securities laws and regulations and with the rules of the

NASD. It must include written procedures that are established, maintained, and enforced.

ONESCO did not have an adequate system of supervision.  There was no system for on-site

or off-site supervisory review of representations, recommendations, and actions by their

registered representatives.  In actuality, ONESCO simply relied upon its off-site salesmen to

supervise themselves.

---

[1]    See also Mac Robbins & Co., 41 S.E.C. 116-119 (1962), Aff'd. Sub. Nom. Berko
v. S.E.C., 316 F.2d (2d Cir. 1963) ("The making of recommendations to prospective purchasers
without a reasonable basis, couched in terms of either opinion or fact, designed to induce
purchases, is contrary to the basis obligation of fair dealing borne by those who engage in the
sale of securities to the public."); Alexander Reid & Co., 40 S.E.C. 986-990 (1962) (A broker's
recommendation must be "responsibly made on the basis of actual knowledge and careful
consideration."); Securities Exchange Act Release No. 6721 (February 2, 1962) ("the making
of recommendations for the purchase of a security implies that the dealer has a reasonable
basis for such recommendations, which in turn, requires that, as a prerequisite, he shall have
made a reasonable investigation:); Rice. Recommendations by a Broker-Dealer; the
Requirement for a Reasonable Basis, 25 Mercer L.Rev. 537 (1974) (A broker that does not
have a reasonable basis for recommending a particular security cannot satisfy the suitability
rule, "since a broker-dealer would have difficulty contending that a recommendation was
suitable for a given customer when you lack adequate information about the security
involved.")

48.    ONESCO'S failure to establish and implement adequate supervisory procedures over Lancaster is inexcusable, particularly in view of the NASD's dissemination to ONESCO of NASD Notice to Members 86-65, dated September 12, 1986, which expressly warned NASD member firms that the NASD had observed a pattern of rule violations and other regulatory problems stemming from the employment of registered persons who engage in securities-related activities on a full and part-time basis at locations away from the offices of the member. The NASD pointed out that these off-site representatives, often classified for compensation purposes as independent contractors, are involved in other business enterprises such as insurance, real estate sales, accounting, or tax planning, and also frequently operate as separate business entities under names other than those of the members.    The NASD made the following observations concerning the regulatory responsibilities of member firms that are of particular relevance to this case:

> Irrespective of an individual's location or compensation arrangements, all associated persons are considered to be employees of the firm with which they are registered for purposes of compliance with NASD rules governing the conduct of registered persons and the supervisory responsibilities of the member.  The fact that an associated person conducts business at a separate location or is compensated as an independent contractor does not alter the obligations of the individual and the firm to comply fully with all applicable regulatory requirements.

> Firms employing off-site representatives are responsible for establishing and carrying out procedures that will subject these individuals to effective supervision designed to monitor their securities-related activities and to detect and prevent regulatory compliance problems.  This can include:

> 1.    Educating off-site personnel regarding their obligations as registered persons to the firm and to the public, including prohibited sales practices.

2.     Maintaining regular and frequent contact with such individuals.

3.     *Implementing appropriate supervisory practices, such as records inspections and compliance audits at the representatives' places of employment, to ensure that their methods of business and day-to-day operations comply with applicable rules and requirements. For greatest effectiveness in preventing and detecting violations, visits should be unannounced and include, for example, a review of on-site customer account documentation and other books and records, meetings with individual representatives to discuss the products they are selling and their sales methods, and an examination of correspondence and sales literature.*

Firms whose off-site personnel also engage in non-securities businesses should remind these individuals that correspondence pertaining to such businesses, unless submitted for review, may not include material related to securities transactions.

If a member has designated an individual responsible for reviewing the activities of other registered persons within the firm, the office of that individual must be inspected annually, regardless of whether such person is compensated as an employee or as an independent contractor.

The actions of an associated person in dealing with customers and customer account, regardless of whether he or she is compensated as an employee or an independent contractor, are actions on behalf of the firm. The firm is responsible for supervising in a manner designed to detect and prevent violations of Section 2 [the NASD suitability rule]. Members should take affirmative steps to ensure that off-site personnel understand and abide by NASD and firm policies regarding dealings with customers, customer account and customer funds.

(See Exhibit "A" attached hereto.) (Emphasis added.)

49.     NASD Notice to Members 86-65 expressly urged each member to duplicate the

Notice and distribute it individually to all associated persons, and indicated that the NASD,

in the course of its member examinations, would make inquiry to ascertain that this Notice had

been provided to all appropriate personnel. (See Exhibit "A.")

50.    Upon information and belief, ONESCO never gave a copy of NASD Notice to Members 86-65 to Lancaster and failed to properly educate Lancaster concerning his obligation as a registered person, including prohibited sales practices.

51.    NASD Notice to Members 86-65 indicates it is not the first admonition by the NASD on this subject. As early as 1982 the NASD circulated to all member firms an SEC Notice Concerning Independent Contractors dated June 18, 1982, which indicated that "to the extent that a firm forms a relationship with an independent contractor, that firm would be responsible for either (1) ensuring that the independent contractor was registered as a broker-dealer or (2) assuming the supervisory responsibilities attendant to a relationship with an associated person." The NASD noted that "it would be advisable if [this SEC Notice] were distributed to all registered and compliance personnel in your firm, including branch office personnel." The NASD further noted:

> Broker-dealers may not shift their obligation to control or supervise the activities of their independent contractor salespersons who are associated persons, and contractual terms that attempt to limit broker-dealer liability for the acts of such persons under the federal securities laws are of no effect. . . . [I]n this connection, we also believe that it is important to emphasize that a simple denial of "control" of an independent contractor by a broker-dealer would not remove its responsibility for supervising that person.

(See Exhibit "O" attached hereto.)

52.    RESPONDENT committed numerous violations of the NASD *Rules of Fair Practice* in handling the transactions with CLAIMANTS, including:

      A.    NASD Rules 2110, 2310, 2120, and 2330, by engaging in conduct inconsistent with high standards of commercial honor and just and equitable principles of trade, recommending unsuitable transactions, engaging in

> deceptive or other fraudulent devices or contrivances, making material misrepresentations, failing to make material disclosures, and guaranteeing CLAIMANTS against loss in connection with their investment; and

B.  NASD Rule 3010, by failing to establish and enforce a proper supervisory system over the activities of registered representatives that was reasonably designed to achieve compliance with applicable securities laws, rules, regulations, and statements of policy and procedure promulgated thereunder.

53.    RESPONDENT'S violations of NASD rules constitute negligence. As the Fifth Circuit observed in Miley v. Oppenheimer & Co., Inc., 637 F.2d 318, 333 (5th Cir. 1981), the "NYSE and NASD rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," and the lower court properly included a reference to these rules in its jury charge. See Mihara v. Dean Witter & Company, Inc., 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and NASD rules served to dignify those rules and regulations to some sort of standard. The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held."). See also Dean Witter Reynolds, Inc. v. Hammock, 489 So.2d 761, 767 (1986) ("Case law is clear that evidence of violation of industry standards is admissible as non-conclusive evidence of negligence."); St. Louis-San Francisco R.R. Co. v. White, 369 So.2d 1007 (Fla. 1st D.C.A. 1979); St. Louis-San Francisco R.R. Co. v. Burlison, 262 So.2d 280 (Fla. 1st D.C.A. 1972); Clements v. Boca Aviation, Inc., 444 So.2d 597 (Fla. 4th D.C.A. 1984); Nance v. Winn Dixie

Stores, Inc., 436 So.2d 1075 (Fla. 3rd D.C.A. 1983); Reese v. Seaboard Coastline R.R. Co., 360 So.2d 27 (Fla. 4th D.C.A. 1978).

54.    RESPONDENT also violated, among others, the following Oregon Administrative Rules, Chapter 441-205-130, Fair Dealing with Customers:

> A.    Guaranteeing a customer against loss in any securities account of such customer carried by the broker-dealer or in any securities transaction effected by the broker-dealer with or for such customer.

