1  ZEIGER, TIGGES & LITTLE LLP
Marion H. Little, Jr., Esq. (admitted *pro hac vice*)
2  Michael R. Reed, Esq. (admitted *pro hac vice*)
3500 Huntington Center
3  41 South High Street
Columbus, OH 43215
4  Telephone:  (614) 365-9900
Facsimile:  (614) 365-7900
5

6  SQUIRE, SANDERS & DEMPSEY L.L.P.
Joseph A. Meckes (State Bar No. 190279)
Daniel T. Balmat (State Bar No. 230504)
7  One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492
8  Telephone: +1.415.954.0200
Facsimile:  +1.415.393.9887
9

10  Attorneys for Plaintiff
THE O.N. EQUITY SALES COMPANY

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| THE O.N. EQUITY SALES COMPANY, an Ohio Corporation, | Civil Action No. C-07-2844 JSW |
|---|---|
| Plaintiff, | **(E-FILING)** |
| vs. | **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM IN SUPPORT** |
| DANIEL MARIA CUI, an individual, | |
| Defendant. | [E-Filed concurrently with [Proposed] Order] |

DATE:     TBD
TIME:     TBD
CTRM:    2, 17th Floor
           Hon. Jeffrey S. White

**Complaint filed:**  May 31, 2007
**Trial date:**  None

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT that, at a date and time to be determined, in the courtroom of the Honorable Jeffrey S. White, located at 450 Golden Gate Ave., Seventeenth Floor, San Francisco, California 94102, Plaintiff the O.N. Equity Sales Company ("ONESCO") will and hereby does move, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary and permanent injunction enjoining Defendant Daniel Maria Cui ("Maria Cui") from taking any further action with respect to Case No. 07-00936 filed with the National Association of Securities Dealers in or about March 2007, and amended on April 3, 2007.

ONESCO has filed its Motion to Consolidate Preliminary Injunction Hearing with Trial on the Merits, and its Motion for an Order Authorizing the Parties to Engage in Immediate Discovery, both to be heard on October 12, 2007. In addition, the instant motion for preliminary injunction requests that the parties be allowed a reasonable time before the hearing of the preliminary injunction motion to conduct discovery into the issues identified. ONESCO believes that an appropriate time and date for the hearing on this motion can and should be determined by the Court and the parties after the Court has considered the Motion to Consolidate. Consequently, and after conferring with the Clerk of the Court on this issue, this motion has not been noticed for hearing on a specific time and date.

This motion is based on the memorandum of points and authorities in support hereof, the exhibits attached to this motion, the pleadings, records and papers on file herein and such other and further evidence and argument as may be presented at or before the hearing.

Respectfully submitted,

Dated: September 6, 2007                ZEIGER, TIGGES & LITTLE LLP


By:_____/s/_____
                        Michael R. Reed

Attorneys for Plaintiff
THE O.N. EQUITY SALES COMPANY

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................. 1

II.   STATEMENT OF FACTS ............................................................................... 3

      A.    Brief Overview of ONESCO and Non-Party Lancaster ........................ 3

      B.    The Lancorp Financial Fund Business Trust Transactions .................... 4

            1.    Defendant Was A Sophisticated Investor ................................... 5

            2.    The Lancorp Fund Expressly Disclaimed Any Relationship With A Broker-Dealer, In Numerous Instances....................................... 6

            3.    Defendants Knew That Lancaster Was Not Acting On Behalf Of ONESCO.    ................................................................................... 8

      C.    Defendants' Purchases .......................................................................... 8

      D.    Defendants' Arbitration Action............................................................. 10

III.  LAW AND DISCUSSION .............................................................................. 11

      A.    ONESCO Has A Strong Likelihood Of Success On The Merits .......... 11

            1.    Arbitration Is Solely A Matter Of Contract, And Parties May Not Be Forced To Arbitrate Disputes They Did Not Agree To Arbitrate. ...... 11

            2.    Whether An Agreement To Arbitrate Exists Is For The Court To Decide.    ................................................................................... 12

            3.    No Agreement Exists Between the Parties To Arbitrate Their Disputes....................................................................................... 13

            4.    Defendants' Claims Are Not Arbitrable Under NASD Rules Because Defendant Was Not A Customer Of ONESCO Or Any Of Its Associated Persons At The Time Of The Events Giving Rise To His Claims. ............................................................................... 13

                  a.    Defendant's Only Claimed Basis For Arbitrability Of This Dispute Lies In The NASD Rules.   ............................... 13

                  b.    Defendant Was Not Customer Of ONESCO, Nor Do His Claims Arise "In Connection With" The Business Of ONESCO.   ................................................................... 14

                  c.    Defendant Was Not Customer Of A Person Associated With ONESCO At The Time Of The Events Giving Rise To His Claims.    ................................................................... 15

                  d.    Applying The Settled Rule Of Wheat To The Facts, Defendant May Not Arbitrate His Claims Against ONESCO.    ................................................................... 17

      B.    ONESCO Would Suffer Irreparable Harm If Forced To Arbitrate A Dispute It Has Not Agreed To Arbitrate, And Defendant Can Show No Countervailing Hardship.    ................................................................... 18

      C.    The Public Interest Is Advanced By Not Forcing Parties To Arbitrate Their Disputes Where They Never Agreed To Arbitrate.   ............................. 18

IV.   CONCLUSION............................................................................................... 19

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA  90017-5554

-i-

TABLE OF CONTENTS
Case No. C-07-2844 JSW

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*AT&T Tech., Inc. v. Communications Workers of America,*
    475 U.S. 643 (1986) ........................................................................................ 11, 12

*Asdar Group v. Pillsbury, Madison & Sutro,*
    99 F.3d 289 (9th Cir. 1996) ............................................................................. 1

*First Options of Chicago, Inc. v. Kaplan,*
    514 U.S. 938 (1995) ........................................................................................ 12, 14

*Gruntal & Co., Inc. v. Steinberg,*
    854 F.Supp. 324 (D.N.J. 1993) ....................................................................... 2, 16, 17

*Hornor, Townsend & Kent, Inc. v. Hamilton,*
    218 F.Supp.2d 1369 (N.D. Ga. 2002) ............................................. 2, 9, 15, 16, 18

*Kidder, Peabody & Co. v. Zinsmeyer Trusts Partnership,*
    41 F.3d 861 (2d. Cir. 1994) ............................................................................. 13

*LAWI/CSA Consolidators,*
    849 F.2d 1236 (9th Cir. 1988) ......................................................................... 12, 18

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,*
    501 U.S. 350 (1991) ........................................................................................ 1

*Litton Fin. Printing Div. v. Nat'l Labor Relations Board,*
    501 U.S. 190 (1991) ........................................................................................ 12

*MONY Sec. Corp. v. Bornstein,*
    390 F.3d 1340 (11th Cir. 2004) ....................................................................... 15

