Not Reported in F.Supp.2d                                                                                                     Page 1

Not Reported in F.Supp.2d, 2004 WL 541846 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

C
Sands Bros & Co., Ltd. v. Ettinger
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
SANDS BROTHERS & CO., LTD., Plaintiff,
v.
Cindi ETTINGER, Defendant.
No. 03 Civ.7854(DLC).

March 19, 2004.

Ariel Berschadsky, New York, New York, for the Plaintiff.
Andrea Fischer, Olshan Grundman Frome LLP, New York, New York, for the Defendant.

*OPINION AND ORDER*

COTE, J.

*1 Sands Brothers & Co., Ltd. ("Sands"), a Delaware corporation with its principal place of business in New York, filed this action against Cindi Ettinger ("Ettinger"), a citizen of Pennsylvania, on October 6, 2003. Sands has moved for a declaratory judgment pursuant to 28 U.S.C. § 2201 that it has no legal obligation to arbitrate any claims arising out of Ettinger's dealings with Bluestone Capital Corp. ("Bluestone") or its subsidiary, Shochet Securities, Inc. ("Shochet"),[FN1] who were Ettinger's brokers before Sands purchased Bluestone. For the reasons described below, the motion is granted in part.

> FN1. Sands did not file a notice of motion, as required by S.D.N.Y. Local Civil Rules 6.1, 7.2 (2001). This statement of the relief Sands seeks through this motion is taken from the introductory paragraph of its October 24, 2003 memorandum of law in support of its motion.

*Background*

The following facts are undisputed or as shown by Ettinger. In January 2000, Ettinger, an artist, opened an IRA account at GKN Securities Corp. ("GKN"). A broker at GKN, Robert Nosel ("Nosel"), was assigned to handle her account. Following several telephone conversations during which Ettinger told Nosel that she wanted to invest conservatively, Nosel sent her a letter dated January 24, 2000 outlining his investment strategy for her account. In the letter, Nosel stated that he had "taken into account your expressed conservatism when tailoring this portfolio." Included among Nosel's recommendations were speculative equity mutual funds. Neither Nosel nor his associate reviewed with Ettinger the risks associated with the proposed asset allocation plan. On January 28, Ettinger invested $256,519.00 in accordance with the recommended asset allocation plan devised by Nosel.

Ettinger's account moved with Nosel to Shochet in December 2000, and to Bluestone in August 2001.[FN2] On November 7, 2001, Sands and Bluestone executed a Purchase Agreement whereby Sands acquired certain of Bluestone's accounts and assets in exchange for $1,075,000 in cash. One of the accounts purchased by Sands was that of Ettinger.[FN3]

> FN2. By an agreement of August 1, 2003, Shochet assigned to Bluestone, *inter alia*, all of its customer accounts, trademarks, and copyrights, including title and interest to its corporate name. As consideration for the transaction, Bluestone paid Shochet in cash and stock.
>
> FN3. In December 2001, Nosel departed Sands for employment at another brokerage house and no longer served as Ettinger's broker.

The Purchase Agreement provided, *inter alia*, that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT**

**G**

Sands would be permitted, but not required, to offer to hire "some or all" of Bluestone's personnel other than the co-chairmen; that Bluestone would transfer all rights in Shochet's trademarks and copyrights to Sands; and that, upon Sands' request, Bluestone would assign to Sands all of Bluestone's properties other than its headquarters in New York and specified other properties. Section 8 of the Purchase Agreement also released Sands from any of Bluestone's "liabilities, expenses, debts or obligations ... contingent or absolute, known or unknown, including ... any Litigation Liabilities." The clause defined "litigation liabilities" as any " debts, obligations or liabilities arising from or relating to pending, threatened and unasserted claims (including, without limitation, customer complaints), litigation, legal actions, counterclaims, suits or arbitration...."

In a March 28, 2002 letter from Sands to Ettinger for the purpose of updating Ettinger's file and account information, Sands introduced itself as having had "successfully acquired" Shochet. The letter asked Ettinger to update her file and account information by completing and returning the enclosed forms. Sands closed the letter by stating that it "look[ed] forward to continuing our long-standing relationship with you." According to Ettinger, she filled out the forms, checking off boxes indicating "low-risk exposure," "preservation of capital" and "long term growth" as investment objectives, and returned them to Sands. A broker at Sands who had taken over Ettinger's account after Nosel's departure called her in April and introduced himself. Sands and Ettinger had no further contact.

