Westlaw.

Not Reported in F.Supp.2d                                                              Page 1

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

H
Northwestern Human Services, Inc. v. Panaccio
E.D.Pa.,2004.

United States District Court,E.D. Pennsylvania.
NORTHWESTERN HUMAN SERVICES, INC.,
Northwestern Intrasystems, Inc., Northwestern
Intrasystems, Inc. Trust Dated April 1, 1994,
Plaintiffs
v.
Robert C. PANACCIO, Marta Panaccio, John L.
McKeever, III, McKeever, Burke & Grant,
Provident Mutual Life Insurance Company,
Provident Mutual Insurance and Financial Services
Company, 1717 Capital Management Company,
Shirley Barr, Joseph J. Patrick, Thomas X. Flaherty,
Barry N. Bowers, John Does 1-6, Jane Does 1-6,
and Doe Corporations 1-6, Defendants
No. Civ.A.03-157.

Sept. 24, 2004.

George Bochetto, Bochetto & Lentz PC,
Philadelphia, PA, for Plaintiffs.
Thomas E. Groshens, Dilworth Paxson, LLP, John
J. Soroko, Duane Morris LLP, Michael E. Dash, Jr.,
Morgan Lewis & Bockius LLP, Philadelphia, PA,
for Defendants.

MEMORANDUM OPINION AND ORDER
RUFE, J.
*1 Plaintiff Northwestern Human Services, Inc. ("
Northwestern") and its subsidiaries are non-profit
entities whose principal mission is to provide
community-based mental health and mental
retardation services to indigent individuals.
According to the Amended Complaint, the nobility
of Northwestern's mission is matched conversely by
the avarice and greed of its former President and
Chief Executive Officer, Defendant Robert C.
Panaccio. Northwestern alleges that Panaccio and
others engaged in a complex and intertwined series
of frauds designed to fleece the Medicare and

Medicaid programs for Northwestern's pecuniary
benefit so that Panaccio could then loot
Northwestern's unlawfully fattened coffers for the
pecuniary benefit of himself and others. In
sweeping fashion, the Amended Complaint alleges
that Panaccio duped Northwestern into funding his
princely lifestyle of slush funds and exorbitant
retirement packages, as well as kick-backs and
secret loans to Panaccio's cronies and business
associates.

These allegations, if true, are deeply troubling, but
their veracity is a question for another day.
Presently before the Court are various motions to
dismiss the Amended Complaint. For the reasons
below, the motions are granted in part and denied
part.

I. BACRGROUND

Plaintiffs are Northwestern, its wholly-owned
subsidiary, Northwestern Intrasystems, Inc., and
Northwestern Intrasystems, Inc. Trust Dated April
1, 1994 (collectively, "NHS"). Defendant Robert C.
Panaccio is a former NHS President and Chief
Executive Officer. His wife, Marta, is also a named
defendant. Defendant Shirley Barr is NHS's former
Director of Insurance. Defendant Thomas X.
Flaherty is NHS's former Chief Financial Officer
and a former member of NHS's Board of Directors
or Trustees. Defendant Barry N. Bowers was a
personal accountant to Panaccio. Defendant John L.
McKeever, III, and his employer, McKeever, Burke
& Grant ("MBG"), were financial advisors to both
Panaccio and NHS. Finally, Defendants Provident
Mutual Life Insurance Company, Provident Mutual
Insurance and Financial Services Company, and
1717 Capital Management Company (collectively, "
Provident"), are financial and insurance service
providers who issues various insurance products to
NHS through its licensed agents, McKeever and
MBG.[FN1]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT

I

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

FN1. The Amended Complaint also names Joseph J. Patrick as a defendant, but the Court understands that Plaintiffs and Mr. Patrick have reached a settlement.

The allegations of the Amended Complaint, which the Court must accept as true on a motion to dismiss, describe four interrelated schemes, all controlled by Panaccio, whereby he stripped the assets of NHS by various fraudulent acts, breaches of fiduciary duty and self-dealing.

First, Panaccio caused an NHS affiliate, Northwestern Center, Inc ., to commit Medicare and Medicaid fraud. This fraud (hereinafter, " Medicare/Medicaid fraud") ultimately resulted in a criminal investigation by the United States Department of Justice ("DOJ") and the filing of a criminal information. In addition, the Medicare/Medicaid fraud was the subject of a related qui tam action in which the United States Attorney intervened. The civil and criminal cases were settled jointly, with NHS paying a combined criminal fine and civil penalty of $7.78 million.[FN2]

FN2. *See United States v. Northwest Center, Inc.,* Crim. A. No. 02-316 (E.D.Pa.); *United States ex rel. Hendricks v. Northwestern Human Serv., Inc.,* Civ. A. No. 97-4203 (E.D.Pa.). Copies of the criminal guilty plea and the civil settlement agreement are attached to the Amended Complaint at Exs. E and F, respectively.

*2 Second, Panaccio used the proceeds of the Medicare/Medicaid fraud to purchase various insurance policies and annuities for himself from McKeever and MBG, thereby providing himself with millions of dollars worth of benefits to which he was not entitled, and enriching McKeever and MBG in the process, all at NHS's expense. NHS alleges that Provident ignored irregularities and conflicts of interest in these insurance-funded transactions, thereby aiding Panaccio and McKeever's fraudulent conduct. This fraud (hereinafter, the "Excessive Compensation" fraud) also involved Panaccio allegedly providing himself with excessive salaries, perquisites, expense accounts and other payments to which he was not entitled.

Third, Panaccio created a for-profit automobile leasing company, Amica Leasing, allegedly to overcharge NHS hundreds of thousands of dollars annually in connection with a fleet of 400 vehicles. Although NHS owned Amica, Panaccio used Amica revenues as a slush fund for himself and others, gave cars to friends and family members at NHS's expense, and put his son (who did no work) on Amica's payroll. Panaccio also allegedly established a similar arrangement through another company, United Staffing, which was to provide temporary labor to NHS. Panaccio's outside accountant, Bowers, allegedly assisted in siphoning cash from these businesses to Panaccio and Patrick's personal accounts (hereinafter, the "Amica/Bowers" fraud).

Finally, Panaccio and Flaherty allegedly cheated NHS out of millions of dollars for a purported investment in a minor league baseball stadium, Lehigh Valley Stadium, and related real estate through a series of misrepresentations to the NHS Board of Trustees and through additional fraudulent transactions (hereinafter, the "Stadium Looting" fraud). Each of these alleged frauds is discussed in greater detail *infra* at Part II.

NHS claims that these four schemes resulted in: (a) a $780,000 criminal fine and a related $7 million civil settlement; (b) hundreds of thousands of dollars in attorneys' fees arising from the DOJ investigation; (c) millions of dollars funneled from NHS to Defendants in the form of unearned salaries, fees, and other benefits; and (d) more than $1 million in administrative and legal costs incurred undoing the wrongs caused by Defendants. The twenty-two counts of the Amended Complaint allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and various common law doctrines. Defendants' motions to dismiss test the sufficiency of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). The familiar standard of review governs.[FN3]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 3
Not Reported in F.Supp.2d, 2004 WL 2166213 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

FN3. In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. A motion to dismiss may only be granted where the allegations fail to state any claim upon which relief may be granted. The Court primarily considers the allegations of the complaint, but it may also consider a document integral to, attached to, or explicitly relied upon in the complaint. Dismissal is warranted if it is certain that no relief can be granted under any set of facts which could be proved. *See Brody v. Hankin,* 299 F.Supp.2d 454, 457-58 (E.D.Pa.2004) (outlining standard of review for motion to dismiss pursuant to Rule 12(b)(6)).

## II. THE RICO CLAIMS

NHS brings two substantive RICO counts and one RICO conspiracy count against Panaccio, Flaherty and Bowers arising from the four schemes described briefly above. Perhaps anticipating insurmountable barriers to a RICO claim based on the Medicare/Medicaid fraud, the second RICO count is pleaded in the alternative and excludes the allegations surrounding the Medicare/Medicaid fraud.

*3 Panaccio and Flaherty filed separate motions to dismiss, but the arguments raised in both motions are nearly identical.[FN4] They argue that: (1) NHS lacks standing to bring a RICO claim arising from the Medicare/Medicaid fraud; (2) NHS's RICO allegations are insufficient under Rule 9(b)'s particularity requirement; (3) NHS's RICO allegations fail to state a claim because they do not adequately allege the requisite "pattern of racketeering activity"; and (4) the Court should decline to exercise supplemental jurisdiction over the state law claims against Panaccio, Flaherty, Mrs. Panaccio, and Barr. The Court addresses these arguments seriatim.

FN4. Despite having received a Court-approved extension of time to file a motion to dismiss, *see* Doc. # 54, Bowers never responded in any fashion to the Amended Complaint.

### A. RICO Standing for Medicare/Medicaid Fraud

NHS contends that Panaccio directed the Medicare/Medicaid fraud, which required Northwest Center, Inc. to make repeated misrepresentations to state and federal agencies in order to qualify for increased Medicare and Medicaid payments. NHS outlines a host of improper billing practices, such as billing for services in excess of those actually provided, for services of a recreational nature, and for treatment services rendered to patients who were so impaired that they were unable to participate in and benefit from those services.

