Page 1

1   THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3   In the Matter of:        )

4                            )   File No. FW-02975-A

5   MEGAFUND CORPORATION     )

6

7   WITNESS:  Gary Lynn Lancaster

8   PAGES:    1 through 156

9   PLACE:    1211 SW Fifth Avenue

10            Suite 1900

11            Portland, Oregon  97204

12

13  DATE:    November 17, 2005

14

15

16         The above-entitled matter came on for hearing,

17  pursuant to notice, at 9:20 a.m.

18

19

20

21

22

23

24         Diversified Reporting Services, Inc.

25              (202) 467-9200

---

FW-2975

Page 3

C O N T E N T S

WITNESS                                          PAGE

Gary L. Lancaster                                  6

                                                  88

E X H I B I T S

NUMBER              DESCRIPTION              PAGE

13     Plan Outlined to Witness            24

14     Plan Outlined to Witness            24

15     Copy of Subpoena                     6

16     Witness' Declaration                10

17     Multipage Exhibit                  102

18     Copy of First Check Received From
       Megafund                           136

19     US Bank Account Information         140

20     Interest Rate Chasing              145

21     Part of Subscription Agreement     145

22     Document                           149

23     Document                           151

24     Insurance Coverage Election Form   152

---

Page 2

1   APPEARANCES:

2   On Behalf of the U. S. Securities and Exchange Commission:

3       JULIE WATSON HUSEMAN, ESQ.

4       U. S. Securities and Exchange Commission

5       801 Cherry Street

6       Unit 18

7       Fort Worth, Texas  76102

8       (817) 978-6460

9

10  On Behalf of the Receiver:

11      MICHAEL J. QUILLING, ESQ.

12      Quilling, Selander, Cummiskey & Lownds, P.C.

13      2001 Bryan Street

14      Suite 1800

15      Dallas, Texas  75201

16      (214) 871-2100

17

18  On Behalf of the Witness:

19      MARC K. SELLERS, ESQ.

20      KEVIN E. BRANNON, ESQ.

21      Schwabe, Williamson & Wyatt

22      1211 SW Fifth Avenue

23      Suite 1900

24      Portland, Oregon  97204

25      (503) 222-9981

EXHIBIT

D

---

Page 4

1              P R O C E E D I N G S

2      MS. HUSEMAN:  On the record at 9:20 on November

3   17th, 2005.  Raise your right hand, please.

4   Whereupon,

5              GARY LYNN LANCASTER

6   was called as a witness and, having been first duly sworn,

7   was examined and testified as follows:

8              EXAMINATION

9   BY MS. HUSEMAN:

10     Q  Please state your full name and spell it for the

11  record.

12     A  Gary Lynn Lancaster.  That's G-a-r-y, L-y-n-n,

13  L-a-n-c-a-s-t-e-r.

14     Q  My name is Julia Huseman and I'm an officer of the

15  Commission for purposes of this proceeding.  This is an

16  investigation by the United States Securities and Exchange

17  Commission in the matter of Megafund Corp to determine

18  whether there have been violations of certain provisions of

19  the Federal securities laws.  However, the facts developed in

20  this investigation might constitute violations of other

21  Federal, State, criminal or civil laws.

22         Prior to the opening of the record, you were

23  provided with a copy of the formal order of investigation in

24  this matter which is marked as Exhibit 1.  Have you had an

25  opportunity to review Exhibit 1?

## Page 5

1  A  Yes.

2  Q  Do you have any questions about the exhibit?

3  A  No.

4  Q  Prior to the opening of the record, you were also

5  provided with a copy of the Commission's supplemental

6  information form. A copy of that document has been marked as

7  Exhibit 2. Have you had the opportunity to read Exhibit 2?

8  A  I have.

9  Q  Do you have any questions about it?

10  A  I do not.

11  Q  Are you represented by counsel?

12  A  I am.

13  MS. HUSEMAN: Would counsel please identify himself

14  by name, firm name, address and telephone number.

15  MR. SELLERS: Marc, M-a-r-c, K. Sellers,

16  S-e-l-l-e-r-s; Schwabe, S-c-h-w-a-b-e, Williamson & Wyatt,

17  Suite 1800, 1211 sw Fifth Avenue, Portland, Oregon 97204;

18  area code 503, 796-2917.

19  MR. BRANNON: Kevin Brannon, Kevin, K-e-v-i-n, E.

20  Brannon, B-r-a-n-n-o-n, same firm, same address. Phone

21  number, 503-796-2874.

22  MS. HUSEMAN: Are you both representing Mr.

23  Lancaster as his counsel today?

24  MR. BRANNON: Yes.

25  MS. HUSEMAN: For the record, also present is

## Page 6

1  Michael Quilling, the court-appointed receiver in this case.

2  Do either of you object to Mr. Quilling being present?

3  MR. SELLERS: No. No, we don't. I'm sorry. I was

4  waiting for an objection from him.

5  (SEC Exhibit No. 15 was marked for

6  identification.)

7  BY MS. HUSEMAN:

8  Q  Mr. Lancaster, a copy of the subpoena has -- that

9  was issued to you has been labeled as Exhibit 15. Is this a

10  copy of the subpoena you're appearing pursuant to here today?

11  A  It is.

12  Q  The subpoena duces tecum calls for the production

13  of certain documents. Have you tendered to the staff all

14  documents called for by the subpoena?

15  A  Yes.

16  Q  Please describe the search that was conducted for

17  the subpoenaed documents and state who conducted that search.

18  A  The search for the documents?

19  Q  Yes.

20  A  I did.

21  Q  And could you describe -- did you just -- all the

22  documents were in your possession?

23  A  All the -- all the documents I provided was -- were

24  in my possession, yes.

25  Q  Have you withheld any documents called for by the

## Page 7

1  subpoena based on any claim of privilege?

2  A  I have not.

3  Q  Were any documents called for by the subpoena not

4  produced for any reason other than privilege?

5  A  No.

6  Q  Do you know of any documents responsive to the

7  subpoena but not provided that were in your possession at a

8  prior time or that were lost, destroyed or otherwise disposed

9  of?

10  A  No.

11  Q  Could you please give me your home address and

12  phone number.

13  A  It is 1910 Bergeron, B-e-r-g-e-r-o-n, Court,

14  Vancouver, Washington 98661.

15  Q  And how long have you lived there?

16  A  30 days.

17  Q  What was your address prior to that?

18  A  400 West Eighth Street, Number 204, Vancouver

19  98660.

20  Q  And how long did you live at that address?

21  A  Six months.

22  Q  And what was your address prior to that?

23  A  1382 Leigh, L-e-i-g-h, Court, West Linn -- second

24  word, Linn, is L-i-n-n -- Oregon 97068.

25  Q  And how long did you live at that address?

## Page 8

1  A  Seven years, I think, all together.

2  Q  Are you married?

3  A  I am.

4  Q  What is your wife's name?

5  A  Jayne, J-a-y-n-e, Lancaster.

6  Q  And what is her date of birth?

7  A  4-23-1957.

8  Q  What is your date of birth?

9  A  4-25-1951.

10  Q  And what is your Social Security number?

11  A  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.

12  Q  Beginning with your graduation from high school,

13  could you briefly describe your educational background.

14  A  I went to Oregon State University in Corvallis,

15  Oregon for four years.

16  Q  Did you graduate?

17  A  I did not.

18  Q  Do you have any degrees?

19  A  I do not.

20  Q  And was that all the formal education that you had?

21  A  Correct.

22  Q  Once you graduated from -- once you left

23  college, what did you do then?

24  A  I went to work for Connecticut Mutual Life as a

25  life insurance agent.

Diversified Reporting Services, Inc. (202) 467-9200

Megafund Corporation                   Multi-Page™                Gary Lynn Lancaster, 11/17/05

Page 9

1   Q   And how long were you in that position?
2   A   Five years, I think.
3   Q   And what did you do after that?
4   A   I started a property casualty agency as a Farmers
5   Insurance agent.
6   Q   And how long were you in that position?
7   A   Through, I think, three years.
8   Q   And --
9   A   I can't remember exactly.
10  Q   You can go -- just continue to describe your
11  employment history, if you would.
12  A   Okay.  Then -- then I started Lan Corp.
13  Consultants, which was really just a continuation of the
14  Farmers agency, which I stopped representing, so I became an
15  independent.  I then went to work for John Deer for John Deer
16  Life.  I was there for five years.  I then worked for First
17  Interstate Bank, which was then taken over by Wells Fargo.  I
18  then became for a short time directly attached to Wells
19  Fargo, worked for Stevens, Inc., as an employee of Stevens,
20  Inc., representing exclusively Wells Fargo interests.  Then I
21  went to the Bank of America after that takeover didn't work.
22  I was at Bank of America -- I can't remember exactly -- about
23  a year-and-a-half where it was taken over by Nations Bank and
24  our department was terminated.  I then went to work for US
25  Bank.  I was at US Bank, I think, three-and-a-half years.

Page 10

1   Q   What year are we in now?
2   A   It ended --
3   Q   What year did you start at US Bank?
4   A   I think it was '99 to 2002.  And then I left US
5   Bank in 2002 and I've been self-employed under Lan Corp.
6   Financial Group since then.
7   Q   Where is Lan Corp. Financial Group incorporated?
8   A   It was -- it was incorporated in Oregon.  It has
9   subsequently been moved to Washington.  Registration --
10       Oh, I left out an employer.  Universal Underwriters
11  was my last employer.
12  Q   What licenses do you hold?
13  A   Life, health, Series 6, 63, 65 and 7 are the ones
14  that I've qualified for.
15  Q   Are any of them active?
16  A   They have been -- all of them are active -- well,
17  in fact, I've just learned that my securities license is now
18  not being held.
19  Q   When did you learn that?
20  A   Last week.
21  Q   And how did you learn that?
22  A   By looking online for my registration.
23       (SEC Exhibit No. 16 was marked for
24       identification.)
25  Q   Prior to opening the record, I gave you a copy of

Page 11

1   what I'm now marking as Exhibit 16, which is your
2   declaration, which was submitted with the case that was filed
3   in July.  Have you had an opportunity to review that?
4   A   I have.
5   Q   Is there anything in that that you wish to change
6   at this time?
7   A   I don't think so, no.
8   Q   And, for the record, your attorneys also had an
9   opportunity to review that?
10  A   Yes.
11  Q   What was the first offering that you ever made from
12  Lan Corp. or using Lan Corp.?
13  A   Lan Corp. financial funds?
14  Q   For example, the People's Avenger Fund, tell me
15  about that.
16  A   That was an attempt to register a fund as a public
17  fund.
18  Q   Attempt to register it with whom?
19  A   With the SEC.
20  Q   And what attempts did you make to do so?
21  A   Retained legal counsel to create the fund and go
22  through the legal process of registration.
23  Q   And what happened in that case?
24  A   It -- it was dragging on forever and it never came
25  to fruition.  It was terminated.

Page 12

1   Q   What do you mean when you say it never came to
2   fruition?
3   A   It never got registered.  It never -- never went
4   effective or became registered.
5   Q   When did you initiate the People's Avenger Fund?
6   A   I -- I don't remember exactly.  It was -- it was a
7   work in progress that was transferred over to me.
8   Q   By whom?
9   A   By Secured Clearing.
10  Q   And what is Secured Clearing?
11  A   Secured Clearing is -- is a company that was owned
12  by a gentleman in England who was -- had had a previous fund,
13  as I understood it, and was going -- wanted to do a public
14  fund to have an unlimited number of investors.
15  Q   And what was that gentleman's name?
16  A   Terrance D'Ath.
17  Q   Could you spell that, please.
18  A   T-e-r-r-a-n-c-e and I think it's D, apostrophe,
19  A-t-h.  I can't remember.
20  Q   How did you meet him?
21  A   I met him through Gary McDuff, who was a director
22  for Secured Clearing in Houston, Texas.
23  Q   How did you meet Gary McDuff?
24  A   I met Gary McDuff through a client of US Bank that
25  he was representing.

## Page 13

1   Q   And what was the client's name?

2   A   Morris Cerello.

3   Q   Could you spell the last name.

4   A   C-e-r-e-l-l-o, I think.

5   Q   And how long have you known Mr. McDuff?

6   A   Since 2001, I think.

7   Q   What is the current nature of your relationship

8 with Mr. McDuff?

9   A   Currently, I have no relationship with him. His

10 interests -- he represented Secured Clearing and his

11 interests were transferred to Mex Bank, so I have no direct

12 dealings or relationship with him at all.

13   Q   When was the last time you did have direct dealings

14 or a relationship with him?

15   A   At the time that the joint venture agreement was

16 executed and all of Secured Clearing's interests were

17 transferred and I don't remember that. You have that

18 document.

19   Q   When you said -- when you say at the time the joint

20 venture agreement was executed, what joint venture agreement

21 are you referring to?

22   A   Joint venture -- joint venture agreement with Mex

23 Bank for sharing the profits earned by Lan Corp. Financial

24 Fund.

25   Q   And how much money did Mex Bank contribute to Lan

## Page 14

1 Corp. Financial Fund?

2   A   They contributed no direct money. They paid some

3 attorneys' expenses and that was the only direct

4 compensation.

5   Q   To you.

6   A   To me, right.

7   Q   And, to your knowledge, how did they compensate Mr.

8 McDuff?

9   A   I don't know.

10   Q   And when you say you no longer have a relationship

11 with him, why did you terminate that relationship?

12   A   There was no basis for a relationship.

13   Q   Would you characterize your relationship -- were

14 you friends?

15   A   Yeah, I like him. He seems to be a good guy. We

16 spent a lot of time going back and forth with the attorney to

17 try and get the People's Avenger Fund up and running.

18   Q   Who was the attorney?

19   A   Norman Reynolds.

20   Q   Where is Mr. Reynolds located?

21   A   In Houston, Texas.

22   Q   Is he with a firm?

23   A   Yes.

24   Q   What firm?

25   A   Currently, Glass, Phillips & Murray. At the time I

## Page 15

1 first met him, he was with Jackson Walker.

2   Q   Does -- do you still keep in touch with Mr.

3 Reynolds?

4   A   I have up until recently.

5   Q   How much money did the People's Avengers Fund raise

6 from investors?

7   A   None. It never became effective. No money was

8 raised for that fund.

9   Q   No money was ever raised for that fund?

10   A   No.

11   Q   Did you prepare or issue investment documents for

12 that fund?

13   A   No.

14   Q   You never prepared any documents for that fund?

15   A   The only documents that were prepared were by

16 Norman Reynolds to get the fund filed with the SEC.

17   MR. SELLERS: Can we go off for a minute?

18   MS. HUSEMAN: Off the record at 9:40.

19   (Whereupon, a recess was taken.)

20   MS. HUSEMAN: Back on the record at 9:45.

21   Q   Mr. Lancaster, we were discussing the People's

22 Avenger Fund and you said, just to recap, that you never

23 raised any funds for that investment; is that correct?

24   A   Correct.

25   Q   And it was never actually registered or

## Page 16

1 successfully registered with the SEC.

2   A   That's correct.

3   Q   What was the next fund that you attempted to

4 initiate?

5   A   Lan Corp. Financial Fund Business Trust.

6   Q   And when did you initiate that?

7   A   I think we began work on it in 2002 and the

8 registration, I think, was complete in 2003.

9   Q   When you say "we began," who began?

10   A   Norman Reynolds.

11   Q   And you were still working with Mr. Reynolds. Did

12 he -- is he the one who prepared your offering documents?

13   A   Norman Reynolds prepared absolutely everything. He

14 has been legal counsel for me for all of Lan Corp.'s

15 activity.

16   Q   And when you said that you completed registration,

17 who did you register the fund with?

18   A   Well, Norman Reynolds did the registration.

19   Q   With whom?

20   A   The fund was registered in State of Nevada. It was

21 a trust, so the trust was registered in Nevada.

22   Q   Okay. But in terms of a securities offering, who

23 did you register the securities offering with?

24   A   I don't know. I'd have to ask Mr. Reynolds.

25   Q   Okay.

Diversified Reporting Services, Inc. (202) 467-9200

Page 17

1    Did you register it with the Commission?
2    A  I didn't.
3    Q  Did you register it with any state?
4    A  Yes.  Every state where investors sent an
5  application to purchase shares, registration was filed in
6  each of those states.
7    Q  What states were those?
8    A  There's probably 20.  I don't know.  I couldn't
9  recite them all to you without checking my records.
10    MS. HUSEMAN:  Did you want to say something?
11    MR. SELLERS:  Yeah.  I'm -- I'm advised that those
12  are not technically registrations in the sense that you're
13  talking about, so I don't want the record to be misconstrued
14  that my client is saying that he did a securities
15  registration in those states.  Those are simply the -- the
16  state registration.
17    THE WITNESS:  The Reg. D -- the Reg. D
18  registration, is that what you're referring to?
19    BY MS. HUSEMAN:
20    Q  I'm just asking -- you conducted a securities
21  offering.
22    A  Yes.
23    Q  Either it has to be registered or there's an
24  exemption.
25    A  I see.

Page 18

1    Q  And I'm asking, did you register your securities
2  offering with either the Commission or a state?
3    A  Not that I know of.  That question has to be
4  directed to Mr. Reynolds.
5    Q  Okay.  But I'm just asking to the best of your
6  knowledge.
7    A  To the best of my knowledge, it was not registered,
8  I guess, in the sense that you're talking about.  The only
9  registrations that occurred, to my knowledge, were the ones
10  in each individual state with the Reg. D filing.
11    Q  And what is Reg. D?
12    A  The securities regulation that governs the fund, I
13  guess.  I can't define any of the --
14    Q  Well, you're saying it's a Reg. D filing.  What
15  does that mean to you?
16    A  That -- with a specific form that was supplied to
17  me by each respective state to file the fund in that state.
18    Q  And did you register the fund as a Reg. D --
19    A  Yes.
20    Q  -- under Reg. D?
21    A  Correct.
22    Q  Do you know what exemption you were going under?
23    A  Not specifically.
24    MR. SELLERS:  I'm going to instruct my client to
25  answer the question as to -- the question poses what you did,

Page 19

1  not what others did on your behalf.  I want the record to
2  clearly reflect that she's asking you what Gary Lancaster
3  did, not what a lawyer did on your behalf.  So answer the
4  question as put, which is -- which is what -- what Gary
5  Lancaster did individually with your hands --
6    THE WITNESS:  Okay.
7    MR. SELLERS:  -- and with your brain.
8    THE WITNESS:  Okay.  What I did is complete the
9  necessary forms with each state for a 506 Reg. D filing for
10  every state where I have received an application for purchase
11  of shares in fund.
12    BY MS. HUSEMAN:
13    Q  When you say an application, you mean someone sent
14  in the documents requesting to be part of your fund.
15    A  Correct.
16    Q  And if a citizen of a given state sent in those
17  documents, you then registered the securities offering with
18  that state.
19    A  Correct.
20    Q  Okay.  What is a 506 offering?
21    MR. SELLERS:  Objection; calls for a legal
22  conclusion.
23    THE WITNESS:  I --
24    MS. HUSEMAN:  I'm just asking for his understanding
25  of what a five -- he said he did a 506 offering.

