1  Joel A. Goodman (FL Bar No. 802468)
   Admitted *pro hac vice*
2  Email: gn.law@verizon.net
   Goodman & Nekvasil, P.A.
3  14020 Roosevelt Blvd., Suite 808
   P.O. Box 17709
4  Clearwater, FL 33762
   Telephone:    727-524-8486
5  Facsimile:    727-524-8786

6  Cary S. Lapidus (CA Bar No. 123983)
   Email: CaryLapidus@aol.com
7  Law Offices of Cary S. Lapidus
   425 California Street, Suite 2100
8  San Francisco, CA 94104
   Telephone:    (415) 296-7101
9  Facsimile:    (415) 296-7821
   Local counsel
10
   Attorneys for Defendant Daniel Maria Cui
11

12            **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
13

14  THE O.N. EQUITY SALES COMPANY,        )  Case No. C 07-02844 JSW
                                          )
15            Plaintiff,                  )  **DEFENDANT'S NOTICE OF MOTION**
                                          )  **TO COMPEL ARBITRATION AND**
16     v.                                 )  **MEMORANDUM OF POINTS AND**
                                          )  **AUTHORITIES IN SUPPORT OF THE**
17  DANIEL MARIA CUI,                     )  **MOTION AND IN OPPOSITION TO**
                                          )  **PLAINTIFF'S MOTION FOR**
18            Defendant.                  )  **PRELIMINARY INJUNCTION**
                                          )
19  _____       )  Date: January 18, 2008
                                          )  Time: 9:00 a.m.
20                                        )  Courtroom: 2, 17th Floor

21            TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

22            PLEASE TAKE NOTICE that, on January 18, 2008, at 9 a.m., or as soon thereafter as the

23  matter may be heard, in the courtroom of the Honorable Jeffrey S. White, located at 450 Golden Gate

24  Avenue, San Francisco, CA 95113, Defendant Daniel Maria Cui, through the undersigned counsel,

25  will and does hereby move for an Order, pursuant to 9 U.S.C. § 4, compelling Plaintiff O.N. Equity

26  Sales Company to arbitrate in the pending arbitration between them under the rules of the National

27  Association of Securities Dealers, Inc. ("NASD").

28

1    This Motion is based on the Memorandum of Points and Authorities in Support hereof, the

2    exhibits attached to this Motion, the pleadings, records, and papers on file herein, and such other

3    argument as may be presented at or before any hearing on this Motion.

4                                        Respectfully submitted,

5    Dated November 21, 2007            GOODMAN & NEKVASIL, P.A.

6                                        By:   /s/ Joel A. Goodman
                                              Joel A. Goodman
7                                              Attorney *pro hac vice* for Defendants

8                                        LAW OFFICES OF CARY S. LAPIDUS
                                              Cary S. Lapidus, Esq.
9                                              Local Counsel

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

3    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT. . . . . . . . . . . . . . . . . . . . 1

4    SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5    STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

7        A.    This Court should Follow the Decisions of Los Angeles, San Diego,  Iowa,
              Minnesota, Virginia, Washington, and West Virginia Federal Judges in
8             Identical Circumstances to Compel ONESCO to Arbitrate with Lancorp
              Investors.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
9
          B.    ONESCO Correctly does not Dispute that Customers of a Firm's Broker are
10             Entitled to NASD Arbitration even if the Firm did not Formally Open an
              Account, the Broker's Actions were Unauthorized, and No One at the Firm,
11             other than the Broker, Knew about these Customers.. . . . . . . . . . . . . . . . . . . . . 7

12        C.    Lancorp and Maria Cui did not Enter into a Completed Contract in July 2003,
              because Lancorp in its Sole Discretion Could without Notice Withdraw,
13             Cancel, or Modify the Lancorp Offering.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14        D.    Maria Cui Entered into a Substituted Contract in April and May 2004, after
              a Material Element of the Lancorp Offering Changed, and Lancorp Required
15             Maria Cui to Either Take Back his Money or Reconfirm his Investment after
              Acknowledging the Change.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
16
          E.    Maria Cui is Entitled to Arbitrate Regarding his Investments, because he
17             Alleged Continuing Fraud and Failure to Supervise Lancaster.. . . . . . . . . . . . . 13

18        F.    Timing Questions are Arbitrable.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

19        G.    This Court must Resolve All Doubts in Favor of Arbitrability.. . . . . . . . . . . . . 18

20        H.    This Court cannot Decide the Merits of the Parties' Claims.. . . . . . . . . . . . . . . 21

21        I.    ONESCO Improperly Relies on Cases Addressing only a Narrow Technical
              Issue Regarding the Repose Period for Claims under Rule 10b-5.. . . . . . . . . . . 23
22

23

24

25

26

27

28

-i-

1

## TABLE OF AUTHORITIES

2

3

### Cases

4    Ainslie v. Spolyar,
926 P.2d 822 (Ore. Ct. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 24

5    Ambling v. Blackstown Cattle Co.,
650 F. Supp. 170 (N.D. Ill. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

6

7    Armijo v. Prudential Ins. Co. of Am.,
72 F.3d 793 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

8    AT&T Tech., Inc. v. Communications Workers of Am.,
475 U.S. 643 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

9

10   Beer v. Nutt,
2007 WL 13100 (S.D.N.Y. Jan. 3, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

11   Belke v. Merrill Lynch, Pierce, Fenner & Smith,
693 F.2d 1023 (11th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

12

13   Blue Chip Stamps v. Manor Drug Stores,
421 U.S. 723 (1975).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 24

14   California Fina Group v. Herrin,
379 F.3d 311 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

15

16   Carlisle v. CitiMortgage, Inc.,
2007 WL 1557411 (E.D. Mo. May 25, 2007) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

17   Cincinnati Gas & Elec. v. Benjamin F. Shaw Co.,
706 F.2d 155 (6th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18

19   Coenen v. R. W. Pressprich & Co.,
453 F.2d 1209 (2d Cir. 1972).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

20   Cohen v. Stratosphere Corp.,
115 F.3d 695 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

21

22   Comer v. Micor, Inc.,
436 F.3d 1098 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

23   Deutschman v. Beneficial Corp.,
761 F. Supp. 1080 (D. Del. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

24

25   Doran v. Petroleum Management Corp.,
576 F.2d 91 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

26   Getty v. Harmon,
53 F. Supp. 2d 1053 (W.D. Wash. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

27

28   Goodman v. Epstein,
582 F.2d 388 (7th Cir.1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Gruntal & Co. v. Steinberg,
837 F. Supp. 85 (D.N.J. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Hornor, Townsend & Kent, Inc. v. Hamilton,
2004 WL 2284503 (N.D. Ga. Sept. 30, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Howsam v. Dean Witter Reynolds, Inc.,
537 U.S. 79 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

In re Prudential Ins. Co. of Am. Sales Practice Litig.,
975 F. Supp. 584 (D.N.J. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Ingenito v. Bermec Corp.,
376 F. Supp. 1154 (S.D.N.Y. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Issen v. GSC Enterprises, Inc.,
508 F. Supp. 1278 (N.D. Ill. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

John Hancock Life Ins. Co. v. Wilson,
254 F.3d 48 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16, 20

Kidder Peabody & Co. v. Zinsmeyer Trusts Partnership,
41 F.3d 861 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Kristian v. Comcast Corp.,
446 F.3d 25 (1st Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,
501 U.S. 350 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

MONY Sec. Corp. v. Bornstein,
390 F.3d 1340 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

Moses H. Cone Hosp. v. Mercury Constr. Corp.,
460 U.S. 1 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Multi-Financial Sec. Corp. v. King,
386 F.3d 1364 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-9

O.N. Equity Sales Co. v. Gibson,
___ F. Supp. 2d ___, 2007 WL 2705859 (S.D.W. Va. Oct. 1, 2007). . . . . . . . . . . . . . . . . . . 7

O.N. Equity Sales Co. v. Pals,
509 F. Supp. 2d 761 (N.D. Iowa 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

O.N. Equity Sales Co. v. Prins,
___ F. Supp. 2d ___, 2007 WL 3286406 (D. Minn. Nov. 7, 2007). . . . . . . . . . . . . . . . . . . 7, 22

O.N. Equity Sales Co. v. Robinson,
2007 WL 2840477 (E.D. Va. Sept. 27, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

O.N. Equity Sales Co. v. Steinke,
504 F. Supp. 2d 913 (C.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

O.N. Equity Sales Co. v. Venrick,
508 F. Supp. 2d 872 (W.D. Wash. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

-iii-

O.N. Equity Sales Co. v. Wallace,
2007 WL 4106476 (S.D. Cal. Nov. 15, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 22

Oppenheimer & Co. v. Neidhardt,
56 F.3d 352 (2d Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Prudential Sec. Inc. v. Dusch,
1994 WL 374425 (S.D. Cal. Mar. 28, 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

R.M. Perez & Assoc. v. Welch,
960 F.2d 534 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Randolph County Fed. Sav. & Loan Assoc. v. Sutliffe,
775 F. Supp. 1113 (S.D. Ohio 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Ryan, Beck & Co. v. Fakih,
268 F. Supp. 2d 210 (E.D.N.Y. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Sands Bros & Co. v. Ettinger,
2004 WL 541846 (S.D.N.Y. Mar 19, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Sands Bros. & Co. v. Alba Perez Ttee Catalina Garcia Revocable Trust,
2004 WL 2186574 (S.D.N.Y. Sept. 28, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Schulte v. Prudential Ins. Co. of Am.,
133 F.3d 225 (3d Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Stone v. Fossil Oil & Gas,
657 F. Supp. 1449 (D.N.M. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Trujillo v. North County Transit Dist.,
63 Cal. App. 4th 280 73 Cal. Rptr. 2d 596 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