55.    RESPONDENT also violated, among others, Oregon Administrative Rules, Chapter 441-205-140, Suitability of Recommendations, which expressly prohibits any broker-dealer or associated person from:

> Recommend[ing] to a customer the purchase, sale, or exchange of any security, unless such broker/dealer or associated person shall have reasonable grounds to believe that the recommendation is suitable for such customer on the basis of information furnished by such customer after reasonable inquiry concerning the customer's investment objectives, financial situation and needs and any other information known by such broker/dealer or associated person.

56.    RESPONDENT also violated the following rules, among others, of the California Department of Corporations:

> **Rule 260.218. Just and Equitable Principles of Trade.** Each broker-dealer and each agent employed by such broker-dealer shall observe high standards of commercial honor and just and equitable principles of trade in the conduct of such person's business.

> **Rule 260.218.2. Suitability of Recommendations.** Any broker-dealer and any agent employed by such a broker-dealer who recommends to a customer the purchase, sale or exchange of any security shall have reasonable grounds to believe that the recommendation is not unsuitable for such customer on the basis of information furnished by such customer after reasonable

inquiry concerning the customer's investment objectives, financial situation and needs, and any other information known by such broker-dealer or agent.

**Rule 260.218.4. Supervision of Agents.**

57.    RESPONDENTS also violated the following rules, among others, the Washington Administrative Code ("WAC"):

**WAC Rule 460-20A-008. Fraudulent Practices of Broker-Dealers and Sales Agents.**

(2)    Contradicting or negating the importance of any information contained in a prospectus or other offering materials with intent to deceive or mislead or using any advertising or sales presentation in a deceptive or misleading manner.

(7)    Effecting any transaction in or inducing the purchase or sale of any security by means of any manipulative, deceptive, or other fraudulent device or contrivance . . . .

**WAC Rule 460-20A-420. Dishonest or Unethical Business Practices -- Brokers-Dealers.**

(2)    Inducing trading in a customer's account which is excessive in size or frequency in view of the financial resources and character of the account;

(3)    Recommending to a customer the purchase, sale or exchange of any security without reasonable grounds to believe that such transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other relevant information known by the broker-dealer;

(24)    Failing to comply with any applicable provision of the Rules of Fair Practice of the National Association of Securities Dealers or any applicable fair practice or ethical standard promulgated by the Securities and Exchange Commission or by a self-regulatory organization approved by the Securities and Exchange Commission.

**WAC Rule 460-20A-425. Dishonest or Unethical Business Practices - Sales Persons.**

(6)     Inducing trading in a customer's account which is excessive in size or frequency in view of the financial resources and character of the account;

(7)     Recommending to a customer the purchase, sale or exchange of any security without reasonable grounds to believe that such transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other relevant information known by the broker-dealer;

(19)    Failing to comply with any applicable provision of the Rules of Fair Practice of the National Association of Securities Dealers or any applicable fair practice or ethical standard promulgated by the Securities and Exchange Commission or by a self-regulatory organization approved by the Securities and Exchange Commission.

58.     RESPONDENT'S violations of the Oregon and Washington Administrative Rules and the Rules of the California Department of Corporations constitute negligence *per se* because these rules were enacted for the protection of investors such as CLAIMANTS. Palmer v. Shearson Lehman Hutton, Inc., 622 So.2d 1085 (Fla. 1st DCA 1993); Twiss v. Kury, 25 F.3d 1551 (11th Cir. 1994).

59.     Further, the contracts between RESPONDENT ONESCO and CLAIMANTS include not only securities industry rules and regulations, but also the internal rules and regulations established to govern the conduct of ONESCO'S own employees (Lancaster), such as the internal supervisory procedures and compliance manuals. (See, e.g., Miller v. Smith Barney, Fed. Sec. L. Rpts. CCH ¶ 92,498 (1986) at 93,031.) For example, in Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981), the Sixth Circuit rejected Prudential-

Bache Securities Inc.'s argument that the District Court should not have relied on Bache's internal rules, as codified in its Standard Practice Instructions Manual, as evidence of the proper standard of care:

> When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the defendant to establish the correct standard of care. The content of such rules may also indicate knowledge of the risks involved and the precautions that may be necessary to prevent the risks. Montgomery v. Balt. & Ohio R.R., 22 F.2d 359 (6th Cir. 1927). See also Prosser, The Law of Torts § 33 (4th Ed. 1971). The District Court correctly measured Bache's conduct by the standard of prudence it has established for its own employees.

Id. at 820.

60.    RESPONDENT violated numerous of its own policies in connection with its Lancorp/Megafund recommendations to CLAIMANTS.

61.    The acts committed by RESPONDENT ONESCO and its employees, agents, and representatives, as alleged herein, were done by them personally through the use of the mails or other instrumentality of interstate commerce. The acts of RESPONDENT ONESCO and its employees, agents, or representatives as alleged herein are deemed to be the acts of and are chargeable to and binding upon ONESCO.

62.    It cannot be contested that Lancaster violated federal and state securities registration and disclosure laws in recommending and selling this Lancorp/Megafund investment to CLAIMANTS. RESPONDENT ONESCO is liable for these transactions even if RESPONDENT ONESCO properly supervised Lancaster, even if RESPONDENT was not aware of these recommendations by its stockbroker, even if RESPONDENT ONESCO did not approve of these recommendations by the firm's stockbroker, and even if CLAIMANTS'

Lancorp/Megafund transactions were not processed through RESPONDENT ONESCO. The

Fifth Circuit Court of Appeals had the following to say on this precise issue in the case of

Lewis v. Walston & Co. 487 F.2d 617, 623-24 (5th Cir. 1973):

> Walston argues that [the broker] was acting beyond the scope of her
> employment. For example, Walston did not deal in unregistered securities.
> Moreover, [the broker] and the brokerage house did not perform their usual
> role as brokers; that is, the transaction did not involve the broker's placing an
> order through the house's New York office, which was then executed by the
> central office. In this regard, they note that Walston never stood to receive, and
> never did receive, any commission or other financial benefit from the direct and
> essentially private exchange [the broker] arranged. . . . Id. at 623-24.

> None of these superficially supportive bases for Walston's argument precludes
> the conclusion that [the broker's] actions were within the scope of her
> employment. That Walston did not deal in unregistered securities addresses
> only the question whether [the broker's] conduct was authorized; . . . however,
> **conduct may be within the scope of employment even if it is unauthorized, if it
> is sufficiently similar to authorized conduct.** That the transactions did not
> involve the execution of an order through the brokerage house also does not
> necessarily mean that [the broker's] acts were without the scope of her
> employment. Brokers may and do take many actions in the course of their
> dealings with customers that do not relate directly to transactions executed
> through the brokerage house; these actions are not for that reason necessarily
> beyond the scope of the broker's employment. That Walston did not receive any
> financial benefit from the transaction is not of controlling importance. **If a
> particular act is authorized, or sufficiently similar to an authorized act, finding
> that act to be within the scope of employment does not require that the act has
> conferred any particular benefit, financial or otherwise, on the employer. Id.
> at 624.**

63.    Likewise, the Sixth Circuit Court of Appeals opined in the case of Holloway v.

Howerdd, 536 F.2d 690, 695-96 (6th Cir. 1976):

> [TSI, the broker-dealer, contends] "that it had no knowledge of nor reasonable
> grounds to believe in the existence of [the broker's] activity in publicly selling
> unregistered stock." Id. at 695.

Page 30 of 167

However, those persons who knew of [the broker's] status with TSI and who were without knowledge that he was acting separately from TSI were [correctly] permitted to recover.

**The liability of TSI is premised on the theory that "if one appoints an agent to conduct a series of transactions over a period of time, it is fair that he should bear losses which are incurred when such an agent, although without authority to do so, does something which is usually done in connection with the transactions he is employed to conduct."**

There was no proof that TSI "usually" engaged in the sale of unregistered stock.

**TSI, however, had an affirmative obligation to prevent use of the prestige of its firm to defraud the investing public.** When its agents are dealing individually in the sale of securities TSI must be clearly disassociated from those transactions, as otherwise it will incur liability on the basis of *respondeat superior* for the fraudulent representations of its agents.