*MONY Sec., Inc. v. Vasquez,*
    238 F.Supp.2d 1304 (M.D. Fla. 2002) ............................................................ 18

*Malhotra v. Equitable Life Assurance Society of the United States,*
    364 F.Supp.2d 299 (E.D.N.Y. 2005) .............................................................. 17

*Md. Casualty Co. v. Realty Advisory Board,*
    107 F.3d 979 (2d. Cir. 1991) ........................................................................... 12

*Merrill Lynch Investment Managers v. Optibase, Ltd.,*
    337 F.3d 125 (2d. Cir. 2003) ........................................................................... 18

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614 (1985) ........................................................................................ 11

*Multi-Financial Sec. Corp. v. King,*
    386 F.3d 1364 (11th Cir. 2004) ....................................................................... 14

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

-ii-

**TABLE OF AUTHORITIES**
(continued)

Page

*Northwestern Human Services, Inc. v. Panaccion,*
    WL 2166293 (E.D. Pa. Sept. 24, 2004) .................................................................. 17

*Perry v. Thomas,*
    482 U.S. 483 (1987) ..................................................................................................... 13

*Prudential Sec., Inc. v. Dusch,*
    WL 374425 (S.D. Cal. Mar. 28, 1994) ............................................................... 2, 15

*Ryan, Beck & Co. v. Fakih,*
    268 F.Supp.2d 210 (E.D.N.Y. 2003) ....................................................................... 15

*Sands Bros. & Co., Ltd. v. Alba Perez Ttee Garcia Revocable Trust,*
    WL 2186574 (S.D.N.Y. Sept. 28, 2004) ................................................................. 15

*Sands Bros. & Co., Ltd. v. Ettinger,*
    WL 541846 (S.D.N.Y. Mar. 19, 2004) ..................................................................... 15

*Sanford v. Memberworks, Inc.,*
    483 F.3d 956 (9th Cir. 2007) .................................................................................... 12

*Six Clinics Holding Corp. v. Cafcomb Systems, Inc.,*
    119 F.3d 393 (6th Cir. 1997) .................................................................................... 12

*Textile Unlimited, Inc. v. A..BMH and Co. Inc.,*
    240 F.3d 781 (9th Cir. 2001) ........................................................................ 2, 11, 12

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.,*
    925 F.2d 1136 (9th Cir. 1991) .................................................................................. 12

*United Offshore Co. v. Southern Deepwater Pipeline Co.,*
    899 F.2d 405 (5th Cir. 1990) .................................................................................... 12

*Va. Carolina Tools, Inc. v. International Tool Supply, Inc.,*
    984 F.2d 113 (4th Cir. 1993) .................................................................................... 12

*Volt Information Sciences, Inc. v. Stanford University,*
    489 U.S. 468 (1989) .................................................................................................... 12

*Wheat, First Sec., Inc. v. Green,*
    993 F.2d 814 (11th Cir. 1993) ....................................................... 1, 14, 15, 16, 17, 18

*Wiepking v. Prudential-Bache Sec., Inc.,*
    940 F.2d 996 (6th Cir. 1991) .................................................................................... 12

*World Group Sec. v. Ko,*
    WL 1811145 (N.D. Cal. Feb. 11, 2004) ................................................................. 15

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

# TABLE OF AUTHORITIES
## (continued)

Page

## STATE CASES

*Pacific Investment Co. v. Townsend,*
   58 Cal.App.3d 1 (Ct. App. 1976) ............................................................... 11

*Securities and Exchange Commission v. Megafund Corporation,*
   Case No. 3:05-CV-1328-L (N.D. Texas) ................................................. 4, 6

## FEDERAL STATUTES

The Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq* ........................................ 11
F.R.C.P. Rule 10b-5 ............................................................................................ 1
F.R.C.P. Rule 65 .................................................................................................. 1
NASD Rule 10100 ............................................................................................. 13
NASD Rule 10201 ............................................................................................. 15
NASD Rule 10301 ........................................................................................ 13, 14

SANFRANCISCO/230674.1

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

TABLE OF AUTHORITIES
Case No. C-07-2844 JSW

# MEMORANDUM IN SUPPORT

## I.   INTRODUCTION

> *"[NASD customer status for purposes of arbitrability should] be determined as of the time of the occurrence of events that constitute the factual predicate for the causes of action contained in the arbitration complaint. ... We cannot imagine that any NASD member would have contemplated that its NASD membership would require it to arbitrate claims which arose while a claimant was a customer of another member merely because the claimant subsequently became its customer."*

[*Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 820 (11th Cir. 1993) (emphasis added).]

This holding applies with equal force to the instant case. Defendant, who invested in a private placement unrelated to ONESCO, seeks to arbitrate claims against ONESCO before the National Association of Securities Dealers, Inc. ("NASD"). Yet Defendant does not have a written agreement to arbitrate any dispute between himself and ONESCO and, indeed, had no business relationship with ONESCO at all. Defendant's only conceivable ground for arbitration is that he entered into an investment transaction with a Trust whose Trustee *later* became an "associated person" with ONESCO. But applying the NASD Rules to the facts of this case, Defendant cannot compel arbitration.

As *Wheat* and other cases consistently hold, NASD "customer" status for purposes of bringing claims in arbitration is determined "as of the time of the occurrence of the events that constitute the factual predicate for the causes of action." *Wheat*, 993 F.2d at 820. In a securities action based on alleged misrepresentations or omissions, the factual predicate is the material misrepresentation or omission that induces the investments in question – not subsequent payments or additional transactions premised on the same original misrepresentations. *See, e.g.*, *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991) (concluding that statute of repose for a Rule 10b-5 claim starts from the date of the alleged misrepresentation inducing a sale, not from the date of sale itself); *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 294-95 (9th Cir. 1996) ("the statute ordinarily begins to run ... when a person commits the act that gives rise to liability under that section").

Here, although Defendant asserts a number of state and federal causes of action, his

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

1  NASD statement of claim reveals that all of his claims are fundamentally based on alleged

2  material misrepresentations and omissions that induced his decision to invest in the Lancorp

3  Fund.  For instance, in paragraph 39 of his first amended statement of claim, Defendant alleges

4  that "Respondent ONESCO, acting through Lancaster, _recommended_ that Claimants invest in …

5  [an] unregistered, fraudulent investment …" [*See* First Amended Statement of Claim, at 16

6  (emphasis added) (Compl. Exh. A).]  At paragraph 40, Defendant alleges that "Respondent

7  ONESCO, acting through Lancaster, made numerous false representations to Claimants

8  concerning this Lancorp Financial Fund Business Trust … and Megafund Corporation …

9  investment." [*Id.* at 17]  And in paragraphs 41 to 45, Defendant accuses ONESCO, acting

10  through Lancaster, of making numerous other misrepresentations or omissions with respect to the

11  risks associated with and operations of the Lancorp Fund.  [*Id.* at 18-20.]