*2 By October 2002, Ettinger's IRA account had declined 53%, from $292,148 to $138,287. Ettinger showed her account statements to one of her brokers at UBS PaineWebber ("PaineWebber"), another brokerage house with which she maintained investment accounts. The PaineWebber broker reviewed the Sands account statements and informed Ettinger that she was invested in speculative equity mutual funds. Ettinger immediately transferred the speculative mutual fund investments from Sands to PaineWebber. In December, she liquidated those investments, paying approximately $4,000 in sales charges.

On July 24, 2003, Ettinger initiated an arbitration proceeding against Sands before the NASD. Ettinger charged Sands with fraud and " unsuitability with respect to the sale of speculative equity mutual funds" in her IRA account, as well as claims for breach of contract and lack of supervision. On October 6, Sands filed this action. In its first cause of action, Sands seeks a declaration that it is not a successor in interest to either Bluestone or Shochet. In its second cause of action, it requests a stay of the arbitration until there is a determination on its first cause of action.

On October 6, Sands requested that the Court issue an *ex parte* stay of the arbitration. The Court refused to issue an *ex parte* order, and scheduled a conference for October 10. At the October 10 conference, Sands requested an opportunity to supplement its motion papers. This motion ensued. The parties do not contest the following facts: (1) Sands, as a member of NASD, is bound by the NASD Code of Arbitration Procedure ("NASD Code"); (2) Ettinger was a Sands customer from November 7, 2001, the date of the Purchase Agreement with Bluestone, to the date in October 2002 on which she transferred her IRA account to PaineWebber; and (3) the dispute between Sands and Ettinger is subject to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14 (1988).

*Discusion*

Sands contends that it has no legal obligation to arbitrate Ettinger's claim against it because Ettinger was not its "customer" for purposes of the NASD Code for any period before it acquired Bluestone on November 7, 2001, and because it is not a " successor in interest" to Bluestone. As a threshold matter, it should be noted the question of arbitrability is for the Court. "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d. 48, 53 (2d Cir.2001) (citation omitted); *see Bensadoun v. Jobe-Riat,* 316 F.3d 171, 175 (2d Cir.2003). "[O]ne party's membership in [the NASD], is insufficient, in and of itself, to evidence the parties' clear and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unmistakable intent to submit the 'arbitrability' question to the arbitrators." *John Hancock,* 254 F.3d at 57. Since Ettinger has pointed to no agreement between her and Sands that would place the issue of arbitrability before the arbitrator, this Court will decide the issue of arbitration.

*3 There is a strong federal policy favoring arbitration. *See Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 (2002) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983)). "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26 (1991) (citation omitted). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone,* 460 U.S. at 24-25.

Whether or not there is a motion to compel arbitration, any disputed issues of fact concerning the existence of a binding agreement to arbitrate are decided under the standard that applies to a motion for summary judgment. *Bensadoun,* 316 F.3d at 175. If material issues of fact are in dispute, the matter is properly left for trial. *Id.* (citing 9 U.S.C. § 4).

*1. Ettinger's Status as a Customer*

Rule 10301(c) of the NASD Code provides that "[a]ny dispute, claim, or controversy ... between a customer and a member and/or associated person arising in connection with the activities of such associated persons" must be submitted to arbitration "upon the demand of the customer." The NASD Code "defines 'customer' broadly, excluding only ' a broker or dealer.' " *John Hancock,* 254 F.3d at 59. If any ambiguity exists in the meaning of "customer" as used in Rule 10301, "the term should be construed in favor of arbitration." *Bensadoun,* 316 F.3d at 176.

The Second Circuit has recently noted that " 'customer status ... must be determined as of the time of the events providing the basis for the allegation of fraud,' so that allegations against a predecessor-in-interest did not give rise to a duty to arbitrate on the part of the successor." *Bensadoun,* 316 F.3d at 177 (quoting *Wheat, First Securities, Inc. v. Green,* 993 F.2d 814, 820 (11th Cir.1993)). An investor is a "customer" of a brokerage house, and able to compel the brokerage house to arbitrate, only for conduct that falls within the scope of the specific account between the investor and the brokerage house. *Id.* at 178 (the investor "would be unable to rely on the existence of his personal account to demand arbitration on issues relating to a different account outside the scope of [the investor's] customer relationship with [the NASD member]").