The DOJ investigated this unlawful conduct and prepared an information against Northwest Center, Inc., alleging multiple violations of the mail fraud statute and sustained practices of fraud and misrepresentation. On May 20, 2002, NHS entered into a criminal plea agreement and a civil settlement agreement with the United States Government, agreeing to pay a penalty and civil fine totaling $7.8 million, to be paid in three installments. The final installment is contingent on NHS's recovery of " insurance assets that Panaccio and other Defendants wrongfully purchased for themselves with NHS revenues," Am. Compl. ¶ 54, *i.e.,* the proceeds of the Excessive Compensation fraud.[FN5]

FN5. As noted *supra* and described in greater detail *infra* at Part II.B., Panaccio allegedly arranged for NHS to purchase certain insurance products to fund his and other NHS executives' "salary continuation plans" or retirement packages. Panaccio and other NHS executives have filed a separate action asserting legal entitlement to those assets, *Panaccio v. Northwestern Human Services, Inc.,* Civ. A. No. 02-7767 (E.D.Pa.). That matter is currently pending before the undersigned.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

NHS alleges that the DOJ identified Panaccio as a " target" of its investigation, and that "throughout the investigation [Panaccio] was understood to be the mastermind" of the fraud. *Id.* ¶ 50. It contends that Panaccio undertook this fraudulent scheme to ensure adequate financial resources to fund his Excessive Compensation fraud, and to provide sufficient revenue to loot NHS through the Amica/Bowers fraud and the Stadium Looting fraud. *See id.* ¶ 52.

Section 1964(c) of Title 18 creates a civil cause of action for RICO violations: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court." Panaccio and Flaherty argue that NHS cannot demonstrate injuries sustained "by reason of" alleged RICO violations associated with the Medicare/Medicaid fraud. In other words, they argue that NHS lacks standing to pursue RICO claims based on the Medicare/Medicaid fraud. [FN6]

> FN6. RICO "standing" is not to be confused with the constitutional or prudential standing doctrines. Despite the somewhat confusing moniker, the statutory requirement of § 1964(c) is said to be RICO's "standing" provision. *See, e.g., Maio v. Aetna, Inc.,* 221 F.3d 472, 482-83 (3d Cir.2000).

Borrowing from the causation requirements of the antitrust laws, the Supreme Court of the United States held in *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) that a plaintiff is injured "by reason of" of a RICO violation and thus has RICO standing if the violation was the proximate cause of the plaintiff's injury. Panaccio and Flaherty concede that NHS suffered injury to its business or property when it paid a fine, a civil penalty and attorneys' fees and costs in connection with the Medicare/Medicaid fraud investigation. The issue presented by their motions to dismiss is whether the alleged RICO violation was the proximate cause of these injuries.

*4 Panaccio and Flaherty argue that NHS's injuries are too remote from the alleged racketeering activity to support RICO standing. They argue that the direct target and victim of the fraud was the Government's Medicare and Medicaid programs, not NHS. To the contrary, they contend, NHS was the intended *beneficiary* of the Medicare/Medicaid fraud, not a victim. They argue that the Government's discovery of the fraudulent scheme-not the Medicare/Medicaid fraud scheme itself-was the proximate cause of NHS's injuries ( *i.e.,* the civil fine, penalty and legal fees). Therefore, they contend, RICO standing is lacking.

In response, NHS urges the Court to view the four fraudulent schemes as an inseparable whole. The Medicare/Medicaid fraud cannot be isolated from the other frauds, it contends, because the Medicare/Medicaid fraud provided the revenues for Defendants' overall scheme to enrich themselves by looting NHS. Taken in this light, it contends, RICO standing exists because the Medicare/Medicaid fraud was "a substantial factor in the sequence of responsible causation, and ... the injury [was] reasonably foreseeable or anticipated as a natural consequence." [FN7]

> FN7. *Brittingham v. Mobil Corp.,* 943 F.2d 297, 304 (3d Cir.1991) (quoting *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23-24 (2d Cir.1990)), *overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.,* 46 F.3d 258 (3d Cir.1995).

Drawing directly from the reasoning in *Holmes,* the Third Circuit has identified three "formal factors of proximate cause in RICO":
(1) the directness of the injury-"the more indirect the injury, 'the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to [defendant's wrongdoing], as distinct from other, independent, factors;' '
(2) the difficulty of apportioning damages among potential plaintiffs-"allowing recovery by indirectly injured parties would require complicated rules for apportioning damages;" and,
(3) the possibility of other plaintiffs vindicating the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

goals of RICO-"direct victims could generally be counted on to vindicate the policies underlying" RICO in a better manner than indirect victims.[FN8]

> FN8. *Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 443 (3d Cir.2000) (brackets in original) (quoting *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 932 (3d Cir.1999) (quoting *Holmes,* 503 U.S. at 268-69)).

As outlined below, application of these factors to the case at bar and examination of analogous case law lead to the conclusion that NHS lacks standing to pursue RICO claims arising from the Medicare/Medicaid fraud.

The first factor to consider is the directness of the injury. As a starting point, the actual, immediate and direct result of the Medicare/Medicaid fraud was the collection of excessive reimbursements. Thus, there is a direct relationship between Panaccio's conduct and a *benefit* to NHS, not an injury. By contrast, the damages claimed by NHS-the civil penalty, fine and attorneys' fees-are the immediate, direct result of the DOJ investigation and the ensuing guilty plea agreement. It is true that the Medicare/Medicaid fraud was the "but for" cause of these injuries, but proximate cause under RICO requires more than "but for" causation: there must be a *"direct relation"* between the injury asserted and the injurious conduct alleged." [FN9]

> FN9. *Holmes,* 503 U.S. at 268 (emphasis added); *see also Allegheny Gen. Hosp.,* 228 F.3d at 443 (directness factor " addresses the difficulty of ascertaining damages traceable to [Panaccio and Flaherty's] conduct," as opposed to "other, independent factors" that are not predicate acts under RICO).

Proximate cause is more likely extant if the RICO plaintiff's interests are the "direct target of the alleged scheme." [FN10] For example, in *Brokerage*

*Concepts,* the plaintiff (BCI) was the former administrator of a pharmacy's self-funded employee health insurance plan. When the pharmacy (Gary's) opened a new branch, it wanted the new branch to be a member of defendant U.S. Healthcare's network. U.S. Healthcare essentially forced Gary's to use a U.S. Healthcare affiliate as the plan administrator and to terminate its relationship with BCI. The court noted that although the alleged RICO predicate acts of extortion were allegedly committed by U.S. Healthcare against Gary's, BCI's injury was direct and not merely indirect or incidental:

> FN10. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 521 (3d Cir.1998).

*5 The injury proved by BCI, the loss of its TPA [third party administrator] contract with Gary's, was not *derivative* of any losses suffered by Gary's.... BCI's injury was not contingent upon any injury to Gary's, nor is it more appropriately attributable to an intervening cause that was not a predicate act under RICO. Here, BCI's TPA relationship with Gary's was a direct target of the alleged scheme-indeed, interference with that relationship may well be deemed the linchpin of the scheme's success.[FN11]

> FN11. *Id.*

By contrast, in *Callahan v. A.E.V., Inc.,* 182 F.3d 237 (3d Cir.1999), the Third Circuit identified an instance where the plaintiff was *not* the "direct target of the alleged scheme." There, smaller beer distributors brought an antitrust and RICO action against a larger beer distributor. They alleged that the defendant had engaged in several anti-competitive practices in violation of antitrust laws. In their RICO counts, the plaintiffs alleged the defendant had engaged in racketeering activity when it made fraudulent license applications to the Pennsylvania Liquor Control Board ("LCB"). The plaintiffs alleged that because of the fraud on the LCB, the defendant was able to continue its anti-competitive practices and obtain volume

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

discounts unavailable to the plaintiffs. The plaintiffs were then harmed by the defendant's ability to sell beer at lower prices.[FN12] The *Callahan* court distinguished *Brokerage Concepts* and found the plaintiffs lacked RICO standing:

FN12. *Callahan,* 182 F.3d at 245.

Here, although the ultimate goal of [the defendant] was presumably to woo customers away from the plaintiffs, the direct target of its alleged fraudulent scheme was the LCB, not customers. Unlike *Brokerage Concepts,* this case involves *two* third parties, one that was the target of the defendants' racketeering and another that had a relationship with the plaintiffs with which the defendants interfered.[FN13]

FN13. *Id.* at 262 n. 16.

Although it involved a different factual scenario, in *Callahan* the Third Circuit essentially rejected the theoretical structure proposed by NHS in support of its standing argument. That is, the Third Circuit rejected the notion that proximate cause exists where a defendant (in *Callahan,* the large beer distributors; here, Panaccio) targets a third party (in *Callahan,* the LCB; here, the Medicare and Medicaid programs) in order to further a scheme against the plaintiff's interests (in *Callahan,* the smaller beer distributors and/or their relationship with beer customers; here, NHS). In such circumstances, the plaintiff is not the "direct target" of the RICO scheme and the plaintiff lacks RICO standing.

As noted by one leading treatise, several federal courts have endorsed the "target" standing requirement.[FN14] The Second Circuit is perhaps the most frequent adherent to this concept. It has consistently held that plaintiffs lack RICO standing where they "were neither the target of the racketeering enterprise nor the competitors nor the customers of the racketeer." [FN15] One such case from the Second Circuit involves RICO standing considerations similar to those in the case at bar.

FN14. David B. Smith & Terrance G. Reed, *Civil RICO* ¶ 6.04[a][iii], at 6-95 & n.151 (March 2002) (citing and discussing cases from the Second and Eleventh Circuits, and the district courts for the Southern District of New York and the District of Columbia).

FN15. *Sperber v. Boesky,* 849 F.2d 60, 65 (2d Cir.1988); *see also Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 124 (2d Cir.2003) ("[W]e have repeatedly emphasized that the reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise.").