Page 20

1    Q  What -- what do you understand to be the
2  limitations imposed by the 506 offering?
3    A  My understanding is that it's subject to the
4  maximum number of investors being 100.  Of those 100
5  investors, 35 can be nonaccredited, 65 must be accredited.
6    Q  What does "accredited" mean?
7    A  I can't give you the specific provisions of how
8  it's defined.  It was -- it was laid out as part of the
9  application by counsel for --
10    Q  When you say counsel, you're referring to --
11    A  Referring to Norman Reynolds.  Any reference I make
12  to counsel relative to Lan Corp. Financial Fund Business
13  Trust will mean Norman Reynolds.
14    Q  Okay.  Is Mr. Reynolds aware that you're testifying
15  today?
16    A  No.  He is aware of this situation and has not
17  given me any advice.
18    Q  I'm not asking you to tell me what -- about any
19  conversation you had with Mr. Reynolds.  I'm just asking if
20  he is aware that you're testifying.
21    A  He does not know that I'm testifying today.
22    Q  Okay.  So under your 506 offering, your
23  understanding is -- was there any financial limitation on how
24  much money you could raise?
25    A  Yes.  We made a filing.  I think it was for up to

Gary Lynn Lancaster, 11/17/05    Multi-Page™    Megafund Corporation

## Page 21

1  250 million.

2  Q  Okay. And that was part of the 506 --

3  A  Correct.

4  Q  -- exemption?

5     And did you raise 250 million?

6  A  No.

7  Q  How much did you raise?

8  A  At the maximum, a little over 10 million.

9  Q  When you say "At the maximum" --

0  A  I mean, it went up and down as investors came in

1  and out and there were deaths and there were redemptions,

2  so --

3  Q  When did you receive your first investment in Lan

Corp.?

5  A  First investment from an investor?

6  Q  Uh-huh.

7  A  In 2003.

8  Q  And when did you receive your last investment in

9  Lan Corp.?

0  A  I'd have to look, but it was probably July or

1  August of 2005.

2  Q  And in July and August of 2005, what did you do

3  with the money that you received? Because I'm assuming you

4  didn't send it to Megafund.

5  A  Correct.

## Page 22

1  Q  What did you do with the money you received from

2  the clients?

3  A  Placed it into the client trust account and then

4  subsequently into a money market account.

5  Q  And where is -- is it that account today?

6  A  It is.

7  Q  How much is in there?

8  A  A million six something.

9  Q  And where is that account held?

0  A  That account is held at Fidelity.

1  Q  And how many investors have funds in that account

2  currently?

3  A  I don't know exactly without checking the list, but

4  somewhere around 25.

5  Q  Are you paying returns on that account of those

6  investments?

7  A  Not currently. I stopped doing anything subject to

8  dealing with the current issue.

9  Q  And what have you told your investors about their

0  money that's sitting there?

1  A  That I'm seeking guidance on the best way for me to

2  handle the funds that came in to the fund after the last

3  installment was made to Megafund.

4  Q  Have you -- has anyone asked to be -- to have their

5  money refunded to them?

## Page 23

1  A  Yes. I've had -- I don't know how many, but a

2  dozen, probably, requests for redemption.

3  Q  And have you refunded their money to them?

4  A  I have not. I have indicated to them that -- that

5  I can't do anything with the funds until this issue is

6  revolved.

7  Q  When you say "this issue," what are you referring

8  to?

9  A  Well, the issue with Megafund.

10  Q  And -- but none of those funds went into Megafund;

11  correct?

12  A  So you're specifically talking about the funds that

13  did not go into Megafund.

14  Q  Right.

15  A  Okay. I've only had, of those people, three or

16  four maybe that have requested redemption.

17  Q  And have you paid -- have you given them their

18  money back?

19  A  I have not. I have indicated to them that I'm

20  seeking legal counsel, guidance on what is or is not

21  appropriate on how to handle the funds that were not part of

22  the Megafund transaction.

23  Q  Who introduced you to Megafund?

24  A  I was introduced by Gary McDuff through his father,

25  John McDuff.

## Page 24

1  Q  And when you say "through his father, John McDuff,"

2  who did John McDuff know?

3  A  John McDuff, as I understand it, had been personal

4  friends with Stan Leitner, the principal of Megafund, for 15

5  plus years.

6  Q  Did you ever meet Mr. Leitner?

7  A  I did not.

8  Q  Did you have any conversations or dealings with Mr.

9  Leitner?

10  A  Well, I've had numerous conversations with Mr.

11  Leitner.

12  Q  When did you first talk to Mr. Leitner about

13  Megafund?

14  A  Sometime in January.

15  Q  Of?

16  A  Of '05.

17  Q  And what did Mr. Leitner tell you about Megafund?

18  A  He sent me an outline of the scope of what the

19  fund -- how it worked. There was two -- two specific plans

20  that he was offering to investors.

21  Q  Did he give you a choice of which plan he wanted to

22  be a part of?

23  A  Yes.

24     (SEC Exhibit No. 13 and 14 were

25     marked for identification.)

Megafund Corporation                Multi-Page™                Gary Lynn Lancaster, 11/17/05

Page 25

1    Q   I'm showing you what's been marked as Exhibit 13
2   and Exhibit 14. Are these the plans that he outlined to you?
3    A   They are.
4    Q   And which one did you invest your investors' money
5   in?
6    A   I invested in the MCF 1025 plan.
7    Q   And how much money did you invest?
8    A   All together?
9    Q   Initially.
10   A   Initially, 5 million.
11   Q   And when did you send 5 million to Megafund?
12   A   February of '05.
13   Q   How much more did you invest?
14   A   There were two other installments, one for
15  2,885,000 and another one for -- I think -- I'd have to do
16  the math. The total was 9,365,000 all together.
17   Q   And what did you understand you were investing your
18  investors' money in?
19   A   That they -- that the -- the investments -- he
20  wasn't specific other than saying that he would comply with
21  the permitted investment section of my memorandum.
22   Q   What -- what does that mean?
23   A   That means it could only be invested in specific
24  things.
25   Q   Okay. And what were those things?

Page 26

1    A   Corporate bonds with specified ratings and any
2   other transactions that conformed to certain minimums.
3    Q   Referring to exhibit -- I'm sorry. I have to check
4   the number. Referring to Exhibit 13, this is the plan that
5   you invested your investors' money in; correct?
6    A   Correct.
7    Q   Where does it say in here that the investment will
8   be in certain bonds that have certain ratings?
9    A   It does not.
10   Q   Then why did you believe that that was what was
11  going to happen?
12   A   Because it was represented to me by Mr. Leitner
13  that that would occur.
14   Q   Despite the fact that it says nothing about that in
15  the offering documents.
16   A   Correct. In fact, my agreement was modified for
17  redemption purposes because of the specific nature of my
18  memorandum of the guidelines.
19   Q   Okay. What do you mean? I don't understand what
20  you're saying.
21   A   Well, under the terms of -- of that plan, you could
22  not take any money out for a year; otherwise, you would lose
23  all your earnings.
24   Q   When you say "that plan," are you referring to
25  Exhibit 13?

Page 27

1    A   Yes.
2    Q   Okay.
3    A   And I indicated to him that I could not do that,
4   that I paid earnings to investors on a quarterly basis, that
5   they had the right to redeem shares at the end of each
6   calendar quarter with 30 days notice and, therefore, I needed
7   to have the ability to make whatever redemptions were
8   necessary at the end of each of calendar quarter.
9    Q   And what did he tell you?
10   A   He said, "No problem. Just change the agreement to
11  reflect that," which I did.
12   Q   Change which agreement?
13   A   The joint venture agreement.
14   Q   That you signed.
15   A   Correct.
16   Q   And is that joint venture agreement an exhibit to
17  your declaration which has been marked as Exhibit 16?
18   A   Yeah, that's it. That's the signature page.
19   Q   What specific changes did you make, if you recall?
20   A   The specific changes were for redemption
21  capabilities.
22   Q   And your understanding was that you would be -- you
23  would be paid how often?
24   A   Monthly.
25   Q   Monthly?

Page 28

1    A   (Nods head.)
2    Q   What percentage of your -- what -- what were you --
3   what did you think you were going to receive on a monthly
4   basis?
5    A   Up to 10 percent.
6    Q   Monthly.
7    A   Monthly.
8    Q   Did it occur to you that any investment that pays
9   up to 120 percent a year is probably -- there's probably
10  something wrong with that?
11   A   Not if they could prove it.
12   Q   How did they prove it?
13   A   Well, they would have to prove it by giving me the
14  rate of return.
15   Q   What due diligence did you do on Megafund before
16  you invested 9.3 million, I believe? Is that correct?
17   A   Correct.
18       The primary due diligence was just looking at the
19  referral, the references from Stan Leitner and getting a
20  letter in writing from legal counsel verifying that the money
21  would be held as agreed and would be insured.
22   Q   And who -- what legal counsel gave you that
23  verification?
24   A   A Mr. Humphries.
25   Q   Did you speak to Mr. Humphries?

Page 29

1  A  I did.

2  Q  Did you do any due diligence to check out Mr.

3 Humphries?

4  A  Only to check that he was an attorney.

5  Q  How did you check that he was an attorney?

6  A  Just online.

7  Q  Did you go to a State Bar site or --

8  A  You know, I don't remember.  At the time the

9 credibility that was presented to me and the reference to me

10 from Leitner was strong and my understanding was that

11 Humphries was selected because he was a good and honest

12 attorney.  And the concern was from Mr. Leitner that to make

13 certain that the funds were protected because a lot of the

14 funds were pension funds from churches.

15  Q  Okay.  Do you have your declaration?  I've got --

16 let me switch copies with you.

17  A  Uh-huh.

18  Q  I'm going to refer you to the exhibit that is the

19 letter from Mr. Humphries.

20  A  Uh-huh.

21  Q  I'm not sure -- these aren't --

22  MR. SELLERS:  Is that page 2 of Exhibit 4?

23  MS. HUSEMAN:  When you say Exhibit 4, you're

24 referring to the exhibit to the declaration?

25  MR. SELLERS:  Uh-huh.

Page 30

  BY MS. HUSEMAN:

2  Q  Is this the letter that you relied on?

3  A  It is.

4  Q  And is this the sum total of the due diligence you

5 did on Megafund?

6  A  Yes.

7  MR. SELLERS:  Objection.  This -- this isn't Mr.

8 Lancaster's due diligence.  This is the work protect of

9 Kenneth Humphries.

10  BY MS. HUSEMAN:

11  Q  Okay.  What due diligence besides reading this

12 letter did you do?

13  A  I also requested and was assured I would also

14 receive the same kind of written verification from corporate

15 counsel for the trader.

16  Q  And who was -- did you understand the trader to be?

17  A  I -- I was not given the name of the trader.

18  Q  Did that hit you as odd?

19  A  At the time it didn't because I understand

20 confidentiality agreements and he could not disclose the

21 name.

22  Q  You had a pretty significant background in

23 investments.  You were licensed.  You had a Series 6, Series

24 7; is that correct?

25  A  Correct.

Page 31

1  Q  And none of the -- the secrecy in this program or

2 the -- the outlandish returns, none of this raised a red flag

3 for you?

4  A  At the time my only concern was that I had

5 verification that the funds were secure.  If they could

6 deliver, great.  If they didn't deliver, then I would get the

7 funds back.

8  Q  Why did you think you would get the funds back?

9  A  Because of the assurance from Mr. Humphries that

10 they would be held as agreed.

11  Q  What are you referring to specifically in this

12 letter?

13  A  It's not in this letter.  It was the letter that

14 was -- the e-mail that was sent to me by what I thought was

15 from the attorney Schoenbach.

16  Q  What -- and is that e-mail attached as an exhibit

17 to this?

18  A  Yes.

19  Q  And is that Exhibit 5 to your declaration?

20  A  Correct.

21  Q  And this -- you received this via e-mail?

22  A  Correct.

23  Q  And did you respond to this e-mail?

24  A  Only that I received it.

25  Q  What do you mean?

Page 32

1  A  This e-mail was -- was forwarded to me from Mr.

2 Leitner.

3  Q  Okay.  But it's addressed to Lancaster Financial

4 Group.

5  A  Right.

6  Q  When did you learn that Mr. Schoenbach was not the

7 author of this e-mail?

8  A  I have to look at the date in here.

9  First part of June.

10  Q  2005?

11  A  2005.

12  Q  Referring to Exhibit 5 of your declaration, the

13 letter from Mr. Schoenbach -- or the e-mail that purports to

14 be from Mr. Schoenbach says, "The principal amount of your

15 investment will be insured by Nationwide Financial Services,

16 Inc., Nationwide Financial Services Bermuda, Inc."  Did you

17 do any due diligence to check to see if that was, in fact,

18 the case?

19  A  Only with Humphries who indicated that he had

20 looked at the contract.  He verified that it was in place.

21  Q  How did -- how did you -- when did he indicate that

22 to you?

23  A  I don't recall.

24  Q  Did he do it via a letter or over the phone?

25  A  Over the phone.

Page 33

1  Q  And were you aware -- had you previously been
2  involved in investments that were insured -- where the
3  principal was insured?
4  A  Not directly.
5  Q  So --
6  A  I had heard of insured investments, but I never
7  dealt with them.
8  Q  Where had you heard of them before?
9  A  Just during the course of conversation. I can't
10 say specifically.
11 Q  So --
12 A  Well, for example, I guess variable mutual funds,
13 some of them have insurance that guarantees that if you die,
14 your principal is restored, but there's insurance attached to
15 investments that make people whole.
16 Q  Did you ever ask Mr. Leitner where Megafund was
17 registered?
18 A  No.
19 Q  Did you ever do any due diligence to determine that
20 on your own?
21 A  No.
22 Q  Did you ever ask Mr. Leitner for his qualifications
23 for making an offer like this, securities offering promising
24 up to 120 percent returns per year on an insured principal?
25 A  Only his assurance that he was well connected and

Page 34

1  he had been doing this for a period of time with good
2  success.
3  Q  Did you tell your investors that you had invested
4  in Megafund?
5  A  No.
6  Q  Why not?
7  A  I didn't feel it was necessary.
8  Q  It's their money. Why wouldn't you tell them?
9  You've got this great deal making up to 120 percent a year.
10 A  Well, I was not certain that it would actually pay
11 that. I was waiting to see if it would actually perform.
12 Q  Did it occur to you that that was pretty outlandish
13 returns?
14 A  Definitely was high rate of return.
15 Q  Doesn't it stand to reason that if that kind of
16 rate of return is out there, that big firms like Merrill or
17 Prudential would be all over that kind of investment?
18 A  I -- I can't say that I gave that avenue much
19 thought.
20 Q  What was Stan Leitner's -- what did Stan Leitner
21 tell you his qualifications were?
22 A  He did not state any specific qualifications, just
23 that he had connections that allowed him to do it.
24 Q  Connections, what did -- what did you understand
25 that to mean?

Page 35

1  A  Influence with people because my understanding was
2  he was a very successful, well-connected businessman in
3  Dallas.
4  Q  And had you ever -- did you ever actually meet him?
5  A  No. We scheduled several times to meet, but
6  something always occurred where we never met face to face.
7  Q  Was that based on him canceling or you canceling?
8  A  Him.
9  Q  Did that cause you any concern?
10 A  At the time it didn't.
11 Q  When did you first get a payout from Megafund?
12 A  In March.
13 Q  Of?
14 A  2005.
15 Q  And I'm sorry to ask. I just have to be specific
16 for the record.
17 A  Understand.
18 Q  And how much was that?
19 A  500,000.
20 Q  And how did you distribute that to your investors?
21 A  20 percent was allocated for investors and the rest
22 of it was shared as profit between Lan Corp. and the joint
23 venture partner.
24 Q  Who's the joint venture partner?
25 A  Mex Bank.

Page 36

1  Q  So 20 percent, 100,000, you allocated to investors.
2  A  On a pro rata over a year, so I took -- for that
3  much, take 20 percent, divided it by 12 and took the monthly
4  allocation and credited it to investors.
5  Q  How much did you get?
6  A  I don't remember exactly. It was -- for the one
7  month you're talking about?
8  Q  Of the 500,000 that you were paid by Megafund, how
9  much did you retain for yourself?
10 A  I don't know exactly. 150 to 175,000.
11 Q  On a $500,000 payment.
12 A  Correct.
13 Q  How much did you give to Mex Bank?
14 A  It was 100 and something.
15 Q  Approximately, 125,000?
16 A  Yeah.
17 Q  So you retained for yourself a 175,000. That's a
18 hell of a commission, wouldn't you say?
19    MR. SELLERS: Objection. Compared to what? It's
20 speculative.
21    BY MS. HUSEMAN:
22 Q  Did you -- what did your offering documents provide
23 that you would retain as -- as commission?
24 A  50 basis points a quarter of profit.
25 Q  Was that -- was the amount that you retained

## Page 37

1   consistent with that?

2    A   No.

3    Q   So why did you take -- keep more than you were

4   supposed to?

5    A   Well, I structured an agreement prior to any

6   arrangement with Megafund. To try and get a better rate of

7   return, I had an agreement between Lan Corp. Financial Fund

8   and Lan Corp. Financial Group that Lan Corp. Financial Group

9   would take over the management of the fund and pay the fund

10   up to a maximum of 22 percent --

11    Q   Okay. Let me stop you right there. Who is Lan

12   Corp. Financial Fund?

13    A   Lan Corp. Financial Fund is the entity of the

14   investment deal.

15    Q   And who is an officer or a control person at Lan

16   Corp. Financial Fund?

17    A   I am.

18    Q   Anyone else?

19    A   No.

20    Q   And the other thing -- Lan Corp. Financial Business

21   Trust, is that what you called it?

22    A   Lan Corp. Financial Fund Business Trust is the

23   legal registered name.

24    Q   And you structured an agreement with --

25    A   Lan Corp. Financial Group, LLC.

## Page 38

1    Q   And who is the officer or control person of Lan

2   Corp. Financial Group, LLC?

3    A   I am.

4    Q   So you structured an agreement with yourself,

5   essentially,

6    A   Correct.

7    Q   And what was that agreement?

8    A   That agreement was that Lan Corp. Financial Group

9   would take over -- all management of the funds and pay the

10   fund up to a maximum of 22 percent a year. The first 22

11   percent of all earnings would go to the fund.

12    Q   And how did you make your investors aware of this

13   arrangement?

14    A   I didn't.

15    Q   Is this arrangement in writing?

16    A   Yes.

17    Q   And where is that? Did you submit that to me?

18    A   I don't know that I did.

19    Q   Would you be willing to do so now?

20    A   Absolutely.

21    Q   I mean, not this second, but --

22     MS. HUSEMAN: Is that okay with you?

23     MR. SELLERS: Yes.

24     BY MS. HUSEMAN:

25    Q   So this agreement is in writing. When did you

## Page 39

1   execute that agreement?

2    A   I think it was December of '04.

3    Q   So you paid out -- explain to me how you paid out

4   the 100,000 to you. I believe you had 100 investors.

5    A   Yes.

6    Q   And how many of them were accredited?

7    A   65.

8    Q   And how did you keep track of who was accredited

9   and who wasn't?

10    A   There -- on the application, they have to complete

11   a section of the application that verifies that they are

12   accredited or nonaccredited.