USAllianz Sec., Inc. v. Southern Mich. Bancorp, Inc..
290 F. Supp. 2d 827 (W.D. Mich. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Vestax Sec. Corp. v. McWood,
280 F.3d 1078 (6th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Washington Square Sec. v. Sowers,
218 F. Supp. 2d 1108 (D. Minn. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Washington Square Sec., Inc. v. Aune,
253 F. Supp. 2d 839 (W.D.N.C. 2003), aff'd
385 F.3d 432 (4th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 20

Wheat, First Sec., Inc. v. Green,
993 F.2d 814 (11th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 16

Whisler v. H. J. Meyers & Co.,
948 F. Supp. 798 (N.D. Ill. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

World Group Sec. v. Ko.,
2004 WL 1811145 (N.D. Cal. Feb. 11, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

World Group Sec., Inc. v. Sanders,
2006 WL 1278738 (D. Utah May 8, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Zink v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
13 F.3d 330 (10th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statutes and Rules**

15 U.S.C. 77*l*, m.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. § 78i(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

15 U.S.C. § 78r(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Federal Arbitration Act, 9 U.S.C. § 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 18

Rule 10b-5, 17 C.F.R. § 240.10b-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 23

Cal. Corp. Code § 25501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Ore. Rev. Stat. § 59.115.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

NASD Rule 10301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 9, 15-21

NASD Rule 10304. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Restatement (Second) of Contracts, §§ 76, 77.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1
2

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

## SUMMARY OF THE ARGUMENT

3    On identical facts, seven courts have compelled Plaintiff to arbitrate, and this Court should

4    reach the same conclusion.  Although Defendant may have signed a subscription agreement related

5    to the investments at issue before Plaintiff's agent started working for Plaintiff, the subscription

6    agreement was not a completed transaction, because it could be modified or terminated at any time.

7    After Plaintiff's agent started working for Plaintiff, he changed the investment terms and required

8    the Defendant either to acknowledge the change or take back his invested funds.  Defendant made

9    a new investment decision at that time not to take back his funds.  Defendant also alleged in his

10   arbitration claim that Plaintiff failed to supervise its agent during this time.  The courts have

11   uniformly agreed that the transaction was not completed until that time and that Defendant is

12   therefore entitled to arbitrate with the Plaintiff under the rules of the National Association of

13   Securities Dealers, Inc. ("NASD") regarding his allegations that Plaintiff is responsible for the

14   investment transaction and failed to supervise its agent during that time.

15   Plaintiff alleges only issues regarding the timing of the investment, which courts have ruled

16   are arbitrable under NASD rules.  Any doubts about the scope of the NASD arbitration obligation

17   must be resolved in favor of arbitration, particularly when the issue is merely a matter of timing.

18   Plaintiff is improperly attempting to convert merits and liability issues into arbitrability issues.  This

19   Court cannot decide merits issues when it determines whether a dispute is arbitrable.  Even if this

20   Court could consider Plaintiff's timing issues on the merits, it would reject these issues as irrelevant

21   to arbitrability.  ONESCO's arguments are based on a narrow technical contention about the statute

22   of repose for Rule 10b-5 claims.  For arbitrability purposes, however, the Defendant's claims are

23   based on the actual sales, which did not occur until after Plaintiff's agent started working for

24   Plaintiff.  Accordingly, all of these claims are arbitrable under NASD rules.

25
26
27
28

## STATEMENT OF FACTS

Plaintiff O.N. Equity Sales Company ("ONESCO") seeks to enjoin an arbitration claim (a copy is attached to ONESCO's Complaint as Exh. "C" ("Arbitration Claim")) which Defendant Daniel Maria Cui ("Maria Cui") filed against ONESCO with the National Association of Securities Dealers, Inc. ("NASD"), relating to sales by ONESCO's agent, Gary L. Lancaster ("Lancaster") of investments in Lancorp Financial Fund Business Trust ("Lancorp"). Maria Cui alleged that Lancaster sold Lancorp through misrepresentations and violations of statutory and common law and that ONESCO failed to supervise Lancaster. The NASD has told ONESCO it is "required by the rules of the NASD Dispute Resolution to arbitrate this dispute." (See attached Exh. "1," NASD service letter.)

ONESCO has also filed at least 20 other nearly identical court complaints around the country, to enjoin other arbitrations relating to Lancaster's Lancorp sales. ONESCO is not seeking to enjoin every Lancorp investor's arbitration. Instead, ONESCO is filing injunctive actions only against those arbitration claimants who ONESCO believes signed their Lancorp subscription agreements before Lancaster worked for ONESCO. By not seeking injunctions against investors who signed their Lancorp agreements while Lancaster worked for ONESCO, and by not objecting in the arbitrations to arbitrating those claims, ONESCO necessarily concedes it is required to arbitrate these claims under NASD rules.

ONESCO does not dispute that, as an NASD member, it generally must arbitrate under NASD Rule 10301 with its registered representatives' customers, including Lancaster's customers, and does not dispute that Lancaster was involved in selling Lancorp to his customer, Maria Cui. ONESCO admits that Lancaster was an ONESCO representative between March 23, 2004, and January 3, 2005. See ONESCO's Complaint, ¶ 6. ONESCO, however, relies on July 2003 investment documents, signed by Maria Cui, relating to a Lancorp purchase. Based on these documents, ONESCO argues that the representations to Maria Cui occurred before Lancaster worked for ONESCO and that ONESCO therefore need not arbitrate Maria Cui's claims.

The truth, however–as ONESCO knows–is that Lancaster at first merely held Maria Cui's funds in escrow, because Lancorp had not yet gotten off the ground. According to the Lancorp

1    Private Placement Memorandum ("PPM") (see ONESCO's Complaint, Exh. "A"), Lancorp

2    investors' initial cash payments were held in escrow until the closing date. (PPM at i) The Lancorp

3    "offering [was] made subject to withdrawal, cancellation, or modification by [Lancorp] without

4    notice." (PPM at iii) "At any time before the maximum number of 50,000 units" had been sold,

5    Lancorp could decide in its "sole discretion[] to terminate this offering." (PPM at 4) If any material

6    changes in the Lancorp offering occurred before closing, Lancorp would amend or supplement the

7    PPM. (PPM at ii)

8         As Lancaster has declared (see Exh. "3" attached to Defendant's Response to Plaintiff's

9    Objections to Magistrate's Order Denying Discovery (doc. 48) ("Lancaster First Dec." or "Lancaster

10   First Declaration")), an important Lancorp feature was an option to purchase insurance, which would

11   insure investors against failure by Lancorp to return investor funds upon redemption of the investors'

12   Lancorp shares. During 2003 and early 2004, changes in the insurance industry prevented Lancorp

13   from obtaining this insurance and prevented Lancorp from going forward. Accordingly, Lancorp

14   replaced the insurance element with a validated written obligation from the bank or broker/dealer

15   acting as custodian, which Lancaster said would provide the same level of protection that was

16   initially contemplated from an outside insurer. (Lancaster First Dec. ¶¶ 3, 4, and Lancaster's March

17   12, 2004, letter to his clients, attached to the Lancaster First Declaration as Exhibit "A.")

18        In April 2004, Lancaster notified Lancorp investors that a material term of their investment

19   had changed. He explained that Lancorp now would offer a new bank or broker/dealer obligation,

20   rather than insurance, that would guarantee their investment. Due to this material change in the

21   offering, Lancorp required investors at that time to either (1) confirm their subscription participation

22   and acknowledge the changes in the offering, or (2) request withdrawal of their subscriptions. This

23   confirmation procedure represented a new investment that would be made in April 2004. (Lancaster

24   First Dec. ¶ 5; specimen copies of the April 5, 2004, letter are attached to the Lancaster First

25   Declaration as Exhibit "B.") At that time, Lancaster was an ONESCO representative.

26        Lancaster said in his Declaration that Lancorp investors could get back their invested funds

27   in April 2004. He knew the delay in finalizing Lancorp had frustrated investors and the offering

28

1  changed significantly in April 2004. He therefore returned the investment principal to a number of

2  investors who requested return of funds. (Lancaster First Dec. ¶ 6)

3      Maria Cui opted not to get back his money. In April 2004, while Lancaster worked for

4  ONESCO, Maria Cui acknowledged the changes in the Lancorp offering and reconfirmed his

5  Lancorp purchase. (See attached Exh. "2.") Thereafter, as alleged in his Arbitration Claim, Maria

6  Cui made additional investments. Lancaster sent the document included in attached Exh. "2" to

7  ONESCO before ONESCO filed its Complaint in this Court. (See Exh. "5" attached to Defendant's

8  Response to Plaintiff's Objections to Magistrate's Order Denying Discovery (doc. 48) ("Lancaster

9  Second Dec." or "Lancaster Second Declaration")) Nevertheless, ONESCO selectively chose to

10 disclose to this Court only the initial July 2003 investment documents, not the April 2004

11 reconfirmation. The Lancorp offering became effective on May 14, 2004, while Lancaster worked

12 for ONESCO. He waited until then to see which investors would stay in the offering and which

13 investors would withdraw their money and cancel their investment. (Lancaster First Dec. ¶ 9;

14 attached to the Lancaster First Declaration as Exhibit "F" is a specimen copy of a letter that

15 Lancaster sent to all Lancorp investors announcing Lancorp's effective date on May 14, 2004.)

16     According to his First Declaration, Lancaster told ONESCO in writing that he had an outside

17 business, Lancorp Financial Group, LLC, that sold annuities and insurance. When he knew that the

18 Lancorp Fund offering would be going forward, he called ONESCO to determine how to disclose

19 this information. He received a one page form from ONESCO, which he returned to ONESCO in

20 May 2004. He told ONESCO on this disclosure form that he would be starting the Lancorp Fund

21 as a private placement fund on May 14, 2004. ONESCO never asked him about these disclosures.