**[T]he District Judge correctly . . . held TSI liable to those plaintiffs who were without knowledge of limitations on the agent's authority. Id. at 696.[2]**

64.    RESPONDENT ONESCO is directly liable because it participated in, aided, and/or supervised the transactions heretofore mentioned. RESPONDENT ONESCO is also liable under the doctrines of *respondeat superior*, licensing, controlling person, and agency principles for the negligent actions and breaches of duty by Lancaster while in the scope of his employment/apparent authority with ONESCO.

65.    CLAIMANTS have been greatly damaged as a result of RESPONDENT'S misconduct. Instead of receiving safety and income, CLAIMANTS were saddled with an unregistered and fraudulent investment. CLAIMANTS seek the recovery of damages in the

---

[2]    Henricksen v. Henricksen and Smith Barney, 640 F.2d 880, 887 (7th Cir. 1980) ("Under common law principles, a principal is liable for the deceit of its agent committed in the very business he was appointed to carry out. This is true even though the latter's specific conduct was carried on without knowledge of the principal.")

amount of at least $658,241.96, not including benefit of the bargain damages, lost opportunity

costs, model portfolio damages, and prejudgment interest from RESPONDENT. See Nordyne

v. Florida Mobile Home Supply, 625 So. 2d 1283 (Fla. 1st DCA 1993) (wherein the Florida

Court of Appeals held that "evidence of profits that [the victim] would have realized in the

ensuing . . . years was relevant because it tended to prove the position that the [victim] would

have been in but for [the] wrongful acts."

66.     It is also well-settled that pre-judgment interest is an automatic element of

damages which is mathematically computed as of the date of the wrongdoing (purchase).

Argonaut Insurance Co. v. May Plumbing Co., 474 So. 2d 212 (Fla. 1985), wherein the court

stated that:

> **Plaintiff is to be made whole from the date of the loss once a finder of fact has
> determined the amount of damages and defendant's liability therefor. . . .**
> Computation of prejudgment interest is merely a mathematical computation.
> There is no 'finding of fact' needed. Thus it is a purely ministerial duty of the
> trial judge or clerk of the court to add the appropriate amount of interest to the
> principal amount of the damages awarded in the verdict. . . . **Furthermore, just
> as the loss theory forecloses discretion in the award of prejudgment interest,
> there is no discretion in the rate of that interest. The legislature has
> established a statutory interest rate [12%] which controls prejudgment
> interest. §687.01, Fla. Stat.** Id. at 214-215.

See also Wickham Contracting v. Local Union No. 3, 955 F.2d 831, 836 (2d Cir. 1992).

67.     RESPONDENT'S failure to conduct a proper due diligence, misrepresentations,

omissions and unsuitable recommendations to CLAIMANTS were egregious, as were

RESPONDENT ONESCO'S supervisory omissions. These acts by RESPONDENT ONESCO

and its agents constitute independent torts for which CLAIMANTS seek recovery. In addition,

these acts were done with wanton, reckless disregard of the rights and property of

CLAIMANTS and CLAIMANTS are also entitled to punitive damages in an amount to be determined by the arbitration panel.

68. Upon information and belief, dozens of RESPONDENT ONESCO'S stockbrokers, including Lancaster, have improperly engaged in private securities transactions, commonly referred to in the industry as "selling away," in recent years. RESPONDENT ONESCO failed to disclose this fact to CLAIMANTS, failed to notify CLAIMANTS that its supervisory practices were inadequate, and failed to caution CLAIMANTS against engaging in any transactions with Lancaster that were not approved in writing by RESPONDENT ONESCO.

69. Punitive damages are further warranted due to RESPONDENT'S *fraudulent concealment* of its misconduct, which constitutes an independent tort for which CLAIMANTS seek recovery. Lancaster continuously assured CLAIMANTS that this Lancorp/Megafund security was a safe investment and that their principal was not in danger. RESPONDENT failed to disclose the inaccurate and incomplete nature of Lancaster's representations, failed to conduct proper due diligence, and failed to disclose that this security was unregistered and a fraud.

70. RESPONDENT'S failure to disclose the inaccurate and incomplete nature of Lancaster's representations, its lack of due diligence, and the fact that the security issued by Lancorp/Megafund was unregistered and fraudulent, not only warrants punitive damages but tolls all statute of limitations periods in view of RESPONDENT'S fiduciary relationship with CLAIMANTS and constitute independent torts for which CLAIMANTS seek recovery. The

Southern District of Florida made the following statement on the issue of fraudulent concealment in a fiduciary relationship:

> ... [T]he law of fraud 'does not require that an aggrieved party have proceeded from the outset as though he were dealing with thieves.' First Federal Savings & Loan Assoc. v. Dade Federal Savings & Loan Assoc., 403 So.2d 1097, 1100 (5th DCA 1981).

> The existence of a fiduciary relationship between the Plaintiff and the Defendant, and silence on the part of the Defendant when there is a duty to disclose facts, can constitute a fraudulent withholding of facts. Less than full disclosure on the part of a Defendant in a fiduciary relationship lawsuit, can be sufficient to establish fraudulent concealment.

**Wilder v. Meyer, 779 F. Supp. 164, 168-69 (S.D. Fla. 1991). In short, where a fiduciary relationship exists, acts of omission (failure to disclose material facts) can constitute fraudulent concealment.**

71.    This can also be seen in Vucinich v. PaineWebber Jackson & Curtis, Inc. et al, 803 F.2d 454 (9th Cir. 1986), where the court held that the fiduciary relationship that exists between a broker and his customer imposes upon the broker the duty to monitor the customer's account and affirmatively advise the client as to any changed circumstances. The Court found that the broker's representations regarding monitoring of a customer's account tolled the running of the statute of limitations [e.g., the prescription period] until such time as the broker fulfilled his obligation to advise the customer regarding matters relevant to possible misrepresentations. (Citing Twomey v. Mitchum, Jones, & Templeton, Inc., 262 Cal. App. 2d 690 727-729, 69 Cal. Rptr. 222 (1968). Further, the fraudulent concealment cannot be mitigated by the mere forwarding of a prospectus containing information that contradicts material representations made orally to investors. Luksch et al. v. Latham, 675 F. Supp. 1168

(N.D. Cal. 1987). See also In Re Robert A. Foster, Sec. Ex. Rel. No. 34408 (July 20, 1994)("broker/dealers and their registered representatives 'owe a special duty of fair dealing to their clients.' The making of misrepresentations runs directly contrary to those fiduciary duties" and can render a broker/dealer liable in private actions "even where the investor has access to a prospectus providing full disclosure").

72.    Both the Florida courts and the Eleventh Circuit have made clear that a broker owes a fiduciary duty to a customer. In Gochnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042 (11th Cir. 1987), the Eleventh Circuit made clear that a broker's fiduciary duty included "a duty to only recommend stocks which he has sufficiently investigated," "a duty to inform its customer of the risks involved in purchasing or selling particular securities," "a duty to refrain from self-dealing or refusing to disclose any personal interest in any particular transaction," and "a duty not to misrepresent any material fact." See also Thompson v. Smith Barney, Harris Upham & Co., Inc., 709 F.2d 1413, 1418 (11th Cir. 1983) ("The law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor.")

73.    Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients. See Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979) (a securities broker dealer is a fiduciary who owes its customer a high degree of care in transacting business); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2nd Cir. 1978) (registered representative, as broker for investor, owed investor a fiduciary duty); Moholt v. Dean Witter Reynolds, Inc., 478 F.Supp. 451 (D.D.C. 1979) (stockbrokers are in a position of quasi-fiduciaries and are held to high degree of trustworthiness and fair dealing); Pachter v.

Merrill Lynch, Pierce, Fenner & Smith, Inc., 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker, under Florida law, stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); Jaksich v. Thomson McKinnon Securities, Inc., 582 F.Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); Utah State University of Agriculture and Applied Science v. Sutro & Co., 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trustee dealing with public funds); E.F. Hutton & Co. v. Weeks, 166 Ga.App. 443, 304 S.E.2d 420 (1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith).