12        As the Northern District of Georgia explained in a recent case, "if the sale occurred at a

13  time when [the associated person] was not employed by [the member], the latter cannot be hauled

14  into an arbitration proceeding … ."  *Hornor, Townsend & Kent, Inc. v. Hamilton*, 2004 WL

15  2284503, at *3 (N.D. Ga., Sept. 30, 2004) (Exh. F).  This is because an NASD member "could

16  not have supervised [the associated person] at a time before [the associated person] became

17  employed with" the NASD member.  *Hornor, Townsend & Kent, Inc. v. Hamilton*, Case No.

18  1:01-cv-02979 (N.D. Ga., Sept. 6, 2005) (slip op., at 12) (Exh. G).  *Accord: Prudential Sec., Inc.*

19  *v. Dusch*, 1994 WL 374425 (S.D. Cal., Mar. 28, 1994) (Exh. H) (enjoining arbitration brought by

20  investor over transactions occurring before investor became the customer of an NASD member);

21  *Gruntal & Co., Inc. v. Steinberg*, 854 F. Supp. 324, 340 (D.N.J. 1994) (same).

22        Simply put, at the time of the occurrence of the events giving rise to his claims, Defendant

23  was not dealing with an "associated person" of ONESCO.  As a result, he may not avail himself

24  of the right to arbitrate under the NASD Rules.  Injunctive relief is appropriate because, as the

25  Ninth Circuit has held, a party is irreparably harmed if it is forced to arbitrate a dispute where it

26  had no contractual obligation to do so.  *See, e.g., Textile Unlimited, Inc. v. A..BMH and Co. Inc.*,

27  240 F.3d 781, 786 (9th Cir. 2001).  ONESCO therefore respectfully requests this Court to

28  schedule this matter for a preliminary injunction hearing and thereafter enjoin Defendant from

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

-2-

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

1  proceeding further in NASD Case No. 07-00936.

## II.    STATEMENT OF FACTS

### A.    Brief Overview of ONESCO and Non-Party Lancaster.

ONESCO is a full service retail broker-dealer registered in all 50 states.  ONESCO, through its more than 1,000 registered representatives, offers a variety of investment products, including standard brokerage services; mutual funds; variable insurance products; and Section 529 plans.

Non-party Gary Lancaster ("Lancaster") was a registered representative with ONESCO, on an independent contractor basis, from March 23, 2004 to January 3, 2005.  [*See* Exh. A, Form U-5 for Gary Lancaster; Exh. B, Affidavit of Jeffrey Bley.]  Prior to his affiliation with ONESCO, Lancaster was an experienced insurance salesman and investment representative.  He had prior experience as a registered representative with BA Investment Services, Inc., Piper Jaffray, Inc., and Quick & Reilly, Inc.[1]  As Lancaster's Central Registration Depository statement ("CRD", at Exh. A) makes clear, his record was free of regulatory issues before he joined ONESCO as an independent contractor.

At the inception of his relationship with ONESCO, Lancaster disclosed his involvement with two other businesses unrelated to the business of ONESCO.  First, Lancaster disclosed his position as an Account Executive with Universal Underwriters Group.  [*See* Exh. C, Other Business Disclosure Reporting Page.]  He described the nature of this business as "property – casualty, Life and Health Sales-Service."  [*Id.*]  Second, Lancaster disclosed his position as President of Lancorp Financial Group, LLC.  [*Id.*]  Again, Lancaster described his role with this entity as "sales and service life, health, annuities."  [*Id.*]  These disclosures were reviewed by ONESCO's Contracting and Licensing group.

During his tenure as an independent contractor with ONESCO, Lancaster failed to generate any business for ONESCO.  In fact, he generated no commission revenue during his

---

[1]    Lancaster was involuntarily terminated by Piper Jaffray, and its parent company, U.S. Bancorp, in September 2002; however, the Form U-5 submitted by that firm expressly states that his termination was "*not sales practice related*."  [*See* Lancaster CRD, at 4.]

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA  90017-5554

-3-

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

1    entire ten-month relationship with ONESCO. As a result, ONESCO terminated its relationship

2    with Lancaster on January 3, 2005, pursuant to a firm policy that requires representatives to

3    generate at least $10,000 in annual commission revenue.

4    **B.    The Lancorp Financial Fund Business Trust Transactions.**

5    The genesis of this case is Defendant's investment, through Lancaster, in a *private*

6    *placement* offered by the Lancorp Financial Fund Business Trust (the "Lancorp Fund"), a Nevada

7    Business Trust unaffiliated with ONESCO.[2]  Lancaster served as Trustee of the Lancorp Fund.

8    *As the NASD expressly recognized in its August 10, 2006 Letter of Acceptance, Waiver and*

9    *Consent Agreement with Lancaster, Lancaster never disclosed his involvement with the Lancorp*

10    *Fund to ONESCO.*  [*See* Exh. D, Letter of Acceptance, No. 20050034080-01.]

11    As part of this private placement offering, the Lancorp Fund prepared a detailed Private

12    Placement Memorandum, a copy of which is attached to the Complaint as Exhibit A. Prior to

13    investing in Lancorp, all potential investors, *including Defendant*, were required to review this

14    Memorandum and execute a Subscription Agreement.

15    The Private Placement Memorandum stated that the Lancorp Fund was "an unregistered,

16    closed-end non-diversified management investment company." [Lancorp Private Placement

17    Memorandum, at introduction.]  Its investment objective involved "the issuance of Forward

18    Commitments … to large financial institutions relating to debt securities bearing interest or sold

19    at a discount …." [*Id.*]  From records recovered from the court appointed receiver in *Securities*

20    *and Exchange Commission v. Megafund Corporation*, Case No. 3:05-CV-1328-L (N.D. Texas), it

21    appears Lancaster invested significant dollars from the Lancorp Fund in Megafund, later revealed

22    as a Texas-based Ponzi scheme. As a result of these investments, many of the Lancorp Fund

23    investors suffered significant losses, and the Lancorp Fund was placed in receivership.

24    Investors in the Lancorp Fund, including Defendant, were not customers of ONESCO, and

25    their investments in the Lancorp Fund were not the type of investments offered by ONESCO

26    through its registered representatives. In fact, the Lancorp Fund's Private Placement

27    ---
     [2]    The information set forth herein relating to the Lancorp Fund, Defendant, and Lancaster is based,
28    in part, on the investigation conducted to date.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA  90017-5554

1   Memorandum reveals, in numerous respects, that Defendant was a sophisticated investor who

2   *knew* that the Lancorp Fund investments were not sold by ONESCO; that such investments were

3   not registered with the Securities and Exchange Commission; and that Lancaster, in selling such

4   investments, was not acting on behalf of or with the authorization of ONESCO.

5          1.      Defendant Was A Sophisticated Investor.