Ettinger cannot, under the theory that she was once a Sands customer, compel Sands to arbitrate her losses stemming from activity in her account before the account was acquired by Sands. To the extent that Nosel engaged in misconduct with respect to her account while at GKN, Shochet, or Bluestone, Ettinger cannot require Sands to arbitrate that claim under the theory that she became a "customer" of Sands thereafter.

To the extent, however, that Sands seeks a declaration that it is not required to arbitrate claims associated with the period during which Ettinger was Sands' customer, its motion is denied. Sands is required to arbitrate any claims by Ettinger regarding the management of her IRA account from the date she became a Sands customer, that is, November 7, 2001, to the time her IRA account was transferred to PaineWebber. It is for the arbitrator to decide to what extent, if any, Sands is liable to Ettinger for its handling of her account from November 7, 2001 to the date in October 2002 when Ettinger transferred her account to PaineWebber.

*2. Successor in Interest Liability*

*4 Sands also seeks a declaratory judgment that it is not required to arbitrate Ettinger's claims for conduct that occurred while she had an account with either Shochet or Bluestone because it is not a successor in interest to their liabilities. Ettinger does not oppose this prong of Sands' motion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02844-JSW    Document 32-8    Filed 09/06/2007    Page 4 of 4

Not Reported in F.Supp.2d                                                                               Page 4
Not Reported in F.Supp.2d, 2004 WL 541846 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Under New York common law,[FN4] a purchase of assets does not render the purchaser liable for the torts of its predecessor unless (1) it expressly assumed the predecessor's tort liability, (2) there was a *de facto* merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations. *Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 45 (2d Cir.2003) (citing *Schumacher v. Richards Shear Co.,* 59 N.Y.2d 239, 244-45 (N.Y.1983)). Because Sands expressly rejected any of Bluestone's liabilities, and there is no allegation or evidence that the parties entered into the Purchase Agreement for fraudulent purposes, only the second and third factor are at issue here.[FN5]

   FN4. The parties do not dispute that New York law governs the Purchase Agreement.

   FN5. The second and third items are so similar that some courts consider them to be the same exception. *Cargo Partner,* 352 F.3d at 45 n. 3.

A *de facto merger* occurs when a transaction is a merger in substance if not in form. *Cargo Partner,* 352 F.3d at 46. To find that a *de facto* merger has occurred, there must be: "(1) a continuity of the selling corporation, evidenced by the same management, personnel, assets and physical location; (2) a *continuity of stockholders,* accomplished by paying for the acquired corporation with shares of stock; (3) a dissolution of the selling corporation; and (4) the assumption of liabilities by the purchaser." *Id.* (citation omitted) (emphasis supplied). The "continuity of ownership" is an essential aspect of the doctrine of *de facto* merger. *Id.*

There was no *de facto* merger of Sands with Bluestone. There was no continuity of ownership between the two companies. Sands paid Bluestone in cash for the purchase of certain of its assets, including the customer accounts. Bluestone owners did not receive any stock in Sands. In addition, under the terms of the Purchase Agreement, Sands did not acquire Bluestone's liabilities. Moreover, the Purchase Agreement prohibited Bluestone's co-chairmen from working at Sands, and Sands was not required to hire Bluestone's employees.

In sum, Sands is not a successor in interest to Bluestone's liabilities. The transaction between the two parties does not satisfy any of the exceptions to the general rule that a successor business entity is not liable for the torts of its predecessor.

*Conclusion*

For the reasons stated above, Sands' motion for a declaratory judgment is granted in part. Sands has no obligation to arbitrate Ettinger's claims for the period before November 7, 2001. The parties shall advise the Court by April 2, 2004 whether there is any reason not to enter a final judgment in this action based on the rulings contained herein.

SO ORDERED:

S.D.N.Y.,2004.
Sands Bros & Co., Ltd. v. Ettinger
Not Reported in F.Supp.2d, 2004 WL 541846 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.