*6 *In re American Express Co. Shareholder Litigation,* 39 F.3d 395 (2d Cir.1994) (hereinafter, " *In re AmEx*" ), was a shareholder derivative action against present and former top-level officers of American Express. The plaintiffs alleged that the American Express officers conspired with "shady overseas operatives, greedy journalists, and corrupt foreign politicians in a scheme to defame a rival by falsely linking him to organized crime, Columbian drug trafficking, and the Iran-Contra affair." [FN16] The scheme was eventually exposed, and the shareholders claimed the following injuries to American Express as a result: lost sales, exposure to potential liability, damages to business reputation, and past and future expenditure of "large sums of costs, expenses and legal fees in connection with defendants' unlawful acts." [FN17] The Second Circuit concluded that the shareholders "were certainly not the intended targets of the RICO violations," and thus lacked RICO standing:

FN16. *In re AmEx,* 39 F.3d at 396.

FN17. *Id.* at 398.

Any fair reading of the complaint in the instant case discloses that the RICO defendants' "preconceived purpose" was most assuredly not to cause some $10 million in losses to American Express. Instead, the complaint consistently alleges that the RICO defendants' actions, however misguided and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

injurious to American Express in the end, were undertaken to further American Express's competitive interests.... The injuries alleged thus were neither the "preconceived purpose" nor the "specifically-intended-consequence" of the RICO defendants' acts. Moreover, any losses to American Express were caused only because the scheme itself was exposed and thus failed.[FN18]

FN18. *Id.* at 400.

In reaching this conclusion, the Second Circuit discussed a similar district court decision, *In re Crazy Eddie Securities Litigation,* 714 F.Supp. 1285, 1290-91 (E.D.N.Y.1989), in which Crazy Eddie, Inc. ("Crazy Eddie") asserted RICO claims against former employees for artificially inflating the company's share price. Crazy Eddie claimed it was injured when the scheme was exposed, causing its share price to drop and opening Crazy Eddie to potential liability. The district court concluded that the RICO acts were "directed not at Crazy Eddie, but at the shareholders and the investing public." [FN19] The scheme was actually intended to benefit Crazy Eddie and only caused harm because it was publicly exposed. Therefore, the district court concluded, Crazy Eddie's injuries were not proximately caused by the alleged RICO violations.

FN19. 714 F.Supp. at 1291.

The reasoning of *In re AmEx* and *In re Crazy Eddie* applies with equal force here. The Medicare and Medicaid programs were unquestionably the "direct target" of the Medicare/Medicaid fraud. Defrauding the Medicare and Medicaid programs was intended to benefit NHS *in the first instance,* regardless of Panaccio's ultimate objective of looting those illegal revenues. Although NHS argues that the proceeds of the Medicare/Medicaid fraud were essential to Panaccio's looting scheme, the pertinent standing inquiry is not the relationship between one RICO scheme and another, or even between separate components of a single scheme. Rather, the critical issue is the relationship between the injury and the conduct constituting the scheme. It cannot be said that the injuries alleged by NHS-legal fees and civil

penalties, etc.-were an essential part of Panaccio's looting scheme. To the contrary, such harm was to be avoided if the scheme was to succeed. It defies reason to suggest that Panaccio intended to fatten NHS's coffers with the illegal proceeds of the Medicare/Medicaid fraud but simultaneously intended the scheme to come crashing down on NHS in the form of a DOJ investigation and all its attendant fallout and costs.

*7 Moreover, like the losses claimed in *In re AmEx* and *In re Crazy Eddie,* the losses to NHS were caused by exposure of the Medicare/Medicaid fraud and not by commission of the fraud itself. In other words, NHS suffered the losses "by reason of" the DOJ's investigation, threatened prosecution and guilty plea agreement, not "by reason of" the alleged RICO conduct.[FN20] NHS asks the Court to ignore that this intervening, independent cause is directly responsible for its harm.[FN21]

FN20. 18 U.S.C. § 1964(c).

FN21. *Cf. Brokerage Concepts,* 140 F.3d at 521 ("nor is [plaintiff's injury] more appropriately attributable to an intervening cause that was not a predicate act under RICO"); *Anderson v. Ayling,* 297 F.Supp.2d 805, 810 (E.D.Pa.2003) (" whether the plaintiff's injury was caused by the RICO offense itself or merely by public disclosure of the offense" is an appropriate consideration in the proximate cause analysis) (quoting Gregory P. Joseph, *Civil Rico* 37 (2d ed.2000)); *see also Callahan,* 182 F.3d at 263 n. 18 (" additional step" in the chain of causation " bars the inference of proximate causation").

The second proximate cause factor requires examination of the difficulty of apportioning damages among potential plaintiffs. This factor weighs in favor of finding that NHS has standing to pursue its RICO claims against Panaccio for the alleged Medicare/Medicaid fraud. There is little or no difficulty in apportioning the damages attributable to the scheme because there is only one plaintiff, and its injuries are an ascertainable sum of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

the civil penalties, fines and legal costs arising from the investigation and its aftermath. Courts routinely make such calculations.[FN22]

> FN22. To the extent that NHS attempts to draw a connection between the injuries attributable to the looting schemes and the conduct constituting the Medicare/Medicaid fraud, any such purported connection does not confer RICO standing on NHS to pursue the Medicare/Medicaid fraud. As noted, NHS contends that the Medicare/Medicaid fraud was an essential component of the looting frauds (*i.e.,* the Excessive Compensation, Amica/Bowers, and Stadium Looting frauds), and thus contends there is a relationship between the Medicare/Medicaid fraud and the looting injuries. Yet, there is no reliable method by which the Court could attribute or apportion the looting injuries to the success of the Medicare/Medicaid fraud as opposed to, for example, the success of the Excessive Compensation fraud. To do so would be an exercise in pure speculation. In other words, there is no "direct relation" between the looting fraud injuries and the conduct constituting the Medicare/Medicaid fraud.
>
> Moreover, attributing these injuries to the Medicare/Medicaid fraud would be duplicative because these injuries can be readily attributed to other RICO conduct. Defendants do not challenge NHS's standing to pursue RICO claims for the alleged Excessive Compensation, Amica/Bowers and Stadium Looting frauds. It is undisputed that there exists a direct relation between these frauds, allegedly committed in violation of RICO, and the looting injuries. Accordingly, even if the Medicare/Medicaid fraud played some role in the success of the looting schemes, for purposes of RICO standing the injuries flowing from the looting frauds are attributable to the looting frauds only.

Regarding the third proximate cause factor, NHS is not the appropriate plaintiff to vindicate the goals of RICO. Here, the "direct victim" of the Medicare/Medicaid fraud was the Government. Even though it did not proceed under the RICO statute, the Government's plea agreement with NHS was an appropriate and successful vindication of the policies underlying RICO: *inter alia,* to protect against use of the mails in furthering a fraudulent scheme constituting a pattern of racketeering. Although NHS was an "indirect victim" of the Medicare/Medicaid fraud, it was a "direct victim" of an alleged civil conspiracy by its officers involving egregious breaches of fiduciary duty and other wrongs. Of course, it may vindicate these wrongs under state law, but its indirect injuries-no matter how grievous or deserving of recompense-do not confer RICO standing.

In conclusion, while problems of apportionment may be not significant, NHS's injuries are sufficiently remote from the RICO conduct. It is not the direct victim of the Medicare/Medicaid fraud, and it is not the best plaintiff to vindicate the goals underlying RICO. Accordingly, proximate cause is lacking.[FN23]

> FN23. *See Allegheny Gen. Hosp.,* 228 F.3d at 444 ("[W]hile the Hospitals may be the best party to vindicate RICO claims and problems of apportionment may not be significant, the remoteness of the Hospitals' alleged RICO injuries from any wrongdoing on the part of the Tobacco Companies leads us to conclude that proximate cause is lacking.") (citation, internal quotes and brackets omitted).

B. Failure to State RICO Claims Against Panaccio and Flaherty

Panaccio and Flaherty argue that the RICO counts of the Amended Complaint fail to state a legally cognizable claim. NHS alleges violations of RICO, 18 U.S.C. § 1962(c), as well as a conspiracy to violate RICO, 18 U.S.C. § 1962(d). Because NHS's RICO counts are based on alleged predicate acts of mail and wire fraud, their allegations must satisfy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
**(Cite as: Not Reported in F.Supp.2d)**

the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).[FN24]

> FN24. *Lum v. Bank of Am.*, 361 F.3d 217, 220 (3d Cir.2004), *petition for cert. filed*, 2004 WL 1553529 (U.S. July 7, 2004).

To plead a violation of RICO, NHS must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.[FN25] An exhaustive list of "racketeering activities" appears in 18 U.S.C. § 1961(1) and includes any act which is indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). Here, Panaccio and Flaherty contend that the Amended Complaint contains boilerplate allegations of mail and wire fraud that lack the requisite particularity, thus failing to allege adequately any predicate racketeering activity. In addition, they argue that NHS fails to allege a "pattern" of racketeering activity.

> FN25. *Id.* at 223.

1. Pleading "Predicates" with Particularity Under Rule 9(b)

*8 To satisfy Rule 9(b), NHS must plead with particularity "the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."[FN26] NHS may satisfy this burden by pleading the "date, place or time" of the fraud, or through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud."[FN27] NHS must also allege "who made a misrepresentation to whom and the general content of the misrepresentation."[FN28] However, the Third Circuit has suggested that a somewhat more lenient standard applies to allegations of frauds conducted in secret:

> FN26. *Id.* at 223-24 (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,

742 F.2d 786, 791 (3d Cir.1984)).

> FN27. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984).

> FN28. *Lum*, 361 F.3d at 224; *see also Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir.2002) (complaint must "state clearly how ... [the] communications were false or misleading, or how they contributed to the alleged fraudulent scheme").

[I]n applying Rule 9(b), courts should be 'sensitive' to situations in which 'sophisticated defrauders' may 'successfully conceal the details of their fraud. Where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed. Nevertheless, even when the defendant retains control over the flow of information, 'boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." '[FN29]

> FN29. *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir.2002) (internal citations omitted).