13    Q   Are you referring to, essentially, two questions on

14   the subscriber page dealing with their -- their net worth

15   with their spouse and their annual income?

16    A   Correct.

17    Q   So those two questions, true-false questions, if

18   they answer true to both of them or one of them, you presume

19   they were accredited?

20    A   Correct.

21    Q   Did you do -- take -- did you ever discuss that

22   with any of the investors or it was just those two questions

23   and that's it?

24    A   There were a few investors who asked and I

25   discussed with them that I could only accept 35 non and 65

## Page 40

1   accredited.

2    Q   Do you think anybody pretended to be accredited who

3   wasn't just to get in?

4    A   Not that I know of.

5    Q   How did you keep track of how many investors you

6   had that were accredited?

7    A   A database for the fund.

8    Q   Do you have that database? Would you produce that

9   database to me?

10    A   Sure.

11    Q   Okay.

12     MS. HUSEMAN: Is that okay with you?

13     MR. SELLERS: No objection.

14     BY MS. HUSEMAN:

15    Q   And you said that people came and went in and out

16   of the fund, people died. Did you always have 35 and 65?

17    A   Yes.

18    Q   And you're positive of that.

19    A   To my knowledge, yes.

20    Q   Based on that -- those two questions.

21    A   Correct.

22    Q   Okay. So you get the 100,000. And explain to me

23   how you paid that out to your investors when you get the

24   500,000 from Megafund.

25    A   It was credited to their account and was reflected

Page 41

1 on their quarterly statement.
2    Q  Did you pay any -- give anyone any money?
3    A  The investors who requested it had the earnings
4 distributed to them at the end of each quarter, received a
5 check, or if there was an IRA, then their trustee received
6 the check.
7    Q  Okay.  And if they didn't have it returned to them,
8 didn't want it paid each quarter, how did you handle that?
9    A  The funds were accumulated until they would reach
10 the $5,000 level and then they would automatically purchase
11 an additional share.
12    Q  Okay.  How many of your investors opted for that?
13    A  At least half or more.
14    Q  And how many additional shares did you issue in
15 March of 2005 based on that?
16    A  I don't know the specific number.
17    Q  Okay.  How many shares were outstanding prior to
18 that?
19    A  I don't have that number committed to memory
20 either.
21    Q  Do you have a general idea?
22    A  Well, it's based on -- as of what date?
23    Q  March 2005, prior to receiving the payment from
24 Megafund.
25    A  I'd have to look back and see what the total -- the

Page 42

1 total money that was in the fund -- whatever was in the fund
2 divided by 5,000, that's how many shares there were.  That's
3 also on a -- on a spreadsheet.
4    Q  But in -- obviously, the share -- the number of
5 shares outstanding increased once you were paid by Megafund;
6 correct?
7    A  Yes, because those people who were accumulating
8 earnings automatically got additional shares credited to
9 their account.
10    Q  When did you get another payment from Megafund?
11    A  In April.
12    Q  And how much was that?
13    A  The total was 500,000.  Not all that came directly
14 to me.  The joint venture share went directly to Mex Bank.
15    Q  And how much did Mex Bank get?
16    A  Again, that was a hundred and some thousand.
17    Q  How much did you retain for yourself?
18    A  The amount over the 20 percent annual credited to
19 the investors.
20    Q  And what was that amount?
21    A  I don't remember exactly.
22    Q  Can you give me a general idea?
23    A  Again, probably 100 --
24    Q  100 --
25    A  -- 150 somewhere.

Page 43

1    Q  So you had retained in March and April combined
2 over $300,000.
3    A  Approximately.
4    Q  And Megafund had paid out approximately $1 million.
5    A  Correct.
6    Q  When did you next get a payment from Megafund?
7    A  I received no further payments.
8    Q  When did you figure out in May that you were not
9 going to receive a payment that month?
10    A  I was suspicious very early and -- but -- but then
11 I was told that -- by Mr. Leitner that under advice of
12 counsel, that he no longer could support the joint
13 venture agreement was considered not a securities transaction
14 and that he was going to refund all of the investors' money.
15    Q  Excuse me.  Let me stop you.  Mr. Leitner told you
16 the joint venture agreement was not a securities transaction?
17    A  He had been operating under the presumption that --
18 it's my understanding, that -- that the private offering he
19 was making was exempt from -- or did not have to have any
20 securities registration.
21    Q  Okay.
22    A  But he was subsequently advised that that was not
23 the case and that he needed to do a private placement filing
24 so all of the funds were going to be refunded to all the
25 investors.  The private -- entity would be created so

Page 44

1 that people could -- like I did with Lan Corp. Financial
2 Fund, then investors could come back in and purchase shares
3 to move forward.
4    Q  And did you ask him what -- what exemption he was
5 going to operate under?
6    A  I didn't ask him specifically, but he -- it seems
7 to me like he volunteered that he was going to do a 506
8 private placement offering.
9    Q  Okay.  And with your financial background, of
10 course, you understood what that was.
11    A  Correct, it made sense to me.
12    Q  So when did he tell you he was going to refund your
13 money?
14    A  May.
15    Q  Of?
16    A  May of 2005.
17    Q  And did he refund your money in May?
18    A  He did not.  That's when the series of excuses
19 began to appear.
20    Q  What was the first excuse he gave you?
21    A  I don't remember the sequence.  It's all in my
22 statement.
23    Q  Were these excuses in writing or were they --
24    A  Everything --
25    Q  -- verbal?

Gary Lynn Lancaster, 11/17/03    Multi-Page™    Megafund Corporation

## Page 45

1  A  Everything was verbal. And that was also -- began
2  to bring red flags to me is that I was not getting
3  appropriate documentation for anything going forward. About
4  May 20th is when he indicated he was going to do a 506 Reg. D
5  filing.
6  Q  Specifically, I'm looking at Exhibit 7 of your
7  declaration, which at the bottom begins with an e-mail from
8  you to Mr. Leitner; is that correct?
9  A  Yes.
10  Q  And it says, "As per the terms of the joint venture
11  agreement," blah, blah, and continues saying that you request
12  refund of all the funds placed with Megafund and the earnings
13  for April of $778,500.
14  A  Correct.
15  Q  Why were the April earnings supposed to be
16  $778,500?
17  A  That was the -- the payout he said that was ready
18  to be paid based on the money that was in that had been given
19  to Megafund by Lan Corp.
20  Q  But I thought that you had gotten a payment of
21  500,000.
22  A  It was always paying in arrears. So the payment
23  that was received in March was for February. The payment
24  that was received in April was for March. And there was a
25  payment scheduled to be made on the funds that were in his --

## Page 46

1  in -- in the program as of the end of April.
2  Q  Okay. Then why would the May payment be 148,000?
3  A  Well, because he had said that -- that there would
4  be no more additional earnings, that it would not be being
5  traded, that that money had already been allocated and
6  scheduled to come back to me.
7  Q  Which money?
8  A  The 700 -- the 7,785,000.
9  Q  7,785,000?
10  A  (Nods head.)
11  Q  Okay.
12  A  Because each installment went into a different
13  cycle where his trading program was concerned, so he told me.
14  So that the -- the 1,480,000 that was sent, the last
15  installment, that that would be traded and the earnings on
16  that would come separate from the rest of it.
17  Q  Okay.
18     And what did you understand -- what trading did you
19  understand was occurring?
20  A  That he was investing in a variety of repos and
21  investment grade bonds and anything that they could do to get
22  a 1 percent margin on, they would be doing. I made it clear
23  to him that I didn't care if I only made 1 percent a month,
24  so long as the money would remain secure and that he
25  conformed to the committed investment schedule.

## Page 47

1  Q  When did you notify your investors that you thought
2  there might be a problem?
3  A  My first communication went out in August.
4  Q  But this was in June 2005.
5  A  Yes. Well, I continued to receive and believed
6  that the money was still forthcoming, that it was going to be
7  made -- made whole, that it was going to go not to his
8  attorney and his attorney was going to forward the funds.
9  Q  You believed that the money was still forthcoming
10  in July of 2005?
11  A  Well, by that time I had serious doubts, so I
12  notified my investors of what was going on.
13  Q  In August.
14  A  In August.
15  Q  Do you remember when you notified them in August?
16  A  First part of August. I can't remember exactly
17  when.
18  Q  Okay. The Commission filing -- the Commission
19  filed its case July -- I'm sorry. I'm trying to remember --
20  July 1st, I believe, of 2005 and you submitted a declaration
21  with that filing, so you were aware of that filing.
22  A  Yes.
23  Q  Why did you wait so long to tell your investors
24  what was going on?
25  A  I was expecting Mr. Leitner to make good. That in

## Page 48

1  spite of all this, he still verbally assured me that he was
2  taking care of it, that he had the means to do so and he
3  would get it done.
4  Q  And why did you believe that?
5  A  I -- I guess I don't have any specific reason other
6  than I was expecting him to make good on his word.
7  Q  Even after the Commission had filed its case.
8  A  Yes, because I figured he was motivated to get it
9  done to keep himself out of trouble.
10  Q  Did you contact Mr. Leitner after the Commission's
11  case was filed?
12  A  No, he contacted me. Yeah, maybe I did. I can't
13  remember. We had numerous conversations where he still was
14  promising to make good and make it go away.
15  Q  In July of 2005.
16  A  I can't remember.
17  Q  When was the last time you remember talking to him?
18  A  September or October.
19  Q  Of?
20  A  Of '05.
21  Q  Tell me about your conversation you had with him in
22  September.
23  A  He indicated that he had very influential friends
24  and that he was --
25  Q  Very influential friends where?

Diversified Reporting Services, Inc.  (202) 467-9200

Page 49

1    A  He didn't say specifically, just that he had the --
2  still had the ability to raise the funds and it was being
3  done so and it was going to be handled directly by his
4  attorney.
5    Q  Had you spoken to Mr. Quilling by that point?
6    A  Yeah. I don't remember when we -- when we met. I
7  don't recall.
8    Q  What would make you believe that that was still --
9  that he was telling you the truth at -- by October or
10 September of 2005?
11   A  Only there -- I mean, the conversation that I guess
12 I had with Jack McDuff saying that he still believed that
13 Stan was a stand-up guy and that he would make good.
14   Q  And when did you have this conversation with Jack
15 McDuff?
16   A  I don't remember.
17   Q  Is this Gary McDuff's father?
18   A  Correct. He's the one who has known him for the
19 longest and --
20   Q  When you say "known him," you mean Leitner.
21   A  Known Leitner for the longest and vouched for him,
22 yes.
23   Q  And did you talk to Gary McDuff about any of this?
24   A  Yes. I asked Gary what he knew and if he could
25 shed any light on it, provide any information.

Page 50

1    Q  What did Gary tell you?
2    A  He had very little information to provide.
3    Q  But hadn't he recommended the investment to you to
4  begin with?
5    A  Yes.
6    Q  Did that concern you, that he suddenly had no
7  information to give you?
8    A  Yeah, it did, because he -- he vouched for him and
9  he -- he was also one of the people I relied upon for
10 knowledge -- firsthand knowledge about Leitner in Dallas. He
11 indicated that he had a multi-million dollar art business and
12 that he was enormously successful.
13   Q  Would that be IGI?
14   A  I was never given a name.
15   Q  Didn't any of this send off red flags? You're told
16 that he's got this multi-million business, but they don't
17 give you a name. You look -- you invest in a plan, but this
18 isn't really what's going to happen. You're getting these
19 100 -- up to 120 percent returns. None of this set off a red
20 flag for you?
21   A  It did some, but, again, I was focusing on the
22 preservation of the principal as verified by the legal
23 counsel. That if he could perform, great. If he couldn't,
24 then I just take the money back.
25   Q  Okay.

Page 51

1       When did you learn that there was no preservation
2  for the principal?
3    A  I think I learned that with my first conversation
4  with Mike.
5    Q  And what did he tell you?
6    A  Well, Leitner was not anything that he represented
7  himself to be and that there was no evidence that he had any
8  real substantive network or business interests or whatever,
9  that he was essentially a con man from day one.
10   Q  When did that conversation occur with Mr. Quilling?
11   A  I don't recall.
12   Q  Can you estimate?
13   A  End of August or September. I can't remember.
14   Q  And that was -- so that was after you sent -- you
15 notified your investors that there was a problem.
16   A  After -- yeah. The first time I notified them that
17 there was an issue, that the funds were frozen. Then after I
18 talked to Mr. Quilling, then I sent a second one saying that
19 the news was not good.
20   Q  And, specifically, what did you explain to them in
21 the second communication?
22   A  That the assets had -- had been seized and that a
23 receiver had been appointed and that the outlook was not
24 good.
25   Q  And when did you let them know that?

Page 52

1    A  It was September something.
2    Q  But that had happened beginning of July; isn't that
3  correct?
4    A  Not my meeting with the Receiver.
5    Q  Well, no, but the Receiver had been appointed at
6  the beginning of July.
7    A  Yes.
8    Q  And the assets had been seized at the beginning of
9  July.
10   A  Yes.
11   Q  So why did you wait until September to tell your
12 investors?
13   A  I wanted to have more information to be able to
14 give them.
15   Q  The filing by the Commission was public record.
16 Did you try to obtain a copy of that?
17   A  I was notified that a website had been set up. I
18 went to that.
19   Q  The website set up by the Receiver.
20   A  Right.
21   Q  And when were you notified that a website had been
22 set up?
23   A  I don't recall. Eric Warner notified me by e-mail.
24   Q  He notified you by e-mail?
25   A  Yes.

Page 53

Q But you don't recall when that was?

A No.

Q Do you still have the e-mail?

A Yes.

Q So you could check that for me.

A I saved absolutely everything.

Q Okay. And when was your last communication with Mr. Warner?

A Somewhere around that time. I don't remember when it was because he --

Q Somewhere around that time?

A Yeah, somewhere around the time that I got the e-mail from him, so I can't remember. September, probably. Again, I'd have to look at my e-mail because at that point he pretty much just said, "Go to the website. It will have all the updates."

Q And did you?

A Oh, yes.

Q Did you direct your investors to the website?

A I have.

Q And how did you do that? Did you send out --

A By -- by e-mail and by letter.

Q To each one of them.

A To each one of them.

Q At the time that the fund was -- excuse me. At the

Page 54

time that the Commission filed its case, how many active investors did you have in Lan Corp.?

A Either 100 or 99, right close to the maximum.

MS. HUSEMAN: Okay. Off the record at 10:30. Take a break.

(Whereupon, a recess was taken.)

MS. HUSEMAN: Back on the record at 10:45. At this time I believe the attorney would like to clarify a couple issues regarding registration; is that correct?

MR. SELLERS: That is correct.

BY MR. SELLERS:

Q Mr. Lancaster, I want you to -- do you recall your testimony previously in this deposition concerning the registration of Lan Corp. Business Financial Group in various states?

A Yes.

Q And you recall that you testified that you registered the trust in various states as investors from those states informed you that they wanted to make investments?

A Correct.

Q Okay. And you testified previously in your direct examination regarding the registration of the trusts in various states.

A Yes.

Page 55

Q Do you recall that testimony?

A Yes.

Q And I believe that you testified that the registration that was effected in those states was a Reg. D filing. Do you recall that testimony?

A Yes.

Q And a filing under Section 506?

A Correct.

Q Do you recall that?

A Yes.

Q Okay.

Did you prepare and make filings in the various states yourself or did counsel do that on your behalf?

A Counsel did for a certain number of states -- I don't remember how many -- and then I did the subsequent filings duplicating the filings that were made by Norman Reynolds.

Q And Norman Reynolds is the counsel you were referring to?

A He's -- he has been legal counsel, was legal counsel for Lan Corp. Financial Fund Business Trust.

MS. HUSEMAN: May I interrupt you briefly?

MR. SELLERS: Yes.

MS. HUSEMAN: Did you provide those filings on the disk that you sent me?

Page 56

THE WITNESS: No.

MS. HUSEMAN: Would you be willing to provide those too?

THE WITNESS: Sure.

BY MR. SELLERS:

Q Now, so Mr. Reynolds was the legal counsel and he made the -- the first filing; is that correct?

A There were several that he made, yes.

Q Do you recall which states those were made in?

A Not offhand.

Q Okay. And -- and so did there come a time when you decided to make those registrations yourself?

A Yes.

Q Okay. And -- and what caused you to make that decision?

A The charges that were being incurred by legal counsel for having the assistant do the filing was such that I could do the same filing myself and save the extra money because the combination of the two quadrupled the cost of the fee to the State. So I just did it for an economic reason.

Q Okay. And so did you obtain forms yourself and fill them out?

A Correct.

Q From each of the various states?

A From each respective state, yes.

Megafund Corporation                    Multi-Page™                    Gary Lynn Lancaster, 11/17/05

Page 57

1    Q   And did you solicit those forms yourself?
2    A   I did.
3    Q   Okay.  So those were obtained from State government
4  entities?
5    A   Correct.
6    Q   Do you recall some of the State government entities
7  that you obtained the forms from?
8    A   Oregon, Washington, California, Ohio, Texas.
9    Q   Were those from the Secretary of State's office in
10  those -- in those states or from other agencies in the
11  states?
12    A   It was either from the Secretary of State or the
13  securities division of the state.  Each one had their own
14  special department.  I had to hunt them down, which one was
15  the right place to go.
16    Q   Okay.  And did you do that work yourself?
17    A   Yes.
18    Q   And so the filings that we're talking about, then,
19  are filings effected under State law?
20    A   I guess so.
21    Q   And on State provided forms?
22    A   Correct.
23    Q   Okay.  Now, on direct examination, you were asked
24  about those filings and you referred to them as Reg. D
25  filings.  Do you recall that testimony?

Page 58

1    A   Yes.
2    Q   To the best of your knowledge, is Reg. D a Federal
3  provision?
4    A   I honestly don't know.  I -- I presume that it is,
5  I guess.  I'm unclear of the differentiation between State
6  and Federal forms relative to the filings.
7    Q   Okay.  So do you know as a fact, then, that the
8  filings that you effected on behalf of the trust in these
9  various states were, in fact, Reg. D filings as defined under
10  Federal law?
11    A   I do not.
12    Q   Okay.  Do you know that they were, in fact, 506
13  filings as defined under Federal law?
14    A   I do not.
15    Q   In -- in the beginning of this registration
16  process, when your legal counsel was making those filings on
17  behalf of the trust in various states, did he provide you
18  copies of that work product?
19    A   He did.
20    Q   Okay.  And do you still have copies of that work
21  product?
22    A   I do.
23    Q   And we've -- and you've agreed to provide those to
24  counsel for the SEC?
25    A   I have.