22 ONESCO never told him of any objections the firm might have about offering or selling Lancorp

23 to customers. He believed that ONESCO had approved and given him permission to sell and offer

24 to sell Lancorp to customers. (Lancaster First Dec. ¶ 8; attached to the Lancaster First Declaration

25 as Exhibits "D" and "E" are Lancaster's written disclosures to ONESCO)

26     Lancaster maintained Lancorp's records at his Oregon office. If ONESCO had inspected his

27 office, he would have shown Lancorp's records to ONESCO. ONESCO, however, never came to

28 his office, reviewed any customer files at his office, reviewed incoming and outgoing

1    correspondence at his office, told him the identity of his supervisor, or gave him copies of the firm's

2    procedures or compliance manuals.   (Lancaster First Dec. ¶ 10; Lancaster Second Dec. ¶ 2)

3    ONESCO also never told him that the State of Pennsylvania was investigating his business activities

4    in September 2004. (Lancaster Second Dec. ¶ 4)

5         If ONESCO had properly supervised Lancaster, it could have stopped Lancorp and directed

6    him to return all funds to his customers.  No losses would then have occurred.

7                                      **ARGUMENT**

8    **A.    This Court should Follow the Decisions of Los Angeles, San Diego, Iowa,
             Minnesota, Virginia, Washington, and West Virginia Federal Judges in
9            Identical Circumstances to Compel ONESCO to Arbitrate with Lancorp
             Investors.**

10        A federal judge in Los Angeles rejected the same arguments that ONESCO has made in the

11   present case and compelled ONESCO to arbitrate with Lancorp investors before the NASD.  The

12   court found no need to permit discovery or an evidentiary hearing on this issue.

13        [B]ased on the extensive briefing and evidence submitted by the parties, this issue
14        can be resolved without further discovery or an evidentiary hearing.
              . . . .

15        "[A] two-part test . . . must be satisfied to trigger the NASD arbitration
16        requirement. First, the claim must involve a dispute between either an
          NASD-member and a customer, or an associated person and a customer. Second, the
17        dispute must arise in connection with the activities of the member or in connection
          with the business activities of the associated person."

18             . . . .

19             . . . Defendants[] . . . seek redress not just for the alleged improper
          investments made by Lancaster, but also for the alleged failure of ONESCO to
20        supervise him after March 23, 2004. A claim for failure to supervise clearly "arises
          in connection with the business" of ONESCO for the purposes of Rule 10301(a).
21
22             Additionally, the actual investment . . . was not made until . . . two months
          after Lancaster became a registered representative of ONESCO.  ONESCO argues
23        that the relevant date is the date that the Defendants signed the "irrevocable"
          Subscription Agreements. However, . . . Defendants' money was held in an escrow
24        account and . . . Lancorp . . . could . . . terminate the offering at any time prior to the
          . . . closing date. As a result, there was no "sale of securities" until May of 2004. . . .
25        [I]n April of 2004, Defendants were required to reconfirm their subscriptions or
          withdraw their funds as a result of the change in [Lancorp's] . . . insurance
26        component . . . while Lancaster was working [for] . . . ONESCO. Accordingly,
          Defendants are "customers" of ONESCO for purposes of Rule 10301(a).

27   O.N. Equity Sales Co. v. Steinke, 504 F. Supp. 2d 913, 916-17 (C.D. Cal. 2007) (citations omitted).

28        An Iowa federal judge has also compelled ONESCO to arbitrate with Lancorp investors.

                                       -5-

1
2
3

ONESCO has not shown that immediate discovery is required to determine . . . arbitrability. . . . [A] motion to compel arbitration does not necessarily require a hearing. Because of the well-developed record provided by the parties . . . and the court's disposition herein of the Motion To Compel Arbitration, the court finds it unnecessary to hold a hearing on any of the pending motions.
            . . . .

4
5
6
7
8
9
10

ONESCO contends that, by the time that Lancaster became an "associated person" of ONESCO on March 23, 2004, Pals had already invested in the Lancorp Fund, so that Pals was never the "customer" of an "associated person." Contrary to ONESCO's contentions, the record shows beyond dispute that the terms of the Lancorp Fund private placement offering were materially changed in April 2004, which required all subscribers to confirm their subscriptions or receive a return of their funds, that Lancaster held all funds invested in the Lancorp Fund private placement offering until May 2004, and that the Lancorp Fund private placement offering did not close until May 2004, all of which shows that there was still an investment relationship between Lancaster and Pals after Lancaster became an "associated person" of ONESCO, and as such, Pals was a "customer" of Lancaster after March 2004, and was thereby a customer of ONESCO.

11
12

. . . All of this activity after Lancaster became an "associated person" of ONESCO, . . . plainly arose "in connection with the activities of such associated person." See NASD Rule 10301(a) (one alternative for the second requirement for arbitration on demand of a customer).

13
14
15
16
17

Moreover, . . ."[t]he NASD requires that its members supervise the activities of their associated persons, as part of their business," so that "negligent supervision [also] satisfies the Code's second arbitration condition." [S]ee also NASD Rule 10301(a) (one alternative for the "in connection with the business" condition is that the dispute arose "in connection with the business of such member"). Here, . . . Pals has alleged negligent supervision . . . by ONESCO, the "member," during the time that Lancaster was an "associated person." Thus, the second condition for an arbitrable dispute within the terms of Rule 10301(a) is met. . . .

18

O.N. Equity Sales Co. v. Pals, 509 F. Supp. 2d 761, 765-70 (N.D. Iowa 2007) (citations omitted).

19

A Washington federal judge has also compelled ONESCO to arbitrate.

20
21
22
23
24

Plaintiff contends that defendant was never a "customer" of ONESCO, and that even if he was at some point, defendant's claims are based primarily on alleged material representations and omissions made by Lancaster before he was an associated person. Defendant argues that his transaction with Lancaster did not become complete until after Lancaster became a registered representative of ONESCO, and that he was therefore a "customer" under the NASD rules. He further argues that his failure to supervise claim against ONESCO is arbitrable regardless of when his initial transaction with Lancaster occurred.

25
26
27
28

The Central District of California recently confronted almost identical issues [in] . . . O.N. Equity Sales Co. v. Steinke,. . . . [T]he court relied on two observations. First, that defendants' failure to supervise claim arose in connection with the business of ONESCO for the purposes of Rule 10301(a), and second, that the actual investment using defendants' funds was not made until two months after Lancaster became a registered agent of ONESCO. This case involves . . . nearly identical facts, and the Court concurs with the Steinke court's reasoning and conclusions.
            . . . .

-6-

1
2
3
4

> Plaintiff cites extensively to . . . cases . . . involv[ing] allegations of wrongdoing that all arose before a NASD member became affiliated with allegedly fraudulent individual or institution. . . . But here, defendant's allegations include negligent supervision claims that arose after Lancaster became affiliated with ONESCO on March 23, 2004. Thus, this is not a case where the activity at issue pre-dated the involvement of the NASD member. In this situation, plaintiff's supervision of Lancaster lies at the heart of defendant's NASD claims.

5
6

O.N. Equity Sales Co. v. Venrick, 508 F. Supp. 2d 872, 875-76 (W.D. Wash. 2007) (citations omitted).

7
8
9
10
11
12
13
14

Courts in Virginia, West Virginia, Minnesota, and San Diego have drawn the same conclusions. O.N. Equity Sales Co. v. Robinson, 2007 WL 2840477 (E.D. Va. Sept. 27, 2007); O.N. Equity Sales Co. v. Gibson, ___ F. Supp. 2d ___, 2007 WL 2705859 (S.D.W. Va. Oct. 1, 2007); O.N. Equity Sales Co. v. Prins, ___ F. Supp. 2d ___, 2007 WL 3286406 (D. Minn. Nov. 7, 2007); O.N. Equity Sales Co. v. Wallace, 2007 WL 4106476 (S.D. Cal. Nov. 15, 2007) (A copy of Wallace is attached to the Defendant's Response to Plaintiff's Objections to Magistrate's Order Denying Discovery (doc. 48) as Exh. "1."). This Court should agree with these decisions and compel ONESCO to arbitrate with the Defendant.