74.    All limitations periods are tolled under the legal doctrines of accrual, continuous treatment, continuous representation, and continuing wrong.[3] See, e.g., Keller v. Reed, 603 So.2d 717, 719 (Fla. 2d DCA 1992) (accrual); Hall v. Steiner, 543 N.Y.S.2d 190 (N.Y. App. Div. 1989) (continuous treatment); Wilder v. Meyer, 779 F.Supp. 164 (S.D. Fla. 1991)

---

[3]    Statutes of limitation of course only apply in civil actions, not arbitration proceedings.

(continuous representation); and <u>Newport Largo, Inc. v. Monroe County</u>, 706 F.Supp. 1507 (S.D. Fla. 1988) (continuing wrong). Further, all limitations periods are tolled under the doctrine of "blameless ignorance" or "*contra non valentum agere nulla currit prescription.*" This doctrine stops the running of the limitations period when the cause of action is not known or reasonably knowable by CLAIMANTS even if their ignorance was not induced by RESPONDENT. Stated simply, CLAIMANTS did not comprehend that they had been sold an unregistered and fraudulent investment and that their legal rights had thus been violated.

75.    In <u>Miley v. Oppenheimer & Co., Inc.</u>, 637 F.2d 318, 332 (5th Cir. 1981), the Fifth Circuit cited the following passage from Goldberg's book entitled *Fraudulent-Dealer Practices* in support of awarding punitive damages that is very appropriate in this case:

> Most courts in the past have seen fit, when they find the broker-dealer's hand in the till, to simply request the removal of the offending appendage. And when the till is empty, and the broker-dealer's fingerprints are all that remain where the money once lay, all the courts do is to require the crook to replace the booty. If ever there was a situation where crime pays it is in such circumstances; heads the dishonest broker-dealer wins and tails everyone breaks even. No wonder one commentator saw fit to term the average recovery in trading cases as creating for the broker-dealer a "low risk larceny."

> . . . [T]he only sure way of deterring such conduct in the future is to take the profit away from the wrongdoers and slap on an additional amount as punitive damages: an award equal to treble damages would be fair, reasonable, and well within the public interest.

76.    CLAIMANTS have suffered mental anguish, emotional distress, humiliation and inconvenience from the loss of use of their property. CLAIMANTS seek recovery for these non-economic injuries.

## COUNT I

## VIOLATIONS OF FEDERAL SECURITIES LAWS

77.     CLAIMANTS reallege, reaffirm and reincorporate paragraphs 1 through 76 above, as if fully contained herein.

78.     The investment sold to CLAIMANTS and described in paragraphs 1 through 77 above was a security as defined in Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10).

79.     Under Section 15 of the Securities Act, 15 U.S.C. § 77o, and Section 20 of the Securities Exchange Act, 15 U.S.C. § 78t, RESPONDENT was a controlling person over the conduct described in paragraphs 1 through 78 above.

A.     **Offer and Sale of Unregistered Securities**

80.     RESPONDENT, by engaging in the conduct described in paragraphs 1 though 79 above, directly, indirectly, or through persons that it controlled, through use of the means or instruments of transportation or communication in interstate commerce or of the mails, offered to sell or sold securities, or, directly or indirectly, carried or caused such securities to be carried through the mails or in interstate commerce for the purpose of sale or delivery after sale.

81.     No registration statement was filed with the Securities and Exchange Commission or was in effect with respect to the security offered by Lancorp/Megafund during its offering of the security sold to CLAIMANTS.

82.    By reason of the foregoing, RESPONDENT directly, indirectly, or through persons it controlled, violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and is subject to liability under Sections 12(1) and 15 of the Securities Act, 15 U.S.C. §§ 77l(1), 77o.

**B.    Fraud in Offer or Sale of Securities**

83.    RESPONDENT, by engaging in the conduct described in paragraphs 1 through 82 above, directly, indirectly, or through persons it controlled, offered to sell or sold securities, by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, and by means of a prospectus or oral communication which included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

84.    By reason of the foregoing, RESPONDENT directly, indirectly, or through persons it controlled, violated and is subject to liability under Sections 12(2) and 15 of the Securities Act, 15 U.S.C. §§ 77l(2), 77o.

**C.    Fraud in Connection With the Purchase or Sale of Securities**

85.    RESPONDENT, by engaging in the conduct described in paragraphs 1 through 84 above, directly, indirectly, or through persons it controlled, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with *scienter*:

a.    Employed devices, schemes, or artifices to defraud;

    b.    Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.    Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

86.    By reason of the foregoing, RESPONDENT directly, indirectly, or through persons it controlled, violated and is subject to liability under Sections 10(b) and 20 of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**WHEREFORE, CLAIMANTS** request this panel to enter an award for actual damages and rescission together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, attorneys' fees, costs, non-economic damages, punitive damages, and such other relief as is deemed proper and necessary.

## COUNT II

### VIOLATION OF OREGON SECURITIES ACT

87.    CLAIMANTS reallege, reaffirm and reincorporate paragraphs 1 through 86 above, as if fully contained herein.

### A.    Failure to Register Lancorp/Megafund in Oregon

88.    Section 59.055 of the Oregon Securities Act states that it is unlawful to offer or sell any security in Oregon unless the security is registered under the Act.

89.    Section 59.115 of the Oregon Securities Act states that every sale made in violation of Section 59.055 may be rescinded at the election of the purchaser. Pursuant to such

rescission, the purchaser is entitled to recover the consideration paid for the security, plus interest at the legal rate from the date of purchase.

90.    Given the lack of registration of Lancorp/Megafund in Oregon, CLAIMANTS are entitled to rescission of their investment as well as legal interest and attorney's fees.

**B.    Unsuitable Recommendations, Misrepresentations, Omission of Material Fact, and Guarantee Against Loss**

91.    Section 59.115 also states that a purchaser is entitled to rescission, along with legal interest and attorney's fees, from a brokerage firm that offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

92.    RESPONDENT ONESCO, acting through Lancaster, made numerous false and misleading statements to CLAIMANTS concerning Lancorp/Megafund and failed to disclose numerous material facts to CLAIMANTS concerning Lancorp/Megafund, all as more fully stated above. CLAIMANTS accordingly are entitled to rescission of their Lancorp/Megafund transactions pursuant to Section 59.115 of the Oregon Securities Act.

93.    RESPONDENT ONESCO is liable under the doctrine of *respondeat superior* for Lancaster's violations of the Oregon Securities Act. In addition, ONESCO is liable under the Oregon Securities Act, Section 59.115(3), as the controlling person over Lancaster's activities. Oregon has adopted the Uniform Blue Sky Act which makes not only the perpetrator liable but also every broker/dealer or agent who directly or indirectly controls a person whose

activities constitute violations of the Act. That is to say, if a claimant can show that the statute was violated, the victim is automatically entitled to the mandated recovery.

**WHEREFORE,** CLAIMANTS pray for compensatory and rescissionary damages under the Oregon Securities Act, interest at the legal rate, reasonable attorney's fees under the Federal Arbitration Act, and punitive damages.

## COUNT III

## <u>VIOLATIONS OF CALIFORNIA SECURITIES LAWS</u>

### *[asserted by all CLAIMANTS except M. ROBERTSON]*

94.    CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 93 above, as if fully contained herein.

95.    The investments sold to CLAIMANTS and described above were securities as defined in Cal. Corp. Code § 25019.

96.    RESPONDENT, acting through its employee and agent Lancaster, violated Cal. Corp. Code § 25110, by offering or selling securities in this state which were not qualified for sale under Cal. Corp. Code §§ 25111, 25112, or 25113. By violating Cal. Corp. Code § 25110, RESPONDENT, acting through its employee and agent Lancaster, is liable to the CLAIMANTS who purchased these securities.

97.    RESPONDENT, acting through its employee and agent Lancaster, violated Cal. Corp. Code § 25401 by unlawfully offering or selling securities in this state by means of written and oral communications which included untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading. The CLAIMANTS were unaware of these untruths and omissions. RESPONDENT, acting through its employee and agent Lancaster, knew or should have known, if it had exercised reasonable care, of the untruths or omissions. By violating Cal. Corp. Code § 25401, RESPONDENT, acting through its employee and agent Lancaster, is liable to the CLAIMANTS who purchased these securities. Cal. Corp. Code § 25501.