6          In order to invest in the Lancorp Fund, each investor was *required* to certify and

7   demonstrate that he or she qualified as either an "accredited" investor, or as a "sophisticated,

8   well-informed investor."  To qualify as an "accredited investor," an investor in the Lancorp Fund

9   had to demonstrate, in pertinent part, that he or she:

> is a natural person whose individual net worth, or joint net worth
> with that person's spouse, at the time of his purchase exceeds
> $1,000,000; [or] … is a natural person who had an individual
> income in excess of $200,000 in each of the two most recent years
> or joint income with that person's spouse in excess of $300,000 in
> each of those years and has a reasonable expectation of reaching the
> same income level in the current year; [or] … any trust, with total
> assets in excess of $5,000,000, not formed for the specific purpose
> of acquiring the securities offered, whose purchase is directed by a
> sophisticated person …

16  [Placement Memorandum, at 9 (citing Regulation D, 1933 Securities Exchange Act).]

17         To qualify as a "sophisticated, well-informed investor," the investor had to provide the

18  Lancorp Fund with "reasonable grounds to believe":

- That he is a sophisticated, well-informed investor and is able to understand and utilize the information contained herein, or is represented by a Purchaser Representative;

- That he or his Purchaser Representative has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of the investment in the Trust;

- That he has financial strength and experience in investment transactions and is able to bear the economic risk of the investment in the Trust; and

- That he understands the necessity of compliance with the foregoing.

27  [Private Placement Memorandum, at p. i.]

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

-5-

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

Of the maximum 100 investors permitted in the Lancorp Fund, no more than 35 were to be "non-accredited," but otherwise *sophisticated* investors. [*Id.* at 9.]

As "accredited" or "sophisticated" investors, each investor also certified his or her knowledge of the inherent risks involved with this private placement transaction. Specifically, they acknowledged that:

- The [Lancorp Fund] is newly organized and has limited development capital and experience.

- This investment is suitable only for investors having substantial financial resources and who desire at least a one-year investment.

- Except for certain redemption rights, the Investor Shares will not be transferable.

- The Investor Shares will have limited voting rights as specified in the Declaration of Trust and Bylaws.

[Private Placement Memorandum, at p. i.]

In other words, the investors were all sophisticated investors who were well aware of the risks associated with their investments in the Lancorp Fund private placement. This is reflected in the related transactional paperwork. Defendant certified that he "has made other risk capital investments or other investments of a speculative nature, ... by reason of his business and financial experience" and "has carefully evaluated his financial resources and investments and acknowledges that he is able to bear the economic risks of this investment." [Exh. E, Subscription Agreement, Section 2(p), at p. SB-9.]

    2.    The Lancorp Fund Expressly Disclaimed Any Relationship
          With A Broker-Dealer, In Numerous Instances.

As a sophisticated investor who executed his respective copy of the Private Placement Memorandum before Lancaster was affiliated with ONESCO, Defendant also acknowledged that the Lancorp Fund was managed exclusively by its Trustees and that it had no relationship of any kind with a broker-dealer or other investment advisor. As stated at page 7 of the Memorandum, "[t]he Trust will not be managed like a typical closed-end investment company. The Trust will be internally managed by the Trustees and *will not have any separate investment advisor*."

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

More importantly, the Private Placement Memorandum emphasized, in two separate

instances, that investments in the Lancorp Fund were offered and sold *without the assistance of*

*any broker-dealer or other selling agent*.  First, at page 4, the Memorandum expressly stated:

> This offering is a "best efforts" and "minimum-maximum" offering
> by the Trust, *without the assistance of any broker-dealer or any*
> *other selling agent*. . . .

[Private Placement Memorandum, at p. 4 (emphasis added).]

Then, at page 12, the Memorandum re-emphasized this specific point:

> **No Broker-Dealer**
>
> The Investor Shares will be sold on a "best efforts" *by the Trust*
> *without the assistance of any broker-dealer or selling agent* subject
> to our right to reject any offer to purchase an Investor Share in
> whole or in part.  There is no firm commitment on the part of the
> Trust or any other party to purchase any of the Investor Shares not
> otherwise sold in this offering.

[Private Placement Memorandum, at p. 12 (emphasis added).]

In fact, if the investors sought the assistance of their own purchaser representative in

evaluating the merits of investing in the Lancorp Fund, they were required to:

> complete and return to the Trust a Purchaser Representative
> Questionnaire … The Trust will [then] evaluate the qualifications of
> each proposed Purchaser Representative and will notify the
> prospective investor as to the acceptability of such person as a
> Purchaser Representative.  Each Purchaser Representative will be
> required to disclose to the prospective investor whom he represents
> any past, present or proposed future relationship of such Purchaser
> Representative with the Trust or any of its subsidiaries, or any other
> party of this offering.

[Private Placement Memorandum, at p. 9.]

It is evident from these numerous, express disclosures (all of which were made prior to

Lancaster's affiliation with ONESCO) that Defendant was aware that his investment in the

Lancorp Fund was sold directly by the Fund.  And Defendant was clearly aware that no broker-

dealer or any other selling agent had *any involvement* in the sale of such investments.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

-7-

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

1            3.      Defendants Knew That Lancaster Was Not Acting On Behalf Of
ONESCO.

2

3         Also noteworthy are Lancaster's personal disclosures in the Private Placement

4 Memorandum, which made clear he was not affiliated with ONESCO. Lancaster, as Trustee of

5 the Lancorp Fund, described himself in the following manner:

6                Gary L. Lancaster has spent the majority of his professional career
in the specialized field of trust administration, financial consulting,

7                and asset management. He has been the Fund's Trustee since its
formation on December 9, 2002. From 1995 to 1996, Mr. Lancaster

8                was a planning officer and retirement specialist handling
investments, estate planning, and trusts with First Interstate Bank -

9                Wells Fargo/Stephens, Inc. From 1997 to 1999, he was an
insurance specialist in investments, estate planning and trusts for

10               BA Financial Services, Inc. *Since 1999 Mr. Lancaster has been
employed as a vice president of financial services and a financial*

11               *consultant of U.S. Bancorp, an affiliate of the Escrow Agent under
this memorandum. Since June 1996, Mr. Lancaster has been the*

12               *owner of Lancorp Financial Group, LLC. Mr. Lancaster is an
investment adviser registered with the Commission under the*

13               *Investment Advisers Act of 1940, as amended.*

14 [Private Placement Memorandum, at p. 15 (emphasis added).]

15 Noticeably absent from this disclosure is *any mention of ONESCO*, or Lancaster's relationship

16 therewith. Indeed, at this point there was no such relationship.