The purpose of Rule 9(b) is to provide notice, not to test the factual allegations of the claim.[FN30]

> FN30. *Morganroth & Morganroth v. Noriss. McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n. 2 (3d Cir.2003).

Panaccio and Flaherty argue that the Amended Complaint is deficient under Rule 9(b) because it fails to explain either how any mailings or wires were false or misleading, or how they contributed to the alleged frauds. Excluding the Medicare/Medicaid fraud for the reasons stated *supra* at Part II.A., each fraud and the attendant mailings or wires are discussed below.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

*Excessive Compensation Fraud*

NHS describes this fraud accordingly: From 1986 through his departure from NHS in 2000, Panaccio looted NHS by increasing his annual compensation and benefits to "excessive and abusive" levels. Am. Compl. ¶¶ 55, 74. Panaccio accomplished this end by manipulating and deceiving the Board of Trustees and the Compensation Committee. He "disseminated reports to the then sitting [NHS] Board of Trustees containing false, doctored, and incomplete information, and was himself directly responsible for the Board's failure to be fully or properly informed of NHS' business matters." *Id.* ¶ 61.

At Panaccio's direction, NHS retained McKeever and MBG to act as insurance and financial consultants to NHS, paying them hourly consulting fees. McKeever also served on NHS's Compensation Committee (a subcommittee of the Board of Trustees). *Id.* ¶¶ 64, 66. At the same time, McKeever and MBG were personal advisors to Panaccio, but this conflict of interest was never disclosed to NHS or the Board. *Id.* ¶ 70. Panaccio, McKeever and MBG undertook to enrich themselves at NHS's expense at a time when NHS was experiencing financial difficulty. *Id.* ¶ 71.

*9 At Panaccio's direction and with McKeever and MBG's assistance, NHS created Plaintiff Northwestern Intrasystems, Inc. ("NI") to act as the employer of NHS executives and to create the Northwestern Intrasystems, Inc. Trust Dated April 1, 1994 (the "Trust") for those executives' benefit. *Id.* ¶¶ 72-73. The Trust created a "salary continuation" plan, which provided key executives with "excessive and abusive" payments following their departure from NHS. *Id.* ¶ 74. In creating the Trust, Panaccio authorized the appointment of McKeever as one of only two trustees. *Id.* ¶ 75.

Panaccio, McKeever and MBG funded the Trust by arranging for NHS, NI and the Trust to purchase several insurance policies from Provident. *See id.* ¶ 79 (listing policy numbers, account values, surrender values and death benefits). "No effort was made to solicit competitive bids for these products." *Id.* ¶ 80. NHS alleges that Panaccio,

McKeever and MBG failed to disclose material information in creating and structuring the salary continuation plans, including McKeever and MBG's sales commissions and numerous provisions of the salary continuation agreements, which were highly unfavorable to NHS. *Id.* ¶¶ 82, 84. In establishing these arrangements, Panaccio, McKeever and MBG "had irreconcilable conflicts of interest and violated even the most minimal standard of duty owed by fiduciaries." *Id.* ¶ 86. Panaccio, McKeever and MBG were able to accomplish this fraud because the individuals serving on the Board and the Compensation Committee "were either not fully informed, not informed at all, or, in the case of the Compensation Committee, peopled by individuals with conflicts of interest or over whom Panaccio had controlling influence." *Id.* ¶ 60.

NHS identifies eighteen separate mailings that contributed to this fraud, all of which relate to routine administration of the Trust or the insurance policies (including checks sent to Panaccio, *see id.* ¶ 162), and none of which are alleged to contain any false or misleading representation. That is, they are "innocent mailings," but their innocence does not defeat NHS's RICO claim.[FN31]

> FN31. For purposes of the mail fraud statute, "[t]he mailing need not contain any misrepresentations. Rather, 'innocent mailings-ones that contain no false information-may supply the mailing element" of a RICO claim. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1413-14 (3d Cir.1991) (quoting *Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)).

Defendants' primary argument is that NHS fails to explain how the mailings were used to defraud NHS. [FN32] NHS responds that "there can be absolutely no question" how the mailings related to Panaccio's scheme to obtain excessive compensation benefits: without the mailings, "transmission of deferred compensation monies would not have occurred." [FN33] Obtaining regular, ongoing salary continuation payments-payments which were fraudulently obtained-was the object of the alleged

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 11

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
**(Cite as: Not Reported in F.Supp.2d)**

fraud, and use of the mails was incident to the fraud.
FN34

> FN32. *See Warden,* 288 F.3d at 114 (complaint must "state clearly how ... [the] communications contributed to the alleged fraudulent scheme").

> FN33. Pls.' Consol. Mem. at 27.

> FN34. *See Schmuck v. United States,* 489 U.S. 705, 710-11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (mailing that is "incident to an essential part of the scheme" or a "step in [the] plot" satisfies federal mail fraud statute) (citation omitted); *Spitzer v. Abdelhak,* No. Civ.A.98-6475, 1999 WL 1204352, at *5 (E.D.Pa. Dec.15, 1999) ("The law of this Circuit suggests that if Plaintiffs received any mail or interstate wires which are remotely connected to a concurrent scheme to defraud, the predicate acts of mail and wire fraud are met.") (Buckwalter, J.).

Although Panaccio and Flaherty clearly attack the allegations of mail fraud as inadequate under Rule 9(b), they do not argue that the "mailing" allegations are deficient as a matter of substantive law under RICO. *See* 18 U.S.C. § 1341 (mailing must be "for the purpose of executing" a scheme to defraud); *United States v. Brown,* 583 F.2d 659, 664-69 (3d Cir.1978) and *United States v. Tarnopol,* 561 F.2d 466, 471-72 (3d Cir.1977) ("mailings taking place after the object of the scheme has been accomplished ... are not sufficiently closely related to the scheme to support a mail fraud prosecution"), *both overruled on other grounds by Griffin v. United States,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991).

These allegations satisfy Rule 9(b) by providing Panaccio with adequately detailed notice of the claims against him. The Amended Complaint explains the machinations of the fraud in some detail. It identifies specific information improperly concealed from the Board and Compensation Committee, as well as who failed to make the required disclosures to whom.FN35 It also provides adequate identifying information for the insurance policies funding the Trust. FN36

> FN35. *See Lum,* 361 F.3d at 224 (complaint must allege "who made a misrepresentation to whom and the general content of the misrepresentation").

> FN36. *See Seville,* 742 F.2d 786 (finding Rule 9(b) satisfied where plaintiffs pleaded which machines were the subject of alleged fraudulent transactions and the nature and subject of alleged misrepresentations).

*10 The Amended Complaint also accounts for any lack of detail: it avers that Panaccio and those under his control, as part of their fraudulent scheme, are responsible for "a wholesale absence of documents and information remaining at NHS." Am. Compl. ¶ 63; *see also id.* ¶¶ 66-67 (alleging "incomplete" and "unavailable" records). These allegations of concealment, taken together with "factual allegations that make [NHS's] theoretically viable claim plausible," FN37 persuades the Court to relax somewhat the rigorous requirements of Rule 9(b). Taken in this light, with respect to the Excessive Compensation fraud, any failure to identify additional mailings or fraudulent statements is not an adequate basis for dismissal at this early stage of the litigation. In short, NHS's allegations are adequate to place Panaccio on notice of the precise misconduct with which he is charged, making NHS's allegations of racketeering activity sufficient for purposes of Rule 9(b).

> FN37. *In re Rockefeller,* 311 F.3d at 216.

One additional issue warrants brief discussion. Panaccio contends that NHS's present Chairman and CEO, M. Joseph Rocks, ratified Panaccio's compensation package when Mr. Rocks executed the 2000 Revised Compensation Agreement. Therefore, argues Panaccio, NHS cannot contend

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 12

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

now that the compensation package was fraudulently obtained. NHS responds that (1) this argument is improper on a Rule 12(b)(6) motion because it relies on a document that is not explicitly relied upon or integral to the Amended Complaint, and (2) even if the Court considers the Revised Compensation Agreement, this merely presents a disputed issue of fact that cannot impact a Rule 12(b)(6) motion. Given the procedural posture of this case, that the Court must accept the allegations as true and draw any inferences in favor of NHS, and that Panaccio improperly relies on an extraneous document, the Court agrees with NHS and rejects Panaccio's argument.

*Amica/Bowers Fraud*

NHS alleges that Panaccio established two separate for-profit entities, Amica Leasing (a vehicle leasing company) and United Staffing (a temporary staffing company), to facilitate his looting of NHS. Am. Compl. ¶ 91. The Amended Complaint focuses on Amica, which Panaccio formed as a subsidiary of NHS, installing himself and Flaherty on its five-member Board of Directors.

At Panaccio's direction, NHS leased from Amica a fleet of 400 vehicles, including numerous luxury automobiles, many of which were unnecessary. *Id.* ¶ ¶ 94-95. Most leases were structured to force NHS to pay far in excess of market value (*e.g.,* $1,179 monthly for a Ford Explorer) "so as to (1) allow Amica to develop extraordinary cash surpluses which Panaccio, Patrick and Flaherty could then siphon off; and (2) to create a cash buyout option to Panaccio and his colleagues far below the lease-end market value of such vehicles." *Id.* ¶ 96.