Page 59

1    Q   And in making the subsequent filings on your own
2  behalf, were you relying on that work product as a model of
3  what to do?
4    A   Yes.
5    Q   Okay.  During the time that you were making those
6  subsequent filings in various states, did you solicit or
7  obtain the advice of legal counsel in making those filings or
8  did you do it on your own?
9    A   Did it on my own.
10    Q   Did you correspond with the State agencies that you
11  were making the filings with?
12    A   Yes.
13    Q   And did you ever have telephone conversations with
14  them?
15    A   A few.  Most of them were done by e-mail.
16    Q   Okay.  When those registrations were filed, were
17  they accepted by the various states?
18    A   Yes.
19    Q   And did you receive written confirmation of
20  acceptance?
21    A   Yes.
22    Q   And were there any states in which your submissions
23  were rejected?
24    A   I only recall one state that indicated that I had
25  to have a licensed broker/dealer or representative in the

Page 60

1  state.  And so I subsequently refunded -- terminated the
2  application from the investor in that state and refunded
3  their deposit and indicated to them that I did not have the
4  appropriate representation to make a filing in that state
5  and, therefore, could not accept their application.
6    Q   Okay.  Above and beyond --
7         MS. HUSEMAN:  Just for clarification, was that
8  Maryland?
9         THE WITNESS:  Could be.  I don't remember.  You
10  have -- in your -- in your files there somewhere, you have
11  it.
12         BY MR. SELLERS:
13    Q   Beyond these State registration filings, which
14  you've agreed to provide to counsel, did you make any other
15  State or Federal submissions yourself --
16    A   No.
17    Q   -- on behalf of the trust?
18    A   I did not.
19    Q   At any time?
20    A   No.
21         MR. SELLERS:  All right.  Thank you.  That
22  concludes my questioning.
23         BY MS. HUSEMAN:
24    Q   Okay.  Going back to the payments that -- the two
25  payments that you got from Megafund, I'm having a little

Page 61

1 trouble understanding how you justified keeping the amount of
2 money that you retained for yourself, so could you explain
3 that to me again.
4     A  How I justified it?
5     Q  Yes.
6     A  It was pursuant to the agreement between the two
7 entities.
8     Q  Between the --
9     A  Between Lan Corp. Financial Fund and Lan Corp.
10 Financial Group.
11     Q  And that was an agreement that you had executed
12 with yourself.
13     A  Correct.
14     Q  And did you make your investors aware of that
15 agreement?
16     A  I did not.
17     Q  So was there anything in the offering materials
18 that your investors saw that would have let them know or
19 disclosed that you were going to retain that amount of money?
20     A  No.
21     Q  In fact, what did you disclose that you might
22 retain in your offering documents?
23     A  The disclosure was 50 basis points a quarter.
24     Q  And that would have -- how much money would that
25 have been?

Page 62

1     A  It would have been approximately $50,000 a quarter.
2     Q  So you retained it almost three times that.
3     A  Correct.
4     Q  Who is your contact at Mex Bank?
5     A  Eduardo Trejo, and don't ask me to spell it.
6     Q  Actually, being from Texas, I know how to spell it.
7         And how did you get in touch with him?
8     A  He -- he contacted me notifying me that he
9 represented the interests of Secured Clearing, that they had
10 assigned them to him.
11     Q  And did you ever meet him?
12     A  No.
13     Q  So all your communication was by phone or by
14 e-mail.
15     A  By phone and e-mail.
16     Q  Do you have his phone number?
17     A  I do.
18     Q  Can you give it to me?
19     A  I -- eventually.
20     Q  How --
21     A  I have it in my -- in my database.
22     Q  How often did you communicate with him?
23     A  Only two or three times to get the joint venture
24 agreement signed and to get the W-8 form to do the documents
25 to set up the arrangement.

Page 63

1     Q  Where is he located?
2     A  I'd have to look. In Mexico.
3     Q  And you don't know where in Mexico?
4     A  No.
5     Q  And what is his affiliation with Mex Bank?
6     A  He represents Mex Bank or he works for Mex Bank.
7     Q  Does he work for them or does he represent them
8 like an attorney?
9     A  I don't know.
10     Q  Okay. What is Hash Cards International?
11     A  I have no idea.
12     Q  Does it have any affiliation with Mex Bank?
13     A  I don't know.
14     Q  Okay.
15     A  I've never heard of it.
16     Q  So I guess -- explain to me why you executed the
17 joint venture agreement with Mex Bank. How did that come
18 about? Who introduced you to Mr. Trejo?
19     A  Mr. McDuff.
20     Q  And what did he tell you about Mr. Trejo?
21     A  That he was going to be the officer in charge of
22 assuming all of the interests that Secured Clearing had.
23     Q  Okay. And refresh my memory, what is Secured
24 Clearing?
25     A  Secured Clearing is -- is the company that

Page 64

1 originally was, as I understand it, operating a fund that was
2 going to be changed to a public offering and they paid for
3 significant attorneys fees during that organizational
4 process, which didn't result in anything.
5     Q  Who raised the money for Secured Clearing?
6     A  I have no idea.
7     Q  What was Gary McDuff's association with Secured
8 Clearing?
9     A  He was a director of Secured Clearing and he was
10 the contact person for Secured Clearing.
11     Q  And how many directors did Secured Clearing have?
12     A  I don't know.
13     Q  Do you know of any directors besides Gary McDuff?
14     A  I do not.
15     Q  We have to be real careful not to talk on top of
16 each other because it makes it hard for her to get.
17         And Secured Clearing's connection to Mex Bank is
18 what?
19     A  The only connection that I know of is that the
20 interests of Secured Clearing in the fund were assigned to
21 Mex Bank.
22     Q  And do you know what -- why that occurred?
23     A  I wasn't given any reason.
24     Q  So is Mr. McDuff -- does Mr. McDuff know Mr. Trejo?
25     A  I don't know. I'm presuming he does.

Page 65

1   Q   Okay.

2     And when did Mr. Trejo first contact you?

3   A   I don't recall. It's in a letter I think that you
4 have.

5   Q   Okay.

6     And he -- he first contacted you by mail? Excuse
7 me.

8   A   By e-mail, yes.

9   Q   Okay.

10     And what kind of ongoing business relationship did
11 you have with him? How often would you talk to him?

12   A   I didn't.

13   Q   You did not.

14   A   No.

15   Q   When did you notify him or Mex Bank of what had
16 occurred with the Commission filing?

17   A   I haven't yet.

18   Q   Oh, why not?

19   A   Because in my discussion with counsel, we were --

20   Q   Don't tell me what you --

21   A   Okay.

22   Q   You just -- you have not -- you've chosen not to.

23   A   I have -- I've talked about it and it is on my list
24 of things to do.

25   Q   Okay.

Page 66

1     Now, explain to me again why they got 125,000 out
2 of the first $500,000 payment.

3   A   The joint venture agreement stipulated a 60/40
4 split of any profits.

5   Q   And what had they contributed to Lan Corp.?

6   A   They contributed the original organizational money
7 for setting up the documents and paying the attorneys fees
8 and they were responsible for bringing the investors to the
9 fund.

10   Q   To Lan Corp.

11   A   To Lan Corp.

12   Q   How did you get investors for Lan Corp.? How did
13 you solicit investments?

14   A   I did not do any solicitation. They were all
15 referred directly to me by investment advisors.

16   Q   Would you agree with me that approximately 80
17 percent of them were referred to you by Robert Rees?

18   A   Yes.

19   Q   How do you know Mr. Rees?

20   A   He was introduced to me by Gary McDuff as -- as a
21 referral source for, I'm presuming, Mex Bank.

22   Q   And how did you compensate Mr. Rees for his
23 referrals?

24   A   I did not compensate Mr. Rees or anyone.

25   Q   So Mr. Rees just sent you all these investors --

Page 67

1   A   Correct.

2   Q   -- out of the goodness of his heart and you didn't
3 compensate him in any way, shape or form.

4   A   I did not compensate him. My -- my presumption was
5 that by referring people to the fund where they would have
6 success, that he would sell them other things.

7   Q   He also, though, communicated to the investors
8 about Lan Corp.; isn't that correct?

9   A   I'm sure he did, yes.

10   Q   What did he know about Lan Corp.?

11   A   Just what the memorandum says.

12   Q   So did you tell him when you invested with
13 Megafund?

14   A   No.

15   Q   So did he know that you invested in Megafund? Did
16 you ever tell him?

17   A   No, not until the issues came up.

18   Q   And when the issues came up, did you contact Mr.
19 Rees?

20   A   I've talked to Mr. Rees numerous times.

21   Q   Okay. What have you talked -- when is the last
22 time you talked to him?

23   A   Earlier this month.

24   Q   Does he know -- does he know that you're here
25 today?

Page 68

1   A   He knows that I'm -- that I'm speaking. I don't
2 think he knows I'm here today. He knows that I'm speaking
3 with the SEC, yeah.

4   Q   And what -- did he say anything about that? Did he
5 have any comment on that fact?

6   A   He just wanted to know what I thought the reason
7 was.

8   Q   And what did you tell him?

9   A   Well, given the nature of what's happened, that I'm
10 going to be looked at, just like everybody else, to make sure
11 that nothing improper was done.

12   Q   And what did he say?

13   A   Nothing in particular. Just okay.

14   Q   And did he ask you whether the SEC had asked any
15 questions about him?

16   A   Yeah, and he -- and he asked how his name came up.

17   Q   And what did you tell him?

18   A   I told him that -- at the -- when I met with the
19 Receiver and you attended the end of that meeting, that you
20 asked me who he was.

21   Q   And what did you tell him you told me?

22   A   That you simply asked "Who's Bob Rees?" and did the
23 fund or me compensate him in any way.

24   Q   And you told him that you told me that they didn't.

25   A   Correct.

Page 69

1  Q  What was his response to that?
2  A  He didn't have any response.
3  Q  Did he ever discuss anything about his own
4  situation with you?
5  A  Very little.
6  Q  What did he tell you?
7  A  Only that he wanted me to look for some way that I
8  could pay him from the fund or from some other means.
9  Q  And did you?
10  A  I told him that I would look into it, but there was
11  no way that I could see -- and I talked to Norman Reynolds
12  about it -- there was no clear way to compensate anyone that
13  was not licensed and that I would not.
14  Q  When you say not licensed, is it your understanding
15  that Mr. Rees did not have a broker/dealer license?
16  A  Correct.
17  Q  And what do you base that understanding on?
18  A  Well, he just told me.
19  Q  What did he -- what is his profession?
20  A  He's a financial advisor and sells insurance, I
21  guess.  He has insurance licenses.  Beyond that, I really
22  don't know much about his activities.
23  Q  Okay.  I'm just trying to understand why this man
24  would steer this much money to you just for the hell of it.
25  Can you -- can you clarify that for me or elaborate on your

Page 70

1  relationship with him in a way that I can understand why he
2  would do all this?  I mean, almost every investor is
3  recommended by Rees; isn't that true?
4  A  Yes.  And I'm presuming that he's part of, you
5  know, the -- the Mex Bank group that's referring investors.
6  That was their role.  Their compensation was to bring
7  investors to the fund.
8  Q  I'm sorry.  Their compensation was to bring
9  investors --
10  A  The 60/40 split, part of that was based on them
11  bringing investors to the fund.
12  Q  Okay.  What was your 40 percent based on?  What did
13  you do for the fund?
14  A  Managed the fund.
15  Q  And what did that involve?
16  A  Keeping track of all the investors, making sure
17  everything is in compliance and doing my best efforts to
18  attempt to provide the greatest return that I could for the
19  investor.
20  Q  What did you do in terms of making sure everything
21  was in compliance?
22  A  What I was instructed by counsel for filings.
23  Q  Is that it?
24  A  Yeah.
25  Q  So you maintained a database with investors.

Page 71

1  A  Correct.
2  Q  You placed the money with Megafund and you paid out
3  two payments; is that correct?
4  A  Correct.
5  Q  And that's pretty much the extent of what you did.
6  A  That was it, yeah.
7  Q  And for that you were compensated 200 -- or excuse
8  me -- approximately $325,000?
9  A  Something like that.
10  Q  When you say that Mex Bank contributed money up
11  front, that's what I'm hearing, is that what you mean to
12  say, that they contributed money up front when you were
13  setting up the fund?
14  A  Secured Clearing did.
15  Q  Secured Clearing --
16  A  Yes.
17  Q  -- excuse me.
18  And how much money did Secured Clearing contribute?
19  A  I don't remember exactly.  There were significant
20  attorneys fees throughout the -- the process of attempting to
21  get the People's Avenger Fund up and running.
22  Q  When you say "significant attorneys fees," what do
23  you mean?
24  A  Thousands of dollars.
25  Q  Okay.  But, approximately, how much in total did

Page 72

1  Secured Clearing or Mex Bank contribute?  Excuse me.
2  A  I don't know.
3  Q  You can't estimate?
4  A  I'm going to estimate 30,000 plus.
5  Q  And they got paid 125,000?
6  A  Yes.
7  Q  So they're getting paid 125, you're getting 175 and
8  the investors are getting 20 percent.
9  A  Correct.
10  Q  Not of the investment -- not of their investment
11  but of the amount that you received from Megafund.
12  A  Correct.
13  Q  How do you justify that?
14  A  By -- by taking my compensation out of earnings
15  only.  There was no fee charged at any time out of principal.
16  If they didn't make any money -- any earnings, then I didn't
17  make anything.
18  Q  Okay.
19  A  If I could provide a good solid rate of return to
20  the clients, that they would be happy and they would keep
21  their money there.
22  Q  Would you agree with me that's a pretty big
23  commission, though?
24  A  I guess that's a subjective question.
25  Q  Okay.  Would -- if you were an investor and you

69 - Page 72

Page 73

1  found out that of the money that your investment made, 80
2  percent of it would be retained by the broker, what would you
3  think?
4      A  Depends on what my return would be, what I'm
5  getting paid.
6      Q  If the investment -- okay.
7         Well, let me ask you this: Under the
8  circumstances, did you ever disclose to your investors the
9  amount of money you were retaining?
10     A  No.
11     Q  Because I think you'll agree with me you were
12 retaining almost 40 percent of the return; is that correct?
13     A  Up to that point, yeah.
14     Q  Was there ever a return that came in from Megafund
15 that you did not retain almost 40 percent of?
16     A  No.
17     Q  Okay.
18        And Mex Bank, did you disclose your arrangement
19 with Mex Bank to your investors?
20     A  No.
21     Q  So you didn't disclose to them that over 20 percent
22 of all returns on the investment were going to someone else?
23     A  No.
24     Q  What about Gary McDuff? Did you -- did you
25 compensate him in any way?

Page 74

1      A  No.
2      Q  He also steered investors to you; isn't that
3  correct?
4      A  Yes.
5      Q  Who else did?
6      A  There were three or four other advisors. I have
7  them as referral sources on the database.
8      Q  And what are their names?
9      A  I'd have to look them up. They're --
10     Q  Is one of them named Mr. Winkler?
11     A  Yes.
12     Q  And how many people did he refer to you?
13     A  A few. Not many.
14     Q  And Mr. McDuff referred how many?
15     A  I don't know exactly.
16     Q  Can you estimate?
17     A  Dozen, maybe.
18     Q  Who else besides Mr. Winkler, Mr. McDuff and Mr.
19 Rees?
20     A  There was one or two more, but they were just, I
21 think, single referers. You know, they referred one person.
22     Q  And you may have already told me this, but how
23 would these people find out about you?
24     A  Through Secured Clearing, I presume.
25     Q  Okay. Secured -- when did Secured Clearing change

Page 75

1  its name or cease to exist or --
2      A  I don't know that it has.
3      Q  So it still exists as Secured Clearing.
4      A  As far as I know.
5      Q  And what kind of entity is it?
6      A  I don't know specifically.
7      Q  Is it a corporation? Is it a partnership?
8      A  I think it's a corporation. I'm not sure.
9      Q  Do you know where it's domiciled?
10     A  I think it's in Houston.
11     Q  And Gary McDuff is a director, but you don't know
12 any of the other directors.
13     A  Correct.
14     Q  Do you have any idea how many directors there are?
15     A  No.
16     Q  Is it a Texas corporation?
17     A  I don't know for sure.
18     Q  Have you ever seen any documents describing the
19 company or the entity?
20     A  No.
21     Q  Did you ever do any due diligence, start -- try to
22 figure out what it was, run it online or anything like that?
23     A  No.
24     Q  Why?
25     A  I didn't see any need to.

Page 76

1      Q  You're sending -- this is -- this is the -- your --
2  kind of your partner and you don't see any need to do any due
3  diligence on it?
4      A  I -- I guess I don't --
5      Q  I mean, you obviously have ties to this entity;
6  correct?
7      A  Right.
8      Q  Their, essentially, people that they know or work
9  with are steering 100 investors to you at a value of, you
10 know, at least 9.6 million to your fund.
11     A  Uh-huh.
12     Q  And you never did any investigation or tried to
13 determine what kind of entity this was or who was behind it?
14     A  Just my conversations with Gary McDuff and --
15     Q  Okay.
16     A  -- and his relationship with Norman Reynolds.
17 Norman Reynolds --
18     Q  What is Gary McDuff's relationship with Norman
19 Reynolds?
20     A  Well, this was -- he was part of, in some way, this
21 other fund that -- and was the original entity --
22     Q  When you say "he," do you mean Gary McDuff or
23 Norman Reynolds?
24     A  Gary McDuff that had retained Norman Reynolds, so I
25 stepped into an existing situation.

Page 77

1    Q  When you say you stepped into an existing
2  situation, what do you mean?
3    A  I was asked to be the fund manager for this fund,
4  was introduced by Gary McDuff to Norman Reynolds and then
5  briefed on all the activity that had occurred up to that
6  point.
7    Q  Why did they ask you to do this?  Why did they ask
8  you to be the fund manager?
9    A  Because of my credentials, of my background and my
10  working with the -- the client, Morris Cerello, that -- that
11  introduced me that -- to Gary.  That the way I conducted
12  myself, they wanted somebody like me to manage the fund.
13    Q  And they -- when they said they wanted you to
14  manage the fund, how were you to be compensated for that
15  management?  Did they -- did they determine how you were
16  compensated?
17    A  No, that was determined by the -- the fund
18  document.
19    Q  That you executed with yourself.
20    A  Correct.
21    Q  Did they know how you were compensated?
22    A  No.
23    Q  Who did you send the money to Mex Bank -- who did
24  you direct the payments to, Mr. --
25    A  Trejo.