15
16
17

**B.     ONESCO Correctly does not Dispute that Customers of a Firm's Broker are Entitled to NASD Arbitration even if the Firm did not Formally Open an Account, the Broker's Actions were Unauthorized, and No One at the Firm, other than the Broker, Knew about these Customers.**

18
19
20
21
22

Case law provides that investors such as Maria Cui, who allege that a firm failed to supervise its registered representative, are generally entitled under section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, to an order compelling the firm to arbitrate pursuant to NASD Rule 10301, even if the firm did not formally open an account for these customers, the representative's actions were unauthorized, and no one at the firm, other than the broker, knew about these customers. Rule 10301 provides as follows (see attached Exh. "3"):

23
24
25
26

> Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

27
28

A customer entitled to demand arbitration under Rule 10301 is anyone who is not a broker or dealer. Multi-Financial Sec. Corp. v. King, 386 F.3d 1364, 1368 (11th Cir. 2004) ("The NASD generally defines the term 'customer' as anyone who is not a broker or a dealer."). ONESCO does

-7-

1   not dispute that Maria Cui is not a broker or dealer and that he had a customer relationship with

2   ONESCO's agent, Lancaster.  <u>Multi-Financial</u> rejected a brokerage firm's argument that it was not

3   required to arbitrate because the investors purchased securities from the firm's representative without

4   the firm's knowledge.  Customers of the broker was also customers of the firm under NASD rules.

> When an investor deals with a member's agent or representative, the investor deals
> with the member.  "Federal case law plainly states that when the investor deals with
> an agent or representative [of a member], the investor deals with the member, and on
> that basis the investor is entitled to have resolved in arbitration any dispute that arises
> out of that relationship." "[B]y dealing with [the firm's] registered representative,
> [the investor] became a customer of that firm for purposes on NASD arbitration
> obligations.". . .  The parties agree that [the investor] dealt with [the broker], so [the
> investor], in turn, dealt with [the firm].

386 F.3d at 1370 (citations omitted); <u>accord</u> <u>Vestax Sec. Corp. v. McWood</u>, 280 F.3d 1078 (6th Cir.

2002).

> Judges in Minnesota and North Carolina have explained the basis for this conclusion.

> [The firm's] obligation here stems from its decision to join the NASD and abide by
> the NASD Code of Arbitration Procedure.  Notably, [the firm] doesn't dispute that
> the goal of the NASD is to "promote and enforce just and equitable principles of
> trade and business, to maintain high standards of commercial honor and integrity
> among members of the NASD, to prevent fraudulent and manipulative acts and
> practices, [and] . . . to protect investors and the public interest." . . . [A]ccepting [the
> firm's] argument and proposed narrow definition of the term "customer" would be
> wholly inconsistent with these goals.

> . . . [A] customer or investor does not necessarily have to demonstrate that it
> dealt directly with the NASD member in order to demand arbitration.  Rather, the
> direct dealings with an "associated person" is sufficient.  Given the plain language
> of the NASD provisions, which provides ample support for the Court's ruling, and
> the assurances it is intended to provide investors, namely, that they will have an
> avenue for redress against the principal member firm as well as its representatives,
> . . . Defendants, as direct customers of [the firm's] representative, are among those
> intended to be direct beneficiaries of the NASD arbitration provision.

<u>Washington Square Sec., Inc. v. Aune</u>, 253 F. Supp. 2d 839, 842 (W.D.N.C. 2003), <u>aff'd</u> 385 F.3d

432 (4th Cir. 2004).

> The short version of [the firm's] argument is that "[the broker] is a thief but not our
> thief."  If this Court were to accept [the firm's] argument . . ., it would place an
> unreasonable, unintended burden on the investing public. . . .

> . . . [I]t seems far more reasonable to place the burden of controlling
> stockbrokers upon the . . . firm with which they are affiliated.  It is typically the
> brokerage firm's duty to exercise supervision of their registered representatives . . . .

> When a broker is alleged to have committed . . . wrongdoing, it is quite
> conceivable that monies would be misappropriated or wrongly invested, and would
> therefore not travel through [the firm's] regular accounts.  The [investors] claimed

1        they established accounts with . . . a licensed representative, and purchased securities
     on his recommendation.  For these purposes, the Court considers them to be
2        customers of [the firm's] associated person, and therefore, customers of [the firm].

3   <u>Washington Square Sec. v. Sowers</u>, 218 F. Supp. 2d 1108, 1117 (D. Minn. 2002).

4        Virtually every other case has agreed with <u>Multi-Financial</u>, <u>Sowers</u>, and <u>Aune</u> and found that

5   investors such as Maria Cui are entitled to arbitrate with brokerage firms, because they are customers

6   and have investment relationships with registered representatives of the firms.[1]  Maria Cui was

7   therefore a customer entitled to enforce NASD Rule 10301 against ONESCO.

8           **C.**    **Lancorp and Maria Cui did not Enter into a Completed Contract in July
               2003, because Lancorp in its Sole Discretion Could without Notice
9                  Withdraw, Cancel, or Modify the Lancorp Offering.**

10       ONESCO objects to NASD arbitration on the basis of July 2003 documents for a Lancorp

11  purchase by Maria Cui.  ONESCO argues that Maria Cui's claims are not arbitrable, because

12  Lancaster was not an ONESCO employee in 2003.  The investment, however, was not completed

13  when the subscription agreement was signed, because it did not bind Lancorp.  According to the

14  Lancorp Private Placement Memorandum at i, Lancorp investors' initial cash payments were held

15  in escrow until the closing date. The Lancorp "offering [was] made subject to withdrawal,

16  cancellation, or modification by [Lancorp] without notice."  (PPM at iii) "At any time before the

17  maximum number of 50,000 units" had been sold, Lancorp could decide in its "sole discretion[] to

18  terminate this offering." (PPM at 4)  If any material changes in the Lancorp offering occurred before

19  closing, Lancorp would amend or supplement the PPM. (PPM at ii)

20       These provisions were similar to those in <u>Cohen v. Stratosphere Corp.</u>, 115 F.3d 695 (9th Cir.

21  1997). Like the present case, the <u>Cohen</u> prospectus reserved the "'right to withdraw or cancel such

22  offer and to reject any subscription.'" <u>Id</u>. at 701.  <u>Cohen</u>, <u>id</u>., concluded that a completed securities

23  contract had not been made.

24       The mutual assent and intent to be bound that are required for the formation of a
     contract to sell securities, therefore, is absent in this case.
25
26       [A]ny proposal to sell shares inherent in the receipt of a subscription
     agreement and the placing of the purchase money in escrow was conditional at best.

27  _____

28      [1]    See, <u>e.g.</u>, <u>John Hancock Life Ins. Co. v. Wilson</u>, 254 F.3d 48 (2d Cir. 2001);
<u>California Fina Group v. Herrin</u>, 379 F.3d 311 (5th Cir. 2004); <u>MONY Sec. Corp. v. Bornstein</u>, 390
F.3d 1340 (11th Cir. 2004).

1

2

3

4

5

6

. . . It may be that the escrow agreement constituted a contract under which the investors agreed to hold their offers to purchase shares open, and Stratosphere agreed to refund the subscription payments if it rejected the offers to purchase, but such a contract is not a binding contract . . . . Stratosphere retained the right to reject subscriptions. A promise conditioned on a performance by the promisor constitutes an illusory promise. See Restatement (Second) of Contracts, §§ 76, 77. "Words of promise do not constitute a promise if they make performance entirely optional with the purported promisor." Id. § 76, cmt. d; see also id. § 77, cmt. a. Thus, even if the subscribers are viewed as promisors who irrevocably committed themselves to purchase securities by executing the Subscription Agreement, a contract of purchase was not formed because Stratosphere made no return promise to sell the securities.

7

8

In Stone v. Fossil Oil & Gas, 657 F. Supp. 1449, 1456 (D.N.M. 1987), a conditional offer to purchase was not a consummated sale until the stock certificates were issued.

9

10

11

12

13

14

[T]heCourt finds that the check sent on [November 5, 1982] by Plaintiff to EarLee in response to EarLee's solicitation of buyers for Fossil stock constituted an offer by Plaintiff to purchase stock. On that date, the sale was not consummated . . . . Although Plaintiff authorized that payment be made on this date, it is clear that Plaintiff's offer to purchase was subject to certain conditions. . . .The parties continued to differ over the type of stock being sold and there remained a tentative, unfinished quality to the transaction. It was not until Mr. Stone agreed to take delivery of unregistered stock that the sale of stock was finally realized. Thus, not until May 5, 1983, when specific stock certificates were issued to Plaintiff, did an actual sale of securities take place.

15

16

17

18

19

20

21

22

23

24

In Ainslie v. Spolyar, 926 P.2d 822, 824-827 (Ore. Ct. App. 1996), a sale of limited partnership units was completed, not when the subscription agreements were signed and then accepted, but when the final payments for the units were made and the partnerships closed.  In Ambling v. Blackstown Cattle Co., 650 F. Supp. 170, 171-72 (N.D. Ill. 1987), the court rejected the issuers' contention "that the sale date was the date plaintiffs parted with the final payment necessary to obtain title to their limited partnership interests."  Instead, "the securities sale was not completed until the date that the partnership was formed" and the partnership closed, because "all parts of a sales transaction, from offer to title transfer, are actionable." See also Doran v. Petroleum Management Corp., 576 F.2d 91, 93 (5th Cir. 1978) ("[T]he relevant inquiry was which of the Defendants' activities–offer, sale, or delivery–occurred last.").