98.     RESPONDENT'S and Lancaster's unsuitable and illegal recommendations to purchase fraudulent, unqualified securities constituted a manipulative, deceptive, or other fraudulent scheme, device, or contrivance and violated Cal. Corp. Code § 25216 and Cal. Code Reg. tit. 10 §§ 260.216 (fraud and misrepresentations), 260.218 (just and equitable principles of trade), and 260.218.2 (suitability of recommendations).

99.     As a broker-dealer, RESPONDENT was a controlling person over the activities of its registered agent, Lancaster. RESPONDENT materially aided and assisted in Lancaster's sales to the CLAIMANTS by providing Lancaster with credibility and the authority to represent that he was a securities agent of RESPONDENT, an established brokerage firm and well-known name in the investment field. RESPONDENT knew about the sales to the CLAIMANTS, and it had reasonable grounds to believe that these sales were occurring. RESPONDENT violated Cal. Corp. Code § 25212(g) and Cal. Code Reg. tit. 10 § 260.218.4 by not having a reasonable system of supervision designed to detect and prevent Lancaster's sales, and by failing effectively to enforce the minimal supervisory procedures that it did have. Because Lancaster's sales to the CLAIMANTS violated Cal. Corp. Code §§ 25501 and 25503,

RESPONDENT became liable to the CLAIMANTS under Cal. Corp. Code § 25504 as a controlling person and as a broker-dealer who materially aided and assisted these transactions.

**WHEREFORE,** the CLAIMANTS pray for relief as hereinafter set forth.

## COUNT IV

### UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES

*[asserted by all CLAIMANTS except M. ROBERTSON]*

99.    CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 98 above, as if fully contained herein.

100.    CLAIMANTS bring this action for relief on behalf of themselves and the general public.

101.    RESPONDENT, acting through its employee and agent Lancaster, committed numerous unlawful, unfair, and fraudulent business acts or practices, and these acts or practices constituted unfair competition as defined in Cal. Bus. & Prof. Code § 17200. RESPONDENT'S unlawful, unfair, or fraudulent business acts or practices gave it an unfair competitive advantage over businesses that did not commit these acts or practices.

102.    On behalf of themselves and the general public, CLAIMANTS seek an injunction against RESPONDENT to prevent it from engaging in these unlawful, unfair, and fraudulent business acts or practices in the future. On behalf of themselves and of other members of the general public who have been harmed by RESPONDENT'S unlawful, unfair, or fraudulent business acts or practices, CLAIMANTS also seek equitable relief, including but

not limited to restitution and rescission, as may be necessary to restore to them any money or property lost as a result of this unfair competition. Cal. Bus. & Prof. Code § 17203.

**WHEREFORE,** the CLAIMANTS pray for relief as hereinafter set forth.

## COUNT V

## VIOLATION OF WASHINGTON SECURITIES ACT

### *[asserted by CLAIMANT ROBERTSON only]*

103.    CLAIMANT realleges, reaffirms and reincorporates paragraphs 1 through 102 above, as if fully contained herein.

**A.    Failure to Register Lancorp/Megafund in Washington**

104.    Section 21.20.140 of the Washington Securities Act states that it is unlawful to offer or sell any securities in Washington unless the security is registered under the Act.

105.    Section 21.20.140 and Section 21.20.430 of the Washington Securities Act state that every sale made in violation of Section 21.20.140 may be rescinded at the election of the purchaser. Pursuant to such rescission, the purchaser is entitled to recover the consideration paid for the securities, plus interest at the legal rate of 8% from the date of purchase, costs, as well as a reasonable attorney's fees.

106.    Given the lack of registration of Lancorp/Megafund in Washington, CLAIMANT is entitled to rescission of his investment as well as legal interest and attorney's fees.

**B.    Unsuitable Recommendations, Misrepresentations, Omission of Material Fact, and Guarantee Against Loss**

107.    Sections 21.20.430 and 21.20.010 also state that a purchaser is entitled to rescission, along with interest at the legal rate of 8%, costs and attorney's fees, from a brokerage firm that offers or sells securities by means of (1) any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, (2) any device, scheme, or artifice to defraud and/or (3) any act or practice, or course of business which operates or would operate as a fraud or deceit upon any person.

108.    RESPONDENT ONESCO, acting through Lancaster, made numerous false and misleading statements to CLAIMANT concerning Lancorp/Megafund and failed to disclose numerous material facts to CLAIMANT concerning Lancorp/Megafund, all as more fully stated above. CLAIMANT accordingly is entitled to rescission of his Lancorp/Megafund transaction pursuant to Section 21.20.430 of the Washington Securities Act.

109.    RESPONDENT ONESCO is liable under the doctrine of *respondeat superior* for Lancaster's violations of the Washington Securities Act.  In addition, RESPONDENT ONESCO is liable under the Washington Securities Act, Section 21.20.430(3), as the controlling person over Lancaster's activities. Washington has adopted the Uniform Blue Sky Act which makes not only the perpetrator liable but also every broker/dealer or agent who directly or indirectly controls a person whose activities constitute violations of the Act.  That is to say, if a claimant can show that the statute was violated, the victim is automatically entitled

Page 46 of 167

to the mandated recovery. RESPONDENT ONESCO is also liable because the firm materially aided in the transaction.

**WHEREFORE,** CLAIMANT prays for compensatory and rescissionary damages under the Washington Securities Act, interest at the legal rate, reasonable attorney's fees under the Washington Securities Act, and punitive damages.

COUNT VI

**VIOLATION OF WASHINGTON'S CONSUMER PROTECTION ACT**

*[asserted by CLAIMANT ROBERTSON only]*

110.    CLAIMANT realleges, reaffirms, and reincorporates paragraphs 1 through 109 above as if fully contained herein.

111.    RESPONDENT ONESCO violated the Washington Consumer Protection Act (Wash. Rev. Code §§ 19.86.010 - 19.86.920) because it engaged in unfair or deceptive acts or practices in the conduct of its securities business.

112.    ONESCO committed unfair or deceptive acts and practices (i) by making material misrepresentations and omissions in connection with the sale of securities through the actions of its agent, Lancaster, (ii) by selling unregistered securities in violation of state and federal securities laws through the actions of its agent Lancaster, and (iii) by failing to detect and prevent securities laws violations by its registered representatives, including Lancaster.

113.    The deceptive or unfair acts or practices conducted by ONESCO occurred in trade or commerce.

Page 47 of 167

114.    The deceptive or unfair acts or practices conducted by ONESCO have a real and substantial potential for repetition.

115.    The deceptive or unfair acts or practices conducted by ONESCO have a likelihood of affecting a substantial number of investing consumers.

116.    CLAIMANT has suffered losses as the result of ONESCO'S deceptive or unfair acts or practices.

117.    Pursuant to Wash. Rev. Code § 19.86.090, CLAIMANT is entitled to an award of damages, attorneys' fees, and costs.

**WHEREFORE**, CLAIMANT respectfully requests that this Panel enter an award for damages and reasonable attorneys' fees for CLAIMANT'S pecuniary and non-economic losses, as well as pre-judgment interest, and such other relief as is deemed appropriate and just.

## COUNT VII

## BREACH OF CONTRACT

118.    CLAIMANTS reallege, reaffirm and reincorporate paragraphs 1 through 117 above as if fully contained herein.

119.    The contractual relationships which were entered into between CLAIMANTS and ONESCO incorporate by reference a brokerage house's duty to comply with all laws, rules, and regulations governing the transactions between RESPONDENT and CLAIMANTS. It must be emphasized that RESPONDENT fraudulently induced CLAIMANTS to enter into this contractual relationship by, among other things, the false representations and non-

disclosures of material facts by Lancaster that are itemized in this First Amended Statement

of Claim.