17         Simply put, Defendant, who executed a copy of the Private Placement Memorandum, had

18 no indication and, thus, *no reason to believe* that ONESCO had anything to do with the Lancorp

19 Fund or Lancaster's sale of investments therein. To the contrary, the above provisions reveal that

20 Defendant knew that his investment in the Lancorp Fund was a private placement, offered

21 directly by the Lancorp Fund and Lancaster as its Trustee, *without the assistance or authorization*

22 *of any broker-dealer, including ONESCO.*

23      **C.**     **Defendants' Purchases.**

24         Defendant never established any form of contractual or customer relationship with

25 ONESCO. Rather, all of his dealings were solely with Lancorp Fund. Moreover, significantly,

26 the information recovered to date by ONESCO reveals that Defendant entered into the

27 Subscription Agreement *prior to* Lancaster becoming an "associated person" of ONESCO.

28 Lancaster's registration with ONESCO was from March 23, 2004 to January 3, 2005, but the

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

-8-

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

1    Defendant executed his subscription agreement well before then: he executed it nearly eight

2    months earlier on July 30, 2003.[3] [Exh. E (Subscription Agreement, executed 7/30/03).] Under

---

3    [3]    The First Amended Statement of Claim filed with the NASD avoids any mention of the events
occurring on or before July 30, 2003. This is not the first time a claimed event date in an NASD action
4    pursued by Defendant's counsel has turned out to be wrong. In Hornor, Townsend & Kent, Inc. v.
Hamilton, 218 F. Supp. 2d 1369 (N.D. Ga. 2002), the same law firm representing Defendant in this case
5    represented investors attempting to force arbitration against an NASD member. In the opinion cited, the
investors secured an order from the court denying a motion by Hornor Townsend, the plaintiff broker-
6    dealer, for an injunction and allowing arbitration to proceed. The court's decision was based on a sworn
statement by the defendant investors that a transaction the investors claimed was subject to arbitration had
7    occurred on October 1, 1999 – three weeks after the sales representative with whom they had dealt became
associated with Hornor Townsend.
8

9           Later, during discovery in the arbitration, Hornor Townsend learned that the transaction in
question had actually occurred on August 2, 1999 – more than a month *before* the sales representative
10   became its associated person – not on October 1, as the investors had represented. After Horner Townsend
presented this new evidence to the court, the court granted reconsideration of judgment, conditioned upon
11   remand of an appeal of the arbitrability issue from the Eleventh Circuit. *See Horner, Townsend & Kent,*
*Inc. v. Hamilton*, 2003 WL 23832424 (N.D. Ga., Sept. 29, 2003) (Exh. I). The court expressed its concern
12   that the defendants had misrepresented the purchase date in their affidavit in order to make their claim
arbitrable. *Id.* at *10-11. In a subsequent decision granting reconsideration after remand, the court also
13   granted defendants' motion for correction, based on counsel's statement that the error was not intentional:
"The Court accepts defense counsel, Mr. Goodman's representation, and hereby grants his motion to
14   correct, to the extent that the Court indicates that plaintiff has not established an intentional
misrepresentation by defense counsel … ." *Horner, Townsend & Kent, Inc. v. Hamilton*, 2004 WL
15   2284503, at *9 (N.D. Ga., Sept. 30, 2004) (Exh. F).

16          Nevertheless, the investors continued to try to force arbitration by means of various arguments that
arbitrability was not controlled by NASD "customer" status on the transaction date, as ample case
17   authorities hold, but, rather as of the dates of subsequent events arising from a contractual relationship. In
a fourth order in that case, the court granted summary judgment to Horner Townsend, ruling the claim not
18   arbitrable. *See Hornor, Townsend & Kent, Inc. v. Hamilton*, Case No. 1:01-cv-02979 (N.D. Ga., Sept. 6,
2005) (slip op.) (Exh. G). In that order, the court issued a final ruling that claims arising from events
19   occurring prior to the August 2, 1999, transaction were not arbitrable, noting that "[d]efendants try
mightily to date their first investment after September 11, 1999 – the date on which Tommy Fountain
20   became associated with plaintiff – in an understandable effort to tie plaintiff to Fountain and thereby force
plaintiff to an arbitration." *Id.*, slip op., at 9. However, the court was not persuaded, and it commented
21   that:

22          The failure of defendants' counsel to alert the Court originally to the existence of this
        August 2nd purchase date and the drafting inconsistencies now apparent in defendants'
23          original description of the purchase dates strongly suggest that even defendants' counsel
        recognize the weakness of their present argument. Otherwise, they would have aired all of
24          these matters when they were originally before the Court instead of the Court having to
        learn all of this only after plaintiff later received discovery material that brought to light
25          the existence of an earlier purchase date than that represented by counsel.

26                        [*Id.*, slip op., at 10.]

27          As evidenced by the written materials submitted herewith, several of the "dates" set forth in the
Statement of Claim are inaccurate. The events giving rise to Defendant's claims occurred before
28   Lancaster was affiliated with ONESCO.

---

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

-9-

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

1    the terms of the contract, Defendant's tendering of funds into escrow operated to make his

2    commitment to purchase shares "irrevocable" as of that date.  [Subscription Agreement, § 1(d).]

3    It logically follows that any alleged material misrepresentations that induced Defendant's

4    execution of the subscription agreement (i.e., his irrevocable commitment to purchase) must have

5    occurred on or before that date.

6         ONESCO's preliminary review reveals some activity post-execution of the Subscription

7    Agreements, however, much of this activity occurred *after* Lancaster was terminated by

8    ONESCO on January 3, 2005.  For example, Defendant apparently made a payment of $1,241.96

9    on April 22, 2005 – more than three months after Lancaster's termination from ONESCO – and,

10    according to Defendant's own Statement of Claim, Defendant made a $200,000 payment on

11    September 6, 2005.  Based on the information recovered to date, however, Defendant's

12    subsequent actions were premised on the same alleged misrepresentations and omissions that led

13    to his July 30, 2003, contractual commitment, including the written materials and disclosures

14    received before July 2003.  At this point, ONESCO submits that Defendant's claims relating to

15    the July 30, 2003, subscription agreement and the alleged misrepresentations that induced

16    Defendant's execution of it are not arbitrable under any circumstances, and evidence that will be

17    offered at hearing will demonstrate that the subsequent payments occurred outside of Lancaster's

18    tenure with ONESCO and were otherwise predicated on conduct pre-dating the execution of the

19    Subscription Agreement.  Specifically, ONESCO anticipates that evidence to be gathered through

20    discovery and offered at hearing will demonstrate that subsequent representations, if any, were

21    not new or material with respect to the Defendants' investment decisions.  Thus, as explained

22    below, ONESCO has no obligation to arbitrate these claims.

23        **D.**    **Defendants' Arbitration Action.**

24         In or about March 2007, non-party Marc E. Robertson ("Robertson") initiated an action

25    with the National Association of Securities Dealers, Inc. (Case No. 07-00936) against ONESCO,

26    wherein he seeks to hold ONESCO responsible for the alleged misrepresentations Lancaster made

27    in the Private Placement Memorandum, discussed herein, and other alleged misrepresentations,

28    on the grounds that, generally, Lancaster was associated with ONESCO, and ONESCO

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

negligently supervised Lancaster.  Robertson filed an Amended Statement of Claim, adding

Defendant and others as Claimants in the same NASD action, on or about April 3, 2007.  Claims

are brought under federal and state securities law, violations of state consumer protection statutes,

breach of contract, common law fraud, breach of fiduciary duty, and negligence and gross

negligence.