By enriching Amica and looting NHS in this manner, Panaccio funded other self-serving schemes. For example, he put his son on Amica's payroll without requiring him to work. (Panaccio's son was in veterinary school at the time.) *Id.* ¶ 99. He also caused Amica to enter into a number of transactions with another vehicle leasing company, Fleetway, which made money for Fleetway at NHS's expense. Examples include Amica purchasing

vehicles from Fleetway in excess of Fleetway's cost, and payment of a $5,000 monthly "consulting fee" to Fleetway. *Id.* ¶ 100.[FN38]

> FN38. Panaccio's relationship with Fleetway is not explained in the Amended Complaint, so his motive for enriching Fleetway remains unclear. The cogent allegation, however, is that Panaccio sought to enrich Fleetway at NHS's expense.

*11 Relatedly, NHS alleges that Panaccio and Patrick siphoned cash directly from Amica, United and other sources of NHS funds. They hired accountant Barry Bowers to create a "secret bank account over which NHS' regular accountants were excluded. Each month for many years, Bowers would make out checks for thousands of dollars to Panaccio, Patrick and others." *Id.* ¶ 102. Bowers allegedly paid Panaccio and others' "personal, non-reimbursable expenses" with NHS funds, transferred money from NHS to Panaccio that Bowers knew Panaccio was not entitled to, and paid his own consulting fees from these secret accounts. *Id.* ¶¶ 103-107.

With respect to predicate acts of mail fraud, NHS alleges that "Bowers made regular use of the United States mails to administer the secret accounts, to receive instructions from Panaccio on when and how to make unlawful transfers of NHS funds, and to make such transfers." *Id.* ¶ 159. Attached to the Amended Complaint at Exhibit U are numerous documents allegedly transmitted through the mails, some of which suggest that other related mailings followed. [FN39]

> FN39. *See, e.g.,* Doc. # BB0684 (Letter from Panaccio to Bowers of 4/30/97 (sent via Federal Express, transmitting $15,000 " toward the special account which you will open and manage on my behalf," stating, " I will be sending you monthly invoices for you to pay from this account," and instructing Bowers to pay enclosed bills from American Express and the Academy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

of Music "post haste")); Doc. # BB0886 & BB0505 (invoice from and check payable to Panaccio's dentist).

NHS's allegations surrounding the Amica/Bowers fraud are lacking in sufficient detail for purposes of Rule 9(b). First, the Amended Complaint fails to go beyond ambiguous allegations of a connection between the Amica fraud and the secret accounts. Its best effort is this: "Panaccio and Patrick also siphoned cash directly from Amica and United Staffing and/or other sources of NHS funds. In doing so, they hired an outside accountant by the name of Barry Bowers...." Am. Compl. ¶ 102. There is no specific explanation of how use or administration of the secret account is connected with the allegedly fraudulent operation of Amica by, for example, explaining how Amica or NHS's funds were allegedly deposited in the secret account. Morever, there are no details whatsoever regarding any fraudulent operation of United, other than to allege an "arrangement similar to the Amica fraud." Am. Compl. ¶ 4.

NHS alleges that Amica cheated NHS out of profits and served as Panaccio's slush fund for luxury automobiles and nepotism, but there is no allegation that Panaccio used the mails to accomplish such fraud. The mailings it does identify, and which serve as the alleged RICO predicate acts, all relate to the secret account. Without any detailed allegations of a connection between the Amica fraud and use of the mails, the Amended Complaint fails to explain how use of the mails contributed to the alleged fraud.

Furthermore, even accepting that the documents were all sent via mail or via interstate facsimile, [FN40] the Amended Complaint does not explain how the documents contributed to any fraud. The documents are innocent on their face, dealing with legal activities such as paying bills, cancelling checks, generating statements of account, and reporting expenses. The Amended Complaint lacks an explanation of how these payments were part of a fraudulent scheme. For instance, while the Amended Complaint alleges that Bowers used the secret account to pay for Panaccio's "personal, non-reimbursable expenses," Am. Compl. ¶ 104, it

fails to identify any particular expenses of a non-reimbursable nature. Rule 9(b) requires that NHS explain how mere administration of the account furthered the overall fraud scheme. [FN41]

FN40. Intrastate facsimiles are beyond the scope of the wire fraud statute, 18 U.S.C. § 1343. *Annulli v. Panikkar,* 200 F.3d 189, 200 n. 9 (3d Cir.1999), *overruled on other grounds by Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000).

FN41. *See Lum,* 361 F.3d at 224 (finding allegations insufficient "because they do not identify particular fraudulent transactions"); *Kehr,* 926 F.2d at 1413-14 (although "innocent mailings" can support a predicate act of mail fraud, "the mailing must relate to the underlying fraudulent scheme").

**\*12** Accordingly, the allegations associated with the Amica/Bowers fraud are insufficient under Rule 9(b) . Those relevant aspects of the Amended Complaint are dismissed without prejudice to NHS's right to amend its allegations consistent with this opinion and to conform to the requirement of Rule 9(b).

*Stadium Looting Fraud*

The Amended Complaint sets forth in significant detail the series of transactions constituting this fraud, although it alleges only generally that Panaccio and Flaherty used the mails in furtherance of the scheme. The fraud was allegedly carried out as follows.

Since approximately June 1998, Panaccio recommended to the Board of Trustees that it acquire a minor league baseball and soccer stadium to be constructed by Flaherty on property owned by NHS in Northampton County. Am. Compl. ¶ 112. However, Panaccio and Flaherty failed to disclose that Flaherty had no independent ability to pay for the construction. The Trustees approved a plan for NHS to acquire the stadium, but only as a gift after Flaherty built it. Panaccio and Flaherty then set out

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 14

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

to finance the stadium construction secretly using NHS funds, even though they repeatedly represented to the Board that no NHS funds were being used for that purpose. *Id.* ¶¶ 113-18.

On August 15, 1998, Flaherty and Panaccio entered into agreements for NHS to buy a building owned by Flaherty and located at 201 Larry Holmes Drive in Easton, Pennsylvania. NHS paid an allegedly inflated price of $1,750,000 for the property. Having paid only $874,000 for the property four years earlier, Flaherty reaped nearly $900,000 in profit. *Id.* ¶¶ 125-26. The proceeds of the sale were then used to finance stadium construction. In addition, Panaccio arranged for NHS to act as guarantor of all construction costs and the long-term debt for the stadium. *Id.* ¶¶ 121-22. None of these transactions were disclosed to NHS's Board. *Id.* ¶ 127.

The August 15, 1998 agreement of sale contained a provision making the agreement contingent upon the Board's approval, and it further provided that if Board approval did not occur, any monies paid by NHS as deposit funds would be repaid by Flaherty to NHS. *Id.* ¶ 129. On December 23, 1998, Flaherty and Panaccio revised the agreement retroactively to December 15, 1998, retaining the Board approval contingency but eliminating Flaherty's obligation to return any deposited funds if Board approval was never obtained. *Id.* ¶ 130. Panaccio did not seek approval of these revisions by NHS's legal counsel. *Id.* ¶ 132. By falsely representing to an NHS executive that the Board had approved the sale, Panaccio arranged for NHS to pay $800,000 in deposits to Flaherty. Ultimately, because the NHS Board did not know about the transaction, let alone approve it, NHS forfeited those deposits to Flaherty. *Id.* ¶¶ 131; 134-37, 140.

In another transaction, on May 29, 1998, without authority from or disclosure to the Board, Panaccio entered into a "Bridge Loan Agreement" with Flaherty. Pursuant to the terms of the loan, on June 2, 1998, NHS transferred more than $400,000 to Federal Development Co., the stadium development company owned by Flaherty. Repayment of the full amount was due on or before September 15, 1998,

but it was never repaid. *Id.* ¶ 124.

*13 In yet another transaction, on May 15, 1998, without informing the Board, Panaccio signed a Land Development Agreement, providing that NHS would guarantee improvement work at the stadium construction site in Williams Township. To meets NHS's obligation under the Land Development Agreement, on December 4, 1998, Panaccio executed a Surety Bond to Williams Township, placing $463,272.10 of NHS's funds in escrow with an insurance company for the Township. Panaccio signed a second Surety Agreement on the property, this time committing $339,514 in NHS funds to guarantee ongoing work at the site. These transactions were never disclosed to NHS's Board. *Id.* ¶¶ 123, 138-39.

Finally, in yet another undisclosed transaction, Panaccio ordered the execution of documents, purportedly on behalf of NHS, asserting that a Flaherty-owned corporation had deposited $200,000 in stock certificates into an escrow account controlled by NHS. Such a deposit was a prerequisite for Flaherty's continued ownership of his minor league baseball team franchise and the team's eligibility to participate in the Atlantic League. The documents made NHS an escrow agent on behalf of Flaherty, thereby obligating NHS to pay $200,000 on demand to the Atlantic League. No members of NHS's Board knew of or approved these documents or their effect. The documents were completely false; no funds or stock were ever placed in escrow. NHS contends that creation of these documents has soiled NHS's credibility in the eyes of its funders, licensors and creditors, and has subjected it to legal action by the Atlantic League. *Id.* ¶¶ 141-46.

By July 1999, construction at the stadium site stopped because Flaherty failed to pay his bills. At that point, an outside financier stepped forward and agreed to pay the contractors by purchasing their accounts receivable. It would do so, however, only if NHS acknowledged that Flaherty had acted in all respects as NHS's agent and that, in fact, payments due from Flaherty were actually debts owed by NHS. At a combined Finance and Executive Committee meeting on July 2, 1999, Panaccio

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

presented the financier's proposal but failed to relate that the proposal required NHS to assume Flaherty's debts. The Committees approved the deal, and Panaccio signed an agreement accepting responsibility to pay the financier $2,759,024. NHS is now a defendant in legal proceedings to collect those monies. *Id.* ¶¶ 147-48.