Page 78

1    Q  Trejo?
2    A  Yeah.
3    Q  And how did you send that money to Mex Bank?
4    A  I sent a wire.  The second time -- the second
5  payment went directly from Megafund to Mex Bank.
6    Q  And how was that arrangement set up?
7    A  I directed Stan Leitner to send 40 percent of
8  the -- of the profits, which was a specified number.
9    Q  Why did you do that?
10    A  Convenience.
11    Q  Did someone ask you to do that?
12    A  No.  It just seemed like it would be easier for me
13  to send it direct than send it to me and then forward it.
14    Q  Well, wouldn't it have been easier, then, to just
15  send payments -- have Megafund send payments directly to your
16  investors?
17    A  I don't know.
18    Q  I'm just wondering why -- why you changed the --
19    A  They really couldn't -- they really couldn't
20  because they wouldn't know --
21    Q  The percentage.
22    A  -- the percentages or who was accumulating or
23  anything.
24    Q  I'm just trying to determine why you would
25  change -- did Stan Leitner ask you why Mex Bank was getting

Page 79

1  paid this amount?
2    A  No.
3    Q  He just did what you told him to.
4    A  Yeah.
5    Q  Did he ever ask you any questions about Mex Bank?
6    A  No.
7    Q  So all these people know Stan Leitner and -- does
8  he know Gary McDuff?
9    A  Yeah.
10    Q  So Stan Leitner, Gary McDuff, Norman Reynolds, Bob
11  Rees, all these people know each other and they bring you in
12  to manage this fund.
13    A  Uh-huh.
14    Q  And they told you it was because of your
15  experience.
16    A  Correct.
17    Q  Was that correct?
18    A  Yeah.
19    Q  And what did you tell them your experience was?
20    A  Just a copy of my resume of my background in
21  insurance and banking.
22    Q  Did this seem odd to you that they were -- if this
23  is going to be such a great fund, why didn't they manage it
24  themselves?
25    A  I guess it didn't seem odd to me.  I appreciated

Page 80

1  the opportunity.
2    Q  What does Gary McDuff do?
3    A  I don't know.
4    Q  You don't know what he does?
5    A  I don't know specifically.  He -- he's engaging in
6  a variety of ventures, as far as I know.  I don't know
7  specifically what he does.
8    Q  Give me an example.
9    A  I don't know specifically.  I really -- I don't
10  know exactly what he does.
11    Q  It just strikes me as odd that you don't know much
12  about any of these people or these entities.  Is that fair to
13  say?
14    A  I have limited knowledge about them, yes.
15    Q  Did that ever cause you any concern?
16    A  Not really.  My -- my concern was getting
17  verification that the funds were safe.
18    Q  And that verification -- your verification that the
19  funds were safe consisted of the letter from Kenneth
20  Humphries; is that correct?
21    A  Yes, and the subsequent verification that I thought
22  I was receiving from the other attorney.
23    Q  Mr. Schoenbach.
24    A  Right.
25    Q  Did you ever see a copy of the policy that

age 77 - Page 80

Page 81

1 supposedly insured the funds?
2    A No.
3    Q Did you ever ask for one?
4    A I did.
5    Q When?
6    A Numerous times.
7    Q When was the first time you asked for a copy?
8    A In January, I asked Stan Leitner for it.
9    Q In January of 2005?
10    A Yes.
11    Q And what did he tell you?
12    A He said he couldn't provide it because of
13 confidentiality.
14    Q And then when did you ask him again?
15    A I don't remember. It was -- at the time I was
16 requesting funds back and I wanted to start filing an
17 insurance claim. I wanted to put the insurance carrier on
18 notice that there was a potential of a claim, so I wanted to
19 know what the policy number was, who the agent was, how I
20 could contact the insurance carrier.
21    Q And what did he tell you? When I say "he," I mean
22 Mr. Leitner.
23    A He told me he couldn't tell me.
24    Q At some point did he provide you with what he
25 claimed was a policy or anything?

Page 82

1    A No. It was his lack of providing that information
2 that caused me to call Mr. Schoenbach.
3    Q And tell me about that conversation.
4    A Well, I just called him up, identified who I was.
5 I told him that given the current circumstances, that I
6 wanted to put the insurance carrier on notice that there is
7 the possibility of a claim because things aren't adding up.
8 The money is not coming back.
9    Q And what did he say?
10    A He said he didn't represent them.
11    Q And when was this conversation?
12    A Where is his letter? June 5th or June 6th,
13 first -- very early, first part of June.
14    Q So what did you do when you found that out?
15    A Well, after I picked myself off the floor, I began
16 to look for -- well, for what I'm supposed to do now, that
17 now it's becoming alarming to me.
18    Q And what was alarming?
19    A The fact that the -- that he didn't know -- or that
20 he didn't represent the group. He indicated to me that he
21 knew -- he recognized the person's name, but that he didn't
22 represent them and I forget now who that was. When I
23 mentioned Stan Leitner, he -- I forget the other name of the
24 person. He said he knew who that person was, but he didn't
25 represent them and that he didn't want to cause any problems

Page 83

1 for anybody and that he would check on it. And then the next
2 thing I received from him was the certified letter disavowing
3 any connection whatsoever.
4    Q You don't recall who the other person was?
5    A I don't recall.
6    Q Did you ever hear of someone named James Rum
7 (phonetic)?
8    A Only in these documents, not prior to.
9    Q When you say "only in these documents," what are
10 you referring to?
11    A From the Receiver website that was -- who all
12 the --
13    Q Defendants are?
14    A -- defendants are. That was the first time I'd
15 heard that name, first time I'd heard Stark's name or any of
16 those people's names.
17    Q Is your understanding now that Stark was the
18 trader?
19    A Yes.
20    Q Did you discuss that with Leitner?
21    A In terms of what?
22    Q Did you say "Hey, you know, tell me about Brad
23 Stark" once you learned his identity?
24    A Yes. I said, "What -- you know, what's the deal?
25 I want to know what's going on," you know, and he claimed to

Page 84

1 be, as he put it -- what did he say? He was befuddled.
2    Q Leitner said he was befuddled.
3    A Yeah.
4    Q What did he know about Stark?
5    A That he was not -- that the money was not coming
6 back. That he met with him and that he was actually going
7 out to meet with him again to make demands in no uncertain
8 terms in the strongest way possible to have the funds
9 delivered.
10    Q Did that give you any consolation?
11    A Yeah.
12    Q When did that meeting take place?
13    A I don't know that he said it -- when he said it was
14 going to take place. I don't know that it actually occurred.
15    Q Did you not talk to him after the meeting was
16 supposed to have occurred?
17    A Yes, I did. He said he was there and he had been
18 there and he had come back.
19    Q So -- so he told you the meeting occurred.
20    A Yes.
21    Q And what -- what did he tell you about the meeting?
22    A He told me that -- that the guy was going to -- or
23 have the funds arranged to be sent to his attorney so his
24 attorney would distribute the funds --
25    Q When you say "the guy," are you referring to Stark?

Page 85

1   A   Yes. That Stark was going to have the funds placed
2 with Stan Leitner's attorney.
3   Q   Who's Stan Leitner's attorney?
4   A   He didn't tell me at the time.
5   Q   Do you know now?
6   A   I presumed it was Humphries, but --
7   Q   Did you ever hear of someone named Scott Baker?
8   A   No.
9   Q   Okay. Go ahead.
10   A   And that he was highly motivated to do that.
11   Q   Who was highly motivated?
12   A   That he had provided high motivation to Stark to --
13 to return the funds.
14   Q   Did he tell you what that high motivation was?
15   A   Criminal charges.
16   Q   So he told you that Stark was going to get the
17 money back to avoid having Leitner try to file criminal
18 charges on him?
19   A   Yes, and that -- and that he was motivated to get
20 the funds back because by restoring all the investors,
21 then -- as he said it, then the issue with the SEC would go
22 away.
23   Q   When did he tell you -- when did he first tell you
24 that the SEC had contacted him? And I'm referring to
25 Leitner.

Page 86

1   A   Yeah, I'm trying to remember. It was either May or
2 June -- it was after he said that the trader -- he never
3 mentioned the name -- had to appear before the Chicago Board
4 of Trade for something.
5   Q   And what did you think about that?
6   A   All kinds of alarm bells are going off at that --
7 at that point.
8   Q   At this time did you ever -- did you ask for the
9 name of the insurance company that insured the funds or the
10 agent?
11   A   Well, I -- I'd asked Stan to verify that the
12 information provided on what proved to be the bogus letter
13 from Schoenbach was, in fact, accurate and he said it was.
14   Q   And that's good enough?
15   A   Well, at that point I was just looking to get the
16 money back. I'd already made a demand to have the money sent
17 back.
18   Q   Okay. And at what point did -- did you ever -- or
19 excuse me. At any point did you talk to Stark?
20   A   No.
21   Q   Never?
22   A   I never talked -- the only person I ever talked to
23 was Stan Leitner.
24   Q   I mean, even after all this happened.
25   A   Even after all this, I never talked to anybody

Page 87

1 but -- well, I talked to Humphries.
2   Q   Okay. And Schoenbach.
3   A   And Schoenbach. And I talked to Humphries since
4 that time.
5   Q   Oh, have you? When was this?
6   A   Two or three weeks ago.
7   Q   And what was the substance of that conversation?
8   A   I told him that given the current circumstances,
9 now I wanted him to produce for me all the documents that he
10 used as his means to write the letter.
11   Q   And what did he say?
12   A   And he said that he would have to get approval from
13 Leitner first because of confidentiality and client --
14   Q   Attorney-client privilege?
15   A   -- attorney-client privilege.
16   Q   And what did you say?
17   A   And I said, "Okay. Call me tomorrow."
18   Q   Did he?
19   A   No.
20   Q   Have you ever heard from him since?
21   A   Yeah. I got -- well, I called him and then he did,
22 in fact, call me back --
23   Q   And what did he say?
24   A   -- returned my call, and said that Mr. Leitner had
25 told him that I had been provided with everything already.

Page 88

1   Q   Okay.
2   A   And I said that's categorically untrue because Mr.
3 Leitner had provided me with nothing. And I asked him if --
4 if he was taking the position that I was going to need to
5 then take action against him to produce those documents and
6 he replied that, well, he'd already had a conversation with
7 the FBI and the SEC and that I could do whatever I felt I
8 needed to do.
9   Q   Who did he tell you he talked to at the SEC?
10   A   He didn't.
11   Q   Did he tell you who he talked to with the FBI?
12   A   No, he just said he talked to both people.
13   Q   Have you had any subsequent conversations with him?
14   A   No.
15     MS. HUSEMAN: Off the record at 11:20.
16     (Whereupon, a lunch recess was taken from 11:20
17 a.m. until 1:00 p.m.)
18     MS. HUSEMAN: On the record at 1 o'clock.
19       EXAMINATION (RESUMED)
20     BY MS. HUSEMAN:
21   Q   Have you spoken -- you mentioned earlier that
22 someone said that they had spoken to the FBI. Who was that?
23   A   Humphries.
24   Q   And have you spoken to anyone from the FBI?
25   A   Yes.

age 85 - Page 88

Page 89

1  Q  Who was that? Is it Dale Shelton?
2  A  No.
3  Q  Tim Nylan (phonetic)?
4  A  Tim Nylan.
5  Q  And when did you speak to Mr. Nylan?
6  A  Shortly after I first talked to Eric.
7  Q  And how long did you talk to Mr. Nylan?
8  A  Five minutes.
9  Q  That was it?
10  A  (Nods head.)
11  Q  Have you spoken to him since?
12  A  No.
13  Q  Have you spoken to an agent named Matt Sagetti
14  (phonetic)?
15  A  No.
16  Q  Okay.
17     What did Mr. Nylan want to talk to you about?
18  A  He just wanted to know did I know that the money
19  that I sent to Megafund was being wired offshore.
20  Q  Did you know that?
21  A  I had no idea.
22  Q  What did you think when you found out that that was
23  the case?
24  A  Stunned.
25  Q  When did you find out what had really happened to

Page 90

1  the money?
2  A  It wasn't until I started talking to Eric and then
3  got the -- Receiver website that showed the flow of funds
4  and who all these people were. I never heard of them before
5  then.
6  Q  So who -- who illuminated the situation for you?
7  Who told you what had actually happened, that the money had
8  gone offshore?
9  A  That was from the website.
10  Q  Okay.
11  A  Well, the first inclination I heard something about
12  offshore that didn't sit -- that I couldn't understand is one
13  of the conversations with Leitner indicated that the money
14  that was supposed to be in JP Morgan was coming back through
15  the Antilles. And I said, "What? Why is it in the Antilles?
16  I don't get that."
17  Q  What did he say?
18  A  And I forget now what he said, something about how
19  it was being brought back into the -- into his lawyer's
20  office. And that didn't make any sense to me at all and he
21  couldn't explain it.
22  Q  Was that the first you'd heard of anything going
23  offshore?
24  A  That's the first I heard of anything offshore.
25  Q  Did you ever send any Lan Corp. money offshore?

Page 91

1  A  No. All Lan Corp. money went directly to Wells
2  Fargo.
3  Q  You mean directly to the Megafund account?
4  A  Correct.
5  Q  What about the money that went to the account in
6  Australia?
7  A  What about it?
8  Q  Where was that? Where did that come from? The
9  bank records you gave me that show the --
10  A  From the bank records from you, yeah. I mean, it
11  was dealing with the fund money. That was the -- the first
12  engagement was with the broker/dealer in Australia.
13  Q  And who was that?
14  A  Tri-Com Securities.
15  Q  And how much money did you send to them?
16  A  It also was in increments and it got close to the
17  10 million that was sent there.
18  Q  And did you get that money back?
19  A  Yes.
20  Q  How much did you get back?
21  A  All of it.
22  Q  Did you get -- did you make any money on it, any --
23  A  We -- there was one transaction that occurred. We
24  got one installment and that was it and then they
25  nonperformed. They kept saying they -- they had -- -- it

Page 92

1  was -- you know, this was a problem or that was a problem and
2  then they lied and said, "Yeah, it's coming. It's coming.
3  It's coming" and then it never came.
4  Q  What's coming -- was coming?
5  A  Earnings.
6  Q  And who -- who lied?
7  A  The guy who represented the trade group.
8  Q  What was his name?
9  A  David Bezell (phonetic). He was one guy. He was
10  the one who said it was coming and it wasn't, though.
11  Q  Is he American or Australian?
12  A  He was -- at the time I talked to him, he was in
13  Africa, but I think he's English.
14  Q  British?
15  A  Uh-huh.
16  Q  And how did you hook up with David Bezell?
17  A  I was referred to him by Secured Clearing.
18  Q  Specifically?
19  A  Uh-huh.
20  Q  No, specifically who at Secured Clearing?
21  A  Gary McDuff.
22  Q  So explain to me how that relationship developed.
23  You were referred to Bezell by McDuff. Then what happened?
24  A  Then it was explained how they could do the
25  underwriting transactions. I was very uncomfortable about

Page 93

holding money offshore, not knowing anybody or anything about
that, and so Gary then -- subsequent Gary McDuff introduced
me to Tri-Com Securities.

Q  And what kind of company is Tri-Com Securities?

A  It is a very substantial broker/dealer.

Q  So then what happened?

A  Then I -- through Secure -- the principal, I
entered into an agreement with Lance Rosenberg, who is the
principal owner of Tri-Com Securities.

Q  And what is Mr. Rosenberg's nationality?

A  He's Australian, at least I think he's Australian.

Q  Does he have an Australian accent?

A  I remember asking him -- not -- not terribly, not
that I could -- you know, he wasn't --

Q  When you talked to him, did you speak to him on the
phone?

A  Yes.

Q  Did you call him in Australia?

A  Yes.

Q  Okay.

So you were introduced to Lance Rosenberg.  Then
what happens?

A  Then I secured a written agreement from him to hold
the funds in Tri-Com Securities and he guaranteed the funds
would be held in a nondepleting account that I could get back

Page 94

any time I wanted.

Q  And did that turn out to be true?

A  Yes.

Q  And when did you send the funds to Australia?

A  2003.

Q  Is this the same 9.6, 9.3 million that you ended up
sending to Megafund?

A  Yes.  Because it seems to me like the total that
ended up there was 9,250,000 -- 9 million something --

Q  When you say "ended up there," do you mean in
Megafund or in Tri-Com Securities?

A  No, in Tri-Com Securities.  That was the ultimate
outcome.  The objective was to get 10 million so we could
trade in $10 million blocks.

Q  So did you send 10 million or just --

A  I didn't quite get to 10 million.

Q  Okay.

A  But we went six months with no earnings, so I
said --

Q  Send it back?

A  -- send it back and he sent it back.

Q  And what was your understanding of the way that
earnings were supposed to be generated in Tri-Com?

A  By doing bond underwriting.

Q  Okay.

Page 95

So you get the money back.  And how long was the
money in your account before you sent it to Megafund?

A  I don't know exactly.  Two, three months.

Q  You got the money back in October?

A  October, November.

Q  2004?

A  2004.

Q  Did you tell your investors that you had gotten the
money back and that you were doing it -- you were going to
put the funds in another --

A  Yeah, I communicated to them that -- that -- that I
had, in effect, been misled, that there were no earnings.
There wasn't any coming.

Q  But you said it did pay once.

A  It made one payment.

Q  What was that?  How much was that?

A  It was 100 -- 153,000, 100 -- somewhere around
there was the earnings amount.

Q  And what portion of that did you keep -- did you
retain?

A  Everything over the 20 percent.

Q  So you gave 30,000 to your --

A  No, I take it back.  On that arrangement, the only
thing I got paid on that was actually from the fund, so that
went in -- was disbursed to the investors and I got paid my 2

Page 96

percent or my 50 basis points a quarter.

Q  And how much was that?

A  I can't remember the exact, but less than 20,000.

Q  And you put the money that you earned back into the
fund or did you pay it out?  The money that went to
investors --

A  Well, some of it got -- some of it got paid out for
the people who are on earnings.  The others who accumulated
it, it just purchased additional shares.

Q  In the years that you have had this fund, how many
times have you made a quarterly earning payment?

A  Once.  Well, once that was legitimate, I guess.
Once in '03 and twice in '05.

Q  And if it was paying quarterly, am I -- am I wrong
in assuming that in March you assumed you were paying for the
first quarter of '05 and in April you assumed you were paying
for the second?

A  Correct.

Q  Why would you pay second quarter earnings in April?

A  I didn't pay second quarter earnings in April.

Q  Okay.  You said that some people are getting paid
quarterly.

A  Everybody that wants earnings paid got paid at the
end of each calendar quarter.

Q  Okay.  So the March payment was intended to be the

Page 97

1  payment for the end of the fourth quarter of 2004?
2     A   The March payment from who?
3     Q   Megafund, that you made.
4     A   Okay. The payment that I made -- what I received
5  from Megafund -- everything I received from Megafund was paid
6  out at the end of the quarter.
7     Q   Right. And so the five -- the first 500,000 you
8  got from Megafund was paid at the end of what quarter?
9     A   End of the first quarter.
10    Q   Of 2005.
11    A   2005.
12    Q   The second 500,000 you got from Megafund was
13 paid -- and I understand that 125 of it went to Mex Bank.
14    A   It was paid at the end of the second quarter.
15    Q   So you paid it in -- at the end of --
16    A   Second quarter '05.
17    Q   June.
18    A   June, right.
19    Q   So you sat -- but you received the money in April;
20 correct?
21    A   Yes.
22    Q   So you sat on the money until the end of June.
23    A   Correct.
24    Q   Okay.
25        Have you had any further contact with the Tri-Com

Page 98

1  Securities and the individuals involved in that?
2     A   No. I had a conversation shortly thereafter about
3  wanting to know where was the money all that time. You know,
4  nine plus million dollars sitting somewhere. Somebody has
5  got something -- got made of somewhere, at least money market
6  interest. Where is it? And --
7     Q   With whom did you have this conversation?
8     A   Lance Rosenberg.
9     Q   And what did he say?
10    A   And he said that he was still trying to determine
11 that himself, that he -- that he had -- he had sent part
12 of -- the deal was $20 million and he was participating on
13 the other side of it that went to City Bank and it was
14 sitting in City Bank and they couldn't perform and it didn't
15 perform. And so he demanded the money back and he got the
16 money back, but he had other issues with them of some kind
17 that he didn't disclose to me.
18    Q   And just -- I know you've already said this, but
19 Gary McDuff was the one who got you involved in this too.
20    A   Correct.
21    Q   Did you ask him what went wrong or where the money
22 went?
23    A   Yeah, he didn't know.
24    Q   What did he say?
25    A   He said he didn't know.