25

26

27

28

Maria Cui's statutory and common law claims are based on the actual sale, which, pursuant to Cohen v. Stratosphere Corp., did not occur until after Lancaster joined ONESCO. Investors in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), had no standing to sue under the Securities and Exchange Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5, as a result of misrepresentations in a prospectus, because they did not buy securities. "[O]ne asserting a claim for

-10-

1   damages based on the violation of Rule 10b-5 must be either a purchaser or seller of securities." <u>Id.</u>

2   at 749.  Maria Cui had no Rule 10b-5 claim until he purchased Lancorp and lost his money, after

3   Lancaster became an ONESCO representative. Earlier representations to Maria Cui carried forward

4   as part of the background for the sale, just as ONESCO may argue that Maria Cui's investment,

5   employment, and educational experience was part of the sale's background.  This Court must reject

6   ONESCO's arbitrability objection, because Lancaster sold the investment after joining ONESCO.

7           **D.    Maria Cui Entered into a Substituted Contract in April and May 2004,
                    after a Material Element of the Lancorp Offering Changed, and
8                   Lancorp Required Maria Cui to Either Take Back his Money or
                    Reconfirm his Investment after Acknowledging the Change.**
9
            ONESCO also has no cause to object to arbitration of Maria Cui's claims, because, as
10
    explained in the Statement of Facts of this Memorandum, while Maria Cui's funds were initially held
11
    in escrow, Lancorp could terminate the offering at any time.  When Lancaster could not obtain the
12
    insurance that was an important feature of the initial offering, he obtained instead a validated written
13
    obligation from the bank or broker/dealer acting as custodian.  He then told Maria Cui about this
14
    material change and required him either to take back his money or to acknowledge the change and
15
    confirm he still wanted the investment.  The 2003 offer was thus withdrawn, and Lancaster made
16
    a new offer that included the change in the offering.  Although a number of investors opted to receive
17
    back their investment, Maria Cui made a new investment decision in April 2004 to acknowledge the
18
    change, accept the new offer, and remain in the investment.  His reconfirmation letter in April 2004
19
    constituted a substituted contract which closed in May 2004 and which reflected the new terms of
20
    the offering and a new sale of the investment, made while Lancaster worked for ONESCO.
21
            In <u>Getty v. Harmon</u>, 53 F. Supp. 2d 1053 (W.D. Wash. 1999), which is closely on point,
22
    investors purchased promissory notes that periodically renewed.  The court found that each renewal
23
    constituted a new investment, based on a new investment decision.  <u>Id.</u> at 1056.
24
            [I]n <u>Goodman v. Epstein</u>, 582 F.2d 388 (7th Cir.1978), . . . a limited partnership
25      agreement contemplated a series of payments over an extended period of time.  In
        <u>Goodman</u>, each payment was treated as a separate purchase of a security.  <u>Goodman</u>
26      turned on the fact that the investors were not required to make the additional
        payments; there was, therefore, "a series of investment decisions that could be made
27      by the investors." . . .
28

-11-

1

2

> Here, the class members had the option of rejecting the renewals. Therefore, each renewal, whether accompanied by new representations or not, was based upon a new decision, and each constituted a new investment . . .

3

4

Other cases have similarly stated that, before a transaction is fully performed, the power to decide to terminate the transaction constitutes a new purchase of securities.

5

6

7

8

> "[I]f a party enters into an agreement to undertake a securities transaction but, prior to full performance of the transaction, the party possesses the power to terminate it, the party may be viewed as making an investment decision at each point the party possesses the power to terminate the transaction but chooses to go forward. Each such investment decision may be viewed as a purchase or sale of securities separate and apart from the initial agreement to undertake the transaction."

9

10

11

12

13

14

Deutschman v. Beneficial Corp., 761 F. Supp. 1080, 1085 (D. Del. 1991) (citation omitted); see also Issen v. GSC Enterprises, Inc., 508 F. Supp. 1278, 1286 (N.D. Ill. 1981) ("[S]atisfaction of the 'in connection with' requirement depends not upon when an agreement was executed, but rather upon 'whether an investment decision remains to be made by the party from whom disclosure is withheld. . . .'"); Ingenito v. Bermec Corp., 376 F. Supp. 1154, 1184 (S.D.N.Y. 1974) ("[P]laintiffs' rights to continue purchasing the installments on their contracts, or to cancel at their option, amounted to a series of investment decisions to purchase, . . . and, accordingly, a series of sales by the issuer.").

15

16

17

18

19

Here, Maria Cui decided in April 2004 not to take back his funds. He was not required to remain as a Lancorp investor and had the option to obtain a refund. He acknowledged the material change in the Lancorp offering and make a new purchase of the Lancorp investment on that basis. This new investment decision occurred while Lancaster worked for ONESCO.

20

21

22

23

24

25

26

27

28

The cases cited by ONESCO are manifestly distinguishable on this basis.  See Wheat, First Sec., Inc. v. Green, 993 F.2d 814 (11th Cir. 1993); Gruntal & Co. v. Steinberg, 837 F. Supp. 85 (D.N.J. 1993); Hornor, Townsend & Kent, Inc. v. Hamilton, 2004 WL 2284503 (N.D. Ga. Sept. 30, 2004); Prudential Sec. Inc. v. Dusch, 1994 WL 374425 (S.D. Cal. Mar. 28, 1994); World Group Sec. v. Ko., 2004 WL 1811145 (N.D. Cal. Feb. 11, 2004); Sands Bros & Co. v. Ettinger, 2004 WL 541846 (S.D.N.Y. Mar 19, 2004); Sands Bros. & Co. v. Alba Perez Ttee Catalina Garcia Revocable Trust, 2004 WL 2186574 (S.D.N.Y. Sept. 28, 2004); Ryan, Beck & Co. v. Fakih, 268 F. Supp. 2d 210 (E.D.N.Y. 2003).  None of these cases involved a new investment decision made while the broker worked for the firm as a result of representations made while the broker worked for the firm,

1    which the investors alleged the firm failed to supervise at that time.  ONESCO's citations of cases

2    are therefore largely irrelevant.

3    　　　　To the extent these cases are relevant, they support Maria Cui's position, not ONESCO's.

4    Wheat First, for example, permitted arbitration regarding trading that occurred after the successor

5    firm purchased the predecessor firm's assets.  993 F.2d at 816.  The investor in Dusch could arbitrate

6    "claims concerning statements made by [the broker] after he became an employee of Prudential, or

7    claims concerning Prudential's management of [the investor's] account after she became a customer

8    of Prudential."  1994 WL 374425, at *2.  The investors in Hornor, Townsend & Kent could arbitrate

9    a "second investment, as [the broker's] representations inducing this investment clearly occurred at

10   a time when [the broker] was associated with the" firm.  Ettinger found that the firm was required

11   　　　　to arbitrate any claims by [the customer] regarding the management of her IRA
     　　　　account from the date she became [the firm's] customer, that is, November 7, 2001,
12   　　　　to the time her IRA account was transferred to PaineWebber. It is for the arbitrator
     　　　　to decide to what extent, if any, [the firm] is liable to [the investor] for its handling
13   　　　　of her account from November 7, 2001 to the date in October 2002 when Ettinger
     　　　　transferred her account to PaineWebber.
14
     2004 WL 541846, at *3.
15
     　　　　ONESCO's cases thus support Maria Cui's position that he can arbitrate regarding events
16
     occurring while Lancaster worked for ONESCO.  Here, after ONESCO hired him, Lancaster
17
     changed the Lancorp offering, made new representations, and required Maria Cui to accept the
18
     changed investment or take back his initial funds.  Maria Cui is entitled to an order directing
19
     ONESCO to arbitrate his claims relating these new investment decisions occurring after Lancaster
20
     started working for ONESCO.
21
     　　　　　　E.　　　Maria Cui is Entitled to Arbitrate Regarding his Investments, because
22   　　　　　　　　　　he Alleged Continuing Fraud and Failure to Supervise Lancaster.

23   　　　　Even if ONESCO were correct that Maria Cui's Lancorp purchase occurred before Lancaster

24   became an ONESCO representative and he made no new investment decisions afterward, Maria Cui

25   could still arbitrate, because, in his Arbitration Claim, he alleged continuing fraud and failure to

26   supervise.  (See, e.g., Maria Cui's Arbitration Claim, ¶¶ 7-32) According to his First Declaration,

27   Lancaster told ONESCO in writing he had an outside business, Lancorp Financial Group, LLC, that

28   sold annuities and insurance. He also said he would be starting Lancorp Fund as a private placement

1    on May 14, 2004. ONESCO never asked about these disclosures.  If ONESCO had inspected

2    Lancaster's office, he would have shown Lancorp's records to ONESCO.  ONESCO, however, never

3    came to his office, reviewed customer files at his office, or reviewed incoming and outgoing

4    correspondence at his office. (Lancaster First Dec. ¶¶ 8, 10) ONESCO never told him his

5    supervisor's identity or gave him copies of procedures or compliance manuals.  (Lancaster Second

6    Dec. ¶ 2)  ONESCO never told him the State of Pennsylvania was investigating his activities in

7    September 2004. (Lancaster Second Dec. ¶ 4) If ONESCO had properly supervised Lancaster, it

8    could have stopped the Lancorp offering and directed him to return all funds to his customers.  No

9    losses would then have occurred.

10        In World Group Sec., Inc. v. Sanders, 2006 WL 1278738 (D. Utah May 8, 2006), which is

11   directly on point, the investor purchased an investment from a predecessor brokerage firm and

12   alleged that the successor firm failed to supervise the broker, after he started working for the

13   successor firm.  The court rejected the firm's argument that it was not required to arbitrate this claim.