120.    RESPONDENT violated, among others, the following rules of the NASD *Rules*

*of Fair Practice* in handling the transactions with CLAIMANTS, including:

A.    NASD Rules 2110, 2310, 2120, and 2330, by engaging in conduct inconsistent with high standards of commercial honor and just and equitable principles of trade, recommending unsuitable transactions, engaging in deceptive or other fraudulent devices or contrivances, making material misrepresentations, failing to make material disclosures, and guaranteeing CLAIMANTS against loss in connection with their investments; and

B.    NASD Rule 3010, by failing to establish and enforce a proper supervisory system over the activities of registered representatives that was reasonably designed to achieve compliance with applicable securities laws, rules, regulations, and statements of policy and procedure promulgated thereunder.

121.    RESPONDENT also violated, among others, the following Oregon

Administrative Rules, Chapter 441-205-130, Fair Dealing with Customers:

A.    Guaranteeing a customer against lost in any securities account of such customer carried by the broker-dealer or in any securities transaction effected by the broker-dealer with or for such customer.

122.    RESPONDENT also violated, among others, Oregon Administrative Rules,

Chapter 441-205-140, Suitability of Recommendations, which expressly prohibits any broker-

dealer or associated person from:

Recommend[ing] to a customer the purchase, sale, or exchange of any security, unless such broker/dealer or associated person shall have reasonable grounds to believe that the recommendation is suitable for such customer on the basis of

information furnished by such customer after reasonable inquiry concerning the customer's investment objectives, financial situation and needs and any other information known by such broker/dealer or associated person.

123.    RESPONDENT also violated the following rules, among others, of the

California Department of Corporations:

**Rule 260.218.  Just and Equitable Principles of Trade.**  Each broker-dealer and each agent employed by such broker-dealer shall observe high standards of commercial honor and just and equitable principles of trade in the conduct of such person's business.

**Rule 260.218.2.  Suitability of Recommendations.**  Any broker-dealer and any agent employed by such a broker-dealer who recommends to a customer the purchase, sale or exchange of any security shall have reasonable grounds to believe that the recommendation is not unsuitable for such customer on the basis of information furnished by such customer after reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other information known by such broker-dealer or agent.

**Rule 260.218.4.  Supervision of Agents.**

124.    RESPONDENTS also violated, among others, the following rules of the

Washington Administrative Code ("WAC"):

**WAC Rule 460-20A-008.  Fraudulent Practices of Broker-Dealers and Sales Agents.**

(2)    Contradicting or negating the importance of any information contained in a prospectus or other offering materials with intent to deceive or mislead or using any advertising or sales presentation in a deceptive or misleading manner.

(7)    Effecting any transaction in or inducing the purchase or sale of any security by means of any manipulative, deceptive, or other fraudulent device or contrivance . . . .

**WAC Rule 460-20A-420. Dishonest or Unethical Business Practices -- Brokers-Dealers.**

(2)    Inducing trading in a customer's account which is excessive in size or frequency in view of the financial resources and character of the account;

(3)    Recommending to a customer the purchase, sale or exchange of any security without reasonable grounds to believe that such transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other relevant information known by the broker-dealer;

(24)    Failing to comply with any applicable provision of the Rules of Fair Practice of the National Association of Securities Dealers or any applicable fair practice or ethical standard promulgated by the Securities and Exchange Commission or by a self-regulatory organization approved by the Securities and Exchange Commission.

**WAC Rule 460-20A-425. Dishonest or Unethical Business Practices - Sales Persons.**

(6)    Inducing trading in a customer's account which is excessive in size or frequency in view of the financial resources and character of the account;

(7)    Recommending to a customer the purchase, sale or exchange of any security without reasonable grounds to believe that such transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other relevant information known by the broker-dealer;

(19)    Failing to comply with any applicable provision of the Rules of Fair Practice of the National Association of Securities Dealers or any applicable fair practice or ethical standard promulgated by the Securities and Exchange Commission or by a self-regulatory organization approved by the Securities and Exchange Commission.

125.    RESPONDENT'S violations of Oregon, California and Washington law clearly constitute negligence, as do RESPONDENT'S violations of NASD rules. The NASD rules constitute the standard of the industry, and the First District Court of Appeals of Florida noted in Dean Witter Reynolds, Inc. v. Hammock, 489 So.2d 761, 767 (1986), that the "case law is clear that evidence of violation of industry standards is admissible as non-conclusive evidence of negligence." See also St. Louis-San Francisco R.R. Co. v. White, 369 So.2d 1007 (Fla. 1st D.C.A. 1979); St. Louis-San Francisco R.R. Co. v. Burlison, 262 So.2d 280 (Fla. 1st D.C.A. 1972); Clements v. Boca Aviation, Inc., 444 So.2d 597 (Fla. 4th D.C.A. 1984); Nance v. Winn Dixie Stores, Inc., 436 So.2d 1075 (Fla. 3rd D.C.A. 1983); Reese v. Seaboard Coastline R.R. Co., 360 So.2d 27 (Fla. 4th D.C.A. 1978).

126.    These infractions breached the contractual relationship between CLAIMANTS and RESPONDENT, which incorporated a brokerage firm's duty to comply with the industry rules, customs and procedures governing the transactions with CLAIMANTS. "[W]e note a number of cases in which customers of stockbrokers are deemed to have contemplated and authorized a course of dealing in accordance with rules and customs of the stock exchanges. Thus, the exchange rules are deemed incorporated into any agreement between customer and broker." Brumm v. McDonald & Co. Sec., 603 N.E.2d 1141, 1147 (Ohio Ct. App. 1992) (citations omitted); Iowa Grain v. Farmers Grain and Feed, 293 N.W.2d 22 (Iowa 1980); White v. Merrill Lynch, Pierce, Fenner & Smith, 218 A.2d 655 (N.J. Super. Ct. 1966). See also Midwest Television v. Scott, Lancaster, Mills & Atha, 252 Cal. Rptr. 573, 579 (Cal. Ct. App.

1988) ("The industry practice becomes a part of the contract, and the evidence of such custom is admissible. . . .").

127.    The contracts between RESPONDENT ONESCO and CLAIMANTS are further defined by the internal rules and regulations established to govern the conduct of RESPONDENT'S own employees, such as internal supervisory procedures and compliance manuals. (See, e.g., Miller v. Smith Barney, Fed. Sec. L. Rpts. CCH ¶92,498 (1986) at 93,031.) ("The relations between [brokerage firm and customer] were not defined solely in terms of the joint account agreement, but also . . . by the internal rules and regulations established to govern the conduct of [the firm's] own employees"). For example, in Thropp v. Bache Halsey Stuart Shields, Inc., 650 F. 2d 817 (6th Cir. 1981), the Sixth Circuit rejected Prudential-Bache Securities Inc.'s argument that the District Court should not have relied on Bache's internal rules, as codified in its *Standard Practice Instructions Manual*, as evidence of the proper standard of care:

> When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the defendant to establish the correct standard of care. The content of such rules may also indicate knowledge of the risks involved and the precautions that may be necessary to prevent the risks. Montgomery v. Balt & Ohio R.R., 22 F.2d 359 (6th Cir. 1927). See also Prosser, The Law of Torts §33 (4th ed. 1971). The District Court correctly measured Bache's conduct by the standard of prudence it has established for its own employees.

Id. at 820.

128.    RESPONDENT violated many of its own internal rules and procedures in handling the transactions with CLAIMANTS.

129.    RESPONDENT also violated the duty of commercial reasonableness, fair dealing, and good faith, required of all parties to a contract.  "Hornbook Law implies a covenant of good faith and fair dealing into the performance and enforcement of every contract. . . . [G]ood faith is part of every contract . . . ."  First Texas Sav. Ass'n v. Comprop Inv. Properties, 752 F. Supp. 1568, 1573 (M.D. Fla. 1990); Burger King Corp. v. Austin, 805 F. Supp. 1007 (S.D. Fla. 1992).  This covenant of fair dealing is particularly demanding for stockbrokers and brokerage firms, who are expert fiduciaries of their customers, who obtain their commissions only after advising and inducing customer investments, and who are thereby subject to an inherent conflict of interest.