### III.    LAW AND DISCUSSION

In an action seeking to enjoin an arbitration proceeding, the traditional equitable criteria

for granting injunctive relief apply.  These factors are: "(1) a strong likelihood of success on the

merits; (2) the possibility of irreparable injury to the plaintiffs if injunctive relief is not granted;

(3) a balance of hardships favoring the plaintiffs; and (4) advancement of the public interest."

*Textile Unlimited, Inc. v. A..BMH and Co. Inc.*, 240 F.3d 781, 786 (9th Cir. 2001).  We address

each of these elements.

### A.    ONESCO Has A Strong Likelihood Of Success On The Merits.

1.    Arbitration Is Solely A Matter Of Contract, And Parties May Not Be
Forced To Arbitrate Disputes They Did Not Agree To Arbitrate.

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, governs arbitration disputes

involving interstate commerce.  Although the public policy embodied in the FAA favors

arbitration in resolving disputes, above all:

> [A]rbitration is a matter of contract, and a party cannot be required
> to submit to arbitration any dispute which he has not agreed to so
> submit.

[*AT&T Tech., Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986).][4]

Because arbitration is, at its core, a matter of contract, courts must take care to ensure that

they do not force a party to arbitrate a dispute that it never agreed to arbitrate.  "[T]he first task of

a court asked to compel arbitration of a dispute is to determine whether the parties agreed to

arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614,

626 (1985).

---

[4]    California law is identical.  See *Pacific Investment Co. v. Townsend*, 58 Cal.App.3d 1, 9 (Ct. App. 1976) ("Arbitration is a matter of contract and a party cannot be required to arbitrate a dispute he has not agreed to submit.").

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

1    In *Volt Info. Sciences, Inc. v. Stanford Univ.*, 489 U.S. 468, 469 (1989), the United States

2    Supreme Court squarely recognized that "[a]rbitration under the act is a matter of consent, not

3    coercion, and parties are generally free to structure their arbitration agreements as they see fit …

4    [and] they may limit by contract the issues which they will arbitrate." *Accord: First Options of*

5    *Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ("Arbitration is simply a matter of contract between

6    the parties; it is a way to resolve disputes – but only those disputes – the parties have agreed to

7    submit to arbitration."); *Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007) ("It is

8    axiomatic that … a party cannot be required to submit any dispute which he has not agreed so to

9    submit."); *Wiepking v. Prudential-Bache Sec., Inc.*, 940 F.2d 996, 998 (6th Cir. 1991) ("An

10    agreement to arbitrate is a contract … [I]t does not prevent parties from agreeing to exclude

11    matters from arbitration if they so desire.").  Thus, if one party seeks to force another to arbitrate

12    a dispute the parties did not agree to submit to arbitration, the proper remedy is to enjoin the

13    arbitration.[5]

14           2.     Whether An Agreement To Arbitrate Exists Is For The Court To
15               Decide.

16    The question of "whether or not a company is bound to arbitrate, as well as what issues it

17    must arbitrate, is a matter to be determined by the Court." *Litton Fin. Printing Div. v. Nat'l*

18    *Labor Relations Bd.*, 501 U.S. 190, 208 (1991).  *See also AT&T Tech.*, 475 U.S. at 649

19    (determining whether a contract creates a duty to arbitrate a particular matter is an issue for the

20    courts to decide); *Sanford v. Memberworks, Inc.*, 483 F.3d at 962 ("[C]hallenges to the *existence*

21    of a contract as a whole must be determined by the court … ."); *Three Valleys Mun. Water Dist.*

22    *v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1141 (9th Cir. 1991) ("The court must determine

23    whether a contract *ever* existed; unless that issue is decided in favor of the party seeking

24    arbitration, there is no basis for submitting a question to an arbitrator.") (citation omitted).

25

26    [5]    In each of the following cases, for example, the courts issued injunctions to preclude arbitration where the disputes at issue were not arbitrable.  *Textile Unlimited*, 240 F.3d 781 (9th Cir. 2001);

27    *LAWI/CSA Consolidators*, 849 F.2d 1236 (9th Cir. 1988); *Six Clinics Holding Corp. v. Cafcomb Systems*, Inc., 119 F.3d 393 (6th Cir. 1997); *Md. Cas. Co. v. Realty Advisory Bd.*, 107 F.3d 979 (2nd Cir. 1997); *Va.*

28    *Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113 (4th Cir. 1993); *United Offshore Co. v. Southern Deepwater Pipeline Co.*, 899 F.2d 405 (5th Cir. 1990).

-12-

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

3.    <u>No Agreement Exists Between the Parties To Arbitrate Their Disputes.</u>

As an initial point, Defendant does not contend – nor can he – that he has an express agreement with ONESCO to arbitrate any disputes between them.

4.    Defendants' Claims Are Not Arbitrable Under NASD Rules Because Defendant Was Not A Customer Of ONESCO Or Any Of Its Associated Persons At The Time Of The Events Giving Rise To His Claims.

a.    Defendant's Only Claimed Basis For Arbitrability Of This Dispute Lies In The NASD Rules.

The only possible grounds for arbitration is that ONESCO is an NASD member and Lancaster was an associated person with ONESCO between March 23, 2004, and January 3, 2005.  Under certain circumstances, the NASD Code of Arbitration Procedure can bind its members to arbitrate claims with third parties.  *See Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 863-64 (2d Cir. 1994).  To determine whether the Code governs this dispute between Defendant and ONESCO, the Court must interpret the Code as it would a contract under applicable state law, giving effect to the ordinary meaning of the language used.  *See Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987).

The applicable provision is Rule 10301(a) of the NASD Code, which governs whether a matter is required to be arbitrated even in the absence of an express arbitration agreement:

> Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

This section "contain[s] two prerequisites before an NASD member can be compelled to arbitrate.  First, a complaining party must be a "customer" of either the NASD member or an "associated person" of that member, and, second, the "dispute, claim or controversy" must have arisen "in connection with the business of such member."  *See, e.g., Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 820 (11th Cir. 1993); *Gruntal & Co., Inc. v. Steinberg*, 837 F. Supp. 85 (D.N.J. 1993) (same).  Defendant cannot satisfy either of these two prerequisites.

-13-

SQUIRE, SANDERS &
DEMPSEY L.L.P.
601 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

1

                     b.      Defendant Was Not Customer Of ONESCO, Nor Do His Claims Arise "In Connection With" The Business Of ONESCO.

2

3        As against ONESCO, Defendant satisfies neither part of the two-prong test to arbitrate his

4    claims under Rule 10301(a).