Panaccio and Flaherty attack these allegations as insufficient under Rule 9(b) because NHS fails to identify any specific mailings or interstate wires used in furtherance of this fraud. As the lengthy recitation above makes clear, the Amended Complaint provides great detail and specificity in outlining the Stadium Looting fraud. The purpose of Rule 9(b) is to provide notice of the "precise misconduct" charged; here, NHS has "inject[ed] precision and some measure of substantiation into their allegations of fraud." [FN42] It has identified numerous transactions, the sums and parties involved, the dates, and the purpose and effect of these transactions. Accordingly, Defendants have more than adequate notice of the charges against them, and the requirements of Rule 9(b) are satisfied.

> FN42. *Seville,* 742 F.2d at 791; *see also Morganroth & Morganroth,* 331 F.3d at 414 n. 2 (purpose of Rule 9(b) is to provide notice, not to test the factual allegations of the claim); *Crown Cork & Seal Co., Inc. v. Ascah,* Civ. No. 93-2933, 1994 WL 57217, at *5 (E.D.Pa. Feb.18, 1994) (Pollak, J.) (denying motion to dismiss RICO claims) ("It is true that the specific details of what exact pieces of paper were mailed or what communications were wired are lacking. Yet it is not necessary for a plaintiff to allege such details in the complaint, before sufficient discovery to discover those details has occurred.").

*14 At this early stage in the litigation, NHS's failure to identify any specific mailings is not fatal to its claim. This is especially so because there can be little doubt that Panaccio and Flaherty used the mails in accomplishing the various transactions

constituting the fraud. [FN43] Moreover, permitting dismissal at this early stage would run counter to the Third Circuit's admonition to "be sensitive to the fact that ... application of [Rule 9(b) ], prior to discovery, may permit sophisticated defrauders to successfully conceal the details of their fraud." [FN44] The Amended Complaint contains factual allegations "that make their theoretically viable claim plausible," [FN45] so NHS is entitled to pursue the claim as presently alleged.

> FN43. Viewing the circumstances of this fraud as they are alleged in the Amended Complaint, an objective observer would undoubtedly conclude "that a mailing (or other covered delivery by an interstate carrier) would have been reasonably foreseeable." *United States v. Tiller,* 302 F.3d 98, 103 (3d Cir.2002).

> FN44. *Christidis v. First Pa. Mortgage Trust,* 717 F.2d 96, 99-100 (3d Cir.1991).

> FN45. *In re Rockefeller,* 311 F.3d at 216.

### 2. Pleading a RICO "Pattern"

To advance a RICO claim under 18 U.S.C. § 1962(c), NHS must plead a "pattern of racketeering activity," defined at 18 U.S.C. § 1961(5) as "at least two acts of racketeering activity" within a ten year period. Having concluded *supra* that NHS may not pursue claims of alleged racketeering activity associated with the Medicare/Medicaid fraud, and having concluded that the Amica/Bowers fraud allegations are deficient under Rule 9(b), the Court will only consider the Excessive Compensation and Stadium Looting frauds in examining whether NHS has sufficiently alleged a pattern of racketeering activity.

"[T]o prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related *and* that they amount to or pose a threat of continued activity." [FN46] Predicate acts are " related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

distinguishing characteristics and are not isolated events."[FN47] NHS proceeds on the theory that all of the above-described frauds are related by virtue of identical leadership (Panaccio), methods (fraudulent looting), purposes (benefitting and enriching Panaccio), and victim (NHS).

> FN46. *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

> FN47. *Id.* at 240.

Panaccio and Flaherty do not challenge NHS's theory of relatedness. Instead, they contend that NHS failed in the first instance to properly allege any predicate acts. Therefore, they argue, NHS has failed to allege a "pattern" of predicate acts. However, as set forth *supra* at Part II.B.1., NHS has adequately alleged predicate acts relating to the Excessive Compensation and Stadium Looting frauds. Accordingly, this simplistic argument of a lack of pattern is rejected.

As for the second, or "continuity," prong of the pattern analysis, the Supreme Court has urged a "flexible approach," permitting plaintiffs to proceed on a theory of closed-end continuity or open-ended continuity.[FN48] Open-ended continuity refers to "past conduct that by its nature projects into the future with a threat of repetition."[FN49] Closed-ended continuity refers to "a closed period of repeated conduct," proved by "a series of related predicates extending over a substantial period of time."[FN50] In the case at bar, NHS advances its RICO claims on a closed-ended continuity theory.

> FN48. *Id.* at 241.

> FN49. *Id.*

> FN50. *Id.* at 242.

*15 Continuity is "centrally a temporal concept."[FN51] Although the Supreme Court couched the continuity test in terms of whether the "racketeering predicates ... pose a threat of continued activity,"

[FN52] in the case at bar the Court must do more than merely count and calendar the alleged acts of mail and wire fraud. The Third Circuit has instructed that "the continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice. Although the mailing is the actual criminal act, the *instances of deceit* constituting the underlying fraudulent schemes are more relevant to the continuity analysis."[FN53]

> FN51. *Id.*

> FN52. *Id.* at 239.

> FN53. *Tabas v. Tabas*, 47 F.3d 1280, 1294 (3d Cir.1995) (en banc) (emphasis added) (quoting *Kehr*, 926 F.2d at 1414).

As with his argument on the relatedness prong, Panaccio relies heavily on the contention that there are no "well-pleaded predicate acts," thereby creating an absence of a pattern of racketeering activity. The Court disagrees. Taking the Amended Complaint in the light most favorable to NHS, the alleged "instances of deceit" reveal underlying schemes of substantial duration.[FN54]

> FN54. *Id.*

With respect to the Excessive Compensation fraud, NHS alleges that Panaccio orchestrated his receipt of princely salary and benefits since at least 1986, when he received the first compensation insurance policy, and through his retirement in June 2000.[FN55] With respect to the Stadium Looting fraud, NHS alleges fraudulent conduct by Panaccio and Flaherty beginning with an April 30, 1998 Board meeting and continuing through July 1999, a period of approximately fourteen months.[FN56]

> FN55. *See* Am. Compl. ¶¶ 56, 165, 173; *id.* Ex. T at 4 (listing NHS deferred compensation plan policies and annuities). The Amended Complaint further alleges fraudulent manipulation of the Board of Trustees and the Compensation Committee

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

in creating the Trust in April 1994, *id.* ¶¶ 72-75 & Ex. I, in providing salary continuation plans for Patrick in May 1997, *id.* ¶ 76 & Ex. L, and for Panaccio in June 1998, *id.* ¶ 76 & Ex. J.

FN56. *Id.* ¶¶ 114-147.

In sum, the Amended Complaint alleges Panaccio's overall scheme to defraud and loot NHS consumed a period of approximately fourteen years, with a particular concentration of activity consuming approximately five years, from 1994 to 1999. Therefore, Panaccio's scheme to defraud NHS lasted a "substantial period of time" and is more than adequate under Third Circuit precedent.[FN57]

FN57. *Tabas,* 47 F.3d at 1294 (implementing scheme to defraud over three and a half year period satisfies closed-ended continuity); *United States v. Pelullo,* 964 F.2d 193, 209 (3d Cir.1992) (nineteen months satisfies continuity); *Swistock v. Jones,* 884 F.2d 755, 759 (3d Cir.1989) (fourteen months satisfies closed-ended continuity).

Finally, Flaherty argues that NHS has failed to allege a pattern of racketeering with respect to him. The Amended Complaint does not include any specific allegations concerning Flaherty's involvement in the Excessive Compensation fraud. At best it avers on "information and belief" that Flaherty "participated in, and was aware of" other frauds, or was their intended beneficiary. Am. Compl. ¶¶ 94, 168. However, such conclusory allegations are plainly lacking the requisite detail for purposes of Rule 9(b).

Although NHS argues that it need not particularize its allegations against Flaherty due to his "insider" status, the Amended Complaint is lacking specific details or factual allegations explaining "why the charges against [Flaherty] are not baseless and why additional information lies exclusively within [Flaherty's] control." [FN58] Unlike its allegations regarding the Excessive Compensation fraud, where it explained an absence of documentary evidence,

*e.g.,* Am. Compl. ¶ 63 ("deliberate management decisions" resulted in "wholesale absence of documents and information remaining at NHS...."), NHS fails to allege and explain why the necessary information lies with Flaherty alone. Accordingly, any alleged predicate acts associated with the Excessive Compensation fraud cannot be considered by the Court in determining whether Flaherty has engaged in a "pattern of racketeering activity" under 18 U.S.C. § 1962(c).[FN59] Therefore, the Court must determine whether NHS's allegations in the Stadium Looting fraud sufficiently allege that Flaherty engaged in a pattern of racketeering.

FN58. *In re Craftmatic Sec. Litig.,* 890 F.2d 628, 646 (3d Cir.1989).

FN59. *Cf. Banks v. Wolk,* 918 F.2d 418, 421 (3d Cir.1990) ("We note that no defendant can be liable under RICO unless he participated in two or more predicate offenses sufficient to constitute a pattern."); *Rowe v. Metabolife Int'l, Inc.,* No. Civ.A.03-4346, 2004 WL 292475, at *2 (E.D.Pa. Jan.20, 2004) ("When the acts of multiple defendants are alleged to constitute fraud, plaintiffs must separately plead the allegedly fraudulent acts of each defendant to comply with Rule 9(b).") (citation omitted).