Page 99

1     Q   So why did you turn around and trust him to send
2  the money to Megafund? I mean, he hadn't -- he steered you
3  wrong once.
4     A   Well, the wrong steer was only in terms of
5  performance. It wasn't in terms of protection of the
6  principal of the money. The agreement was secure and the
7  money came back, so that's why I felt confident that, okay,
8  Leitner is a stand-up guy. No problems there. I got a
9  letter from the attorney that -- I had a comfort zone much
10 the way I did with Tri-Com.
11    Q   And your comfort zone with Leitner was based on the
12 letter from Humphries and the recommendation by McDuff.
13    A   Correct.
14    Q   Did you ever talk to Gary McDuff's father?
15    A   Yes.
16    Q   And what did he tell you about Leitner?
17    A   He said he'd known him for a long time and that --
18 you know, that they had a religious connection and --
19    Q   Did that cause you any concern?
20    A   No.
21    Q   Did that give you comfort?
22    A   I was neutral on it. It didn't matter to me. I
23 was more --
24    Q   I'm just asking because you keep mentioning it. So
25 you seem to remember that.

Page 100

1     A   No, just that -- that's -- you know, that was the
2  auspices of their relationship was he was a pastor and he had
3  known him for --
4     Q   Evangelical Christians?
5     A   I don't know what denomination.
6     Q   What else can you tell me about Robert Rees that
7  you haven't -- that we haven't already discussed? Is there
8  anything?
9     A   I know -- I really don't know that much about him.
10 Probably we've had phone conversations and that's it.
11    Q   Do you think you'll continue to have a relationship
12 with him?
13    A   I don't know on what basis.
14    Q   Does he continue to refer investors to you?
15    A   Not now.
16    Q   When did he stop?
17    A   When the first notification of problems occurred.
18    Q   What do you consider to be the first notification
19 of problems?
20    A   When I sent the last letter saying that -- the
21 first one saying that the funds were frozen, that there is a
22 problem.
23    Q   And that was in September of '05?
24    A   Yeah.
25    Q   And that's when he stopped sending you investors.

Page 101

A  I think so, yes. There were people that I don't
know when they -- when he talked to them, the ones I referred
to that sent applications for Fund II and I don't remember
when those came up.

Q  Tell me about Fund II.

A  Up until now, Fund II is -- is not effective. It's
not going effective. Fund II is dead.

Q  What -- what are the offering documents for Fund
II?

A  What are they refund to?

Q  What are the offering -- have I seen the offerings
documents for Fund II? Did you produce those to me?

A  Oh, I don't know if I did or not.

MS. HUSEMAN: Can we add that to the list?

MR. SELLERS: That's fine with me.

THE WITNESS: It's identical to Fund I with the
exception that any reference to the insurance that was
optional and the like in the first one, all of that was
removed.

BY MS. HUSEMAN:

Q  So Fund II was supposed to be invested in debt
securities as well?

A  Correct.

Q  And why didn't -- how much money have you raised
for Fund II?

Page 102

A  Well, I have deposits for Fund II that amount to
550 or 575.

Q  Thousand?

A  Yeah.

Q  How many investors?

A  Four.

Q  Four large investors?

A  Uh-huh.

Q  Did you disclose to those investors -- are those
investors also Megafund investors?

A  No.

Q  Did you disclose to those investors your experience
with Megafund?

A  No.

Q  I want to go through your investment documents,
your offering documents.

A  Okay.

Q  I made some extra copies.

Can I have -- I need to mark your copy.

A  Oh.

(SEC Exhibit No. 17 was marked for
identification.)

Q  Thanks. This is Exhibit 17. And I realize that we
went through this at our prior meeting, but I need to do it
for the record.

Page 103

1  A  Okay.

2  Q  The first -- the first bullet point on page 1 of
3  Exhibit 17, the securities or original debt securities rated
4  A plus by Standard & Poor's Corporation or A1 by Moody's
5  Investors Service, that's not what you invested in, is it?

6  A  I can't say with certainty what it was invested in.

7  Q  Did you know that they were A plus debt securities?

8  A  I -- I did -- I did not know with certainty, no.

9  Q  What -- if you thought that they were A plus debt

10  securities, what do you base that on?

11  A  I can only base it on verification, which I did not

12  get.

13  Q  Looking at Exhibit 13, which is the outline of the

14  plan that you invested in with Megafund; is that correct?

15  A  Correct.

16  Q  Where would you get that from this exhibit?

17  A  It's not in that exhibit.

18  Q  So if you thought that's what you were investing

19  in, how can you tell me that you didn't know that you weren't

20  investing in A plus debt securities?

21  A  Say that again.

22  Q  I know. I'm sorry.

23  If you thought you invested in this plan, how can

24  you tell me that you invested in A plus debt securities?

25  A  I can't from the outline of this plan.

Page 104

1  Q  Okay. Then what -- what basis could you possibly

2  have for saying you thought you might have?

3  A  The basis was verbal verification from Mr. Leitner

4  that the Lan Corp. portion of the funds would only been

5  invested pursuant to the permitted investment in the

6  memorandum.

7  Q  But nothing in there says anything about A plus or

8  A1 debt securities, does it?

9  A  Does not.

10  Q  So I don't understand how you could come to that

11  conclusion.

12  A  That was the basis upon which I agreed to move

13  forward with the agreement, that I had to conform to this and

14  that I had to be able to make redemptions at the end of each

15  calendar quarter.

16  Q  Okay. You've lost me.

17  How could you think that Megafund -- the Megafund

18  investment was in debt securities rated A plus by Standard &

19  Poor's or A1 by Moody's?

20  A  I couldn't know for certain at the outset. It

21  was -- that was the agreement that I would be.

22  Q  Leitner said that to you?

23  A  That he would conform to the permitted investments

24  portion of my memorandum.

25  Q  Did he ever write that? Did he ever put that in

Page 109

1 person" -- the bottom -- "acknowledges that he's an
2 accredited investor or if such person is not an accredited
3 ...estor" -- first bullet point -- "that he is sophisticated,
4 well -- that he is a sophisticated, well-informed investor
5 and is able to understand and utilize the information
6 contained herein."
7        How did you establish that?
8    A  I didn't establish it for the nonaccredited
9 investors.
10   Q  But isn't that what this says you were going to do?
11   A  That's what this says, yeah.
12   Q  But you didn't do it; is that correct?
13   A  I took no action to verify.
14   Q  And I'm sure, in retrospect, you've learned that
15 some of your investors were really, really nonaccredited.
16   A  Absolutely.
17   Q  And had actually invested far more than they could
18 afford to lose.
19   A  That has come to my attention now. I had no idea
20 at the time. Had I known at the time, I would not have
21 accepted their application.
22   Q  Did you take any steps to figure out whether they
23 were?
24   A  I didn't deem it to be necessary at the time.
25   Q  Why?

Page 110

1    A  Because the referrals that were coming in were
2 supposed to be from like Bob Rees who knew what the outlines
3 were and would only refer the kinds of people that are
4 suitable for investment.
5    Q  What reasons did you have to -- or what did you
6 base your trust in Bob Rees on? And from what I've been able
7 to ascertain, you didn't know him that well.
8    A  Yeah, I didn't. I just made the presumption
9 that -- that referrals that would be made to me for people in
10 this would be screened people.
11   Q  But what did you base that belief on?
12   A  Representations made by Gary McDuff that, you
13 know -- that the kinds of investors that they had been
14 associating with were all, you know, pretty much
15 sophisticated, high network people.
16   Q  Did Gary McDuff make any representations to you
17 about Mr. Rees?
18   A  No, not specifically.
19   Q  So you just kind of went on --
20   A  I made the presumption that -- you know, that
21 ...ngs were being done appropriately.
22   Q  Now, you said that in the -- I'm sorry. On page 3,
23 Roman numeral -- Roman numeral three, the bottom paragraph,
24 "The investor shares have not been registered under the 1933
25 Act and are being offered pursuant to the private placement

Page 111

1 exemption provided by Section 42 and/or Rule 506 of Reg. D."
2        Prior to seeing this document, did you understand
3 what Rule 506 and Reg. D was, what that exemption entailed?
4    A  No.
5    Q  Did you understand what the Section 42, private
6 placement exemption, entailed?
7    A  No.
8    Q  Who told you what that meant?
9    A  Nobody told me specifically what that meant.
10   Q  Did you look it up?
11   A  No. I -- I relied on Norman Reynolds to handle it,
12 to make sure everything was in order.
13   Q  I think we went over this previously, but when is
14 the last time you had contact with Mr. Reynolds?
15   A  Been a couple months.
16   Q  Is he aware of what's happened --
17   A  Yes.
18   Q  -- as far as you know?
19   A  Yes.
20   Q  And what was his response when you -- when he found
21 out, if you know?
22   A  He was horrified and he verbalized that the first
23 thing that needs to be done is to make certain that -- that a
24 claim is filed on behalf of the fund.
25   Q  A claim with?

Page 112

1    A  A claim with the Receiver.
2    Q  And he advised you to do that?
3    A  In effect, yes.
4    Q  And did he file the claim for you?
5    A  No, I did it myself.
6    Q  Did he say anything else?
7    A  No.
8    Q  Was he the one -- who was the -- of all these
9 players that we've discussed, McDuff, Reynolds, Rosenberg,
10 who was the first person that you knew -- that you met?
11   A  Gary McDuff.
12   Q  And he introduced you to everybody else.
13   A  Correct.
14   Q  What is your opinion of Mr. McDuff now?
15   A  I would certainly have engaged in no business
16 activity with him going forward. My -- my experience with
17 him has been, I would say, positive. It appears -- has
18 already appeared to me that he's attempted to do the right
19 things, directing me to Norman Reynolds to make sure
20 things were done in proper order.
21   Q  What has he done to help you deal with the
22 situation that you're in now?
23   A  Nothing. Nothing that I'm aware of.
24   Q  What has he done to help you make your investors
25 whole or --

Megafund Corporation                                      Gary Lynn Lancaster, 11/17/05

Multi-Page™

Page 105

1  writing?
2     A  No.
3     Q  When did you have this conversation?
4     A  During the -- in January during the time that the
5  joint venture agreement was being executed.
6     Q  When you made the -- when you executed the joint
7  venture agreement, did you notify your investors that you'd
8  done so?
9     A  In Megafund?
10    Q  Uh-huh.
11    A  No.
12    Q  Did you send them anything saying "We've invested.
13 We're moving forward"?
14    A  Oh, I sent them notification that the -- that a new
15 arrangement had been made and that the fund was going to go
16 effective again.
17    Q  And when you say the fund goes effective, what does
18 that mean to you?
19    A  That means it begins to engage in profit activity.
20    Q  At the bottom of page 1 of Exhibit 17, you say,
21 "Neither the Securities and Exchange Commission nor any State
22 securities commission has approved or disapproved of these
23 securities."
24       Previously you testified, I believe, that you
25 thought you'd registered the securities with the State; is

Page 106

1  that correct?
2     A  I made a registration.  I can't say for certain
3  what that registration was.
4     Q  But at the time, is that what you thought?
5     A  At the time that's what I thought.
6     Q  Then why would you have this?
7       MR. SELLERS:  Can I ask a question?  Are you
8  talking about his -- his testimony today or in a previous
9  conversation you had with him?
10      MS. HUSEMAN:  No, his testimony today where he --
11 he thought at the time --
12    Q  I understand that we've clarified that, but you
13 thought at the time through Mr. Reynolds that you had
14 registered the securities with the -- some of the states;
15 correct?
16      MR. SELLERS:  I think he testified that he
17 registered the trust with the states.
18      BY MS. HUSEMAN:
19    Q  Okay.  You registered the offering with the states;
20 is that fair enough?
21    A  I registered the offering, yes.
22    Q  You thought you had.
23    A  Correct.
24    Q  Then why would you have this disclaimer?
25    A  It was done by my attorney.  I --

Page 107

1     Q  Did you have any input on this?
2     A  I had no input whatsoever.
3     Q  Then how did he draw it up besides you telling him
4  "I want to call it Lan Corp. Financial Fund Business Trust"?
5     A  This was a process already in motion when I stepped
6  into it.
7     Q  Okay.  I'm going to ask you a question.  Were you
8  essentially recruited to be -- to manage this fund after
9  these documents were all created?
10    A  Pretty much.
11    Q  And you just said okay?
12    A  Well, after speaking to Norman Reynolds and going
13 over, you know --
14    Q  Did it occur to you that if this was such a great
15 deal, that one of -- Gary McDuff or Norman Reynolds or
16 somebody else would run it?  I mean, I'm giving you the
17 benefit of the doubt.
18    A  At the time, no.  At the time I was just interested
19 in and flattered that I was being made the offering.
20    Q  What do you think of it now?
21    A  Not much.
22    Q  Do you think you were set up?
23    A  I think it's a possibility.  I'm a very trusting
24 guy and I've never had any negative issues of any consequence
25 in the 31 years that I've been out there.  I guess you could

Page 108

1  say to that degree I'm a little naive.
2     Q  How did you determine that once you reached the
3  million or the 9.6 million mark that was when you would
4  invest the funds in either Megafund or Tri-Com?
5     A  That wasn't the number.  It had to be 5 million
6  minimum to begin.
7     Q  Right, but how did you decide to cut it off at 96
8  or 9.3?
9     A  Because I was wanting an accounting.  I was wanting
10 something more substantive from Leitner that he wouldn't
11 provide and --
12    Q  That's how you determined the number?
13    A  No, no.  Well, the number was determined by
14 investor funds that came in.  The way he had the deal
15 structured was that if any money that was received by
16 Megafund by the 5th of the month of any given month would be
17 engaged in that -- in trading activity over the next 30 days.
18 If it came in on the 6th of the month, then whatever that
19 money is that came in would not be engaged in trading
20 activity until the following month.  So there was a cut-off
21 date each month for funds to be received to be engaged.  So
22 as monies came in from investors to purchase shares by the
23 cut-off date, then I would send what I had accumulated from
24 investors to Megafund.
25    Q  On page 2 of the document, it says that "Each

Page 113

1  A  Nothing.
2  Q  So why do you think he's always steered you right?
3  A  Well, I mean, up to -- up to this point, it's
4 like --
5  Q  When you say "up to this point," do you mean up to
6 today or up until --
7  A  Up until the problems started occurring.
8  Q  Have you asked him for any explanation?
9  A  Yeah.  He has none.
10  Q  What does he say, "I don't know"?
11  A  Yeah, he's like -- he's surprised.
12  Q  When you say he's surprised, what -- if you can
13 recall, what specifically did he say to you?
14  A  Nothing specific other than he can't believe it.
15  Q  Did you ask him what he thinks of Leitner?
16  A  Yeah.
17  Q  I mean, I would imagine you've had a pretty long
18 conversation with Mr. McDuff; is that fair to say?
19  A  Oh, yes, and he said he's -- he's known Stan for a
20 period of time and he talked -- I can't remember
21 specifically -- like they may have had some other dealings of
22 some kind.  I don't know any details, but that his impression
23 and what he knew of him was that he was a -- had a
24 multi-million art business, was very successful and very well
25 respected businessman in Dallas.

Page 114

1  Q  And you never did any research to find out anything
2 about that multi-million dollar art business.
3  A  No.
4  Q  Do you know Brad Weaver?
5  A  No.
6  Q  Have you ever heard the name?
7  A  I -- I -- that sounds familiar, but I don't know
8 where I've heard it.
9  Q  Do you know the name Tom Bandick (phonetic)?
10  A  Yes.
11  Q  How do you know him?
12  A  He is an investment advisor who referred some
13 people and who at one point did an outline of the trust on
14 his website.  And when it came to my attention, I --
15  Q  What's his website?  What's the address?
16  A  I don't remember.
17  Q  Could you get that for me?
18  A  Maybe.  I -- I don't know for sure.  I just -- I
19 was -- it was brought to my attention that the -- an outline
20 was on a website that he controlled.  And I sent him an
21 e-mail and gave him a cease and desist to -- and to remove
22 any reference to the Lan Corp. fund off his website
23 whatsoever, that he did not and would not have any
24 authorization to solicit anyone on behalf of the fund.
25  Q  Did you talk to him in person -- or excuse me.  Did

Page 115

1 you have a conversation with him?
2  A  Not on the phone, but we conversed back and forth
3 by e-mail.
4  Q  Do you still have that e-mail?
5  A  Yes, I do.
6  Q  Okay.  I'd be interested in getting that.  Is that
7 okay?
8  A  Yeah.
9  Q  Besides referring people to the Lan Corp. fund,
10 did he -- did you have any other contact with Mr. Bandick?
11  A  Well, he was an investor in the fund.
12  Q  How do you pronounce his last name?
13  A  I think it's Bandick.
14  Q  It's Bandick, not Bandike?
15  A  I don't know for sure.
16  Q  When you say he was an investor in the fund, do you
17 think he accumulated monies from other investors and then
18 sent them to the fund or that he personally was an investor?
19  A  No.  I think it was his personal money because it
20 was -- it was the minimum amount, 25,000.  And then he sent
21 another 5,000, I think, later, so I think his total was 30,
22 so he clearly was not a significant investor.
23  Q  Has he -- have you spoken to him since the demise
24 of Megafund?
25  A  I have never spoken to him and I have not

Page 116

1 communicated with him after my ordering him to cease and
2 desist and honoring his request, which I was going to execute
3 anyway, of terminating his investment in the fund.
4  Q  When did you terminate his investment?
5  A  I'd have to go back and look.
6  Q  Did you return his money?
7  A  I returned his money.
8  Q  You ever heard of guaranteed short-term trades
9 program?
10  A  No.
11  Q  Have you ever heard of something called error
12 trades?
13  A  No.
14  Q  Or an error account?
15  A  No.
16  Q  When I say "error," that's e-r-r-o-r.  I know my
17 accent makes it hard.
18  A  No, never heard of it.
19  Q  How many investors came through Bandick?
20  A  Two or three, maybe.
21  Q  Did he ever ask for any kind of compensation from
22 you?
23  A  No.
24  Q  Did you ever invest in any of his programs or with
25 him?

## Page 117

A   No, no. From what I've heard, I'm glad I didn't.

Q   What do you mean from what you've heard?

A   Well, I heard from Bob Rees that some deal that he was --

Q   When you say "he," you mean Bandick?

A   Bandick. Some deal that Bandick was involved in turned out also to be a Ponzi scam.

Q   What was that?

A   Don't know any specifics. It was some trader, somebody that he had known personally for a period of time. I actually heard about this through -- rescind that. I did not hear it from Bob Rees. I talked to Bob Rees about it later, but I heard it from a couple of investors in Lan Corp. who had invested in it.

Q   And who would that be?

A   I knew you were going to ask that and I can't remember.

Q   Would that be Mr. Venrick (phonetic)?

A   Yes. Venrick is one, Jack Venrick.

Q   Who else?

A   I can't say for certain, but there's -- there was two or three that I recall asking me what I knew about it and I, of course, didn't know anything about it. And they had mentioned that they had lost -- or they were involved in -- in that transaction.

## Page 118

Q   Have you ever spoken to anyone from the SEC's office in Chicago?

A   No.