14            . . . WGS . . . states that Ms. Sanders's claims relate only to her initial 1999
             investment. In December of that year, [she] bought an American Skandia annuity
15           from Mr. William Styles, who then was a registered representative of WMA
             Securities. At that time, WGS did not yet exist; it began operations as an NASD
16           member broker-dealer April 12, 2002, after it purchased specific assets (including
             Ms. Sanders's account) from WMA Securities. Since Mr. Styles became a registered
17           representative of WGS after Ms. Sanders's 1999 purchase, and since WGS did not
             exist until 2002, WGS argues that it cannot be liable for any alleged wrongdoing in
18           connection with the 1999 investment.

19           WGS reads Ms. Sanders's NASD . . . claim too narrowly. . . .

20           The plain language of Ms. Sanders's claims . . . indicates she seeks redress
             not just for the alleged improper investments Mr. Styles made in 1999, but also for
21           the alleged failure of Mr. Styles's broker-dealers-which, after 2002, was WGS-to
             supervise him. Indeed, Ms. Sanders's NASD statement of claim alleges negligent
22           supervision. As such, WGS incorrectly argues that Ms. Sanders complains only of
             events that predate WGS's existence.

23   Id. at *3 (footnotes omitted).

24        The court in USAllianz Sec., Inc. v. Southern Mich. Bancorp, Inc.. 290 F. Supp. 2d 827, 831

25   (W.D. Mich. 2003) (citation omitted), likewise rejected a brokerage firm's argument that it was not

26   required to arbitrate supervision claims arising from investments purchased from a broker before he

27   started working for the firm.

28

-14-

USAllianz also contends that [the investors] do not have claims arising in connection with its business because the securities at issue were purchased from [the broker] before he became a registered representative of USAllianz. [The investors] have raised claims including USAllianz's failure to supervise [the broker]. USAllianz contends these claims are a matter of causation, that USAllianz failed to prevent [the broker] from selling viaticals before he even was affiliated with USAllianz. [The investors], however, clearly allege a continuing duty to supervise and to act to lessen the losses . . . Whether [the investors] have alleged meritorious claims is not pertinent to this inquiry. These allegations clearly implicate USAllianz for its conduct upon affiliating with [the broker]. The claim of failure to supervise "arises in connection with the business" of USAllianz for the purposes of Rule 10301(a).

. . . USAllianz conjectured that Rule 10301(a) as this Court applies it today would result in broker-dealers being vulnerable to compelled arbitration for claims arising many years before becoming affliated with its "associated persons." This Court, however, must leave the legitimate policy issues raised by Plaintiffs to those charged with developing and approving NASD policy.

. . . [The investors] are "customers" of USAllianz within the meaning of the NASD Code of Arbitration and the claim of failure to properly supervise "arises in connection with the business" of USAllianz. [The investors] are entitled to summary judgment as a matter or law.

In <u>Beer v. Nutt</u>, 2007 WL 13100, at *3 (S.D.N.Y. Jan. 3, 2007), the court found that allegations of continuing fraud were arbitrable under NASD rules, even though the disputes concerned an investment in 2000 a year before the brokerage firm came into existence, two years before the firm became an NASD member, and two years before the broker became an associated person of the NASD member.

Plaintiffs argue that the dispute does not arise in connection with their business. . . . Plaintiffs allege that the Statement of Claim exclusively involves [the investor's] investment in Fiesta in 2000, a year before [brokerage firm's] formation and two years before [the broker] became an associated person of [the firm]. Thus, Plaintiffs contend, they cannot be compelled to arbitrate in front of the NASD panel because they were not members at the time the claim arose. While it is true that causes of action in the Statement of Claim primarily deal with [the investor's] initial investment . . . in 2000, [he] alleges a continuing fraud that spanned the formation of [the brokerage firm] and includes [the broker's] association with the company.

<u>Sanders</u>, <u>USAllianz</u>, and <u>Beer</u> are directly applicable and require arbitration in this case.

**F.    Timing Questions are Arbitrable.**

The Supreme Court held regarding the six-year time bar in NASD Rule 10304 that "the NASD time limit rule is a matter presumptively for the arbitrator, not for the judge. The time limit rule closely resembles the gateway questions that this Court has found not to be 'questions of arbitrability.'"   <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 85 (2002). Pursuant to <u>Howsam</u>, timing questions under NASD arbitration rules do not involve arbitrability and are decided

1   by arbitrators, not courts. The arbitrators, not this Court, properly decide the validity of ONESCO's

2   incorrect defense on the merits that it is not liable because the supposed operative events with respect

3   to the Lancorp sales to Maria Cui occurred before Lancaster's tenure as an ONESCO agent.

4          Here, Maria Cui did not invest in Lancorp until he confirmed his investment and did not take

5   back his funds. Accordingly, he can arbitrate regardless of whether cases such as Wheat, First Sec.,

6   Inc. v. Green, 993 F.2d 814 (11th Cir. 1993), are correct, because the sale occurred after Lancaster

7   worked for ONESCO. Earlier representations carried forward to the completion of the sale when

8   Maria Cui lost his money, and he had a cause of action.

9          Howsam's decision that arbitrators decide timing questions under NASD rules, however,

10  calls into question ONESCO's reliance on Wheat First and similar cases. The Eleventh Circuit has

11  itself found that the arbitration agreement applied to prior transactions.

12         [A]ppellee argues that because certain acts complained of occurred prior to execution
           of the arbitration agreement those claims are not properly disposed of by submission
13         to an arbitrator. Again, we disagree. By its own terms the contract between the
           parties covers not only disputes arising out of the agreement, but in the disjunctive
14         includes "any controversy between us arising out of your business." (emphasis
           supplied). An arbitration clause covering disputes arising out of the contract or
15         business between the parties evinces a clear intent to cover more than just those
           matters set forth in the contract.
16
    Belke v. Merrill Lynch, Pierce, Fenner & Smith, 693 F.2d 1023, 1028 (11th Cir. 1982).
17
           Like the arbitration agreement in Belke, NASD Rule 10301 calls for arbitration of disputes
18
    arising "in connection with the business activities of the member or the associated person." Here,
19
    Maria Cui's allegations that ONESCO is liable for fraudulent sales of securities and for Lancaster's
20
    activities relate to ONESCO's business and to the activities of ONESCO's associated person,
21
    Lancaster. See John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 58-59 (2d Cir. 2001) ("Even
22
    assuming that the Investors' claims do not relate to [the firm's] business, . . . the parties do not
23
    dispute that the Investors' claims arise out of the activities of . . . an associated person."). 
24
    Accordingly, under Belke, Maria Cui's claims are arbitrable.
25
           The Second Circuit considered the New York Stock Exchange's mandatory arbitration rule,
26
    which like NASD Rule 10301, required arbitration of "any controversy" "arising out of the business
27
    of such member." The Court found that this rule applied to past disputes.
28

1

> Coenen's argument that the New York Stock Exchange arbitration clause only applies to "future" disputes that arise after both parties have become members of the Exchange need not detain us long. . . . [W]e think the clause is clear on its face. It reads "any controversy" between members. And that is precisely what it must mean if controversies between members are to be kept out of the courts. Had those who drafted the clause intended otherwise they doubtless would have used language plainly stating that "any future controversy" or any controversy between members "arising after both parties to the dispute have become" members. Moreover, the two clauses referring to disputes between members and disputes between members and non-members must be read together. In the one clause the reference is to "any controversy," and in the other the reference is to any controversy "arising out of the business of such member." The purpose of each clause is to keep "any controversy" between members and any controversy "between members and non-members . . . arising out of the business of such member" out of the courts. This purpose would be frustrated and in effect nullified if we were to construe such clause as applicable only to "future" disputes.

Coenen v. R. W. Pressprich & Co., 453 F.2d 1209, 1212 (2d Cir. 1972).

The Tenth Circuit made a similar ruling in Zink v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 13 F.3d 330, 332 (10th Cir. 1993).

> The agreement reads: "[A]ny controversy between [the parties] arising out of [plaintiff's] business *or* this agreement shall be submitted to arbitration" (emphasis added). . . . [W]e are guided by the principle that arbitration agreements are favored and are to be broadly construed with doubts being resolved in favor of coverage. In this light the arbitration agreement is clearly broad enough to cover the disputed issue despite the fact that the dealings giving rise to the dispute occurred prior to the execution of the agreement.

The court in Whisler v. H. J. Meyers & Co., 948 F. Supp. 798, 802 (N.D. Ill. 1996), made the same decision.

> The arbitration clause . . . states that it will apply to "any controversy arising out of or relating to any of my accounts . . . ." (emphasis added). Such a statement "speaks in terms of relationships and not timing," and therefore, the transactions that occurred prior to the signing of the account agreement also must be submitted for arbitration.[2]

Here, the NASD Rule 10301 speaks in terms of relationships and not timing. Rule 10301 requires arbitration of all controversies by customers relating to a firm's business or to an associated person's activities. Allegations that ONESCO is liable for fraudulent securities transactions as a

---

[2]    Accord Kristian v. Comcast Corp., 446 F.3d 25, 31, 36 (1st Cir. 2006) ("[D]istrict court erred in ruling that the arbitration agreements did not apply retroactively," when the agreement called for arbitration of "any claim or dispute related to . . . the services provided."); R.M. Perez & Assoc. v. Welch, 960 F.2d 534, 539 (5th Cir. 1992) (Investor's claims were subject to arbitration even though he did not sign the arbitration agreement "until after the transactions he complains of had taken place."); Carlisle v. CitiMortgage, Inc., 2007 WL 1557411, at *3 (E.D. Mo. May 25, 2007) ("The fact that plaintiff's employment-related dispute arose before he signed the arbitration agreement does not alter this finding. Courts have construed arbitration agreements to include claims that arose before the execution of the agreement.").

result of the relationships between ONESCO, Lancaster, and Maria Cui necessarily relate to the firm's business and to the associated person's business activities. The timing of the associated person's activities is not dispositive and should be decided by the arbitrators, not the courts. Accordingly, ONESCO's incorrect argument alleging that operative events occurred before Lancaster joined ONESCO is not pertinent to arbitrability and should be made, if at all, as a merits argument to the arbitrators, not to this Court.