> [P]etitioner acted simultaneously in the dual capacity of investment advisor and of broker and dealer.  In such capacity, conflicting interests must necessarily arise.  When they arise, the law has consistently stepped in to provide safeguards in the form of prescribed and stringent standards of conduct on the part of the fiduciary.

Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949).

130.    The covenant of good faith and fair dealing required RESPONDENT to do what the contract presupposed would be done to accomplish its purpose and to protect the contracting parties' reasonable expectations.  It presupposed that RESPONDENT would comply with applicable industry and governmental rules, provide all necessary information to CLAIMANTS, and act reasonably and in good faith to recommend suitable investments for CLAIMANTS in light of CLAIMANTS' financial circumstances and needs.  RESPONDENT violated this covenant by putting its own interests first, not complying with industry rules, recommending wholly unsuitable investments to CLAIMANTS, and misrepresenting,

concealing and not supplying material information.  CLAIMANTS suffered damages from these breaches of covenant and are entitled to recompense.

131.    RESPONDENT'S infractions breached its written contract with the NASD to follow securities laws and NASD rules.   As a condition of RESPONDENT'S NASD membership application pursuant to Article III, Section 1 of the NASD By-Laws, RESPONDENT contracted with the NASD to comply with all NASD rules, federal securities laws, and federal securities rules and regulations in the handling of customer accounts.

132.    Defrauded customers such as CLAIMANTS are intended third-party beneficiaries of RESPONDENT'S agreement with the NASD to comply with securities laws and regulations and NASD rules.  CLAIMANTS are entitled to redress for RESPONDENT'S breaches of these contracts.  Oppenheimer & Co. v. Neidhardt, [Current Binder] Fed. Sec. L. Rep. (CCH) ¶98,224 (S.D.N.Y. May 4, 1994) (customers are third-party beneficiaries of brokerage firm's obligation to follow NASD rules); Scobee Funeral Home v. E.F. Hutton & Co., 711 F. Supp. 605, 607 (S.D. Fla. 1989) (customers are third-party beneficiaries of NASD requirements); Creative Sec. v. Bear Stearns & Co., 671 F. Supp. 961, 966 (S.D.N.Y. 1987) ("Many courts recognize that securities exchange members are contractually bound by the regulations of their organizations."); Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 828, 841 (2d Cir. 1971) ("Each member firm, by virtue of its admission, agrees to be governed by the Exchange's constitution and rules.  When a transaction of purchase and sale of any security is effected, the contract is subject to all the provisions of the Exchange's constitution and rules. . . . These provisions are binding on exchange members.")

133.    The RESPONDENT'S failure to comply with the contracts between the parties and with the laws, rules, and regulations governing the contracts between the parties, was intentional or reckless and was done in willful and wanton disregard of CLAIMANTS' rights. All of RESPONDENT'S actions and omissions were done solely for the purpose of generating commissions, and as such is conduct for which the RESPONDENT should be punished.

**WHEREFORE,** CLAIMANTS request this panel to enter an award for actual and rescissionary damages together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

**COUNT VIII**

**<u>COMMON LAW FRAUD</u>**

134.    CLAIMANTS reallege, reaffirm and reincorporate paragraphs 1 through 133 above, as if fully contained herein.

135.    All of the misrepresentations and omissions of RESPONDENT were done with the intent to mislead CLAIMANTS and with the specific intent to have CLAIMANTS rely on said misrepresentations and omissions. At a minimum, the misrepresentations were done recklessly, without knowledge of their truth or falsity. CLAIMANTS did rely thereon and made investments to their detriment causing substantial losses.

136. Further, RESPONDENT'S misrepresentations and omissions constitute constructive fraud, which entails the use of a confidential or fiduciary relationship to take advantage of another.

137. The fraud, the misrepresentations, and the omissions claims are quasi-contractual in nature and arose from and are implied from the contractual relationship between CLAIMANTS and RESPONDENT. These claims also arose independently from the contractual relationship between CLAIMANTS and RESPONDENT.

**WHEREFORE**, CLAIMANTS request this panel to enter an award for actual damages and rescission together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

COUNT IX

**BREACH OF FIDUCIARY DUTY**

138. CLAIMANTS reallege, reaffirm and reincorporate paragraphs 1 through 137 above, as if fully contained herein.

139. At all times relevant hereto there existed between the RESPONDENT and CLAIMANTS a fiduciary relationship by reason that:

A. The RESPONDENT at all times possessed superior knowledge, judgment, skill, and experience in the securities market in contrast to CLAIMANTS' lack of meaningful knowledge and understanding in that CLAIMANTS could not fully appreciate the substantial risk to which their monies were exposed; and

Page 57 of 167

B.   The RESPONDENT at all times had access to the books, records, and other sources of information concerning the financial and operating condition, rules, and policies of the RESPONDENT, the NASD, and the State Statutes and Administrative Codes. This information was not readily accessible to CLAIMANTS; and

C.   Lancaster at all times while handling CLAIMANTS' monies was an experienced and skilled account executive acting within the scope of his employment and authority and apparent authority with ONESCO.

140.   This fiduciary duty arose from and is implied from the contractual relationship between CLAIMANTS and RESPONDENT. This fiduciary duty also arose independently from the contractual relationship between CLAIMANTS and RESPONDENT.

141.   Because of the RESPONDENT'S superior knowledge, skill, judgment, and experience in the securities market, the RESPONDENT owed to CLAIMANTS a duty to recommend suitable investments, to disclose all material facts, and to refrain from misleading CLAIMANTS. Further, the RESPONDENT owed this fiduciary duty to protect and further CLAIMANTS' interests over and above its desire to generate commissions through transactions with CLAIMANTS and to promote its own interests. ONESCO specifically had a duty by virtue of this fiduciary relationship with CLAIMANTS to conduct a proper due diligence, to supervise Lancaster's recommendations and representations, and to disclose to CLAIMANTS that the Lancorp/Megafund security was an unregistered, high-risk investment, that Lancorp/Megafund was a fraud, that Lancaster's representation to CLAIMANTS concerning their investments was incomplete and inaccurate, and that RESPONDENT ONESCO was not properly supervising Lancaster.

142.    Both the Florida courts and the Eleventh Circuit have made clear that a broker owes a fiduciary duty to a customer.  In Gochnauer v. A.G. Edwards & Sons, Inc., 810 F.2d 1042 (11th Cir. 1987), the Eleventh Circuit made clear that a broker's fiduciary duty included "a duty to only recommend stocks which he has sufficiently investigated," "a duty to inform his customer of the risks involved in purchasing or selling particular securities," "a duty to refrain from self-dealing or refusing to disclose any personal interest in any particular transaction," and "a duty not to misrepresent any material fact."  See also Thompson v. Smith Barney, Anderson Upham & Co., Inc., 709 F.2d 1413, 1418 (11th Cir. 1983) ("The law is clear that a broker owes a fiduciary duty of care and loyalty to a securities investor.")

143.    Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients. See Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979) (a securities broker dealer is a fiduciary who owes his customer a high degree of care in transacting business); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2nd Cir. 1978) (registered representative, as broker for investor, owed investor a fiduciary duty); Moholt v. Dean Witter Reynolds, Inc., 478 F.Supp. 451 (D.D.C. 1979) (stockbrokers are in a position of quasi-fiduciaries and are held to high degree of trustworthiness and fair dealing); Pachter v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker, under Florida law, stands in special relationship to client and owes him duty to use reasonable care and to act in good

faith); Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); Jaksich v. Thomson McKinnon Securities, Inc., 582 F.Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); Utah State University of Agriculture and Applied Science v. Sutro & Co., 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trustee dealing with public funds); E.F. Hutton & Co. v. Weeks, 166 Ga.App. 443, 304 S.E.2d 420 (1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith).

144.    Because of the fiduciary relationship between CLAIMANTS and the RESPONDENT, CLAIMANTS reasonably relied to their detriment on the RESPONDENT'S superior knowledge, skill, judgment, and experience in handling their monies.