5        *First*, he was not a "customer" of ONESCO.  In short, he kept no accounts, signed no

6    contracts, filled out no applications, indeed, had no contact whatsoever with ONESCO.

7        *Next*, because the first prong is not satisfied, the second prong of the test is not even

8    reached with respect to ONESCO.  *See Wheat*, 993 F.2d at 820-21 (finding that because investors

9    were not Wheat First customers, "we do not reach the question of whether [the investors'] claims

10   arose 'in connection with the business' " of Wheat First).  Nevertheless, *even if* the Court were to

11   consider the second prong, Defendant cannot satisfy it because there is simply no nexus between

12   Defendant's claims and the business of ONESCO.  The Private Placement Memorandum

13   expressly states that the securities were not offered through a broker-dealer.  ONESCO played

14   absolutely no role in the transactions in question.  ONESCO did not authorize the transactions or

15   otherwise have any knowledge of the transactions before they occurred.  None of the transactions

16   were effectuated through ONESCO.  ONESCO is not identified anywhere in the Private

17   Placement Memorandum or in any of the written materials provided to Defendant by Lancaster.

18   Defendant's only contact was with Lancaster.  There is no evidence Lancaster ever made any

19   representation, whether oral or written, concerning ONESCO to Defendant.  And, of course,

20   ONESCO received no compensation for any of the transactions.

21       Courts narrowly construe the second prong of the test, the "in connection with"

22   requirement, and they reject the notion that an investor may arbitrate *all* of his transactions with

23   any NASD member, including those not made in connection with the member's business.  As the

24   Eleventh Circuit explained in a recent case, "in the universe of member-customer disputes, only a

25   portion will arise in connection with the member's business and only those satisfy the Code's

26   arbitration provisions." *Multi-Financial Sec. Corp. v. King*, 386 F.3d 1364, 1370 (11th Cir. 2004).

27

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

-14-

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

1                c.     **Defendant Was Not Customer Of A Person Associated With**

2                       **ONESCO At The Time Of The Events Giving Rise To His Claims.**

3       So, Defendant is forced to argue that he had a relationship with Lancaster. It is not

4 enough, however, to allege having entered into a transaction with someone who was "associated"

5 with an NASD member at some other time. Rather, as first held in *Wheat, First Securities, Inc. v.*

6 *Green*, there must be a relationship between the investor and the member or associated person *at*

7 *the time* of the relevant events or occurrences giving rise to the investor's claims. "Customer

8 status" under the NASD Rules "must be determined as of the time of the events providing the

9 basis for the allegations of fraud." 993 F.2d at 820 ("customer" status for purposes of

10 arbitrability "*should be determined as of the time of the occurrence of events that constitute the*

11 *factual predicate for the causes of action contained in the arbitration complaint*"). As the *Wheat*

12 court explained: "We cannot imagine that any NASD member would have contemplated that its

13 NASD membership would require it to arbitrate claims which arose while a claimant was a

14 customer of another member merely because the claimant subsequently became its customer. …"

15 *See MONY Sec. Corp. v. Bornstein*, 390 F.3d 1340 (11th Cir. 2004) (Eleventh Circuit reaffirmed

16 that " 'customer status for purpose of' the NASD is 'determined as of the time of the events

17 providing the allegations.' " *Id.* at 1345 (citing *Wheat* at 820).

18       In *Wheat, First*, because the claimants "were not customers of Wheat First at the time of

19 the allegedly fraudulent … stock transactions," the court held they could not "invoke the NASD

20 Code to compel Wheat First to arbitrate." *Id.* As a result, the court affirmed summary judgment

21 on Wheat First's declaratory judgment action, finding that Wheat First could not be compelled to

22 arbitrate. *Id.* at 815.

23       This legal proposition has been adopted by every court that has considered this issue,

24 including the Southern District of California in *Prudential Sec., Inc. v. Dusch*, 1994 WL 374425

25 (S.D. Cal., Mar. 28, 1994) ( . H).[6] On point with the instant case is *Hornor, Townsend & Kent,*

---

26    [6]     In *Duscsh*, the investor made investments in accounts established with another NASD member

27 while her stockbroker (the associated person) was associated with that NASD member. Later, Prudential acquired the assets of that NASD member, and the associated person with whom the investor had been dealing moved to Prudential, along with the investor's accounts. Then, additional transactions were

28 made. The court agreed with Prudential that it was not required to arbitrate claims based on investments

SQUIRE, SANDERS & DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

1    *Inc. v. Hamilton*, 2004 WL 2284503 (N.D. Ga., Sept. 30, 2004) (Exh. F), wherein the court

2    granted summary judgment to the NASD member, holding that it could not be compelled to

3    arbitrate claims based on investors' transactions with a sales agent that were premised on alleged

4    misrepresentations that occurred before the agent occurred before the agent became associated

5    with the member.  In *Hornor*, the facts showed that the investors had made a securities

6    transaction based on alleged misrepresentations made at least <u>*two months*</u> before the agent

7    became associated with Hornor Townsend, the NASD member.  Claims arising from those

8    events, therefore, were held not arbitrable.  The court explained that, "if the sale occurred at a

9    time when [the associated person] was not employed by [the member], the latter cannot be hauled

10   into an arbitration proceeding ... ."  *Id.* at *3 (citing 2003 WL 23832424, at *4 (earlier ruling in

11   same action)).

12        In another case involving similar facts, *Gruntal & Co., Inc. v. Steinberg*, 854 F. Supp. 324

13   (D.N.J. 1994), the court applied *Wheat* to enjoin arbitration, concluding that the investors who

14   were pursuing arbitration were not customers for purposes of an NASD arbitration.  There, as

15   here, the pertinent events occurred before the investors became customers of the broker-dealer.

16   made <u>*before*</u> the investor's accounts were moved to Prudential.  Following *Wheat*, the court held that these
     claims were not arbitrable because they arose when the investor was not yet a customer of Prudential.  *Id.*
17   at *2. *cf: World Group Sec. v. Ko*, 2004 1811145, at *6 (N.D. Cal., Feb. 11, 2004) (holding under similar
     NASD Rule 10201 that an associated person had no claim against member based on contractual
18   relationship and events occurring before the person was associated with the member).

19        Other courts have reached this same conclusion.  In *Sands Bros. & Co., Ltd. v. Ettinger*, 2004 WL
     541846 (S.D.N.Y., Mar. 19, 2004) (Exh. J), the investor sought to arbitrate claims against an NASD
20   member based on the conduct of an associated person with whom she had dealt.  But the investor's
     problem was that the transactions occurred <u>*before*</u> the associated person was associated with the member
21   against whom arbitration was sought.  The court followed *Wheat* and concluded that, "Ettinger cannot
     compel Sands to arbitrate her losses stemming from activity in her account before the account was
22   acquired by Sands.  To the extent [the associated person with whom the investor had dealt] engaged in
     misconduct with respect to her account while at [predecessor brokerages], Ettinger cannot require Sands to
23   arbitrate that claim under the theory that she became a 'customer' of Sands thereafter."  *Id.* at *3.  *See also*
     *Sands Bros. & Co., Ltd. v. Alba Perez Ttee Garcia Revocable Trust*, 2004 WL 2186574, at *4 (S.D.N.Y.,
24   Sept. 28, 2004) (Exh. K) (same result as to a different claimant).