*16 Even focusing narrowly on Flaherty's participation in the Stadium Looting fraud, the Amended Complaint adequately alleges that Flaherty engaged in a pattern of racketeering activity. NHS alleges that he and Panaccio, over a period of approximately fourteen months, orchestrated a series of transactions designed to enrich Flaherty at NHS's expense. The Amended Complaint details at least five separate instances during that fourteen-month period where Flaherty misrepresented or failed to disclose material information to the Board concerning the stadium project.[FN60] In light of Third Circuit precedent, the Court cannot conclude that NHS's RICO claim against Flaherty is deficient. [FN61] This is a close question, but at this early stage of the litigation it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

does not appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [FN62] NHS will have the opportunity to develop its theory through discovery, and the Court may revisit this issue on a developed record.[FN63]

> FN60. *See* Am. Compl. ¶¶ 115-118 (failing to disclose Flaherty's inability to pay for the stadium construction; failing to disclose that NHS must purchase the stadium property; misrepresenting that no NHS funds were being used to finance stadium construction); ¶ 127 (failing to disclose the Larry Holmes Drive transaction and Flaherty's large profit therefrom); ¶¶ 143-145 (ordering creation of false escrow documents and failing to disclose or seek approval of the Board regarding execution thereof).

> FN61. *See Swistock,* 884 F.2d at 759 (fourteen months satisfies closed-ended continuity).

> FN62. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

> FN63. *See Banks,* 918 F.2d at 419-20 (" We note that in RICO actions, 'in many cases plaintiffs will be able to withstand a facial attack on the complaint and have the opportunity to have their pattern allegations threshed out in discovery.' ") (quoting *Swistock,* 884 F.2d at 758).

### 3. RICO Conspiracy

To state a a RICO conspiracy claim, the plaintiff " must allege (1) agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate [§ 1962]." [FN64] A claim of RICO conspiracy must also allege that the plaintiff was injured by a predicate act of racketeering, rather than an overt act of the conspiracy that is not otherwise wrongful under RICO. [FN65]

> FN64. *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989) (citation omitted).

> FN65. *Beck v. Prupis,* 529 U.S. 494, 505-06, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

Defendants' arguments concerning the RICO conspiracy claim are rather terse, comprising only a few sentences. They allege that the Amended Complaint fails to satisfy the above requirements because: (1) NHS cannot allege an agreement to commit predicate acts when the Amended Complaint fails to allege predicate acts in the first place; (2) NHS cannot allege awareness of a pattern of racketeering activity because the Amended Complaint fails to describe such a pattern; and (3) the Amended Complaint attributes NHS's injuries to a conspiracy generally and not to predicate acts of racketeering as required by the Supreme Court's decision in *Beck v. Prupis.*[FN66]

> FN66. *See* Panaccio Mem. of Law at 25; Flaherty Mem. of Law at 16-17.

The first two arguments depend on premises already rejected *supra* and thus cannot prevail. As to the last argument, the rule announced in *Beck v. Prupis* is inapposite to the case at bar. As correctly noted by NHS, *Beck* involved a corporate officer who discovered racketeering activity by other corporate officers and directors, reported it to regulators, and lost his job in retaliation. Because the claimed injury-termination-was not caused by a predicate act under RICO, the claimed injury did not give rise to a cause of action under § 1964(c) for a violation of § 1962(d).[FN67] Unlike the case in *Beck,* NHS alleges injuries by reason of the predicate acts of racketeering underlying the Excessive Compensation and Stadium Looting frauds. Accordingly, the *Beck* rule does not defeat NHS's conspiracy claim.[FN68]

> FN67. *See Beck,* 529 U.S. at 505.

> FN68. *Cf. Smith v. Berg,* 247 F.3d 532, 539 (3d Cir.2001) ("As the District Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 19

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

correctly concluded, the Plaintiffs' claims in this case stem from injury directly attributable to Berg's racketeering; they are the direct victims of substantive RICO violations.... Thus the Appellants remain subject to liability under the reasoning enunciated by the Supreme Court in *Beck.* ") (internal footnote omitted).

### C. Conclusion

*17 NHS lacks standing to pursue its RICO claims insofar as those claims are premised on the alleged Medicare/Medicaid fraud. In addition, the allegations concerning the Amica/Bowers fraud fail to meet the specificity requirements of Rule 9(b) and thus are dismissed. The Court will permit NHS to file a Second Amended Complaint if it can cure the deficiencies outlined in this Memorandum Opinion. In all other respects, however, the Amended Complaint is sufficient and withstands Defendants' motions to dismiss.

Defendants do not challenge the merits of NHS's state law claims against Panaccio, Flaherty, Mrs. Panaccio, and Barr. Having determined that some of NHS's federal claims against these defendants survive the motions to dismiss, the Court will retain supplemental jurisdiction over NHS's state law claims.

### III. THE SECURITIES FRAUD CLAIMS

Plaintiffs pursue federal securities fraud claims against Defendants McKeever, MBG and Provident. These Defendants move to dismiss the Amended Complaint for a host of reasons, but their arguments boil down to this: The federal securities claims are barred by the statute of limitations, or in the alternative, they fail to meet the heightened pleading requirements of Rule 9(b), and they fail to state a claim under Rule 12(b)(6). Accordingly, the federal claims should be dismissed, and the Court should decline to exercise subject matter jurisdiction over the state common law claims. Alternatively, even if the Court wants to retain jurisdiction over the common law claims, they all fail on their substantive merits.

Because the Court concludes that the federal securities claims are barred by the applicable statute of limitations, it need not reach Defendants' alternative arguments. The Court declines to exercise supplemental jurisdiction over the state law claims.

### A NHS's Securities Claims

In Count 13 of the Amended Complaint (mislabeled as the second "Count 12"), NHS alleges that McKeever and MBG violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) . It contends that "Defendant McKeever sold certain annuities, life insurance policies and other insurance products to NHS through the Trust. Specifically, beginning in or around 1986, and continuing at least through 1998, McKeever sold to NHS the insurance policies set forth and attached hereto as Exhibit [T]. " Am. Compl. ¶ 268. [FN69] In connection with the sale of such securities, McKeever and MBG allegedly misrepresented material facts and omitted material facts, including whether the insurance products were "suitable for NHS," and that McKeever "would earn substantial commissions and other fees on the sale of the insurance products." *Id.* ¶ 270. In setting out the facts common to all counts of the Amended Complaint, NHS also alleges that McKeever and MBG failed to disclose: (a) McKeever's conflict of interest in that he served both as a consultant to NHS and as a personal advisor to Panaccio, *id.* ¶¶ 68, 70, and (b) that the salary continuation agreements contained provisions highly unfavorable to NHS, *id.* ¶¶ 84-85.

> FN69. Paragraph 268 of the Amended Complaint actually refers to Exhibit "X," but as noted by the parties in their memoranda, this appears to be a typographical error because the list of annuities, life insurance policies and other insurance products appears in Exhibit T.

*18 In Count 14 (mislabeled as Count 13), NHS alleges controlling person liability against MBG and Provident in violation of Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

short, it alleges that MBG and Provident directly or indirectly controlled McKeever and thus are jointly and severally liable for McKeever's violation of Section 10(b). The viability of NHS's claim for controlling person liability is contingent upon the success of its section 10(b) claim against McKeever and MBG.[FN70]

> FN70. *See In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 153 (3d Cir.2004) ("If no controlled person is liable, there can be no controlling person liability.") (quoting *Shapiro v. UJB Fin. Corp. .,* 964 F.2d 272, 279 (3d Cir.1992)).

B. Statutes of Limitations and Repose

Section 10(b) of the Securities Exchange Act contains no express statute of limitations, which is not surprising because private causes of action under section 10(b) are a judicial creation.[FN71] In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court of the United States determined the applicable limitations period for such claims, holding that "[l]itigation instituted pursuant to § 10(b) ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation."[FN72] Claims under section 20(a) are governed by the same one-year/three-year limitations/repose period.[FN73] Neither the one-year limitations period nor the three-year repose period are subject to equitable tolling; the three year period is an absolute "cutoff."[FN74]

> FN71. *See Superintendant of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (recognizing an implied private right of action under section 10(b)).

> FN72. Section 804 of the Sarbanes-Oxley Act of 2002 extended section 10(b)'s statute of limitations and repose from the one-year/three-year period outlined in

*Lampf* to a two-year/five-year period. *See* Pub.L. No. 107-204, 116 Stat. 745, § 804 (codified in part at 28 U.S.C.A. § 1658(b) (West Supp.2004)). Whether the Sarbanes-Oxley Act revives claims that expired under *Lampf* s shorter limitations/repose periods is a matter of some debate, although almost all courts (including this Court) have determined it does not. *See Lieberman v. Cambridge Partners, L .L.C.,* No. Civ.A.03-2317, 2004 WL 1396750, at *3 & n. 12 (E.D.Pa. June 21, 2004) (Rufe, J.) (collecting cases). In a July 12, 2004 letter to the Court, counsel for NHS states explicitly that NHS does not rely on Sarbanes-Oxley's longer limitations/repose periods in pursuing its claims.

> FN73. *Dalicandro v. Legalgard, Inc.,* No. Civ.A.99-3778, 2004 WL 250546, at *4 n. 9 (E.D.Pa. Jan.21, 2004).

> FN74. *Lampf,* 501 U.S. at 363 ("The 1-year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary. The 3-year limit is a period of repose inconsistent with tolling.... Because the purpose of the 3-year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period.").

A "violation" of section 10(b) occurs not at the time the securities are purchased but on the date that the alleged fraudulent misrepresentation is made or, in the case of an omission, on the date a duty to disclose the withheld information arises.[FN75] Here, the Amended Complaint contains no specific dates on which McKeever made any misrepresentation or omission. Rather, NHS alleges that McKeever sold the relevant securities, which are listed in Exhibit T, "beginning in or around 1986, and continuing at least through 1998." Am. Compl. ¶ 268. Turning to Exhibit T, the earliest effective date for any policy issued to Panaccio is December 16, 1998 (# 7100577), and the latest effective date is November 10, 1998 (# 9076395).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

FN75. *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 975 F.Supp. 584, 602-05 (D.N.J.1996) (hereinafter, *"In re Prudential"* ); *In re Phar-Mor, Inc. Sec. Litig.,* 892 F.Supp. 676, 686-88 (W.D.Pa.1995).