Q   How about the U.S. Attorney's office in Chicago?

A   No.

Q   Any Federal regulators in Chicago at all?

A   No.

Q   Did you receive any assets from investors that Bandick introduced you to or introduced to Lan Corp.?

A   I think there was -- I think there was two or three, but I can't say for certain. I'd have to go back and look.

Q   Do you know how much it was, how much money?

A   All of them, I think, were minimum amounts. 25,000 is the minimum.

Q   And did you end up returning their funds when you returned Bandick's?

A   I think so. You know, I'd have to check. There may -- might have been only one other person besides Bandick. Seemed to me like it was very -- very small amount and I was glad to see it all gone. I didn't wanted anything to do with Bandick.

Q   When is the last time you spoke to him or communicated with him?

A   Months. I don't know for sure, but it's been quite

## Page 119

1   some time.

2   Q   After the Megafund filing or before?

3   A   What do you mean?

4   Q   After -- after the Commission filed their case

5   beginning of July or before?

6   A   Oh, I think it was before. I haven't talked to him

7   since any issues of Megafund.

8   Q   I noticed in the detail -- the -- the checks behind

9   your bank records that you had filed -- or registered

10   something recently in Hawaii. When I say "recently," I mean

11   in July of 2005. What was that?

12   A   That was that same filing that I made in all the

13   states.

14   Q   The one that Reynolds told you to make?

15   A   Yes.

16   Q   And why -- since Megafund had tanked at that point,

17   were you registering Fund II -- Lan Corp. Fund II?

18   A   Probably.

19   Q   Do you recall?

20   A   I don't recall specifically.

21   Q   Is that the last state filing you did?

22   A   I think so.

23   Q   Who had you sold to in Hawaii?

24   A   I can't remember the guy's name.

25   Q   Was it just one investor?

## Page 120

1   A   One investor. And I remember thinking that all

2   these fees to the states for one investor is hardly worth it.

3   Q   When did you come to that conclusion, in July?

4   A   Well, actually, I was thinking that early on even.

5   The fee varied dramatically from state to state.

6   Q   Did you -- looking at your offering document, could

7   you point to me -- point out to me where it is that you

8   disclosed to your investors or your potential investors what

9   your commission -- and I'm using that term generally -- what

10   amount of money you will be paid?

11   A   Page 1 under "Fee Table Synopsis."

12   Q   Okay. And what does that provide?

13   A   It provides for 50 basis points per quarter.

14   Q   And what does that mean?

15   A   50 basis -- 50 basis points of the amount of money

16   under management each quarter.

17   Q   And how much money was under management?

18   A   Ultimately, 10.1, I think.

19   Q   So 10.1 million?

20   A   (Nods head.)

21   Q   But only 9.3 went --

22   A   9.3 went to Megafund, correct.

23   Q   What happened to the other 800,000?

24   A   There's still 1.6 million of the funds that are

25   sitting in a money market.

Diversified Reporting Services, Inc. (202) 467-9200

Page 121

1    Q   Okay.
2    I'm sorry.  And this is -- this is my stupidity.  I
3  don't understand what you mean when you say basis points.
4  Could you explain that to me?
5    A   That's one-half of 1 percent.  If you look on the
6  right-hand side there which talks about trustees fees and
7  other expenses --
8    Q   Uh-huh.
9    A   -- that's 1 percent per year for fee and 1 percent
10  for expenses, so there's no low, but there's 2 percent per
11  year paid out each quarter of the assets under management.
12    Q   No, but clearly you were retaining more than that.
13    A   Yes.  Under my other agreement, right.
14    Q   And that agreement was never disclosed to
15  investors.
16    A   Correct.
17    Q   So --
18    A   I didn't know that it needed to be or I would have.
19    Q   I understand, but the point is they -- they still
20  thought that you were retaining the amount disclosed on page
21  1 of your offering memorandum.
22    A   Correct.
23    Q   And, in fact, you were retaining a lot more --
24    A   Correct.
25    Q   -- based on -- based on an agreement you made with

Page 122

1  yourself.
2    A   Right.
3    Q   And looking at page 3 of your offering document --
4  document -- excuse me -- "The trust may invest only in
5  permitted investments which satisfy each of the following
6  criteria."
7    Did Megafund satisfy any of these criteria based on
8  what you saw in their offering document?
9    A   No.
10    Q   Not the first criteria, first bullet point?
11    A   I -- I received no verification that that was
12  adhered to.
13    Q   And I'm sorry.  I'm not trying to put words in your
14  mouth.  You received -- you never were able to determine that
15  it satisfied any of these criteria; is that correct?
16    A   That's correct.
17    MS. HUSEMAN:  Off the record at 1:40.
18    (Whereupon, a recess was taken.)
19    MS. HUSEMAN:  Back on the record at 1:45.
20    BY MR. QUILLING:
21    Q   Mr. Lancaster, as you know, I'm Mike Quilling, the
22  court-appointed receiver as to Megafund Corporation, Stanley
23  Leitner and others.  I've just got a few questions to ask you
24  based on some of your testimony today and what you've told me
25  previously.

Page 123

1    How did a guy like you from Oregon wind up
2  associated with a lawyer in Texas named Mr. Reynolds?
3    A   Direct referral.  As I said, I stepped into this
4  process and he was already the engaged attorney for trying to
5  get the Avenger Fund under way and that just rolled over into
6  the private placement fund, so he was  direct referral to me
7  from Secured Clearing and Gary McDuff.
8    Q   And has he -- you had no prior relationship with
9  him.
10    A   No.  He was represented to me as a very, very
11  highly respected attorney who at the time was working for
12  Jackson Walker, which I was told was a preeminent law firm
13  dealing with SEC and SCC issues.  He subsequently left that
14  firm and went to Glass, Phillips & Murray, but he was
15  represented to me as a very astute SEC attorney.
16    Q   During the time that Mr. Reynolds provided
17  services, was he representing Lan Corp. or was he
18  representing Gary Lancaster individually?
19    A   Lan Corp.
20    Q   And only Lan Corp.
21    A   And only Lan Corp., correct.
22    Q   Do you have -- does Lan Corp. or Gary Lancaster
23  have any E&O policy or other insurance that might cover
24  claims that investors might want to serve against either you
25  or the fund?

Page 124

1    A   Actually, I do not.  And I'm -- I'm going to take
2  this issue up with the Oregon Insurance Commissioner's
3  office.  My previous appointment with a broker/dealer allowed
4  me to purchase errors and omission insurance through that
5  company.  They canceled, nonrenewed my E&O contract when they
6  canceled my appointment with the broker/dealer and I received
7  no notification whatsoever.
8    Q   Was there ever a period of time when you did have
9  E&O --
10    A   Yes.
11    Q   -- coverage?
12    A   Correct, yes.
13    Q   What period of time?
14    A   '04 and '05.
15    Q   Do you have a copy of that policy?
16    A   I do.
17    Q   Would you provide that to the --
18    A   Absolutely.
19    Q   -- SEC?
20    A   Yeah.
21    Q   The reason I ask that, Gary, is a number of
22  investors, as you know, have contacted my office --
23    A   Yes.
24    Q   -- and several of them have referenced that they
25  were told by you that you had E&O coverage.  Do you remember

Page 125

ever telling any investors that?

A Yes. At the time I spoke to them, I had E&O coverage. In fact, when this first came to light, I pulled my E&O contract out, looked for who to contact to put the E&O carrier on notice and that's when I discovered that I didn't have a current renewal.

Q Have you consulted with anyone, be it a lawyer or otherwise, to assist you in determining whether you may have coverage under that policy?

A We've talked about it briefly.

Q Don't tell me what your lawyer said.

A Okay.

Q You have consulted.

A I have, yes.

Q And have you undertaken any action to try to obtain coverage under that policy?

A Not -- not at this point.

Q Have you been formally denied any coverage under that policy?

A No.

Q What is the -- if you can recall, what are the parameters in the policy in terms of coverage and that sort of thing?

A It's basic, you know, but I also elected additional coverage for investment advice, so it would cover securities,

Page 126

so it covered mutual funds and the like.

Q If the policy were still in force and effect, is it your opinion that it would cover the issues that have arisen now with respect to this investment?

MR. SELLERS: I'll allow him to answer the question, but I want the record to note that calls for a legal conclusion. He's not a lawyer.

THE WITNESS: I'm uncertain, but it was my understanding under the -- when I read the application of what it covers to get the extra coverage, that that would be a covered event.

BY MR. QUILLING:

Q And that's why you bought the coverage.

A And that's why I bought the coverage.

Q In the -- in the event that something like this ever arose --

A Exactly.

Q -- you would be covered.

A Correct.

Q What's the face value of the coverage?

A 5 million.

Q And what's the deductible?

A I think it's 5,000.

Q Did that -- who did the policy cover, just you?

A Me, yeah.

Page 127

1   Q Anyone else?

2   A No.

3   Q Is there any other insurance that you think might

4 have or might possibly provide you coverage for the events in

5 question?

6   A Not insurance that's on me, no, or on the entity.

7   Q So if this E&O policy -- nothing can be resurrected

8 there, there is no coverage.

9   A Not on my end, no.

10   Q I want to make sure that I have a clear

11 understanding of -- of the way the money flowed after you

12 received it from Megafund. The records reflect and you've so

13 testified that the first return -- or what you thought was a

14 return from Megafund was sent to you on March 23rd of '05 and

15 it was for $500,000. Do you agree with that?

16   A Correct.

17   Q Did you take any mental note of the fact that that

18 money was being returned to you from the same account to

19 which you had sent your funds?

20   A I recognized it, but it didn't cause any cause for

21 considering it further.

22   Q Had Leitner or anyone else with Megafund ever

23 described to you that deposits would go into one account and

24 returns would come out of another account?

25   A No.

Page 128

1   Q So it made no -- no difference to you whatsoever.

2   A No.

3   Q When you got the money, the 500,000, if I follow

4 your math correctly, $100,000 was set aside to investors,

5 percent.

6   A (Nods head.)

7   Q Correct?

8   A It would have been one -- 20 percent divided by 12

9 would have -- was set aside. So what I did was I took out of

10 that rate of return, amortized what 20 percent a year would

11 be for the investors and took one-twelfth and set it aside.

12   Q You didn't set aside the whole 100,000.

13   A I set aside whatever the percentage -- wait.

14   MR. BRANNON: I think there's some confusion. The

15 20 percent is 20 percent return on the total invested.

16   THE WITNESS: On the total invested.

17   MR. BRANNON: So it wasn't 20 percent of whatever

18 Megafund sent them.

19   THE WITNESS: It was 20 percent of the funds under

20 management. So if the -- if the -- the investors were to

21 receive a 20 percent return, so then percent dollar amount

22 divided by 12 was set aside. So it might have been 100,000.

23 I'd have to go back and look at the number.

24   BY MR. QUILLING:

25   Q And I -- I was under a misunderstanding. I thought

Diversified Reporting Services, Inc. (202) 467-9200

Page 129

1  you took 100,000, which was 20 percent of what you got back,
2  and set that out in the direction of the investors, but
3  that's not the way it happened.
4      A  It's 20 percent -- the whole thing was calculated
5  on providing the investors the first 20 percent annualized on
6  a quarterly basis. And when I received it on a monthly
7  basis, I would set aside that month's worth in reserve for
8  investors.
9      Q  And, in any event, the amount that you sent back to
10  them will be set forth in the accountings that you sent to
11  me.
12      A  Yes.
13      Q  Just so that I'm clear on this, when you say 20
14  percent of the amount under investment or under -- under your
15  supervision, when you got this money back on March 23rd, you
16  had made an investment on February 2nd of $5 million.
17      A  Uh-huh.
18      Q  So when you set about to determine who got 20
19  percent, was it 20 percent of the whole nine point million
20  something --
21      A  Yes.
22      Q  -- or just of the five?
23      A  Of the entire amount.
24      Q  Okay.
25      A  Treating all share holders alike.

Page 130

1      Q  So that I can understand this a little bit better
2  in my caveman math, assume with me for the moment that out of
3  the 500,000, 100,000 went to investors. It's -- if I
4  followed your testimony correctly, the remaining $400,000 was
5  to be split 60/40?
6      A  Correct.
7      Q  Who got the 60?
8      A  Me.
9      Q  Lancaster.
10      A  Or Lan Corp.
11      Q  Lan Corp.
12         And that would have been Lan Corp. Group.
13      A  Lan Corp. Financial Group, correct.
14      Q  And who got the 40?
15      A  Went to Mex Bank.
16      Q  And it was paid to Mex Bank.
17      A  Directly to Mex Bank.
18      Q  Not to Eduardo Trejo.
19      A  No, it was paid directly to Mex Bank.
20      Q  So under that scenario, if you assume $100,000 went
21  to the investors, Gary Lancaster/Lan Corp. Group would have
22  gotten $240,000 and Mex Bank would have gotten 160,000.
23      A  (Nods head.)
24      Q  Right?
25      A  Sounds right.

Page 131

1      MR. SELLERS:  For the record, that's based upon
2  your assumptions because his testimony prior -- previously
3  was inconsistent with that in terms of dollars.
4      THE WITNESS:  Yeah. I don't know the exact dollar
5  amounts without going back into my records.
6      BY MR. QUILLING:
7      Q  If you just take the assumptions that I gave you
8  and that's 100,000 goes to investors, there's 400 left to
9  split. 60/40 was 240 and 160.
10      A  Uh-huh.
11      Q  But in actuality, because the one-twelfth of the 20
12  percent was less than 100 grand, you actually retained
13  something a little more than that.
14      A  Yes.
15      Q  And Mex Bank would have gotten something a little
16  more than 160; is that right?
17      A  That could be, yeah.
18      Q  When the money came into your account, the
19  $500,000, did you transfer it to other accounts under your
20  control or did it stay there until you sent money to Mex
21  Bank?
22      A  It stayed right in the client trust account until
23  it was transferred to Mex Bank.
24      Q  So you didn't divert it to other accounts for
25  record keeping or anything like that?

Page 132

1      A  No.
2      Q  You didn't treat that trust account as a checking
3  account for you when you wanted to start spending some of
4  your $240,000?
5      A  Absolutely not.
6      Q  Where would you transfer that money for your
7  personal -- for Lan Corp. Group?
8      A  It would have gone into the Lan Corp. account.
9      Q  At the same bank?
10      A  At the same bank.
11      Q  I haven't had a chance to study --
12      A  All at the Bank of America. There's a -- there's
13  a -- Lan Corp. Financial Group has a business account,
14  there's a Lan Corp. Financial Group client trust account, and
15  then there's what's called a maximizer, which is the bank's
16  money market. So all funds always went into the client trust
17  account. Once they were cleared, then they were transferred
18  into the maximizer account because it got interest.
19      Q  And does Gary Lancaster have a personal account?
20      A  At Bank of America?
21      Q  Yes, sir.
22      A  No.
23      Q  Where would you have moved your --
24      A  To -- I have an account at US Bank.
25      Q  Okay.

Page 133

1    So if I'm trying to follow the money, I'm going to
2  look to see what happens at Bank of America and I should see
3  some money going to Mex Bank --
4    A  Right.
5    Q  -- out of Bank of America and I should see some
6  money going to Gary to a US Bank account?
7    A  From Lan Corp. Financial Group, correct.
8    Q  Are there any other banks that I should be looking
9  for?
10    A  There's only one other bank account and that's at
11  Washington Mutual, which I've provided you with.  I -- while
12  nothing was happening with money for reinvestment, I opened
13  up a series of CD's that could be added to and subtracted
14  from that was paying three-and-a-half percent, better than
15  anybody that's out there, and I've still got the minimum,
16  5,000, in each of those accounts at Washington Mutual.
17    Q  And the beneficiary of those accounts is the trust?
18    A  It's -- it's Lan Corp. Financial Group.
19    MS. HUSEMAN:  When you established those accounts,
20  you established -- I believe you said 15 $50,000 CD's?
21    THE WITNESS:  Yes.
22    MS. HUSEMAN:  Ten-month CD's?
23    THE WITNESS:  Correct.
24    MS. HUSEMAN:  And you took out -- I believe that
25  was in September or August?

Page 134

1    THE WITNESS:  Yeah, one of the two.
2    MS. HUSEMAN:  And then the following month you took
3  45,000 out of each account?
4    THE WITNESS:  Yes.
5    MS. HUSEMAN:  Why?
6    THE WITNESS:  To -- I was going to start engaging
7  in -- in a new transaction, so I was accumulating all the
8  funds to do the activity.
9    MS. HUSEMAN:  What new transaction?
10    THE WITNESS:  I was going to do underwriting
11  through Sloan Securities.
12    MS. HUSEMAN:  Sorry.
13  BY MR. QUILLING:
14    Q  The methodology that we just described with respect
15  to the $500,000 was followed when you got the next payment;
16  is that right?
17    A  Yes.
18    Q  Except that the Mex Bank went directly to Mex Bank.
19    A  Yes.
20    Q  You say that you know who John McDuff is; correct?
21    A  Yes.
22    Q  And John McDuff is Gary McDuff's father?
23    A  Correct.
24    Q  Did you know that John McDuff was getting paid
25  monthly by Megafund?

Page 135

1    A  I did not.
2    Q  Did he ever tell you that he wasn't?
3    A  He never told me anything.
4    Q  Did you ever inquire?
5    A  No, never occurred to me.
6    Q  Do you know who Roger McDuff is?
7    A  No.
8    Q  Do you have an understanding or have you heard of
9  Roger McDuff?
10    A  No.  That's the first -- first I've heard that
11  name.
12    Q  Do you know that -- you ever heard of Roger McDuff
13  Evangelistic --
14    A  No.
15    Q  -- Association?
16    A  No.
17    Q  Did you know that Roger McDuff and Roger McDuff
18  Evangelistic Association was getting paid monthly by
19  Megafund?
20    A  Never heard of them.
21    Q  When you had your discussions with Mr. Humphries,
22  the lawyer in Kentucky -- or reported lawyer in Kentucky, did
23  you -- did you ask him had he been paid any money by
24  Megafund?
25    A  No.  All I wanted to do was verify that what he had

Page 136

1  provided in writing was accurate.
2    Q  Did Leitner or anybody with Megafund ever tell you
3  that Humphries was on a monthly retainer that was being paid
4  by Megafund?
5    A  No, no.
6    MR. QUILLING:  I appreciate your time.  I don't
7  think I have any further questions.  Should they arise, we
8  obviously can talk through your attorney --
9    THE WITNESS:  Sure.
10    MR. QUILLING:  -- or informally if we have need.
11    MS. HUSEMAN:  I have a couple more questions.  Is
12  that okay?
13    THE WITNESS:  Okay.
14    (SEC Exhibit No. 18 was marked for
15    identification.)
16  BY MS. HUSEMAN:
17    Q  I'm going to show you what I'll mark as Exhibit 18.
18  Is that a copy of the first check that you received from
19  Megafund?
20    A  Yes.
21    Q  And page 2 of Exhibit 18, is that a wire transfer
22  from Megafund to you?
23    A  Yes.
24    Q  And I'm assuming based on your previous testimony
25  that a little less than $176,000 went directly to --

Page 137

1 A  Mex Bank.
2 Q  So in the 60/40 scheme, how much did you get?
3 A  This is it.
4 Q  But I mean after you paid your investors.
5 A  I had to pay the investors out of my 60.
6 Q  And how much did you pay them out of this wire?
7 A  Whatever the calculated amount was for 20 percent.
8 Q  Do you recall what that was?
9 A  Not offhand.
10 Q  Approximately, a little over 70,000?
11 A  Could be.
12 Q  So you would have retained 250,000?
13 A  Could be.  I'd have to look it up.
14 Q  Okay.
15 A  I'm trying to -- yeah.
16 Q  Was anybody besides you responsible for keeping
17 records --
18 A  No.
19 Q  -- in regard to Lan Corp.?
20 A  No.
21 Q  What was your wife's position in the company?
22 A  She had no position with the company.
23 Q  Did she work for you?  Did she help you out?
24 A  Every now and then she'd do some -- you know, help
25 me out with making labels for the files and that kind of

Page 138

1 thing.
2 Q  What's her profession?
3 A  She doesn't work.  She has arthritis.
4 Q  Has she ever worked?
5 A  Yeah.  She was -- she worked for a chiropractor for
6 a period of time and she did medical transcription for a
7 period of time.
8 Q  During the time that you've had Lan Corp., has she
9 worked?
10 A  Yes.
11 Q  When -- what did she work?
12 A  She did medical transcription.
13 Q  Okay.
14 A  That was up until -- I'm trying to think -- two
15 years ago, I think, and she just couldn't do it anymore,
16 physically couldn't do it.
17 Q  So now she doesn't work at all?
18 A  Can't work.
19 Q  Is she on disability?
20 A  We can't -- she doesn't qualify for disability.
21 She's in that area where, you know, I guess if you can hold a
22 phone to your lips or sell a pencil on the corner, you're not
23 eligible.
24     MR. QUILLING: Let me jump in here just a second.
25 You said something that sort of threw me for a loop again.