### G.     This Court must Resolve All Doubts in Favor of Arbitrability.

Maria Cui thinks that, for the reasons stated above, he is unambiguously entitled to arbitrate. If this Court has doubts, however, the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), requires resolution of those doubts in favor of arbitration. ONESCO does not dispute that, as an NASD member, it agreed to comply with NASD Rule 10301 and must arbitrate disputes with customers. Rule 10301 "sets forth the conditions under which an NASD member may be compelled to arbitrate. It provides that, when a dispute arises between an NASD member and a 'customer' in connection with the business of that member, the member is required to arbitrate if the customer so demands." Oppenheimer & Co. v. Neidhardt, 56 F.3d 352, 356 (2d Cir. 1995). Rule 10301 is an "agreement in writing" enforceable under Section 2 of the FAA. Kidder Peabody & Co. v. Zinsmeyer Trusts Partnership, 41 F.3d 861, 863 (2d Cir. 1994).

ONESCO does not dispute the existence of this NASD arbitration obligation but rather its scope. ONESCO disagrees that the scope of the NASD arbitration obligation extends to Maria Cui's claims. Under the FAA, however, all doubts regarding the scope of an arbitration agreement must be resolved in favor of arbitration. Although use of the arbitrability presumption is unnecessary in this instance because Rule 10301 is unambiguous, this Court should nevertheless apply the presumption to the extent necessary or appropriate.

> Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. . . .
>
> . . . The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

Moses H. Cone Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1984).

1    This Court must require arbitration unless, with positive assurance, it can say that the

2    agreement is not susceptible to an interpretation allowing arbitration.

3    > [W]here the contract contains an arbitration clause, there is a presumption of
     > arbitrability in the sense that an order to arbitrate the grievance should not be denied
4    > unless it may be said with positive assurance that the arbitration clause is not
     > susceptible of an interpretation that covers the asserted dispute.  Doubts should be
5    > resolved in favor of coverage.

6    AT&T Tech., Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986) (quotation marks

7    and brackets omitted).

8    Courts often apply this presumption to NASD arbitrations.  "Because this court cannot say

9    with certainty what is meant by "intrinsically insurance" claims [under NASD arbitration rules], . . .

10   our mandate is clear: a presumption in favor of arbitration applies and doubts in construction are

11   resolved against the resisting parties."  Schulte v. Prudential Ins. Co. of Am., 133 F.3d 225, 234 (3d

12   Cir. 1998).  "[T]o acknowledge the ambiguity [in NASD arbitration rules] is to resolve the issue,

13   because all ambiguities must be resolved in favor of arbitrability."  Armijo v. Prudential Ins. Co. of

14   Am., 72 F.3d 793, 798 (10th Cir. 1995).

15   ONESCO cites a footnote in Comer v. Micor, Inc., 436 F.3d 1098, 1004 n.11 (9th Cir. 2006),

16   which said that when the question is "whether a particular party is bound by the arbitration

17   agreement . . ., the liberal federal policy regarding the scope of arbitrable issues is inapposite."  The

18   Ninth Circuit in Comer, however, discussed whether a nonsignatory could be bound to arbitrate.

19   Here, by contrast, ONESCO is undisputedly an NASD member and bound by Rule 10301, and the

20   footnote in Comer is therefore inapposite.  ONESCO is not arguing that it was fraudulently induced

21   to become an NASD member, that it was on psychotropic drugs when it became an NASD member,

22   or that its signature on its NASD membership application was forged.  Under such circumstances,

23   an issue might exist about the "making" of the agreement or whether an arbitration agreement exists

24   at all.

25   Instead, the question in this case is not whether the arbitration obligation in Rule 10301 exists

26   or whether ONESCO agreed to be bound by it but rather whether the arbitration obligation in Rule

27   10301 applies to the disputes raised.  This question is unmistakably a scope question, not an

28   existence question.

> There was no question about the refusal or failure to perform under the arbitration agreement.  CG & E filed this action to avoid being required to perform. No trial was required on this issue.  Nor was there any factual question about the "making" of the agreement to arbitrate.  CG & E did not contend that the parties had not intended to include the arbitration clause in the . . . contract.  There was no question of mistake or inadvertence which might require proof of matters not shown by the contract itself.  The only question of "the making of the agreement to arbitrate" in this case is whether the claim of Shaw is covered by the arbitration clause.  This could be determined by examination of the language of the arbitration provision itself . . . .

Cincinnati Gas & Elec. v. Benjamin F. Shaw Co., 706 F.2d 155, 159 (6th Cir. 1983).

ONESCO cites the Fifth Circuit's decision in California Fina Group, Inc. v. Herrin, 379 F.3d 311, 317-18 (5th Cir. 2004), which indicated that a presumption of arbitrability did not apply to the question whether investors were "customers" under NASD Rule 10301.  At least three Circuits, however, disagree with the Fifth Circuit on this point.  Washington Square Sec., Inc. v. Aune, 385 F.3d 432, 435 (4th Cir. 2004); MONY Securities Corp. v. Bornstein, 390 F.3d 1340, 1342 n.1 (11th Cir. 2004) ("[B]oth the Eleventh and Fourth Circuits hold that because the NASD Code is a written agreement to arbitrate, the only dispute goes to the scope of that agreement and thus the general presumption applies."); John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 58 (2d Cir. 2001) ("In determining that John Hancock must arbitrate the Investors' claims we need look no further than the plain language of Rule 10301, keeping in mind that any ambiguity in the language must be construed in favor of arbitration.").  This Court should follow the Second, Fourth, and Eleventh Circuits on this point, rather than the Fifth Circuit.

In addition, even assuming *arguendo* that California Fina Group is correct, the presumption of arbitrability still applies in this case because the issue is not whether Maria Cui was a "customer" under Rule 10301.  He undisputedly was a customer of Lancaster, and, pursuant to California Fina Group itself, as well as overwhelming case law which ONESCO does not challenge, is therefore entitled to arbitrate at least some disputes.  The issue instead, as framed by ONESCO, is whether he was a customer at the right time to entitle him to arbitrate disputes regarding his Lancorp investment. Courts have found that timing issues like those in the present case are scope issues subject to the arbitrability presumption.

> Plaintiffs argue that the arbitration agreements are not enforceable as to their particular antitrust claims because the arbitration agreements do not apply retroactively. Plaintiffs concede that the arbitration agreements are generally valid.

-20-

1
2

Put another way, Plaintiffs argue that their antitrust claims do not fall within the scope of the arbitration agreements as a result of non-retroactivity. Plaintiffs are in fact raising a scope question. Thus, the general [presumption in favor of arbitration for the resolution of scope questions] . . . applies.

3
4

Kristian v. Comcast Corp., 446 F.3d 25, 35 (1st Cir. 2006); see also Carlisle v. CitiMortgage, Inc.,

5

2007 WL 1557411, at *3 (E.D. Mo. May 25, 2007) ("[A]rbitration agreements are . . . to be broadly

6

construed with doubts resolved in favor of coverage. . . . The fact that plaintiff's employment-related

7

dispute arose before he signed the arbitration agreement does not alter this finding.").

8

This presumption is specially appropriate in this case, because Rule 10301 broadly calls for

9

arbitration of "[a]ny dispute, claim, or controversy."

10
11

[A] presumption is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of "any differences . . ." In such cases, "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."

12
13

AT&T Tech., Inc. v. Communication Workers of Am., 475 U.S. 643, 650 (1986) (citation omitted).

14

This Court should therefore apply a presumption of arbitrability in this case, to the extent it finds that

15

Rule 10301 is ambiguous.

### H.    This Court cannot Decide the Merits of the Parties' Claims.

16

When deciding arbitrability, a court cannot consider the merits of the parties' claims.

17
18
19
20

In deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether 'arguable' or not, indeed if it appears to the court to be frivolous, the . . . claim . . . is to be decided, not by the court asked to order arbitration but . . . by the arbitrator. ". . .The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious."

21

Id. at 649-50 (citation omitted).

22

Here, ONESCO is improperly asking this Court to convert liability issues into arbitrability

23

issues and thereby asking this Court to make rulings on the merits on matters that are committed to

24

the arbitrators for decision.  In its filings in this Court and in other courts around the country,

25

ONESCO has identified just two factual issues: (1) the extent of the involvement of Robert Reese

26

("Reese"), and (2) the timing of the representations that induced the Lancorp investments. As Maria

27

Cui explained in more detail in his Response to ONESCO's Objections to Magistrate's Order

28

Denying Discovery (doc. 48) at 4, however, with respect to Reese's involvement, Lancaster

-21-

1    organized Lancorp and wrote the reconfirmation letter which required Maria Cui either to accept

2    changes in the Lancorp offering or to withdraw his subscription.  "Because Lancaster was at all times

3    president and CEO of Lancorp, . . . [the] inquiry [of 'who sold Lancorp securities to the investors']

4    would seem to be only collateral to the question of arbitrability. . . .  [T]his is . . . the kind of inquiry

5    that is at the heart of the merits of the claim and not necessary for resolution at this stage."  Gibson,

6    2007 WL 2705859, at *6.