145.    RESPONDENT knowingly and deliberately breached its fiduciary duty to CLAIMANTS by making material misrepresentations, failing to conduct a proper due diligence investigation, failing to make material disclosures, and investing in an unsuitable security in total disregard for CLAIMANTS' best interests, solely for the purpose of enriching and protecting the RESPONDENT, and concealing the unsuitable nature of the transactions by not making the requisite disclosures to CLAIMANTS. The RESPONDENT'S disregard and violation of the rules of the SEC and NASD governing its conduct and the conduct of its agents and employees constitutes a breach of fiduciary duty to CLAIMANTS.

146.    RESPONDENT also breached its fiduciary duty by failing to ensure compliance with all applicable State statutes and rules, including those relating to misrepresentations and omissions in the sale of securities, suitability, and registration.

147.    RESPONDENT is jointly and severally liable because it participated in, supervised, or approved the previously noted transactions. In addition, ONESCO is jointly and severally liable under the principles of licensing, agency, controlling person and *respondeat superior* for the damage caused to CLAIMANTS by the breach of its fiduciary duty.

148.    The acts committed by RESPONDENT, as alleged herein, were done by it personally through the use of the mails or other instrumentality of interstate commerce. The acts of ONESCO, and each employee, agent, or representative of ONESCO, including Lancaster, are deemed to be the acts of and are chargeable to and binding upon ONESCO.

149.    It is well-settled law that "an employer is vicariously liable for compensatory damages resulting from the negligent acts of employees committed within the scope of their employment even if the employer is without fault." See, e.g., Mercury Motors Express, Inc. v. Smith, 393 So. 2d 545, 549 (Fla. 1981).

150.    RESPONDENT'S breach of its fiduciary duty to CLAIMANTS constitutes conduct for which the RESPONDENT deserves to be punished to deter RESPONDENT from engaging in the same or similar conduct in the future.

WHEREFORE, CLAIMANTS request this panel to enter an award for actual damages together with benefit of the bargain damages, rescissionary damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages,

punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

## COUNT X

## NEGLIGENCE AND GROSS NEGLIGENCE

151.    CLAIMANTS reallege, reaffirm and reincorporate paragraphs 1 through 150 above, as if fully contained herein.

152.    RESPONDENT, by virtue of its position as CLAIMANTS' broker-dealer, its professional skill and ability, the level of confidence and care imposed upon other broker dealers in similar positions, and its fiduciary obligations owed CLAIMANTS due care. The industry standard of care is set forth by the NASD, the SEC rules, the State Acts and Administrative Codes, and the firm's own internal guidelines.

153.    RESPONDENT'S violations of the NASD Rules constitute negligence. As the Fifth Circuit observed in Miley v. Oppenheimer & Co., Inc., 637 F.2d 318, 333 (5th Cir. 1981), the "NYSE and NASD rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," and the lower court properly included a reference to these rules in its jury charge. See Mihara v. Dean Witter & Company, Inc., 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and NASD rules served to dignify those rules and regulations to some sort of standard. The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held.") See also Dean Witter Reynolds, Inc. v. Hammock, 489 So.2d 761, 767 (1986) ("Case

law is clear that evidence of violation of industry standards is admissible as non-conclusive evidence of negligence"); St. Louis-San Francisco R.R. Co. v. White, 369 So.2d 1007 (Fla. 1st D.C.A. 1979); St. Louis-San Francisco R.R. Co. v. Burlison, 262 So.2d 280 (Fla. 1st D.C.A. 1972); Clements v. Boca Aviation, Inc., 444 So.2d 597 (Fla. 4th D.C.A. 1984); Nance v. Winn Dixie Stores, Inc., 436 So.2d 1075 (Fla. 3rd D.C.A. 1983); Reese v. Seaboard Coastline R.R. Co., 360 So.2d 27 (Fla. 4th D.C.A. 1978).

154.    RESPONDENT'S violations of the Oregon and Washington Administrative Rules and the Rules of the California Department of Corporations constitute negligence *per se* because these rules were enacted for the protection of investors such as CLAIMANTS. See, e.g., Palmer v. Shearson Lehman Hutton, Inc., 622 So.2d 1085 (Fla. 1st DCA 1993); Twiss v. Kury, 25 F.3d 1551 (11th Cir. 1994).

155.    ONESCO had supervisory duties over Lancaster and failed to diligently and properly supervise its officers, employees, and agents.

156.    Lancaster was at all times material hereto acting within the scope of his employment with ONESCO and ONESCO is also liable under principles of *respondeat superior*, licensing, controlling person and agency.

157.    RESPONDENT'S conduct, as set forth in previous Counts, is a breach of its duty to CLAIMANTS.

158.    RESPONDENT breached its duty to CLAIMANTS by failing to provide sufficient control and supervision over its officers, employees, agents, and registered

representatives and in not ensuring compliance with the applicable federal and state securities laws, rules, regulations, policies, self-regulatory organization policies, and procedures.

159.   The RESPONDENT'S actions as set forth above constitute both negligence and gross negligence.

160.   As a result of the RESPONDENT'S conduct as set forth above, CLAIMANTS have suffered damages.

161.   The RESPONDENT'S conduct as set forth above proximately caused CLAIMANTS' damages.

WHEREFORE, CLAIMANTS request actual damages, together with benefit of the bargain damages, lost opportunity costs, rescissionary damages, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed necessary and proper.

## CERTIFICATE OF SERVICE

I certify that a copy hereof was furnished to Barbara A. Turner, Pres., COO, The O.N.

Equity Sales Company, One Financial Way, P. O. Box 371, Cincinnati, Ohio, 45201-0371, by

Certified U.S. Mail, Return Receipt Request #7003 1680 0001 1775 6961, this 3rd day of April,

2007.

Respectfully Submitted,

GOODMAN & NEKVASIL, P.A.

Joel A. Goodman, Esq.
Stephen Krosschell, Esq.
14020 Roosevelt Blvd., Suite 808
P.O. Box 17709
Clearwater, Florida 33762
Telephone:    (727)524-8486
Facsimile:    (727)524-8786
Attorneys for CLAIMANTS

# INDEX OF EXHIBITS

Exhibit "A"          <u>NASD Notice to Members 86-65</u> (dated September 12, 1986)
                     "Compliance with the NASD Rules of Fair Practice in the Employment
                     and Supervision of Off-Site Personnel"

Exhibit "B"          SEC Division of Market Regulation
                     Staff Legal Bulletin No. 17: <u>Remote Office Supervision</u>

Exhibit "C"          Industry Standards for Inspections of Off-Site Locations

Exhibit "D"          Lancaster's Disclosure of Lancorp Financial Group, LLC

Exhibit "E"          Lancorp Financial Fund Business Trust Reg-D Offering

Exhibit "F"          Lancaster's Disclosure of Lancorp Financial Fund Business Trust

Exhibit "G"          September 3, 2004, Letter from the Pennsylvania Securities Commission
                     September 22, 2004 Response Letter by ONESCO to the Pennsylvania
                     Securities Commission

Exhibit "H"          <u>In the Matter of The O.N. Equities Sales Company</u>, S.E.C. Release No.
                     34-32592 (9/30/96)

Exhibit "I"          Gary L. Lancaster's Registration History

Exhibit "J"          <u>NASD Notice to Members 89-49</u> (dated July 1989)
                     "SEC Approval of Amendment to Schedule C of NASD By-Laws to
                     Require Members to Submit Applications for and Maintain the
                     Registration of Only Such Persons Who Intend to Engage or are

Engaged in the Investment Banking or Securities Business for the Member."

Exhibit "K"     NASD Notice to Members 88-67 (dated September 1998)
"Subject: Obligation to Provide Accurate Information on Forms U-4 and U-5 and to Research Potential Employee's Background."

Exhibit "L"     Lancaster's Form U-5

Exhibit "M"     SEC v. Megafund Corporation, et al., Civil Action No. 3:05-CV-1328-L (N.D. Tex. 7/8/05)

Exhibit "N"     Certificates of Non-Registration of Lancorp/Megafund in Oregon

Exhibit "O"     NASD Memorandum concerning "Important SEC Notice Concerning Independent Contractors"