25        And in *Ryan, Beck & Co. v. Fakih*, 268 F. Supp. 2d 210 (E.D.N.Y. 2003), the Eastern District of
     New York rejected an investor's attempt to arbitrate over a transaction that took place <u>*after*</u> the investor
26   ceased to be a customer of the NASD member, Ryan Beck.  There, the investor had terminated his
     investment relationship with a brokerage that was the predecessor to Ryan Beck.  Later, after Ryan Beck
27   acquired the assets of that brokerage, the investor sought to arbitrate claims against Ryan Beck based on
     transactions occurring in his account while it was with the previous brokerage.

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

-16-

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

"Like the acts of fraud involved in *Wheat,*" the court reasoned, "*the misconduct which is the subject of the Arbitration Proceedings took place, in its entirety at least two months before the Steinbergs became customers of Gruntal*." *Id.* at 340 (emphasis added).

The Gruntal court added that the second prong of the arbitrability test also could not be met: "The claims at issue in the Arbitration Proceedings, moreover, did not arise 'in connection with the business of' Gruntal, as is required by the NASD Code of Arbitration Procedure. As indicated, the Arbitration Proceedings relate to acts and omissions occurring over two months before Gruntal had any relationship to the Steinbergs." *Id.* at 341.

> d.    Applying The Settled Rule Of *Wheat* To The Facts, Defendant May Not Arbitrate His Claims Against ONESCO.

Applying the rule of *Wheat* and its progeny to the facts of this case produces exactly the same result:  Defendant's irrevocable commitment to purchase with the Lancorp Fund occurred on July 30, 2003, and was premised on alleged material misrepresentations and/or omissions that occurred before that date – more than seven months before Lancaster became an "associated person" of ONESCO.

ONESCO submits that any activity after Defendant's execution of his Subscription Agreement appears to have occurred outside of Lancaster's tenure with ONESCO, and was otherwise based on the same operative facts relating to the Subscription Agreement and any misrepresentations prior thereto – or what the *Wheat* court described as the same "*occurrence of events that constitute the factual predicate for the causes of action*." 993 F.2d at 820. *See also Malhotra v. Equitable Life Assurance Society of the United States*, 364 F. Supp.2d 299, 305-06 (E.D.N.Y. 2005) (subsequent investment decisions, for purposes of claims premised on fraud and misrepresentation, do not constitute relevant events or occurrences – for purposes of timeliness – unless premised on "*new and materially different*" omissions) (emphasis added); *Northwestern Human Services, Inc. v. Panaccion*, 2004 WL 2166293, at *18 (E.D. Pa. Sept. 24, 2004) ("As a matter of simple logic, any misrepresentation of omission must have occurred on or before the date of sale.") (Exh. L).

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

1    In summary, ONESCO "cannot be hauled into an arbitration proceeding" based on the

2    occurrence of events (specifically, alleged misrepresentations by Lancaster) that occurred before

3    he became associated with ONESCO. *Hornor*, 2004 WL 2284503, at *3. Indeed, an NASD

4    member "could not have supervised [the associated person] at a time before [the associated

5    person] became employed with" the NASD member. *Hornor, Townsend & Kent, Inc. v.*

6    *Hamilton*, Case No. 1:01-cv-02979 (N.D. Ga., Sept. 6, 2005) (slip op., at 12) (Exh. G). As *Wheat*

7    reasoned, "we cannot imagine that any NASD member would have contemplated that its NASD

8    membership would require it to arbitrate claims … merely because the claimant subsequently

9    became its customer." 993 F.2d at 820.

10   **B.    ONESCO Would Suffer Irreparable Harm If Forced To Arbitrate A Dispute
            It Has Not Agreed To Arbitrate, And Defendant Can Show No**
11          **Countervailing Hardship.**

12   The Ninth Circuit has clearly spoken that a party is caused irreparable harm if it is forced

13   to arbitrate a dispute where it had no contractual obligation to do so. *See LAWI/CSA*

14   *Consolidators, Inc. v. Wholesale & Retail Food Distribution, Teamsters Local 63*, 849 F.2d 1236,

15   1241 n.3 (9th Cir. 1988) (holding that party was entitled to injunctive relief once it established that

16   it was not under a contractual duty to arbitrate). *Accord: Merrill Lynch Investment Managers v.*

17   *Optibase, Ltd.*, 337 F.3d 125, 129 (2nd Cir. 2003) (unless arbitration is enjoined, movant would

18   suffer irreparable harm by being forced to expend time and resources arbitrating an issue that is

19   not arbitrable and as to which any award would not be enforceable); *MONY Sec., Inc. v. Vasquez*,

20   238 F. Supp. 2d 1304, 1308 (M.D. Fla. 2002) ("This Court has continuously held that irreparable

21   harm is present if a party is compelled to arbitrate a claim absent an agreement between the

22   parties to arbitrate).

23   In light of this law, the balance of hardships tips completely in ONESCO's favor, because

24   if Defendant has no right to an arbitration, he will suffer no hardship at all by having to litigate

25   his disputes in court like every other litigant who lacks an agreement to arbitrate.

26   **C.    The Public Interest Is Advanced By Not Forcing Parties To Arbitrate Their
            Disputes Where They Never Agreed To Arbitrate.**
27

28   Although it is often said that public policy favors arbitration of disputes, that is true only if

-18-

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
Case No. C-07-2844 JSW

the parties have agreed to arbitrate in the first instance. Arbitration is a creature of contract, and if the parties never had a contract to arbitrate their disputes, then no public interest is advanced by compelling them to arbitrate. Where a court finds that no agreement to arbitrate exists, they do not linger on this factor for even a moment because the public interest is obviously served when a party is not forced to arbitrate a dispute that it never agreed to arbitrate.

## IV.    CONCLUSION

For the foregoing reasons, ONESCO seeks preliminary injunctive relief (1) enjoining the Defendants from further proceedings in the NASD actions; and (2) enjoining the Defendants from filing any arbitration claims before the National Association of Securities Dealers, Inc. against ONESCO relating to the Lancorp Fund, and requests that the Court schedule a hearing on ONESCO's preliminary injunction motion at a date and time which will allow the parties to conduct reasonable discovery into these issues prior to the hearing.

Respectfully submitted,

Dated: September 6, 2007                    ZEIGER, TIGGES & LITTLE LLP


By:_____/s/_____
                   Michael R. Reed

Attorneys for Plaintiff
THE O.N. EQUITY SALES COMPANY

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554