As a matter of simple logic, any misrepresentation or omission must have occurred on or before the date of sale. Accordingly, taking the allegations in the light most favorable to NHS, the last possible date on which McKeever violated section 10(b) was November 10, 1998. Applying *Lampf*'s three-year statute of repose, NHS's claims expired in November 2001. Because NHS did not commence the instant action until January 2003, its section 10(b) and 20(a) claims are untimely.

NHS offers three arguments in opposition to this conclusion. First, it contends that the discovery rule should be applied and the statutes of limitations and repose should be tolled. This argument lacks merit and requires no discussion, the Supreme Court having concluded unequivocally in *Lampf* that tolling principles do not apply to the one-year statute of limitations or the three-year statute of repose.[FN76]

FN76. *See Lampf,* 501 U.S. at 363.

*19 Second, NHS argues that Defendants' statute of limitations argument is premature on a motion to dismiss. Under the so-called "Third Circuit Rule," defendants may raise a limitations defense on a Rule 12(b)(6) motion to dismiss, but only if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.... If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint." [FN77]

FN77. *Robinson v. Johnson,* 313 F.3d 128, 135 (3d Cir.2002) (citations omitted).

NHS contends that the limitations bar is not apparent on the face of the Amended Complaint because it "contains no independent averment of

when the last annuity was purchased," and that Defendants' argument is premised "on an assumption that the last policy was obtained in 1998. " [FN78] These arguments are unavailing. NHS's argument implies that there were sales of securities after November 1998, but neither the Amended Complaint nor its memoranda of law allege such sales. In any event, as noted above, the relevant date for accrual of a section 10(b) claim is the date of a misrepresentation or omission, not the date of sale. NHS's failure to allege any such dates does not preclude Defendants or the Court from determining, with adequate specificity for purposes of the instant motion, when these omissions could have occurred. The unavoidable inference flowing from NHS's claim that McKeever misrepresented or omitted material facts in connection with the sale of securities is that he did so *before* NHS purchased those securities. NHS identifies the securities at issue as those set forth in Exhibit T, and the latest effective date of any security identified in Exhibit T is November 10, 1998.[FN79] Therefore, a plain reading of the Amended Complaint reveals a time-frame during which McKeever allegedly violated section 10(b), *i.e.,* sometime on or before November 10, 1998. NHS is simply incorrect that the untimeliness of its securities claims is not apparent from the face of the Amended Complaint. [FN80]

FN78. Pls.' Opp. at 45.

FN79. *See Oatway v. Am. Int'l Group, Inc.,* 325 F.3d 184, 185 n. 1 (3d Cir.2003) (when considering a Rule 12(b)(6) motion, a district court may consider a document integral to or explicitly relied upon in the complaint).

FN80. Some courts within the Third Circuit hold that a plaintiff bears the burden of pleading compliance with *Lampf* because the statute of limitations *Lampf* sets forth is a substantive requirement rather than a procedural one. *See In re Prudential,* 975 F.Supp. at 598 (noting courts in the District of New Jersey "have consistently" so held) (citing *Rolo v. City*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

*Investing Co. Liquidating Trust,* 845 F.Supp. 182, 243 n. 38 (D.N.J.1994) and *Kress v. Hall-Houston Oil Co.,* No. Civ.A.92-543, 1993 WL 166274, at *2 (D.N.J. May 12, 1993)); *see also Davidson v. Wilson,* 973 F.2d 1391, 1402 (8th Cir.1992). Judge Posner of the Seventh Circuit argues forcefully in *Tragenza v. Great American Communications Co.,* 12 F.3d 717, 718-19 (7th Cir.1993) that the rule is dubious and should be discarded. If the rule applies here, NHS has utterly failed to satisfy it. In any event, the Court need not resolve this issue because the limitations bar is apparent on the face of NHS's Amended Complaint. *See id.* at 718 ("Of course if [the plaintiff] pleads facts showing that his suit is time-barred or otherwise without merit, he has pleaded himself out of court.").

Finally, NHS notes that it is making continuing premium payments on annuities it purchased from McKeever. Each of these annuities is terminable at its option; therefore, it argues, each contribution it makes constitutes an independent investment decision "for which [it] is entitled to full disclosure and freedom from any scheme to defraud." [FN81] It contends that as long as NHS makes continuing premium payments, its securities claims continue to accrue. This argument ignores that NHS's section 10(b) claims accrue on the date McKeever allegedly made a misrepresentation or omission, not on the date of sale.[FN82] Accordingly, absent allegations that NHS's continuing payments are tied to a misrepresentation or omission by McKeever that occurred within the three-year period of repose, NHS's section 10(b) claims are time-barred.[FN83]

FN81. Pls.' Opp. at 45-46 (citing *Helman v. Murry's Steaks, Inc.,* 742 F.Supp. 860, 870 (D.Del.1990) ("[I]f the parties enter into an agreement to purchase securities into the future and the parties possess the power to terminate the agreement, any additional investment of money may be seen as a new investment decision and thus a new purchase or sale.")).

FN82. *In re Prudential,* 975 F.Supp. at 602-05; *In re Phar-Mor, Inc. Sec. Litig.,* 892 F.Supp. at 686-88.

FN83. *See In re Prudential,* 975 F.Supp. at 604 n. 15 ("Although the continuing investment doctrine remains valid after *Lampf,* and plaintiffs may accordingly allege securities fraud based upon payments they made within the three-year period, we hold that plaintiffs must also tie such payments to a misrepresentation or omission occurring within that period.").

### C. Conclusion

Accordingly, NHS's securities fraud claims are barred by the applicable statute of limitations, and those claims are dismissed. Because NHS cannot cure the deficiencies of its time-barred claims, it may not amend these claims.

**\*20** Having dismissed the federal claims against Provident, McKeever and MBG, retaining jurisdiction over the state law claims against these defendants is within the Court's discretion. The Third Circuit has instructed, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state law claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." [FN84]

FN84. *Borough of W. Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995).

The Court believes there is no affirmative justification for retaining the state law claims against these defendants. Although considerable time has passed since NHS filed this action, discovery in this matter has been stayed. Thus, despite the passage of time, this matter is essentially in an early stage. Furthermore, although discovery has proceeded in the related matter of *Panaccio v. Northwestern Human Services, Inc.,* Civ. A. No. 02-7767, and although the issues in that case overlap somewhat with the case at bar, Provident,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753
(Cite as: Not Reported in F.Supp.2d)

FN85 McKeever and MBG are not parties to that litigation.

> FN85. The Court entered summary judgment in favor of Provident on May 12, 2004. Panaccio consented to such disposition, and NHS did not object at the time. *See Panaccio v. Northwestern Human Services, Inc.,* Civ. A. No. 02-7767, Doc. # 74 (E.D.Pa.).

NHS has offered no persuasive justification for retaining jurisdiction. Accordingly, the Court declines to exercise jurisdiction over the state law claims against these defendants, and they are dismissed from this action.

An appropriate Order follows.

### ORDER

AND NOW, this 24th day of September, 2004, upon consideration of Provident's Motion to Dismiss [Doc. # 42], Thomas X. Flaherty's Motion to Dismiss [Doc. # 44], McKeever and MBG's Motion to Dismiss [Doc. # 45], Panaccio's Motion to Dismiss [Doc. # 46], NHS's Consolidated Response thereto [Doc. # 55], Defendants' Reply memoranda [Docs.57-59], NHS's Sur-Reply [Doc. # 60], and for the reasons set forth in the attached Memorandum Opinion, it is hereby ORDERED that Defendants' Motions are GRANTED IN PART and DENIED IN PART. It is specifically ORDERED that:

1. Those aspects of the Amended Complaint asserting a RICO claim premised on the alleged Medicare/Medicaid fraud, including but not limited to the factual allegations (¶¶ 45-54) and Count 1 ( ¶¶ 166-179), are hereby DISMISSED WITH PREJUDICE;

2. Those aspects of the Amended Complaint asserting a RICO claim premised on the alleged Amica/Bowers fraud, including but not limited to the factual allegations (¶¶ 91-109), are hereby DISMISSED WITHOUT PREJUDICE. Plaintiffs

are granted leave to amend those allegations consistent with this Memorandum Opinion within twenty (20) days of the date of this Order;

3. The Court retains supplemental jurisdiction over the state law claims asserted against Defendants Robert C. Panaccio, Marta Panaccio, Barry N. Bowers and Thomas X. Flaherty;

4. Plaintiffs' federal securities fraud claims (Counts 13 and 14) [FN1] are hereby DISMISSED WITH PREJUDICE as barred by the applicable statute of limitations and repose;

> FN1. Citations to the counts of the Amended Complaint are sequential and ignore the misnumbering that begins after Count 12.

5. The Court declines to exercise supplemental jurisdiction over the state law claims against Defendants Provident Mutual Life Insurance Company, Provident Mutual Insurance and Financial Services Company, and 1717 Capital Management Company (Counts 8-10, 15-16, 19-21). Accordingly, those claims are hereby DISMISSED WITHOUT PREJUDICE;

*21 6. The Court declines to exercise supplemental jurisdiction over the state law claims against Defendants John L. McKeever, III and McKeever, Burke & Grant (Counts 6, 8-9, 12, 15-16, 19-22). Accordingly, those claims are hereby DISMISSED WITHOUT PREJUDICE.

It is so ORDERED.

E.D.Pa.,2004.
Northwestern Human Services, Inc. v. Panaccio
Not Reported in F.Supp.2d, 2004 WL 2166293 (E.D.Pa.), RICO Bus.Disp.Guide 10,753

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.