Page 139

1     My earlier example to you, the 500,000, was you pay
2 your investors first and then you and Mex Bank split it
3 60/40.  That's really not the way it worked; right?
4     THE WITNESS: I paid the investors first out of my
5 part, yes.
6     MR. QUILLING: Okay.  But the 500,000 would be
7 split 60/40, which would be 300 and 200,000, and then you had
8 to pay the investors out of your 60.
9     THE WITNESS: Correct.
10     MR. QUILLING: Okay.  So that -- and that's how it
11 actually worked.
12     THE WITNESS: Yes.
13     MR. QUILLING: Okay.  So out of this first 500,000,
14 you would have gotten 300,000 and Mex Bank would have gotten
15 200,000 and then you would have paid your investors.
16     THE WITNESS: Yeah, that's -- that's approximately,
17 yeah.
18     MR. QUILLING: Thank you.
19     THE WITNESS: It was supposed to be originally
20 50/50 and then it was 60/40 because I had to pay investors
21 out of my part.
22 BY MS. HUSEMAN:
23 Q  Who negotiated this deal?
24 A  Gary McDuff on behalf --
25 Q  Did he just call you and say "Here's the deal.

Page 140

1 It's 50/50"?
2 A  Well, that was -- that was conversation early on at
3 the very beginning that they -- I essentially was going to
4 manage the fund, they would take care of all the rest of it
5 and we would split 50/50.
6 Q  Conversation with whom?
7 A  Gary McDuff on behalf of Secured Clearing.
8 Q  And did he continue -- was there ever a written
9 agreement to this effect?
10 A  No.
11 Q  Just a gentlemen's agreement?
12 A  Yeah.
13     (SEC Exhibit No. 19 was marked for
14     identification.)
15 Q  I'm showing you what I've marked as Exhibit 19.  I
16 believe this is the US Bank account that you referred to.  Is
17 this your checking account?
18 A  Yeah.
19 Q  Okay.  I specifically pulled some pages out of
20 there.  Looking at the March 1st, the first page of Exhibit
21 19 -- yes -- you show an ATM deposit of 139,185.  Where did
22 that come from?
23     MR. SELLERS: Counsel, where do you see -- oh, down
24 here?
25     MS. HUSEMAN: Uh-huh.

Page 141

THE WITNESS: ATM deposit? You'd think I would know that, wouldn't you? ATM. That's throwing me. I'd have to go look.

BY MS. HUSEMAN:

Q Okay.

A Okay. I bet that is --

MR. SELLERS: Don't speculate if you don't know the answer.

THE WITNESS: Okay. I don't know for certain.

BY MS. HUSEMAN:

Q Okay. Going to your April statement, page 4, which is page 4 of Exhibit 19, you have an April 27th deposit of $198,500. What is that from?

A Okay. That would have been from the second installment from Megafund.

Q That would have been the 60 after you paid the investors?

A Yes. And the first one is -- is the same. After investors were paid the balance, I wrote a check from Lan Corp. to me and deposited it.

Q Okay.

A So those are the two amounts that I received.

Q Okay.

MR. SELLERS: Counsel, what was the second number, 142?

Page 142

THE WITNESS: 198 she said.

MS. HUSEMAN: 198. It was on page 4 of Exhibit 19.

MR. SELLERS: What page are you on?

THE WITNESS: So the total amount would have been the 198 and the 139. That's the total amount that went to me.

BY MS. HUSEMAN:

Q Okay. Turning to May, the May statement -- I'm not sure which page of the exhibit it is, but the second page of the May statement.

MR. SELLERS: Can we just -- oh, this is the 198. Okay.

MS. HUSEMAN: I'm sorry. Do you want me to slow down?

MR. SELLERS: I just didn't know where the -- where you were referring to in the exhibit.

THE WITNESS: Okay, May.

BY MS. HUSEMAN:

Q Second page, page 2 of 2, 220,000 sent to ING, what was that for?

A That was just to get a better rate of interest.

Q And how long did you leave that money there?

A I think it's still there.

Q Okay.

And that money obviously is proceeds from Megafund.

Page 143

1   A Correct.

2   Q Turning to page -- first page of the June

3 statement, you have electronic deposit at the bottom of the

4 page from ING, 97,000. So you took 97,000 out.

5   A Yes.

6   Q So that money is not still there.

7   A No, we chase interest rates.

8   Q And on the second page of the June statement, you

9 send $100,000 to Immigrant Direct?

10   A Yes.

11   Q Is that another interest rate change --

12   A Yes.

13   Q -- chasing?

14   A Uh-huh. And we only put 100,000 because that's the

15 maximum insured by FDIC, so we spread them around.

16   Q Okay.

17   Turning to the July statement, you took 5,000 out

18 of ING Direct account. Was that for living expenses or --

19   A Yeah.

20   Q Did you have any other source of income at this

21 time besides Megafund -- or Lan Corp.? Excuse me.

22   A I get periodic insurance renewal commission checks

23 that amount to a few thousand dollars a year. They come

24 sporadically. Those would be reflected on deposits into the

25 Lan Corp. account, which you have.

Page 144

1   MR. SELLERS: Where is the $5,000 on this exhibit?

2   MS. HUSEMAN: It's on page 1, July.

3   MR. SELLERS: Oh, you said page 2, Counsel, I

4 think.

5   MS. HUSEMAN: I'm sorry.

6   MR. SELLERS: There it is. Okay.

7   BY MS. HUSEMAN:

8   Q Turning to August, page 1, you take 100,000 out of

9 the ING account.

10   MR. SELLERS: Make sure you see the number before

11 you testify. Okay?

12   BY MS. HUSEMAN:

13   Q And where is that? Is that money still in your

14 checking account now? Or I imagine it's been depleted to

15 some degree. Did you transfer it back?

16   A I don't think it went back to ING.

17   Q Okay. Do you --

18   A My wife is the one who does all the chasing of the

19 interest rates, so I just --

20   Q So she does have a job.

21   A Yeah. She -- she pays our bills. I mean, she

22 keeps track of everything.

23   Q The September statement, on September 7th, you have

24 a deposit from ING for 79,000. Did you empty the account at

25 that point?

Page 145

1　A　Probably.

2　Q　You also have a deposit of $100,721.12 from

3　Immigrant. Is that again interest rate chasing?

4　A　Probably.

5　Q　How much money is in your checking account now?

6　What is the current balance or in this account?

7　A　I couldn't tell you that without looking. I -- I

8　don't keep track of the personal stuff. My wife does.

9　　　　　　　(SEC Exhibit No. 20 was marked for

10　　　　　　　identification.)

11　Q　Okay. I'm showing you what's been marked as

12　Exhibit 20. Is this another interest rate chasing?

13　A　Yes. This was the CD's. Washington Mutual was the

14　CD's.

15　Q　And is that account still open?

16　A　Yes, there's --

17　Q　5,000 in each of them?

18　A　5,000 in each of them. I think you have copies of

19　all those.

20　　　　　　　(SEC Exhibit No. 21 was marked for

21　　　　　　　identification.)

22　Q　Yes, I do. Thank you. I'm showing you what I'll

23　mark as Exhibit 21. Was Mr. -- and I'm going to mispronounce

24　it. Is it Couture?

25　A　Yeah. I -- your guess is as good as mine.

Page 146

1　Q　C-o-u-t-u-r-e.

2　A　Couture.

3　Q　At the bottom there's a handwritten note. Is that

4　his handwriting?

5　A　Mr. Couture?

6　Q　Uh-huh.

7　　　MR. SELLERS: Do you -- do you recognize --

8　　　THE WITNESS: I don't know.

9　　　BY MS. HUSEMAN:

10　Q　I mean, is it your handwriting?

11　A　It's not my handwriting, no.

12　Q　And this is -- this is part of the subscription

13　agreement that was resubmitted to you; correct? Not

14　resubmitted. Was submitted to you with his investment.

15　A　Yes.

16　Q　And the bottom it says, "It is my understanding per

17　discussions with Robert Rees & Associates that insurance

18　coverage is no longer needed as the bank has guaranteed

19　principal."

20　　　What bank guaranteed principal?

21　A　Well, the bank was defined as -- as bank or

22　broker/dealer.

23　Q　Where was it defined that way?

24　A　Isn't it -- I think it's in the memorandum.

25　Q　Okay. I'm just asking.

Page 147

1　A　Yeah. In the memorandum, "bank" is defined as --

2　you know, bank -- a bank with a rate -- certain rating or a

3　broker/dealer. Broker/dealer actually is a better place to

4　hold the money because there's no FDIC issues. You got SEIPI

5　(phonetic) coverage up to 500,000 and then almost every major

6　broker/dealer carries third-party insurance for 25 million or

7　100 million or an unlimited amount, so that while it's in

8　that account, it's covered against all risk except for market

9　fluctuations.

10　Q　Well, it was your belief that Megafund had an

11　insurance policy on the principal; is that correct?

12　A　Yes, separate coverage.

13　Q　So why were you charging your investors?

14　A　I didn't. There was no charge. On -- at the very

15　beginning of the fund in Lan Corp. I, when the money was in

16　Tri-Com, we were trying to arrange through AIG optional

17　insurance coverage that the investor could purchase for 2

18　percent and have a separate policy covering their account

19　individually.

20　Q　Were you able to arrange for that?

21　A　And -- we came close, but we -- it was a logistic

22　nightmare because of fluctuations and up and down and issues

23　in contracts and the like. It was just -- it became mission

24　impossible to make that happen.

25　Q　Did you ever charge a Megafund investor or an

Page 148

1　investor whose funds you put into Megafund for insurance?

2　A　No.

3　Q　Never.

4　A　Never.

5　Q　So you took this out.

6　A　This was removed and it was replaced with an

7　addendum that everyone signed indicating that we couldn't get

8　the insurance piece done, but that we made arrangements so

9　the money could be held so that it would be insured in the

10　same -- consistent with what we were trying to do here, only

11　there would be no charge to the investor.

12　Q　Okay.

13　A　Because broker/dealers don't charge for the

14　insurance coverage.

15　Q　So how many people -- how many of your investors

16　was Robert Rees talking to?

17　A　I have no idea.

18　Q　I mean, would it be fair to say that he was having

19　more contact with your investors than you were?

20　A　I would guess.

21　Q　Based on their communications with you like this

22　saying "I've spoken to Robert Rees and he says" --

23　A　Yes.

24　Q　-- based on some of the e-mails I saw in your

25　production that said "I've spoken to Robert Rees --"

Page 149

A  Yes.

Q  "-- and he says --"

A  Yes.

Q  -- would you agree with me that he had more contact on a day-to-day basis with your investors than you did?

A  Oh, I would certainly think so.

Q  And the representations that they claim he made, are those representations based on information he received from you?

A  The only information he received from me was the private placement memorandum.  And when he would ask questions for clarification, I would make it clear.

Q  Are you aware or do you know if he ever spoke to Gary McDuff or Stan Leitner or anyone else about the Megafund investment?

A  I have no idea.

Q  When did Lan Corp. -- when did you say you initiated -- you got the first investment in Lan Corp.?

A  The very first?

Q  The very first.

A  In 2003.

(SEC Exhibit No. 22 was marked for identification.)

Q  I'm showing you what's been marked Exhibit 22.  Was Mr. Estrada one of your Lan Corp. investors?

Page 150

A  Yes.

Q  And the date on that check is July 12th, 2002; is that correct?

A  Okay.  Yes.

Q  So does that mean you were taking investments in 2002?

A  I was accumulating funds.

Q  Had you even created Lan Corp. yet as an entity?

A  Yes, the entity was created.  It didn't go effective until 2003.

Q  Okay.

A  This was the accumulation phase.  In fact, it became --

Q  When did you first -- when is the first time, if you can recall, that you -- that you received any funds from Lan Corp.?

A  It was sometime in 2002.  That's when the first memorandums were distributed.  And everybody was notified that the fund could not go effective until it hit 5 million, that we were in an accumulation phase, and that I didn't know how long that was going to be.

Q  And I'm ascertaining from what you say that there were various changes made at different times to the offering memorandum; is that correct?  Pieces taken out.

A  Yeah.

Page 151

1    Q  Pieces put in.

2       Would it be possible for you to produce to me the

3    memorandum or memoranda as they evolved essentially --

4       A  Well, there was only -- the only change that

5    occurred was the insurance piece and that was just a one page

6    addendum.

7       Q  That was it.

8       A  That was it.  There were no other changes to --

9       Q  There were not changes made to the offering

10   memorandum --

11      A  No.

12      Q  -- when you invested in Megafund as opposed to

13   Tri-Com Securities?

14      A  No.

15      MS. HUSEMAN:  Let's go off the record at 2:20.

16      (Whereupon, a recess was taken.)

17      MS. HUSEMAN:  Back on the record at 2:25.

18      (SEC Exhibit No. 23 was marked for

19          identification.)

20      BY MS. HUSEMAN:

21      Q  I'm showing you what's been marked as Exhibit 23.

22   Previously you referred to a notification that you received

23   that you could not -- you were not registered in a state that

24   would enable you to sell the securities in that state.  Is

25   that Maryland?

Page 152

1       A  Yes.

2       Q  And who contacted you from the securities division

3    in Maryland?

4       A  I don't remember.  I got a -- I got a phone call

5    and I returned the phone call.  It was somebody at the

6    division.

7       Q  And what did they say when they called you?

8       A  They just said they couldn't process my application

9    without the information about where the licensed -- the

10   address and so on of the licensed person who is selling the

11   securities in Maryland.

12      Q  Okay.

13      So you -- is this the only state where you had to

14   return an investment based on something like this?

15      A  Yes.

16      Q  You didn't have any other problems?

17      A  I don't think so.  This is the only one I remember.

18      Q  Okay.  I'm sorry.

19      A  I don't think there's any more.

20      Q  Okay.

21      A  I only remember the one.

22      (SEC Exhibit No. 24 was marked for

23          identification.)

24      Q  Okay.  I'll show you what I'll mark as Exhibit 24.

25   This is the insurance coverage election form that I guess you

Page 153

1  were using in 2005 based on the date.
2      A  It was -- it was just a page that wasn't deleted.
3      Q  Okay.  And in someone's writing next to the
4  signature of the investor, it says, "Please refer to
5  amendment later dated April 18th, 2005 and signed by Gary L.
6  Lancaster which provides the insurance with no premium
7  charge."
8      A  That's the amendment letter referring to the
9  arrangement with the broker/dealer so they didn't have to buy
10 insurance.
11     Q  Okay.  What did you do in terms -- had you ever
12 charged anybody in the fund for insurance?
13     A  No.  Could never get the insurance arranged so that
14 we'd go effective.
15     Q  Okay.  And you informed -- you notified investors
16 of this on April 18th, 2005?
17     A  Yeah, I think so.
18     Q  Did you ever tell any investors that Megafund had
19 insurance?
20     A  Absolutely not.
21     Q  You never told any investors you were in Megafund.
22     A  Correct.
23     MS. HUSEMAN:  Mr. Lancaster, at this time I have no
24 further questions.  However, you may be called again to
25 testify in this proceeding.  At this time I'll ask your

Page 154

1  attorneys if they would like to ask you any clarifying
2  questions.
3      MR. SELLERS:  Can we go off the record for a
4  minute?
5      MS. HUSEMAN:  Absolutely.  Off the record at 2:30.
6      (Whereupon, a recess was taken.)
7      MS. HUSEMAN:  On the record at 2:50.
8      At this time do you wish to ask your client any
9  clarifying questions?
10     MR. SELLERS:  No, I do not.
11     MS. HUSEMAN:  Mr. Lancaster, do you wish to make
12 any statements or add anything to what you testified to here
13 today?
14     MR. SELLERS:  Not at this time.
15     MS. HUSEMAN:  Then we are off the record at 2:51 on
16 November 17th, 2005.
17     THE COURT REPORTER:  Ms. Huseman, would you like to
18 order the original?
19     MS. HUSEMAN:  Sure.
20     MR. SELLERS:  I want a copy.
21     (Whereupon, the deposition was concluded at 2:51
22 p.m.)
23
24
25

Page 155

1              PROOFREADER'S CERTIFICATE
2
3  In the Matter of:  MEGAFUND CORPORATION
4  Witness:        Gary Lynn Lancaster
5  File Number:    FW-02975-A
6  Date:           November 17, 2005
7  Location:       Portland, Oregon
8
9
10     This is to certify that I, Don R. Jennings (the
11 undersigned), do hereby swear and affirm that the attached
12 proceedings before the U.S. Securities and Exchange
13 Commission were held according to the record and that this is
14 the original, complete, true and accurate transcript that has
15 been compared to the reporting or recording accomplished at
16 the hearing.
17
18
19
20 _____
21 (Proofreader's Name)          (Date)
22
23
24
25

Page 156

1              REPORTER'S CERTIFICATE
2
3
4      I, Jeanine L. Rood, do hereby certify that pursuant
5  to the Rules of Civil Procedure, the witness named herein
6  appeared before me at the time and place set forth in the
7  caption herein; that at the said time and place, I reported
8  in stenotype all testimony adduced and other oral proceedings
9  had in the foregoing matter; and that the foregoing
10 transcript pages constitute a full, true and correct record
11 of such testimony adduced and oral proceeding had and of the
12 whole thereof.
13     IN WITNESS HEREOF, I have hereunto set my hand this
14 27th day of November, 2005.
15
16
17
18
19
20 _____
   Signature      Expiration Date
21
22
23
24
25