7         With respect to the second alleged factual issue–the timing of the representations regarding

8    Lancorp–ONESCO does not dispute that, while Lancaster was an ONESCO representative in April

9    2004, he required Lancorp investors either to acknowledge changes in the Lancorp investment or to

10   take back their invested funds.  Representations that occurred before Lancaster became an ONESCO

11   representative are part of the background for the actual initial sale, which occurred in April and May

12   2004.   Whether representations, if any, that occurred before Lancaster became an ONESCO

13   representative have any bearing on ONESCO's liability for the sales in April and May 2004 is a

14   merits issue for the arbitrators, not an arbitrability issue.

15            [T]he Court declines to accept ONESCO's invitation to sever claims that are based
              on activities that took place before Mr. Lancaster's association with ONESCO or after
16            his departure.  Defendants' claims stem from a series of transactions with Mr.
              Lancaster involving a single investment opportunity. It is up to the arbitrator to
17            decide the case on its merits and to determine which, if any, of the events give rise
              to liability on the part of ONESCO.
18
     Prins, 2007 WL 3286406, at *6.
19
              ONESCO contends that an evidentiary hearing is necessary to determine who
20            actually sold the ONESCO shares to Wallace, what misrepresentations or omissions,
              if any, induced Wallace's investments, and who made such misrepresentations and
21            omissions. These questions go to the merits of Wallace's claims and the Court need
              not address them in making its arbitrability determination.  After reviewing the
22            record, the Court concludes that Wallace was a "customer" of Lancaster during the
              period when Lancaster was an "associated person" of ONESCO, and Wallace's
23            claims arose in connection with the activities of Lancaster during this time period.

24   Wallace, 2007 WL 4106476, at *4.

25         Because this Court cannot resolve the merits of the parties' disputes, the arbitrability issue

26   in this case does not depend on the proper characterization of the events relating to Maria Cui's

27   investments that occurred after Lancaster became an ONESCO representative.  Consequently, this

28   Court need not give any credence to whatever irrelevant explanation ONESCO devises for these

-22-

1    events.  Instead, what counts for arbitrability purposes is that (1) these events occurred while

2    Lancaster worked for ONESCO, which they clearly did, and (2) Maria Cui's arbitration claim seeks

3    to hold ONESCO liable for these events, which it clearly does.  Whether ONESCO is in fact liable

4    for these events or whether ONESCO's characterization of these events and their timing is correct

5    is pertinent only to the merits of the parties' disputes, not to arbitrability.

6    **I.    ONESCO Improperly Relies on Cases Addressing only a Narrow**
         **Technical Issue Regarding the Repose Period for Claims under Rule**
7        **10b-5.**

8        Even if this Court could consider ONESCO's timing claims on the merits, it would reject

9    these claims as irrelevant to arbitrability.  To contend that Maria Cui's claims are based on

10   representations made before Lancaster worked for ONESCO and therefore are not arbitrable,

11   ONESCO relies in its Memorandum in Support of its Motion for Preliminary Injunction at 14 on

12   federal cases interpreting the repose period for claims under the Securities and Exchange

13   Commission's Rule 10b-5, 17 C.F.R. § 240.10b-5.  In Lampf, Pleva, Lipkind, Prupis & Petigrow v.

14   Gilbertson, 501 U.S. 350, 364 & n.9 (1991), the Court adopted for Rule 10b-5 claims, the limitations

15   period from 15 U.S.C. § 78i(e), which bars claims more than three years after a violation.  Lampf

16   could have chosen–but did not choose–the repose period from 15 U.S.C. § 78r(c), which runs three

17   years from the "cause of action," rather than from the "violation." Some cases have found that the

18   distinction between "cause of action" and "violation" is significant and therefore have calculated the

19   repose period from the date of the misrepresentation, even if the actual securities sale occurs later.

20   See, e.g., In re Prudential Ins. Co. of Am. Sales Practice Litig., 975 F. Supp. 584, 603 (D.N.J. 1997).

21       Other cases, however, have rejected this view and found that the repose period runs from the

22   sale date.   Starting a time bar before investors have even purchased the investment is

23   counterintuitive.

24       This Court believes the better view to be that the statute of limitations for a § 10(b)
         and Rule 10b-5 claim runs from the date of the purchase or sale of the security. The
25       violation is the use of a fraudulent device or the making of an untrue statement of
         material fact or the omission to state a material fact in connection with the purchase
26       of sale . . . . Thus, a violation is not complete until a sale or purchase occurs.

27

28

-23-

1   Randolph County Fed. Sav. & Loan Assoc. v. Sutliffe, 775 F. Supp. 1113, 1122 (S.D. Ohio 1991).

2   ONESCO's contentions thus rest on a disputed technical contention of law about the applicable

3   statute of repose for Rule 10b-5 claims.

4         Regardless of this technical point about repose periods, Maria Cui's arbitration claims are

5   based on his causes of action, which are necessarily based on the Lancorp sales to him.  He has no

6   claims and no standing, under Rule 10b-5 or otherwise, until the sales occurred, and he lost his

7   money.  "[O]ne asserting a claim for damages based on the violation of Rule 10b-5 must be either

8   a purchaser or seller of securities."  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 749

9   (1975) (Person who is induced as a result of misrepresentations in a prospectus not to purchase a

10  security lacks standing to bring a Rule 10b-5 claim.).

11        As Maria Cui has already explained in this Memorandum, Lancorp investors' initial

12  subscription agreements were merely conditional, because Lancorp could cancel, modify, or

13  withdraw the offer at any time.  Consequently, execution of the initial Lancorp subscription

14  agreements did not constitute sales, and the Lancorp shares were not sold until, at the earliest, April

15  or May 2004 after Lancaster became an ONESCO employee, when the investors reconfirmed their

16  investments, opted not to receive back their funds, and Lancorp became operational.  Maria Cui is

17  entitled to arbitrate Rule 10b-5 claims based on this sale.

18        ONESCO also fails to recognize that Maria Cui has other claims besides his Rule 10b-5

19  claims. His claims under the Securities Act of 1933 require an actual purchase, and, when Lampf

20  was decided, the statute of repose for his securities fraud claims under the 1933 Act was "three years

21  after the sale." 15 U.S.C. 77*l*, m.  If ONESCO is correct that arbitrability depends on the timing of

22  the operative event of the claim, then Maria Cui's 1933 Act claims are arbitrable, because these

23  claims require actual sales which did not occur until after Lancaster became an ONESCO employee.

24  Similarly, Maria Cui's claims under the California and Oregon securities laws require actual sales

25  to purchasers. Cal. Corp. Code § 25501; Ore. Rev. Stat. § 59.115; Ainslie v. Spolyar, 926 P.2d 822,

26  824-827 (Ore. Ct. App. 1996).   Maria Cui's common law claims require actual damages and

27  therefore require that the sale occurred. See, e.g.,Trujillo v. North County Transit Dist., 63 Cal. App.

28  4th 280, 286-287, 73 Cal. Rptr. 2d 596, 600 (1998) ("[T]he usual elements of a tort . . . [are] legal

1   duty of care . . ., breach of duty . . ., legal causation, and damages . . . .").  ONESCO's claims on the

2   merits, which are based on a disputed technical contention about the statute of repose for Rule 10b-5

3   claims, have no bearing on arbitrability under the FAA.

4          WHEREFORE, pursuant to these black letter principles of law, this Court must require

5   ONESCO to arbitrate under section 4 of the FAA.

6                                             Respectfully submitted,

7   DATED: November 21, 2007               GOODMAN & NEKVASIL, P.A.
                                            By: /s/ Joel A. Goodman
8                                           Joel A. Goodman
                                            Attorney *pro hac vice*
9
                                            LAW OFFICES OF CARY S. LAPIDUS
10                                          Cary S. Lapidus, Esq.
                                            Local Counsel
11
                                            Attorneys for Defendant
12
                              **CERTIFICATE OF SERVICE**
13
14         I hereby certify that on November 21, 2007, I electronically filed the foregoing with the Clerk

15   of the Court using the CM/ECF system, which will send notification of such filing to the e-mail

     addresses denoted on the Electronic Mail Notice List below.
16
                                             /s/ Joel A. Goodman
17                                          Joel A. Goodman
                                            Goodman & Nekvasil, P.A.
18                                          14020 Roosevelt Blvd., Suite 808
                                            P.O. Box 17709
19                                          Clearwater, Florida 33762
                                            Telephone:  727-524-8486
20                                          Facsimile:  727-524-8786

21   **Electronic Mail Notice List**

22   Daniel T. Balmat               dbalmat@ssd.com
     Joseph Anthony Meckes          jmeckes@ssd.com, sfr_docket@ssd.com
23   Marion H. Little, Jr.          little@litohio.com
     Michael R. Reed                reed@litohio.com
24

25

26

27

28

Def. Mot. to Compel Arbitration and Opposition to Preliminary Injunction  - Case No. C 07-02844 JSW